**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| LAW DEBENTURE TRUST COMPANY OF NEW YORK, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2,<br><br>Plaintiff,<br><br>v.<br><br>WMC MORTGAGE  LLC, f/k/a WMC MORTGAGE CORP. and GENERAL ELECTRIC CAPITAL CORPORATION,<br><br>Defendants. | Civil Action No.:<br><br><br><br><br><br><br><br><br><br><br>October 26, 2012 |

## COMPLAINT

Plaintiff Law Debenture Trust Company of New York ("Law Debenture" or the "Separate Trustee"), solely in its capacity as separate trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 (the "Trust") for the holders of Mortgage Pass-Through Certificates Series 2006-WM2 (the "Certificates") issued by the Trust pursuant to a Pooling and Servicing Agreement dated as of October 1, 2006 as amended (the "PSA"), and at the direction of certain Certificateholders (as defined below), as and for its complaint against defendant WMC Mortgage LLC, f/k/a WMC Mortgage Corporation ("WMC") and defendant General Electric Capital Corporation ("GE Capital") (collectively, "Defendants"), states and alleges as follows:

### Preliminary Statement

1.       This is an action for breach of contract arising out of WMC's failure to comply with its unambiguous contractual obligation under the PSA to repurchase defective loans from a pool of residential mortgage loans (the "Loans") that it originated or acquired and ultimately sold to the Trust for approximately $1 billion.

2.      WMC entered into the PSA with Securitized Asset Backed Receivables LLC ("SABR"), as depositor (the "Depositor"), HomEq Servicing Corporation, succeeded by Ocwen Loan Servicing, LLC in such capacity, as servicer (the "Servicer"), and Wells Fargo Bank, National Association ("Wells Fargo"), as trustee (the "Trustee").  The PSA created the Trust and governs the various rights and obligations associated with the securitization of the Loans.  A true and correct copy of the PSA is attached hereto as Exhibit 1.

3.      As the responsible party under the PSA (the "Responsible Party"), WMC made over 60 representations and warranties (the "Representations and Warranties") regarding the agreed-upon characteristics and quality of each Loan.  The Representations and Warranties included, among many others, specific representations and warranties that (a) no fraud or misrepresentation with respect to a Loan had taken place on the part of WMC or any other entity or any other party (including the borrower and/or loan officer) in connection with the origination of the Loans; (b) the Loan was underwritten in accordance with WMC's underwriting guidelines; and (c) there was no default, breach, violation or event of acceleration existing under the mortgage or the mortgage note associated with each Loan.  (*See* Exhibit 1, Schedule III, (m), (x), (s))

4.      The Representations and Warranties contained in the PSA constitute numerous contractual assurances made by WMC to the holders of Certificates issued by the Trust (the "Certificateholders") that the Loans met certain essential characteristics.  These characteristics were negotiated and required because they served as indicators of the quality and value of the Loans, and ultimately the price at which the Trust purchased the Loans from WMC.

5.      WMC, as the originator, was in a far superior position to know the true nature of the Loans it was selling—far superior to the Trustee (whose duties were contractually restricted)

2

and far superior to the eventual purchasers of the mortgage-backed securities that would bear the brunt of WMC's shoddy origination practices.

6.      Sensibly, the PSA made clear that the risk of defective Loans was to remain with WMC, the only party able to prevent such defects in the first place.  WMC expressly agreed in the PSA that if any Loan is in breach of the Representations and Warranties (a "Defective Loan") − where such breach materially and adversely affected the value of the Loan or the interest of the Trustee or the Certificateholders therein − WMC shall either cure such breach in all material respects or repurchase the Defective Loan.  (Exhibit 1, § 2.03(d))  The PSA provides that WMC must comply with these obligations within 60 days of the earlier of WMC's discovery of, or receipt of notice of, such breach or Defective Loan (the "Cure Period").

7.      Section 2.03(c) of the PSA also provides that "[u]pon discovery by the Responsible Party [WMC] . . . of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the others [*i.e.*, the Trustee, Servicer, and Depositor]."

8.      A loan-level investigation initiated by certain Certificateholders has revealed that WMC breached the Representations and Warranties with respect to numerous Loans, which breaches require the repurchase of those Loans by WMC in accordance with the PSA.

9.      The Certificateholders selected two separate samples of Loans, which were reviewed by two independent forensic mortgage loan review firms (the "Forensic Review Firms").  Out of the first sample of 250 Loans reviewed by one of the Forensic Review Firms, 238 − or over 90 percent − of the Loans were found to be in breach of the Representations and Warranties.  Similarly, out of the second sample of 539 Loans reviewed by the other Forensic Review Firm, 451 or − over 80 percent − of the Loans were found to be in breach of the

Representations and Warranties.  The breaches uncovered by the Forensic Review Firms included, among many others, overstatement of borrower income, understatement of borrower liabilities, and misstatement of the occupancy status of the mortgaged property.

10.     Upon receipt of the results of the Forensic Review Firms' investigation, the Trustee and the Separate Trustee promptly provided WMC with detailed loan-level information regarding the breaches and demanded that WMC cure the breaches or repurchase the Defective Loans.  WMC failed to cure the identified breaches or repurchase the Defective Loans during the Cure Period.  In fact, to date, WMC has failed to cure a single breach or repurchase a single Defective Loan in response to the notices.

11.     Beyond the material breaches uncovered by the Forensic Review Firms, the origination and business practices of WMC during the 2004-2007 time period – during which WMC originated the Loans – have been called into question by recent independent investigations.  These investigations have revealed that WMC systematically disregarded its underwriting guidelines and engaged in underwriting practices that directly violated the Representations and Warranties.  These revelations, combined with the pervasiveness and severity of the breaches of Representations and Warranties found in the sample reviewed by the Forensic Review Firms, indicate that the Loans were not originated on any legitimate foundation, and strongly suggest a high breach rate throughout the entire Loan pool in the Trust. Nonetheless, despite its receipt of loan-specific breach notices and repurchase demands, as well as evidence that WMC is and has been aware of the breaches plaguing the Loans since origination, WMC has failed to repurchase any of the Defective Loans from the Trust.  It is therefore clear that WMC has abandoned its duty to notify all applicable parties of breaches of its

representations and warranties, as well as its repurchase obligation under the PSA, and any further notice to WMC would be futile.

12.     The Trust and the Certificateholders have suffered and will continue to suffer losses as a result of WMC's failure and refusal to comply with its express contractual obligations in connection with the Defective Loans.  Accordingly, the Separate Trustee, on behalf of the Trust, is entitled to specific performance of WMC's repurchase obligation under the PSA.  The Separate Trustee is also entitled to reimbursement of all expenses incurred to enforce WMC's repurchase obligation under the PSA, including attorneys' fees and costs.

## PARTIES

13.     Plaintiff Law Debenture is a New York banking corporation with its principal place of business in New York, New York, and brings this action in its capacity as Separate Trustee on behalf of the Trust.  Law Debenture is an independent provider of traditional indenture trustee, paying agent and registrar services.  By a June 6, 2012 order, the Minnesota District Court for the County of Hennepin, State of Minnesota, confirmed the Trustee's appointment of Law Debenture as the Separate Trustee with the right, among others, to enforce WMC's repurchase obligation under the PSA.

14.     Defendant WMC is, upon information and belief, a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Woodland Hills, California.  WMC's business is directed, controlled, and coordinated from the offices of its sole member, GE Capital.

15.     WMC is the successor entity to WMC Mortgage Corp., which originated residential home mortgage loans.  WMC Mortgage Corp. was licensed by the Connecticut Department of Banking as a Mortgage Lender/Broker and was registered with the Connecticut Secretary of State as a foreign corporation doing business in Connecticut.

16.     Defendant GE Capital is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Norwalk, Connecticut.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

18.     Venue is proper in this district pursuant to 28 U.S.C. § 1391, Defendants reside within this District and because a substantial part of the events giving rise to Plaintiff's claims occurred within this district.

## FACTUAL ALLEGATIONS

### I.     The Securitization Of The Loans

19.     A mortgage loan securitization is an extensively negotiated structured finance transaction whereby financial and economic risk is distributed by pooling mortgage loans and issuing securities or certificates for which the mortgage loans serve as collateral.  The securities pay principal and interest from the cash flow generated by the mortgage loan pool in accordance with specific payment rules.  The securities are purchased by investors who are attracted to a particular risk profile represented by the originator of the mortgage loan.

20.     The most common form of a residential mortgage loan securitization involves the creation of a trust, which purchases a portfolio of mortgage loans and issues certificates.  The trust and trustee hold the mortgage loans for the benefit of the certificate holders.  The value of the mortgage loans (*i.e.*, the price that the trust paid for those loans) and the certificates issued by the trust are contingent on the quality of the mortgage loans.

21.     This particular transaction was effectuated through this basic process in or about October 2006.  Pursuant to the PSA, SABR, as the Depositor, created the Trust under the laws of

the State of New York and deposited the Loans into the Trust.  (*See* Exhibit 1, § 2.01(a), (c))

Upon its deposit of the Loans into the Trust, SABR conveyed to the Trust "all the right, title and

interest of the Depositor in and to the Trust Fund," *see id.*, § 2.01(a), which is defined as the

"corpus of the trust created [under the PSA] consisting of . . . the Mortgage Loans and all interest

and principal with respect thereto . . . ."  (*See* Exhibit 1, § 1.01)

22.    The parties to the PSA authorized the Trust to "have the capacity, power and

authority . . . to accept the sale, transfer, assignment, set over and conveyance by the Depositor

to the Trust of all the right, title and interest of the Depositor in and to the Trust Fund (including

… the Mortgage Loans . . . ) pursuant to Section 2.01(a) [of the PSA]."  (*See* Exhibit 1, §

2.01(d))

23.    In turn, Wells Fargo, as Trustee, on behalf of the Trust, agreed to "accept[] the

Trust Fund" and declared that, as of the securitization closing date, "it holds or will hold such

other assets as are included in the Trust Fund, in trust for the exclusive use and benefit of all

present and future Certificateholders."  (*See* Exhibit 1, §§ 2.01(a), 2.02)

24.    Put simply, pursuant to the PSA, the Trust is the holder and owner of the Loans,

as well as of all of the rights relating to the Loans, on behalf and for the benefit of the

Certificateholders.

## II.    WMC's Obligations Under The PSA For
## Breaches Of The Representations And Warranties

### A.    WMC's Representations And Warranties
### In Connection With The Origination And Sale Of The Loans

25.    Following its origination and underwriting of a pool of mortgage loans, WMC

sought to profit from the sale of the Loans to the Trust and the Trust's sale of the Certificates, the

value of which is contingent upon the quality of the Loans.  WMC − through its origination and

underwriting activities – had direct access to the detailed information contained in each Loan file

and possessed unique knowledge regarding the Loans.  In contrast, the Certificateholders did not have access to the underlying Loan files when the Certificates were issued.

26.      In order to execute the sale of the Loans in a commercially-efficient matter – *i.e.*, to relieve investors of the burden of verifying the quality of every single Loan in the pool – WMC guaranteed the quality of each Loan in the pool.  WMC's guarantee consisted of two components:  (1) WMC made the specific Representations and Warranties regarding each Loan; and (2) WMC agreed to cure in all material respects any breach of the Representations and Warranties or repurchase any Loan affected by such breach.

27.      This guarantee provided the Certificateholders with assurance that the Loans were of a certain quality.  Consequently, the Certificates derived their value from the veracity of the Representations and Warranties, as well as from the reliability of WMC's cure and repurchase obligations.  As such, the Representations and Warranties, as well as WMC's cure and repurchase obligations, were and continue to be vital components of this transaction.

28.      The parties intended and understood the PSA to provide that the risk of defects in the Loans would remain with WMC, and that WMC would make the Trust whole should defects be identified.  As discussed below, this intent and mutual understanding to have the risk of defects in WMC's loan processes remain with WMC is evidenced not just by the individual terms agreed to by the parties, but by the larger contextual fact that, at every turn, the agreements seek to protect the Trust from such defects.

29.      The parties' intent for the risk of loan defects to remain with WMC can be seen in the breadth of the Representations and Warranties themselves.  The full list of WMC's Representations and Warranties is attached in Schedules III and IV to the PSA.  (*See* Exhibit 1, Schedule III, Schedule IV)  In Schedule IV, WMC made 19 different Representations and

Warranties about its own operations.  In Schedule III, WMC made over 70 Representations and Warranties regarding the mortgage loans themselves.  In Section 2.03(d), WMC agreed to cure, repurchase, or substitute any Mortgage Loan for which there was a breach of any of these numerous warranties that "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein."

30.     Among the Representations and Warranties made by WMC in Schedules III and IV were the contractual assurances that:

- No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Loan has taken place on the part of WMC in connection with the origination of the Loan;

- No fraud, misrepresentation, or similar occurrence or, to WMC's knowledge, error, omission or negligence with respect to a Loan has taken place on the part of any person (other than WMC), including without limitation, the mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Loan;

- Each Loan was originated in accordance with WMC's Underwriting Guidelines;

- WMC employed a methodology that incorporated objective criteria to determine that each borrower had the ability to repay his/her applicable Loan; and

- Neither the underlying mortgage loan purchase agreement nor any information, statement, tape, diskette, report, form, or other document furnished or to be furnished pursuant to that agreement or any reconstitution agreement or in connection with the transactions contemplated thereby (including any securitization transfer) contains any untrue statement of a material fact.

(Exhibit 1, Schedule III(m), (x), (lll); Schedule IV(m))

31.     The PSA further provided that these Representations and Warranties were valid and binding on WMC notwithstanding any examination or failure to examine any mortgage file. (Exhibit I, § 2.03(c))

32.     WMC also expressly agreed to notify all other parties to the PSA, including the Trustee – promptly and in writing – if it discovered any breach of its Representations and Warranties.   (Exhibit 1, § 2.03(c))

33.     By their number and breadth, it is clear that the Representations and Warranties, as well as the duty to report any breaches of those Representations and Warranties, were meant to ensure that the Loans met certain essential criteria that directly pertained to the quality of the Loans.  In fact, WMC explicitly agreed that many of the Representations and Warranties were "Deemed Material and Adverse Representation," whereby their breach automatically triggered WMC's repurchase obligation without an opportunity to cure.  (Exhibit 1, § 2.03(d))  Without the Representations and Warranties, the Loans most likely would not have been securitized at all, or would have been securitized on materially different economic terms.

**B.      WMC's Obligation To Cure Breaches Of Its Representations And Warranties Or Repurchase The Defective Loans**

34.     Reflecting the significance of the Representations and Warranties, WMC accepted the risk that if any of the Representations and Warranties were breached with respect to any Loan, and WMC could not cure the breach within the Cure Period, WMC itself – not the Trust or the Certificateholders – would solely bear the consequences of the breach by repurchasing any of the affected (*i.e.*, Defective) Loans.

35.     Specifically, the PSA provides that, "within 60 days of the earlier of either discovery by [WMC, during the origination of the loan or otherwise] or notice to the Responsible Party of any breach of a representation or warranty, set forth in Section 2.03(b) [*i.e.*, the Representations and Warranties], that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein, the Responsible Party shall use its best efforts . . . promptly to cure such breach in all material respects and, if such defect or

10

breach cannot be remedied, the Responsible Party shall . . . repurchase such Mortgage Loan at the Repurchase Price. . . ."  (*See* Exhibit 1, § 2.03(d))

36.     With respect to any Loan, the PSA defines the Repurchase Price as "an amount equal to the sum of (i) the unpaid principal balance of such Mortgage Loan as of the date of repurchase, (ii) interest on such unpaid principal balance of such Mortgage Loan at the Mortgage Rate from the last date through which interest has been paid to the date of repurchase, (iii) all unreimbursed Servicing Advances and (iv) all expenses incurred by the Trustee arising out of the Trustee's enforcement of [WMC's] repurchase obligation [under the PSA]."  (*See id.*, § 1.01 (Repurchase Price))

37.     WMC also agreed in the PSA that in addition to its repurchase obligation referred to in Section 2.03(d), WMC shall indemnify the Depositor, any of its Affiliates, the Servicer, the Trustee and the Trust, and hold such parties harmless against any losses, damages, penalties, fines, forfeitures, reasonable and necessary legal fees and related costs, judgments and other costs and expenses (including, without limitation, any taxes payable by the Trust) resulting from any third-party claim, demand, defense or assertion based on or grounded upon, or resulting from, a breach by WMC of any of the Representation and Warranties or obligations contained in the PSA.  (Exhibit 1, § 2.03(h))

C.     **The Parties' Understanding With Respect To Liquidated Loans**

38.     The parties understood that the PSA does not prohibit the Trust from seeking a remedy for any breaches of Representations and Warranties made by WMC with respect to Loans that have been liquidated.

11

39.     The parties' understanding is consistent with the industry-wide understanding that securitizations such as this Trust allow for the trusts to recover even after liquidation.  This understanding is confirmed by the fact that such recoveries take place all the time.

40.     In addition, the term "repurchase" is a recognized industry term.  In the industry, as between these parties, it is understood to mean a mechanism to make whole a mortgage loan purchaser for a seller's breach of its representations and warranties with respect to the securitized loans.  The mechanism ensures that the originator is responsible for and retains the entirety of the risk of loss associated with any breach of the representations and warranties.

41.     In addition, pursuant to the PSA, the Servicer is required to service the Loans in accordance with industry standards, and in the same way that it would service loans in its own portfolio.  Servicing the loans within industry norms means diligently pursuing repayment from the borrowers on whatever timeline was deemed the most economically sensible to maximize recovery on that loan.  Once a decision is made that foreclosure is the best way to mitigate loss to the Trust – a decision that would also minimize WMC's potential repurchase liability – that process should be allowed to proceed without hindrance.  It would not be servicing the loans in accordance with industry standards to delay foreclosure proceedings to allow the Trust and WMC to work out their respective contractual rights.  That the PSA does not allow the Servicer to halt diligent pursuit of the borrowers confirms the parties' understanding that the foreclosure process with respect to the borrowers was viewed as separate from, and thus would not prejudice, the remedial process with respect to the Trust.

**III.**   **WMC's Representations And Warranties Were False When Made**

    **A.**   **WMC Failed To Follow Its Underwriting
Guidelines When It Originated The Loans**

42.   Recent developments have revealed that WMC completely disregarded its underwriting guidelines in pursuit of profit while originating and selling mortgage loans between 2004 and 2007.

43.   For instance, according to a January 6, 2012 news story, "a former compliance manager at WMC, sa[id] sales reps [at WMC] intent on putting up big numbers used falsified paperwork, bogus income documentation and other tricks to get loans approved and sold off to Wall Street investors."  (*See* Exhibit 2, attaching a true and correct copy of Michael Hudson, *Fraud And Folly: The Untold Story Of General Electric's Subprime Debacle*, IWATCH NEWS (Jan. 6, 2012))

44.   The aforementioned news story further states that employees at WMC were well aware that the company was not employing proper origination practices:  "eight former WMC employees claim WMC's management ignored them when they reported loans supported by falsified documents, inflated incomes or other legerdemain.  Two of them say they were transferred and demoted because they pressed too hard to expose corrupt practices."  (*Id.*)

45.   A former WMC risk analyst's account is especially troubling:

Argueta sa[id] one top sales staffer escaped punishment even though it was common knowledge he was using his computer to create fake documents to bolster applicants' chances of getting approved.

"Bank statements, W-2s, you name it, pretty much anything that goes into a file," Argueta sa[id].  "Anything to make the loan look better than what was the real story."

In one instance, Argueta sa[id], he sniffed out salespeople who were putting down fake jobs on borrowers' loan applications − even listing their own cell phone numbers so they could pose as the borrowers' supervisors and confirm that the borrowers were working at the made-up employers.

> Management gave him a pat on the back for pointing out the problem, he sa[id], but did nothing about the salespeople he accused of using devious methods to make borrowers appear gainfully employed.

(*Id.*)

46.     Ultimately, according to the former WMC employees, WMC "push[ed] loans that were likely to land borrowers in trouble in the long run.  The desire to keep sales numbers growing often trumped good judgment. . . ."  (*Id.*)

47.     In confirmation of the news story, a study done by the Office of the Comptroller of the Currency at the U.S. Department of the Treasury and released in November 2008 found that WMC was one the "Worst Subprime Originators" during the 2005-2007 time period. Indeed, with over 10,000 recent loan foreclosures, WMC came in near the top of the list of the 10 worst originators in the 10 most foreclosed United States metro areas.  (*See* Exhibit 3)

48.     WMC's origination practices were so bad that they have even garnered federal scrutiny.  According to a January 20, 2012 news story, the "FBI and Justice Department are looking into potentially criminal business practices at WMC Mortgage Corp. in Burbank during the home-loan boom. . . . The government is asking whether WMC used falsified paperwork, overstated income and other tactics to push through questionable loans."  (*See* Exhibit 4, attaching a true and correct copy of Michael Hudson and E. Scott Reckard, *GE Lending Unit Said To Be Probe Target*, LOS ANGELES TIMES (Jan. 20, 2012))

### B.     WMC Breached Its Representations And Warranties With Regard To The Loans

49.     The Loans in the Trust have deteriorated at an unprecedented rate:  the Trust has suffered at least $425 million of realized losses to date.  Given this severe deterioration, the Forensic Review Firms were retained to investigate the Loans.  The Forensic Review Firms

examined two samples of Loans, with characteristics that are representative of the entire Loan pool.

50.     To conduct the review, the Forensic Review Firms analyzed the files for every Loan in the samples to confirm the accuracy of legal documents, credit documentation, and the underwriting decision in relation to WMC's stated underwriting standards.  The Firms examined the Loan files for compliance with the Representations and Warranties, including for any red flags that should have been caught by WMC in the origination process, such as evidence that stated income was unreasonable or that the borrower's other mortgage debt was not fully disclosed.  The Forensic Review Firms then determined whether breaches of the Representations and Warranties existed.

51.     The Forensic Review Firms found that the Representations and Warranties were breached on a large scale:  of the 250 Loans in the first sample, 238 – or over 90 percent – of the Loans contained breaches of one or more of the Representations and Warranties.  Of the 539 Loans in the second sample, 451 – or over 80 percent – of the Loans contained breaches of one or more of the Representations and Warranties.

52.     The fundamental premise underlying WMC's Representations and Warranties was that loan originators had sufficiently analyzed each loan application and made a determination that the borrower was creditworthy and had the ability to repay the loan.  For example, WMC represented that no originator had "exten[ded] credit without regard to the ability of the Mortgagor to repay."  (Exhibit 1, Schedule III(ddd))  WMC also represented that the originator had made a "reasonable determination" based on "objective criteria" such as income, assets, and liabilities, that the borrower had the ability to repay the loan.  (Exhibit 1, Schedule III(lll))

15

53.     These violations include, among many others, the following:

54.     *Overstatement of Income:*  A fundamental step in evaluating a borrower's creditworthiness is assessing the borrower's income.  The income of a borrower is directly correlated with the borrower's ability to repay the loan – *i.e.*, the lower the borrower's income in relation to a given loan balance, the less likely the borrower will have the ability to repay that loan.  In addition, it is less likely that a borrower with lower income will have the ability to save money to prepare for adverse economic conditions.  In other words, a finding of lower than expected borrower income for a given loan indicates that the originator did not make a sound determination as to whether the borrower had sufficient financial means to repay the loan, and reduces the actual value of the loan on the day that it was purchased by a securitization trust.

55.     If the Trust had known that the income of the borrowers of the Loans was materially less than represented by WMC, it would have paid a lower price for the Loans to reflect the higher risk of the underlying Loans, or would never have purchased the Loans at all. Given the above-described considerations, misrepresentations of borrower income materially and adversely affected the value of the Loans.  The following examples represent breaches related to borrower income:[1]

- A loan application for $732,000 indicated that the borrower had worked as a regional sales manager for Advantage Home Medical Equipment, with monthly earnings of $25,000 ($300,000 per year).  The subject loan 000 closed in May 2006.  The borrower filed for bankruptcy in March 2008.  The Statement of Financial Affairs, filed with the bankruptcy petition, indicated that the borrower reported annual 2006 income of only $45,000 and 2007 annual income of only $48,000.  There were red flags at origination that indicated that the borrower's income was overstated:  the borrower's previous mortgage payments were only $2,464.05 per month, whereas the proposed monthly mortgage payments equaled $7,635.30, a payment shock increase of 210%; the credit report did not support

---

[1] To protect the confidentiality of the underlying borrower information, the examples in the Complaint do not provide certain data.  However, the breach notices and repurchase demands submitted by the Trustee, and later by the Separate Trustee, at the direction of certain Certificateholders, provided WMC with detailed descriptions of these and other breaches.

the borrower's ability to sustain this size of mortgage payment; the pre-funding verification of employment was not signed by the lender; and the borrower's employer's federal employer identification and telephone numbers could not be validated.

- A loan application indicated that the borrower had worked as a card dealer for one year, with stated monthly earnings of $6,300 ($75,600 per year). The borrower actually only earned $47,000 per year in 2006. There were red flags at origination that indicated that the borrower's income was overstated: the borrower's previous rent payment was only $1,000 per month, whereas the proposed monthly mortgage payments equaled $2,474.96, a payment shock increase of 148%; the borrower's credit report indicated total collection, charge-off and judgment balances of $15,797; and only $4,868 of cash assets were verified, which based on the borrower's stated income of $6,300, represented less than one month of earnings.

56.     *Understatement of Existing Debt Obligations*:  A clear understanding and review of a borrower's existing debt obligations is another key component of sound loan underwriting. Like misrepresentations of income, underreporting of a borrower's existing debt obligations at origination make it less likely that the borrower will be able to repay the loan. Also, like income misrepresentations, a finding that borrower debt obligations are higher than they were represented to be indicates that the originator did not make a sound determination as to whether the borrower had sufficient financial means to repay the loan and reduces the actual value of the loan on the day that it was purchased by a securitization trust. If the Trust had known that borrowers of the Loans were encumbered by other significant debt obligations, it would have paid a lower price for the Loans to reflect the higher risk of the underlying Loans or would never have purchased the Loans. Given the above-described considerations, misrepresentations of borrower debt obligations materially and adversely affected the value of the Loans. The following are a few of the many examples of breaches related to misrepresentation of a borrower's debt obligations:

- On a loan application for $360,000, the borrower did not disclose an existing mortgage loan, which can be found on LexisNexis and the Mortgage Electronic

Registration System (MERS).  The borrower refinanced that particular loan in November 2005, before the subject transaction's closing in June 2006.  The refinancing increased the borrower's existing debt obligations by $145,000.  In addition to LexisNexis and MERS, the loan originator was on notice of the borrower's existing mortgage obligation because the borrower's bank statements showed a large wire transfer in the amount of the additional mortgage loan obtained through the refinancing.

- On a loan application for $232,000, the borrower did not disclose an existing mortgage loan, which can be found on LexisNexis and the Mortgage Electronic Registration System (MERS).  The borrower closed this additional mortgage loan in February 2006, before the subject transaction's closing on June 15, 2006.  The additional mortgage loan increased the borrower's existing debt obligations by $108,000.  In addition to LexisNexis and MERS, the loan originator was on notice of the borrower's existing mortgage obligation because the borrower's credit report indicated the borrower had two previous mortgages, including one that closed in February 2006.

57.     *LTV or CLTV Ratios Exceed Program Guidelines*:  A loan-to-value ("LTV") ratio of a mortgage loan is a measure of the loan balance compared to the value of the mortgaged property.  LTV can be useful in assessing prepayment and credit risk of mortgage loans, and the likely severity of loss in the event of foreclosure.  LTV may serve as an indicator of how easily a borrower may be able to refinance or purchase a new home, thus prepaying the outstanding mortgage loan.  Loans with higher LTVs are considered more likely to default because the borrower has less invested and has less incentive to retain ownership of the mortgaged property.  A combined-loan-to-value ("CLTV") ratio reflects similar credit risk concerns, but combines the amount of any other mortgage debt secured by the subject property.  WMC's underwriting guidelines provided for maximum LTV and CLTV ratios, and WMC made specific assurances in the Representations and Warranties that such ratios would be met.  The following are a few of the many examples of breaches relating to excessive LTV or CLTV ratios, which violated those Representations and Warranties:

- A loan for $440,000 closed with a CLTV ratio of 100%.  The final title policy for the mortgage indicated that the subject loan was in second lien position, and the

subject property had an outstanding first lien in the amount of $320,000.  The first lien loan increased the subject property's CLTV ratio to 158.18%, well beyond WMC's maximum allowable CLTV ratio of 100%.

- A loan for $431,996 closed with a LTV ratio of 80%.  WMC's guidelines indicated that the maximum allowable LTV ratio, considering the borrower's credit score and credit grade, was 70%.

58.     *Debt-to-Income Ratio*:  The debt-to-income ratio ("DTI"), or the borrower's monthly debt obligations as compared to his or her monthly income, is a key measure of a borrower's expected ability to repay the loan.  The higher the DTI (*i.e.*, the greater the percentage of monthly income a borrower must devote to debt payments), the greater the risk that the borrower will be unable to pay its mortgage loan due to high debt levels.  Conversely, a lower DTI allows the borrower to save money for mortgage payments during adverse economic conditions.  The DTI is such a delicate metric of the borrower's creditworthiness that a mere two to three percentage point change may require re-evaluation of loan approval.  WMC set maximum DTI levels for borrowers to qualify for particular loan products and made specific assurances in the Representations and Warranties that such levels would be met.  However, in many cases the borrower DTI levels materially exceeded the specifications of the related Representations and Warranties.  If the Trust had known that the DTI of the borrowers violated WMC's underwriting guidelines, it would have paid a lower price for the Loans to reflect the higher risk of the underlying Loans or would never have purchased the Loans.  Given the above-described considerations, misrepresentations of the DTI materially and adversely affected the value of the Loans.  The following are examples of the breaches of WMC's DTI representations:

- A loan for $732,000 was listed with a DTI of 36.85%.  Based on actual borrower data regarding income listed above (*see* ¶ 55), however, the borrower's DTI ratio increased from 36.85% to 351.11%, well beyond the 55% maximum DTI represented by WMC for this type of borrower.

19

- A loan for $220,000 was listed with a DTI of 48.46%. Based on actual borrower data, regarding income listed above (*see* ¶ 55), however, the borrower's DTI ratio increased from 48.46% to 181.91%, well beyond the 50% maximum DTI represented by WMC for this type of borrower.

- A loan for $360,000 was listed with a DTI of 36.64%. Based on actual borrower data regarding existing debt obligations listed above (*see* ¶ 56), however, the borrower's DTI ratio increased to 110.43%, well beyond the 55% maximum DTI represented by WMC for this type of borrower.

59.    *Occupancy Status*:  The occupancy type of a mortgaged property indicates how the mortgage borrower will use the property.  There are generally three occupancy types:  owner-occupied, second home, and non-owner-occupied properties.  A borrower is more likely to pay a mortgage loan on the home in which the borrower is living than a mortgage loan on property which the borrower is not occupying.  Accordingly, mortgaged properties occupied by the borrower are less likely to experience payment delinquencies and/or payment defaults than non-owner-occupied properties.  Therefore, the occupancy type is relevant to analyzing the credit risk profile of a loan when determining its value.  In the case of many of the loans, the owner-occupied representations were false.  If the Trust had known that the properties underlying the Loans were not used as primary residences and/or merely served as investment properties, it would have paid a lower price for the Loans to reflect the higher risk of the underlying Loans or would never have purchased the Loans.  Given the above-described considerations, misrepresentations of occupancy status materially and adversely affected the value of the Loans. The following is one example of the many occupancy misstatements among the Defective Loans:

- A loan for $522,500 was originated to facilitate the purchase of a primary residence, but was never used as such.  There were red flags at origination that indicated that the subject property would not be owner occupied:  the appraisal included a Single Family Comparable Rent Schedule, and the loan application indicated that the property was an investment property.

60.     In each of the Defective Loans, the understatement of income, the overstatement of liabilities, the failure to meet key underwriting ratios and/or the misstatement of occupancy status each breached the Representations and Warranties.  These breaches materially and adversely affected the value of the Defective Loans because, among other things, they overstated the Loans' quality as of the date the Defective Loans were purchased by the Trust.  Had the Trust known the true quality of the Defective Loans – including correct (non-inflated) borrower income, actual (not understated) existing debt, true (not manipulated) LTV and CLTV ratios, true (not manipulated) DTI, and verified (not false) occupancy status – as well as the fact that WMC did not follow its own underwriting guidelines in originating the Loans, the purchase and the securitization of the Loans would have been outright rejected or negotiated on fundamentally different economic terms.

61.     In light of the recent public revelations regarding WMC's originating violations during the time when it originated the Loans, taken together with the findings of the Forensic Review Firms, the Trust unknowingly overpaid for the Loans.  Indeed, the breaches in the Defective Loans make clear that WMC completely disregarded the Representations and Warranties; showed little, if any, concern for a borrower's ability to repay; and followed few, if any, objective standards or criteria in originating and underwriting the Loans in accordance with its Representations and Warranties.  If the true condition of the Loans was known, or if the Trust knew that WMC would refuse to perform its express contractual obligations to cure the breaches or repurchase the Defective Loans in accordance with the PSA, WMC would have been unable to sell the Loans to the Trust or would have sold the Loans for significantly less than $1 billion.

**IV.    WMC's Refusal To Comply With**
**Its Express Contractual Obligations**

62.     As they learned of the results of the Forensic Review Firms' investigation of the first sample of Loans, the Trustee, and later the Separate Trustee, at the direction of certain of the Certificateholders, promptly sent notices demanding that WMC cure or repurchase the Defective Loans specifically identified in the notices.  The Trustee sent notices on September 16, 2011, May 30, 2012[2] and June 7, 2012 (the "September 16 Notice," "May 30 Notices" and "June 7 Notice," respectively).  The Separate Trustee sent another breach notice on June 28, 2012 (the "June 28 Notice," and with the September 16 Notice, May 30 Notices, and June 7 Notice, the "Breach Notices").  Each of the Breach Notices enumerated the Defective Loans and detailed specific breaches for each of those Loans.

63.     WMC's Cure Period for each of the Breach Notices expired by no later than August 28 2012, but WMC failed to cure or repurchase any of the Defective Loans identified in the Breach Notices.   In fact, to date, WMC has failed to cure or repurchase even a single Defective Loan in response to the Breach Notices.

64.     Instead, WMC has refused to recognize the Breach Notices as sufficient to trigger WMC's cure or repurchase obligations under the PSA.  WMC has also attempted to circumvent its contractual obligations by providing baseless rebuttals of some of the cited breaches without recognizing its obligation to cure or repurchase even one Defective Loan in response to the Breach Notices.

65.     WMC's refusal to recognize the sufficiency of the Breach Notices is consistent with publicly-stated policy of WMC and GE Capital to, in all cases, "refute every loan" when presented with repurchase demands.  Specifically, Mark Begor (President and CEO, GE Capital

---

[2]   The Trustee sent two separate notices on May 30, 2012.

Real Estate and President and CEO, GE Capital Restructuring Operations), the executive responsible for managing WMC and GE Capital's handling of loan repurchase demands publicly boasted to investors on a conference call that "[i]f you've seen some of our results you know that we refute every loan." GE Capital Investor Webcast, December 7, 2010.

66.     WMC's refusal to comply with its repurchase obligations is also typical of what the Securities and Exchange Commission (the "SEC") has recognized as the "lack of responsiveness by [originators] to potential breaches of the representations and warranties relating to the pool assets [which] has been the subject of investor complaint." Indeed, the SEC has even proposed including a provision in the pooling and servicing agreement "that would require the party obligated to repurchase the [loans] for breach of representations and warranties to periodically furnish an opinion of an independent third party regarding whether the obligated party acted consistently with the terms of the pooling and servicing agreement with respect to any loans that the trustee put back to the obligated party for violation of representations and warranties and which were not repurchased." SEC Rule, 17 C.F.R. Parts 229, 232, 240, 249, *Disclosure for Asset-Backed Securities Required by Section 943 of the Dodd-Frank Wall Street Reform and Consumer Protection Act* (2011).

67.     In light of WMC's unresponsiveness to the Breach Notices, especially given the revelations that WMC knowingly disregarded its underwriting and origination standards, it is clear that WMC has no intention of complying with its repurchase obligation with regard to any of the Defective Loans in the Trust, and that additional investigation and notice would be futile.

68.     In addition, to the extent WMC itself discovered a breach of Representations and Warranties involving Loans in the Trust, it was required to notify the Trustee, and later the

Separate Trustee, of such breaches.  On information and belief, WMC did discover such

breaches, but failed to notify the Trustee or the Separate Trustee.

## V.   WMC Is An Alter Ego Of GE Capital

69.     WMC operated as GE Capital's subprime lending arm and does not have an

identity distinct from GE Capital.  As WMC's CEO, Laurent Bossard, testified to the U.S. Senate

Committee on Banking, Housing and Urban Affairs on March 22, 2006, "GE Money made the

decision post-acquisition to place WMC's mortgage operations under federal regulation.  This

was accomplished by bringing the mortgage business under GE Money's Federal Savings

Bank."[3]

70.     WMC shared offices in Burbank, California with GE Capital's consumer finance

division.  The two purportedly separate companies operated out of the same offices throughout

the relevant period surrounding the facts alleged in this Complaint.

71.     The fused identities of WMC and GE Capital carried through to the companies'

product line.  On July 15, 2005, WMC launched a program called "WMC Select," which was

said to allow "greater flexibility in qualifying the borrower for a loan since the borrower selects

the loan features most important to him."  Notably, WMC stated in SEC filings, "WMC Select is

offered by GE Money Bank."  Structured Adjustable Rate Mortgage Loan Trust Mortgage Pass-

Through Certificates, Series 2007-6, Filing on Form 424B5 at S-85 (filed June 29, 2007).

72.     WMC and GE Capital presented themselves to the world as one entity, with GE

Capital providing financial backing for WMC.  For example, at an American Securitization

Forum presentation in 2007, WMC distinguished itself from its competition by citing its "GE

---

[3] "GE Money" is the consumer lending division of the General Electric Company.  "GE Money Bank" was an
FDIC-insured federal savings bank and a wholly-owned subsidiary of a holding company of GE Capital.

Support," which provided WMC access to GE Capital's "institutional resources and balance sheet." WMC further pitched itself as having "GE purchase power."

73.     As of January 1, 2007, WMC assigned substantially all of its mortgage origination operations, including its broker relationships, to GE Capital's GE Money Bank and transferred all of its employees to WMC-GEMB Mortgage Corp., a wholly owned operating subsidiary of GE Money Bank. On January 2, 2007, GE Money Bank commenced doing business as "WMC Mortgage"[4] and began originating and acquiring mortgage loans.

74.     GE Capital's restructuring and reorganization of WMC resulted in the ostensible transfer of WMC's obligations under the PSA to the new, undercapitalized WMC Mortgage, LLC.

75.     The core strategic decisions concerning GE Capital's WMC business continued to be made by GE Capital. For example, on an investor conference call, Mark Begor (President and CEO, GE Capital Real Estate, and President and CEO, GE Capital Restructuring Operations) discussed GE Capital's reserves for "potential future repurchases that may come from investors from loans that we have sold in the past." Mr. Begor explained that GE Capital — controlling WMC's business — "put in a new leadership team," and in connection with these changes imposed by GE Capital, "we fixed underwriting" and now "we are no longer writing to Wall Street guidelines, we are underwriting to our guidelines." General Electric Company Earnings Call, April 13, 2007.

76.     Over the last few years, GE Capital's public statements have indicated that it is aware that GE Capital is ultimately responsible for WMC's duties and obligations arising out of WMC's subprime mortgage origination business. Indeed, as stated above, GE Capital's Mark

---

[4] Upon information and belief, WMC Mortgage reorganized to form WMC Mortgage LLC, the sole member of which is GE Capital.

Begor said to investors in regards to loan repurchase demands asserted against WMC that "[i]f you've seen some of our results you know that we refute every loan, and we've had a success rate of defending that claim in GE's favor at well over 80%, close to 84%." GE Capital Investor Webcast, December 7, 2010.

77.     In addition, GE Capital stated in its SEC disclosures that soon after folding WMC into GE Money Bank, GE Capital sold its WMC mortgage business in the fourth quarter of 2007. In referring to this sale, GE Capital informed the SEC that "[u]pon sale, we retained contractual obligations to repurchase previously sold loans as to which there was an early payment default or with respect to which certain contractual representations and warranties were not met." June 29, 2010 letter from GE Capital to the SEC regarding 12/31/2008 10-K, at p. 8 (filed on July 2, 2010).

78.     In recognition of Defendants' repurchase and indemnification obligations arising out of the WMC Representations and Warranties, GE Capital continues to record reserves on its consolidated balance sheet for repurchase requests based upon pending and estimated future loan repurchase requests.

79.     When asked on a GE earnings call about indications on GE's 10-Ks that "you do actually retain some sort of obligation for liabilities or loans previously sold" by WMC, Keith S. Sherin, Vice Chairman and CFO of GE, did not dispute GE's retention of WMC's repurchase obligations. General Electric Company Earnings Call, October 15, 2010.

80.     Today, GE Capital's WMC mortgage business is being wound down and Defendants are responsible for responding to repurchase demands. The decision to not fulfill Defendants' obligations under the PSA  was made by GE Capital from its Connecticut headquarters.

26

**VI.**     **The Separate Trustee Has The Power To Enforce**
                  **WMC's Obligations Under The PSA**

81.     The PSA grants the Trustee the right to enforce on behalf of the Trust WMC's

contractual obligations, including its obligation to cure or repurchase Defective Loans.  (Exhibit

1, § 2.03(d))

82.     On June 6, 2012 , the District Court, Fourth Judicial District, County of Hennepin,

State of Minnesota, entered an Order With Respect To Verified Petition Of Wells Fargo Bank,

National Association As Trustee For Instructions In The Administration Of A Trust Pursuant to

Minn. Stat. § 501B.16 (the "June 6 Order").

83.     The June 6 Order confirmed the Trustee's appointment of Law Debenture as

Separate Trustee for the Trust and afforded the Separate Trustee all of the rights, powers,

privileges, protections and indemnities of the Trustee under the PSA to enforce WMC's cure,

repurchase, and notice obligations under the PSA.

84.     Accordingly, the Separate Trustee has standing to bring this action to enforce

WMC's cure, repurchase, and notice obligations under the PSA.

## FIRST CAUSE OF ACTION

### Breach of Contract/Breaches of Representations and Warranties

85.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1

through 84, inclusive, of this Complaint as though set forth fully herein.

86.     The PSA is a valid and enforceable contract that gives rise to certain obligations

on the part of WMC with respect to the Representations and Warranties made upon its sale of the

Loans to the Trust.  WMC has breached its contractual obligations under the PSA to (i) cure the

breaches of the Representations and Warranties that materially and adversely affect the value of

the Defective Loans or (ii) repurchase the Defective Loans.

87.     In accordance with the PSA, on September 16, 2011, May 30, 2012, June 7, 2012, and June 28, 2012, the Trustee or the Separate Trustee, at the direction of certain Certificateholders, notified WMC of the breaches of the Representations and Warranties and demanded that WMC cure those breaches or repurchase the Defective Loans.  Over 60 days have passed since WMC received the Breach Notices.  WMC has failed and refused to comply with its express obligations under the PSA to cure the breaches or repurchase the Defective Loans identified in the Breach Notices.

88.     The Defective Loans identified in the Breach Notices are representative of the entire Loan pool held by the Trust. Further, certain facts have come to light regarding WMC's rampant origination and underwriting violations, which encompass WMC's origination and underwriting of the Loans.  As a result, the breaches uncovered in the 689 – or over 85 percent – of the 789 sampled Loans are highly indicative of the condition of the entire Loan pool.  In light of WMC's refusal to cure a single breach or repurchase a single Defective Loan in response to the Breach Notices, it is clear that WMC has no intention of ever complying with its cure and repurchase obligations in the PSA.  Accordingly, any additional pre-suit investigation of the Loans and additional notice to WMC of its breaches would be futile.

89.     The Trustee and the Separate Trustee on behalf of the Trust have performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the PSA.

90.     The Separate Trustee, on behalf of the Trust, is therefore entitled to specific performance of WMC's obligation to repurchase the Defective Loans identified in the Breach Notices, as well as any other Defective Loans in the Trust, which further investigation or discovery may uncover.  Specific performance is required because the PSA specifically provides

28

for the repurchase of any Loans that breach the Representations and Warranties in a manner that materially and adversely affects the value of such Loans or the corresponding interest of the Certificateholders in the Loans.

91.     Defendants are liable for WMC's breaches of contract.

92.     The Separate Trustee and the Trust are also entitled to the reimbursement of all expenses incurred to enforce WMC's repurchase obligations, including attorneys' fees and costs.

## SECOND CAUSE OF ACTION

### Breach of Contract/Failure to Notify

93.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 92, inclusive, of this Complaint as though set forth fully herein.

94.     Section 2.03(c) of the PSA requires WMC to give prompt written notice to the other PSA parties (including the Trustee) when it discovers that any Loan breaches its representations and warranties.

95.     Upon information and belief, WMC knew or should have known that the Loans breached its representations and warranties, but failed to notify the PSA parties.  WMC's failure to notify breached its obligations under Section 2.03(c) of the PSA.  WMC's breach is material and adverse to the value of the Loans and to the interests of the Certificateholders.

96.     The Trust has been damaged by WMC's breaches.  WMC must specifically perform its obligations under the PSA and give prompt written notice to the PSA parties of breaches WMC is aware of in WMC's representations and warranties.

97.     WMC must also pay the Trust damages caused by WMC's failure to notify the Trustee (and the Separate Trustee) and other PSA parties of breaches of WMC's representations and warranties in the Loans.  Alternatively, WMC must indemnify the Trust and hold it harmless under Section 2.03(h) of the PSA for its failure to perform its duties under the PSA.

98.    The Trustee and the Separate Trustee have performed all of the conditions, covenants, and promises required in accordance with the PSA in order to entitle it to recover such damages for the benefit of the Trust and the Certificateholders.

## **PRAYER FOR RELIEF**

WHEREFORE, judgment should be entered in favor of the Separate Trustee, on behalf of the Trust, and against Defendants as follows:

a)  For a declaration that has WMC breached the terms of the PSA by failing to repurchase the Defective Loans from the Trust;

b)  For specific performance of WMC's obligation under the PSA to repurchase the Defective Loans in the Trust;

c)  An award of all compensatory, consequential, rescissionary, equitable damages and/or indemnification compensating for the Trust's losses relating to WMC's failure to notify the Trustee and the Separate Trustee of its breaches of representations and warranties relating to the Loans;

d)  For expenses incurred by the Separate Trustee and the Trust to enforce WMC's obligations under the PSA, including attorneys' fees and costs; and

e)  For any such other and further relief as this Court may deem just and proper.

Respectfully submitted,

PLAINTIFF,
LAW DEBENTURE TRUST COMPANY OF
NEW YORK, solely in its capacity as Separate
Trustee of the Securitized Asset Backed
Receivables LLC Trust 2006-WM2

By: /s/ Thomas D. Goldberg
Thomas D. Goldberg (ct 04386)
Kathryn G. Newman (ct 28708)
**DAY PITNEY LLP**
One Canterbury Green
201 Broad Street
Stamford, Connecticut 06901
Tel.: (203) 977-7300
Fax: (203) 977-7301
Email: tgoldberg@daypitney.com
Email: knewman@daypitney.com

*Of Counsel*

Harvey J. Wolkoff
Robert B. Gordon (ct 14017)
Daniel V. Ward
Allison M. Boscarine
**ROPES & GRAY LLP**
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel.: (617) 951-700
Fax: (617) 951-7050
Email: harvey.wolkoff@ropesgray.com
Email: robert.gordon@ropesgray.com
Email: allison.boscarine@ropesgray.com

*Its Attorneys*

31