**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

LAW DEBENTURE TRUST COMPANY OF NEW YORK, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2,

Plaintiff,

v.

WMC MORTGAGE LLC, f/k/a WMC MORTGAGE CORP.,

Defendants

Case No.: 3:12-cv-01538-CSH

July 21, 2014

**Declaration of Nelson R. Lipshutz, Ph.D.**

1. I have been asked by counsel for Law Debenture Trust Company of New York to develop a random sample of loans originated by WMC Mortgage LLC, F/K/A WMC Mortgage Corp. ("WMC") and sold to the Securitized Asset Backed Receivables LLC Trust 2006-WM2 (the "Trust").

## I. QUALIFICATIONS

2. I am President of Regulatory Research Corporation, where I specialize in the application of statistics, economics, and financial theory to legal and regulatory issues. I hold a Ph.D. in theoretical physics from the University of Chicago, and an MBA in finance from the Wharton School of the University of Pennsylvania. I have served as an Assistant Professor of Physics at Duke University, was a senior consultant in Regulation and Economics at Arthur D. Little, Inc., and have been a lecturer in economics at Northeastern University. I have submitted expert reports and declarations, and I have testified before state and Federal courts, before state legislatures, before state insurance departments, and before the International Trade Commission.

3. My qualifications are set forth in further detail in the professional biography attached to this declaration. My compensation is in no way dependent on the nature of my findings or the outcome of this case or of any related litigation or other proceeding.

4. I have 44 years of experience in carrying out economic, financial, and statistical studies. These studies have involved the collection and analysis of data of various types, and have frequently required that I design statistical samples. Since 2010, I have developed random samples of loans from approximately 20 securitizations, and was qualified to testify as an expert in statistical sampling in securitizations before Judge Rakoff in the matter captioned Assured Guarantee Municipal Corp. v. Flagstar Bank, C.A. 11-Civ- 2375 (JSR).

5. Statistical sampling is a technique that has been used for well over a century,[1] in order to determine the characteristics of a large population of objects or persons by examining the characteristics of a subset of that population, making measurements on each and every individual member of the population unnecessary.[2]

6. Statistical sampling is based on a rigorous mathematical foundation of probability theory. It provides methods for selecting a sample from a population so that the properties measured for the sample provide unbiased estimates of the properties of the population as a whole.[3] Simple random samples provide such unbiased estimates.[4]

---

[1] For a comprehensive overview of the history of sampling and statistics, see Hald, Anders, *A History of Mathematical Statistics*. New York, Wiley, 1998 passim.

[2] Cochran, William G., *Sampling Techniques (Third Edition)*, New York, Wiley, 1977, chapter 1 section 1.1

[3] Thompson, op. cit., p. 3 points out "With careful attention to the sampling design and using a suitable estimation method, one can obtain estimates that are unbiased or population quantities, such as the population mean or total, without relying on any assumption about the population itself."

7. Statistical sampling is used routinely in a wide variety of contexts, for example, to control the quality of industrial processes,[5] and to determine the efficacy of drugs.[6] Fannie Mae explicitly requires that loan originators selling into the secondary market monitor their loan quality using statistical sampling plans.[7]

## II. THE SAMPLE

8. I have determined that a sample size of 400 loans is statistically significant. Accordingly, I will construct a random sample of 400 loans from the population of loans in the Trust which have not been paid in full. I will construct the samples using a program incorporating a random number generator based on the Mersenne Twister algorithm,[8] and set up to prevent selecting the same loan more than once.

9. As explained more fully below, the sample size of 400 is intended to result in a maximum margin of error of +/- .05 (5 percentage points) at the 95 percent confidence level for a binary question. I will perform a series of tests – known as significance testing – to confirm that the sample is representative of the population.

---

[4] Simple random samples are universally recognized as unbiased estimates of population proportions. See, e.g., the standard text on statistical sampling, Cochrane, William G., *Sampling Techniques*, Wiley, 1977, pp. 51-53. See also ibid, p. 11 ff.

[5] Ryan, Thomas P., *Statistical Methods for Quality Improvement (Third Edition)*, New York, Wiley, 2011, p. 117

[6] Thompson, Steven K., *Sampling (Second Edition),* New York, Wiley, p.1

[7] Fannie Mae Selling Guide Announcement SEL-2013-05, available at https://www.fanniemae.com/content/announcement/sel1305.pdf

[8] The Mersenne Twister algorithm is widely recognized as one of the most reliable generators available. For a description of the algorithm, see e.g. Gentle, James K., *Random Number Generation and Monte Carlo Methods*, Springer, 2010, pp. 38 - 43

10. The size of the sample needed to estimate the proportion of members of a population exhibiting any characteristic is given by the following standard formula:[9]

$$n = \frac{Np(1-p)}{(N-1)\left(\frac{d^2}{z^2}\right) + p(1-p)}$$

where

n = required sample size

N = number of members of population

z = the upper α/2 point of the normal distribution, where α = 1 - the confidence level

p = the population proportion

d = the half-width of the confidence interval

11. The population proportion p is unknown before any measurements have been made. However, n takes on its maximum value when p = 0.5.[10] For all other values of p, n is lower. To put it another way, the sample must be at its largest for any targeted level of certainty at a particular confidence level when the result of the measurement is half one value (e.g., a material breach of representations and warranties) and half another value (e.g., no material breach). This means that a sample size sufficient to estimate a proportion of 0.5 is more than

---

[9] See, for example, Thompson, Steven K., *Sampling – Second Edition*, Wiley Series in Probability and Statistics, John Wiley and Sons, New York, 2002, pp. 41 to 42

[10] Since N is generally a large number, n is proportional to p(1-p) = p – $p^2$. The quantity p(1-p) varies regularly with p. For example p(1-p) takes on the value 0.16 when p = 0.2; a value of 0.25 when p = 0.5; and a value of 0.16 when p = 0.8. More formally, for any function, maxima and minima occur when the first derivative with respect to the independent variable vanishes. The derivative of p(1-p) is 1 – 2p. Setting this expression to zero yields 1 – 2p = 0 so that p = ½ = 0.5. To prove that this extremum is a maximum, note that the second derivative is -2, which is negative.

adequate to estimate any other proportion to the required certainty with a given confidence level. For example, when p is either greater or less than .5 and n is at least 400, the level of uncertainty will be less than .05 at the confidence level of 95%.

12. I have determined that the sample size of 400 will achieve a confidence level of 95%, and thus will limit the uncertainty of the proportion to ±0.05. (This can also be expressed, as noted earlier, as a margin of error of +/- 5 percentage points at a 95% confidence level.) This means that, if p is 50% for the sample (mean), 95% of the time the true value for the population will be between 45% and 55%, 2.5% of the time it will be lower than 45% (lower limit), and 2.5% of the time it will be higher than 55% (upper limit). This is illustrated in the following chart. The area under the curve represents the fraction of cases in which the population value will be in the indicated range.




## III. DATA TO BE USED

13. I expect to analyze data files containing information on the loans included in the Trust. The data files will consist of Excel worksheets with a record for each loan. Each record will include the loan number and a number of descriptors of the loan characteristics.

## IV. REPRESENTATIVENESS OF THE SAMPLE

14. Just by chance, any random sample runs the risk of not reflecting the overall population distribution of variables of particular relevance. In this instance, the relevant variables are those which are of particular importance to a mortgage loan underwriter. In order to be sure that such an infelicitous accident has not occurred, I will compare the sample distributions of these variables with the total population distributions using the chi-squared test.[11]

### A. How the Chi-Squared Test Works

15. A chi-squared test starts out by making an initial hypothesis that two distributions are the same except for some random noise in the data. The test then calculates a number ("chi-squared") based on the observed differences between the distributions being tested. Unless the number exceeds some critical value, the initial assumption is statistically meaningful, or, conversely, the difference between the two distributions is not statistically significant.

16. The critical value depends on the level of confidence that one wants to have in the result. A 95% confidence level means that one wants to be 95% sure that there is a difference which is not merely due to chance. I will use a confidence level of 95%, which is the confidence level most frequently used in statistical testing.[12]

[11] For a discussion of the chi-squared test see, e.g., Afifi, A. A. and Azen, S. R.,*Statistical Analysis – Second Edition*, Academic Press, New York, 1979, pp. 53-54

[12] Kaplan, Daniel T., "Resampling Stats," quoted in *Matlab Users Guide*, page 2, "The use of a confidence level of 95% is the convention in science."

## B. Distributions to be Tested

17. I will compare the sample distributions and the total population distributions for a set of important underwriting variables. Depending on data availability, I will compare the distributions based on variables such as the state in which the property is located, the loan to value ratio, the type of documentation used in the loan underwriting process, the amount of the loan, the borrower's FICO credit score, and the borrower's debt to income ratio.

## V. CONCLUSION

18. The random samples which I will construct will provide a sound and accepted statistical basis for assessing the extent of WMC's liability and damages.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Nelson R. Lipshutz

Nelson R. Lipshutz July 21, 2014

Dr. Nelson R. Lipshutz

**NELSON R. LIPSHUTZ**
24 Radcliff Road
Waban, MA 02468-2222

Telephone: (617) 964-6940
Fax: (617) 964-0426
E-mail: nlipshutz@rcn.com

**EDUCATION:**

M.B.A. (1972), WHARTON SCHOOL, UNIVERSITY OF PENNSYLVANIA. Concentration in Business Finance. Graduated first in class. Elected to Beta Gamma Sigma (general academic honors).

Ph.D. (1967) and S.M. (1963), UNIVERSITY OF CHICAGO. Concentration in theoretical high energy nuclear physics. National Science Foundation Cooperative Graduate Fellow. Elected to Sigma Xi (scientific research).

A.B (1962), COLLEGE OF ARTS AND SCIENCES, UNIVERSITY OF PENNSYLVANIA. Major in Physics. General Honors Program. Mayor's Scholar. John L. Haney Scholar. Elected to Pi Mu Epsilon (mathematics) and Sigma Tau Sigma (tutoring).

**EMPLOYMENT:**

AUGUST 1977 TO PRESENT: President, Regulatory Research Corporation.

AUGUST 1972 TO AUGUST 1977: Senior Consultant in Regulation and Economics, Arthur D. Little, Inc.

AUGUST 1970 TO AUGUST 1972: Management Research Analyst and Member, Board of Directors, Management and Behavioral Science Center, Wharton School, University of Pennsylvania.

SEPTEMBER 1967 TO AUGUST 1970: Instructor/Research Associate (1967-69) and Assistant Professor (1969-70), Department of Physics, Duke University.

JANUARY 1967 TO SEPTEMBER 1967: Atomic Energy Commission Postdoctoral Research Associate, Enrico Fermi Institute for Nuclear Studies, University of Chicago.

**PROFESSIONAL:**

SPRING 1986: Instructor, College of Business Administration, Northeastern University.

1993: Coordinator, industry and consumer advisors to Title Insurance Working Group of the National Association of Insurance Commissioners.

**CIVIC:** President, Waban Improvement Society, 1992-93.

**BOOK:** *The Regulatory Economics of Title Insurance*, Praeger Publishers (1994)

**PROFESSIONAL SOCIETIES:**

American Association for the Advancement of Science

American Bar Association - Antitrust Section

American Physical Society

American Statistical Society

Society of the Sigma Xi

INFORMS (Operations Research & Management Science)

The National Association of Forensic Economics

The New York Academy of Sciences

**PAPERS AND PRESENTATIONS – PAST 5 YEARS**

March 9, 2014

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
*MASTR adjustable rate Mortgages Trust 2006-OA2, MASTR Adjustable Rate Mortgages Trust 2007-1, and MASTR Adjustable Rate Mortgages Trust 2007-3 v. Ubs Real Estate Securities Inc. Case 12cv7322*
Expert Deposition testimony re: sampling methodology

September 12, 2013
IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT - CHANCERY DIVISION
*Chultem v. Ticor Title Insurance et al. No. 06 CH 00488*
*Collella v. Chicago Title Insurance et al. No. 06 CH 09489*
Expert testimony re: class damages

October 11-12, 2012
UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
*Assured Guarantee Municipal Corp, v. Flagstar Bank et al., Civil Action 11-CIV-2375 (JSR)*
Expert testimony re: sampling methodology.

July 10, 2012
INDIANA LAND TITLE ASSOCIATION
Seminar, Indianapolis IN
Invited Continuing Education lecture: "Objectives and Options for Title Insurance Rate Review and Regulation"

March 12, 2012
NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES
Rate Filing, New York NY
Report: "Projected Economic Impacts of Rates Proposed By the Title Insurance Rate Service Association"

February 29, 2012
PENNSYLVANIA INSURANCE DEPARTMENT
Rate Filing, Harrisburg PA
Report: "Projected Economic Impacts of Rates Proposed By the Pennsylvania Title Insurance Rating Bureau"

November 14, 2011
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
*Assured Guarantee Municipal Corp, v. Flagstar Bank et al., Civil Action 11-CIV-2375 (JSR)*
Expert report re: sampling methodology.

August 17, 2011
UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK
*Assured Guarantee Municipal Corp, v. Flagstar Bank et al., Civil Action 11-CIV-2375 (JSR)*
Declaration re: sampling methodology

June 4, 2011
ARKANSAS LAND TITLE ASSOCIATION
Annual Meeting, Branson, Missouri
Continuing Education Lecture: "Objectives and Options for Title Insurance Rate Review and Regulation"

May 18, 2011
IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY, MARYLAND
*North American Title Company v. David Kanstoroom, et al., Civil No. 332860-V*
Expert report and deposition testimony re: value of damages to a title operation due to breach of a non-compete agreement.

January 24, 2011
NEVADA SUPREME COURT
*Case No. 09-21481-BKC-AJC*
Report: "The Importance of the Doctrine of Equitable Subrogation to the Nevada Economy"

October 27, 2010
DELAWARE INSURANCE DEPARTMENT
Rate Filing, Wilmington DE
Report: "Projected Economic Impacts of Rates Proposed By the Delaware Title Insurance Rating Bureau"

October 12, 2009
2008 TITLE INSURANCE STUDY ADVISORY COUNCIL
Meeting, Tallahassee, FL
Invited Presentation: "Objectives and Options for Title Insurance Rate Review and Regulation"

September 14, 2009
TEXAS DEPARTMENT OF INSURANCE
Public Hearing, Austin, Texas
Testimony on title insurance economics.

May 28, 2009
PENNSYLVANIA INSURANCE DEPARTMENT
Public Hearing, Harrisburg, PA
Testimony on the reasonability of agents' commissions and the impact of current economic conditions on the title insurance industry.

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2014, a copy of the foregoing ***Declaration of Nelson R. Lipshutz, Ph.D.*** was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by regular mail to counsel unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

By: /s/ Thomas D. Goldberg
Thomas D. Goldberg