# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| LAW DEBENTURE TRUST COMPANY OF NEW YORK, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2, | Civil Action No. 3:12-cv-1538 (CSH) |
| Plaintiff, | |
| v. | **AUGUST 8, 2017** |
| WMC MORTGAGE, LLC f/k/a WMC MORTGAGE CORP., | |
| Defendant. | |

## <u>RULING ON DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

### <u>HAIGHT, Senior District Judge</u>:

This is one of the many residential mortgage backed securities ("RMBS") cases generated by the collapse in 2008 of the United States real estate market. That earthquake may have subsided, but its aftershocks remain, as exemplified by this energetically conducted litigation.

The case at bar is now before the Court on Defendant's motion for partial summary judgment, which Plaintiff resists in its entirety. This Ruling resolves that motion. Familiarity is assumed with the Court's prior Rulings, reported at 2014 WL 1289234 (denying Defendant's motion to dismiss Plaintiff's complaint), and 2015 WL 9581729 (granting Plaintiff's motion to expedite determination of statistical sampling and denying Defendant's motion to exclude testimony of Plaintiff's expert witness).

## I. Background

The case at bar follows the typical pattern. A residential mortgage is created when a home owner applies for and receives a loan from a financial institution. The home owner's obligation to repay the loan and interest is secured by a mortgage on the residence, which the financial institution holds. In RMBS parlance, the financial institution is referred to as the "originator," an appropriate designation for the entity that decided whether or not to make the loan requested by the home owner.

Thus far, we inhabit that earlier, uncomplicated world, where modestly sized banks on Main Street lend money to farmers on the edge of town, acquire mortgages on the farm, and everyone hopes for years of bountiful crops. We enter the dramatically different RMBS world when thousands of separate residential mortgages are bundled together into a trust, which then issues certificates purchased by the investing public, designated "certificateholders." Payments of principal and interest by thousands of underlying homeowner mortgagees find their way, not to the vaults and balance sheets of rustic banks on Main Street, but rather into the pockets of trust certificateholders. If the mortgages are sound and the mortgagees make their obligated payments, the trust investors realize significant profits. If there are widespread defaults on the mortgages, the certificates become valueless and the investors suffer significant losses.

The "originator," who made the loans creating the corpus of the trust, receives its profit early on, when the trust and its attendant agreements are executed and become effective. The certificateholders' economic anxiety about the mortgagees' subsequent performance is not shared by the originator – at least, not until lawyers get involved.

Turning to the case at bar, the present record shows that Defendant WMC Mortgage, LLC is the successor entity to WMC Mortgage Corp., which originated the residential home mortgage

loans involved in the case. I will refer to these entities collectively as "WMC." The documents which accomplished the securitization in suit were executed in 2006. As the result of those agreements, a pool of 5,162 separate residential loans, all originated by WMC, were ultimately deposited into the Securitized Asset Backed Receivables LLC Trust 2006-WM2 (the "Trust"). The Trust issued certificates that were sold to investors.[1] Plaintiff's complaint [Doc. 1] alleges in ¶ 1 that at this time, WMC sold this pool of residential mortgages "to the Trust for approximately $1 billion."

Plaintiff in the case is Law Debenture Trust Company of New York ("Law Debenture"), described in the complaint caption as "solely in its capacity as Separate Trustee" of the Trust. Wells Fargo Bank, National Association, the original Trustee, was replaced by Law Debenture as successor and Separate Trustee by an order of a Minnesota state court in June 2012, under circumstances it is not necessary to recount.

Plaintiff's theory of the case is that over time, there were a multitude, even a pervasive number, of defaults in the underlying mortgages, resulting in losses to investors, for recourse of which the Trustee, pursuant to authority conferred upon it by the Trust, sues WMC. It has become apparent, as discovery progresses, that at the eventual bench trial, counsel for Plaintiff intends to rely significantly upon expert opinion testimony, to prove liability on the part of WMC and the quantum of damages. It is in the context of Law Debenture's proffered expert opinion testimony that WMC makes its present motion for partial summary judgment.

## II. Defendant's Motion for Partial Summary Judgment

The stage for WMC's motion for partial summary judgment is set by the Court's earlier

---

[1] The facts in this paragraph of text are derived from WMC's Brief [Doc. 136-1] at 4, which in turn cites to Defendant's Local Rule 56(a)(1) statement of undisputed material facts [Doc 136-2].

ruling, 2015 WL 9581729, which resolved motions focusing upon the proffered opinion testimony of an expert witness designated by Law Debenture: Nelson R. Lipshutz, Ph.D. Dr Lipshutz is a statistical consultant who has previously testified on behalf of plaintiffs in bench trials of RMBS cases: before Judge Rakoff, in *Assured Guaranty Municipal Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475 (S.D.N.Y. 2013), and before Judge Castel, in *U.S. Bank, National Association v. UBS Real Estate Securities, Inc.,* 205 F. Supp. 3d 386 (S.D.N.Y. 2016).

As a statistical consultant for Law Debenture in the case at bar, Dr. Lipshutz turned his attention to the 5,162 residential mortgages originated by WMC and thereafter placed in the Trust pool. Dr. Lipshutz calculated that 4,170 of those loans had not been paid in full as of the time of his retention.[2] He then "devised a randomly selected, statistically significant sample of 400 loans out of 4,170 loans not paid in full." 2015 WL 9581729, at *2. Dr. Lipshutz will then "conduct a review of the loans in the sample to determine whether the loans are in breach of WMC's representations and warranties," "mathematically determine the breach rate among the loans in the sample," and "extrapolate the breach rate among the remainder of the loans in the Trust to a reasonable degree of scientific certainty." *Id.* at *3 (citation omitted). The amount of money damages would then be calculated by Dr. Joseph Mason, another expert witness designated by Law Debenture. *Id.* I summarized Law Debenture's trial strategy in the prior Ruling:

> Law Debenture's game plan for the trial, then, is to call Dr. Lipshutz as a statistical expert whose testimony based on sampling will, if the trial judge accepts it, establish WMC's liability for breaches of contractual representations and warranties across the broad scope of

_____

[2] A submission prepared by counsel for WMC states that of the 5,162 loans originally in the Trust, 1,018 had been paid in full, and 4,144 were outstanding. *See* Power Point presentation, Court Ex. 1 at March 7, 2017 hearing. The difference in the number of loans then outstanding is not material.

nonperforming mortgages within the Trust. Dr. Mason will follow up as a damages expert whose damages calculations will proceed from the breach rate statistically established by Dr. Lipshutz.

*Id.*

Confronted by that proffered expert opinion testimony, WMC filed a *Daubert* motion to exclude or limit what Dr. Lipshutz would be permitted to say at trial. I denied that motion, for the reasons stated in the earlier opinion and not repeated here. *See* 2015 WL 9581729. However, it is important for present purposes to note one observation the Court made during the course of the prior opinion. Since day one of this litigation, WMC has argued that Law Debenture's claims for money damages are barred by what WMC refers to as the "sole remedy clause" in the governing Trust contract. True to its conviction, WMC's counsel gave voice to that argument as the parties prepared for oral argument on the *Daubert* motion. I thought it right to say at that time:

> Prior to the hearing, the Court entered a Scheduling Order which eliminated WMC's first stated objection to Dr. Lipshutz's report from the subjects to be considered as part of a *Daubert* hearing. That Order said: "While an argument can be made for shoehorning the 'sole remedy' substantive merits issue into a *Daubert* inquiry into the validity of the methodology by which Dr. Lipshutz arrived at his statistical opinion, I think the better practice is to require WMC to make a separate, free-standing motion *in limine* if it wishes to press the sole remedy theory (as I suspect it does)."

*Id.* at *3.

WMC's next tactical step was to file the present motion for partial summary judgment, pursuant to Fed. R. Civ. P. 56. The Notice of Motion [Doc. 136] specifies two related but separate requests for summary disposition. *First*, it is contended that

> WMC is entitled to summary judgment with respect to those loans in the trust for which there is no genuine dispute that Law Debenture did not satisfy the notice provision set out in the governing contract. That agreement dictates that, at least by the time of summary

5

> judgment, Law Debenture give notice of any breach for which it
> seeks recovery, or offer evidence that WMC itself actually discovered
> the alleged breach. Absent loan-by-loan evidence of notice or actual
> discovery, the plaintiff cannot obtain a recovery for the loan.

Doc. 136, at 1. *Second*, WMC contends that the Court should grant WMC partial summary judgment on two representative loans "where Law Debenture indisputably cannot prove, as required by the governing agreement, that any alleged breach materially and adversely affects the value of the loan." *Id.* at 2.

These particular contentions may not fit squarely within WMC's consistently reserved "sole remedy" theory, but they arise principally from the trust agreement's provisions about notice or knowledge of mortgage defaults and resulting remedies. In any event, a partial summary judgment and a ruling *in limine* confer comparable relief upon a successful movant. Either is a an appropriate procedural vehicle.

### III. The Pooling & Service Agreement

The core contract in this case is called the Pooling and Service Agreement ("PSA"). The PSA created the Trust and defines the rights and obligations of, *inter alia*, Law Debenture as successor Trustee (acting on behalf of the certificate investors) and WMC (defined by the PSA as the "Responsible Party"). On WMC's motion for partial summary judgment, the briefs and arguments of counsel focus upon certain provisions in § 2.03 of the PSA, captioned in part "Representations, Warranties and Covenants of the Responsible Party . . . " The following partial quotations from the PSA focus upon the particular provisions cited by counsel.

Section 2.03(b) provides: "The Responsible Party hereby makes the representations and warranties set forth in Schedule III and Schedule IV to the Depositor and the Trustee, as of the Closing Date." The "representations and warranties" in Schedules III and IV are those promises

respecting the quality of a loan with which this litigation is concerned.

Section 2.03(c) provides: "Upon discovery by the Responsible Party, the Depositor, the Trustee or the Servicer of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the others."

Section 2.03(d) provides: "[W]ithin 60 days of the earlier of either discovery by or notice to the Responsible Party of any breach of a representation or warranty, set forth in Section 2.03(b), that materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein," the Responsible Party must "use its best efforts" to cure the breach, or replace the nonconforming mortgage with a substitute mortgage loan, or repurchase the nonconforming loan.

Section 2.03(k)  provides in a separate paragraph that "the obligation of the Responsible Party under this Agreement to cure, repurchase or substitute any Mortgage Loan as to which a breach of a representation and warranty has occurred and is continuing, together with any related indemnification obligations of the Responsible Party set forth in Section 2.03(h), shall constitute the sole remedies against such Person respecting such breach available to Certificateholders, the Depositor and any of its Affiliates, or the Trustee on their behalf."

### IV.  What is WMC's Motion for Partial Summary Judgment <u>Really</u> About?

This question is posed because, after extensive briefing on the present motion, during oral argument a disagreement between counsel emerged about what WMC's motion for partial dispositions is really about.

Counsel for WMC began his argument by saying: "Our partial summary judgment motion

presents two issues – notice and materiality." Tr. 11.[3] That distinction tracks the two separate bases

for judgment specified in the Notice of Motion.  "Materiality" relates to the narrow issue posed by

the two representative loans described in the second specification.  "Notice" is a broader issue,

applicable to the universe of nonperforming loans in the Trust.  As to them, counsel argued that

> the plaintiff must come forward with loan-specific evidence of a breach, either by giving notice of the breach or by coming forward with evidence that the defendant itself had discovered the breach. . . . . We acknowledge that Law Debenture has come forward with notice for 876 loans out of approximately 5,000 in the pool.  Those loans are in the case, at least for purposes of summary judgment . . . . Four-and-a-half years later, they have no notice, they have not pointed to any problem with any other loan.  So they get to go forward on the loans that they have satisfied their burden at summary judgment, but they don't get to go forward on the rest.

Tr. 12, 15-16.

Counsel for Law Debenture opened by saying:

> I would suggest, your Honor, that will due respect to WMC and its counsel, this is not a case – it's not a case about notice; it's a case about sampling, or a motion, I should say, about sampling.

Tr. 62.

At the conclusion of forceful arguments, counsel summed up in manners consistent with their

openings.  Counsel for WMC said:

> We would like the Court to rule in the following manner: On the notice and discovery issue, that the plaintiff is entitled to go forward on the 876 loans for which there is some evidence of *notice* plus the other 17 loans, the 13 and four, that we are not contesting discovery, and that WMC receive summary judgment as to the balance of the loans in the trust.

---

[3] Citations are to the transcript of the March 7, 2017 hearing on the summary judgment motion.

Tr. 58-59 (emphasis added). Counsel for Law Debenture said:

> Notice would be futile, and notice is not required on every single loan when you have *sampling* . . . . You don't then have to analyze every single loan. It would defeat the purpose of sampling. It would eliminate sampling.

Tr. 85 (emphasis added).

What is this motion really about – notice or sampling? The labels affixed by counsel in their arguments reflect the exigencies of advocacy. It is inherent in human nature that perceptions of reality are not wholly objective, and may differ significantly with respect to the same subject. To decide the present motion, the Court need not choose between characterizing the motion as about notice or about sampling. Both concepts are implicated by the complex contracts governing the case and the welter of bad feelings resulting from the nonperformance of vast numbers of securitized residential mortgages. The Court will decide WMC's motion for partial summary judgment by analyzing the particular claims Law Debenture asserts in its complaint, and then determining whether the standards governing Rule 56 practice entitle WMC to the requested partial summary disposition with respect to those claims.

### V. The Claims Law Debenture Asserts in its Complaint Against WMC

Law Debenture's complaint against WMC [Doc. 1] comprises 31 pages and 98 numbered paragraphs. Paragraphs 1 through 84 contain detailed factual allegations, interspersed with argumentative or conclusory passages and contentions regarding applicable law.

The complaint then sets forth two separate causes of action. The First Cause of Action, ¶¶ 85-92, is captioned "Breach of Contract/Breaches of Representations and Warranties." The Second Cause of Action, ¶¶ 93-98, is captioned "Breach of Contract/Failure to Notify."

Each cause of action incorporates by reference ¶¶ 1-84 of the complaint. Paragraph 5

alleges:

> WMC, as the originator, was in a far superior position to know the true nature of the Loans it was selling – far superior to the Trustee (whose duties were contractually restricted) and far superior to the eventual purchasers of the mortgage-backed securities that would bear the brunt of WMC's shoddy origination practices.

What the complaint means by "shoddy origination practices" is amplified in succeeding paragraphs. Paragraph 8 alleges that "[a] loan-level investigation initiated by certain Certificateholders" revealed breaches by WMC of representations and warranties "with respect to numerous Loans." Paragraph 9 alleges that further investigations by "Forensic Review Firms" uncovered breaches of representations and warranties in many more loans, which included "overstatement of borrower income, understatement of borrower liabilities, and misstatement of the occupancy status of the mortgaged property." Paragraph 11 alleges that additional "recent independent investigations" have revealed that

> WMC systematically disregarded its underwriting guidelines and engaged in underwriting practices that directly violated the Representations and Warranties. These revelations, combined with the pervasiveness and severity of the breaches of Representations and Warranties found in the sample reviewed by the Forensic Review Firms, indicate that the Loans were not originated on any legitimate foundation, and strongly suggest a high breach rate throughout the entire Loan pool in the Trust. Nonetheless, despite its receipt of loan-specific breach notices and repurchase demands, as well as evidence that WMC is and has been aware of the breaches plaguing the Loans since origination, WMC has failed to repurchase any of the Defective Loans from the Trust. It is therefore clear that WMC has abandoned its duty to notify all applicable parties of breaches of its representations and warranties, as well as its repurchase obligation under the PSA, and any further notice to WMC would be futile.

Law Debenture considers this conduct by WMC to be deplorable. The complaint derives WMC's obligations to pay the Certificateholders' resulting damages from provisions in the PSA, the

contract under which the bundled WMC-originated loans were transferred into the Trust.

Specifically, the Preliminary Statement in the complaint alleges in ¶ 6 that, under § 2.03(d) of the PSA, if any loan is in breach of a representation or warranty which materially and adversely affects the value of the loan or the interest of the Trust or Certificateholders, WMC must cure the breach or repurchase the loan "within 60 days of the earlier of WMC's discovery of, or receipt of notice of, such breach or Defective Loan."  In addition, ¶ 7 of the complaint alleges that § 2.03(c) of the PSA provides that "[u]pon discovery by Responsible Party [WMC] . . . of a breach of any of the foregoing representations and warranties, the party discovering such breach shall give prompt written notice to the others [*i.e.*, the Trustee, Servicer and Depositor]."

The two causes of action pleaded in the complaint track these allegations of WMC's contractual obligations.  The first cause of action focuses upon WMC's obligation to cure or replace a nonperforming loan when WMC acquires *or receives from others* notice of a material breach of the representations and warranties.  The second cause of action focuses upon WMC's obligation to *give to others* notice of breaches of which WMC has acquired actual or constructive knowledge. The two claims differ in that, with respect to the relationship between the Trust and WMC, the giving of notice of loan breaches flows in different directions: *to* WMC in the first cause of action, *from* WMC in the second.

Law Debenture's theory of the case is that WMC's wrongful conduct, beginning at the time of WMC's origination of the loans and continuing throughout the establishment of the Trust and thereafter, breached each of these several duties WMC owed to certificateholders under these terms of the PSA.  The complaint concludes with a prayer for relief which includes, *inter alia*, "specific performance of WMC's obligation under the PSA to repurchase the Defective Loans in the Trust,"

and "compensatory, consequential, rescissionary, equitable damages and/or indemnification compensating for the Trust's losses relating to WMC's failure to notify the Trustee and the Separate Trustee of its breaches of representations and warranties relating to the Loans." The first of these two requested forms of relief arises from the first cause of action pleaded in the complaint; the second form of relief arises from the second cause of action.

WMC's motion for partial summary judgment, if granted, would significantly reduce Law Debenture's first claim and eliminate the second. The first claim would be reduced because the effect of granting the motion would be going forward with a trial limited to those separate loans, less than one thousand, where Law Debenture gave WMC notice of, or WMC had acquired, some evidence of breaches. WMC would "receive summary judgment as to the balance of the loans in the trust," to quote its counsel's submission at the hearing [Tr. 58-59], thereby disposing of thousands of additional loans in the pool, a result which is also entirely dispositive of Law Debenture's second claim, that WMC should have given notices of breaches as well as receiving them.

The Court must now consider whether, on the present record, the standards of review in Rule 56 practice entitle WMC to these summary dispositions.

## VI.  Standards of Review

WMC moves for partial summary judgment, in the particulars noted *supra*. That less-than-total procedure is sanctioned by the first sentence of Rule 56(a), which provides: "A party may move for summary judgment, identifying each claim or defense – or the part of each claim or defense – on which summary judgment is sought."  The next sentence of the Rule declares the standard applicable to all summary judgment motions, full or partial: "The court shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

If, after discovery, the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party must "demonstrate the absence of any material factual issue genuinely in dispute" to be entitled to summary judgment. *Am. Int'l Grp., Inc. v. London Am. Int'l Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (quoting *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319-20 (2d Cir. 1974)) (internal quotation marks omitted). A fact is *material* if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "[I]f the evidence is such that a reasonable jury could return a verdict for the nonmoving party," then a dispute concerning a material fact is *genuine*. *Id*. All inferences and ambiguities must be viewed in the light most favorable to the nonmoving party. *Rogoz v. City of Hartford*, 796 F.3d 236, 245-46 (2d Cir. 2015).

In order to defeat a properly supported motion for summary judgment, "the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Robertson v. Wells Fargo Bank, N.A.*, No. 3:14-cv-1861, 2017 WL 326317, at *7 (D. Conn. Jan. 23, 2017) (quoting *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)) (internal quotation marks omitted). "[W]hen the moving party has carried its burden under Rule 56, its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 58 (1986). The nonmoving party "must present evidence demonstrating

a genuine dispute." *Gannon v. UPS*, 529 F. App'x 102, 103 (2d Cir. 2013) (citing *Anderson*, 477 U.S. at 248). "Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon which the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie." *Robertson*, 2017 WL 325317, at *7 (citing *Fincher v. Depository Trust & Clearance Co.*, 604 F.3d 712 (2d Cir. 2010)).

## VII. Discussion

### A. *The First Prong of WMC's Motion for Partial Summary Judgment*

Under these familiar standards, the existence of a disputed fact, standing alone, does not preclude summary judgment. For a factual issue to defeat summary judgment and mandate a plenary trial, the dispute must be *genuine* and its resolution must be *material*. Those are the explicit requirements that are imposed by Rule 56(a).

In the case at bar, it states the obvious to say that factual disputes exist between Law Debenture and WMC. A core dispute has to do with the manner in which WMC, as the "originator" of the residential mortgage loans in the Trust, conducted itself when it *originated* each loan before they were bundled and securitized, or subsequently, after the Trust had been established and certificates sold to investors. Was WMC's conduct "shoddy," as Law Debenture charges in its complaint, or at all times did WMC act in an honest, straightforward contractually appropriate fashion, as WMC insists in defending against the action?

The issue of the probity of WMC's conduct surfaced early in the litigation. In *Deutsche Bank National Trust Company v. WMC Mortgage, LLC*, No. 3:12-cv-933, 2014 WL 1289234 (D. Conn. March 31, 2014), I considered and denied defendant WMC's motion to dismiss four RMBS cases

which were at that time consolidated, Law Debenture's instant case being one of them.  Steven Molo,

counsel for plaintiff Deutsche Bank in the other three cases, argued at the hearing on the motion to

dismiss:

> And the three Deutsche Bank transactions here, which are my client
> in these three cases, involved almost four and a half billion dollars.
> And in each deal WMC told investors and told the Trust that they
> carefully diligenced the loans, that the borrowers could repay, and
> then they also promised to buy back the loans if there were any
> breaches in the representations and warranties about the quality of the
> loans.
>
> It turns out that what they sold us was garbage.

2014 WL 1289234, at *4.  In Deutsche Bank counsel's submission, most or many of the mortgage

loans were "garbage" when WMC originated them, WMC knew that at the time, concealed the loans'

noisome condition when WMC sold them to the Trust, pocketed its profit, and refused to cure or

repurchase any of the loans when inevitably the trash of nonperforming mortgages began to

accumulate in residential streets.

  Mr. Wolkoff, who represented Law Debenture at that consolidated hearing, moved

successfully at its conclusion to vacate the consolidation of his case with the Deutsche Bank cases.

While thereafter the Law Debenture case has proceeded on its own, at the earlier hearing Mr.

Wolkoff wholeheartedly endorsed Mr. Molo's submissions that the mortgage loans WMC transferred

to RMBS trusts (including the one at bar) were "garbage" when originated, and since then WMC

wrongfully refused to pick up its garbage or clean up the mess of investor losses it created.  These

have always been core factual contentions by Law Debenture.  The complaint in this case alleges

in ¶ 11 that "the origination and business practices of WMC during the 2004-2007 time period  –

during which WMC originated the Loans," WMC "systematically disregarded its underwriting

guidelines and engaged in underwriting practices that directly violated the Representations and Warranties." The complaint further alleges in ¶ 65 that WMC's refusal to repurchase any loans in response to breach notices sent by the Trustee was "consistent with publicly-stated policy of WMC and GE Capital to, in all cases, 'refute every loan' when presented with repurchase demands." In that regard, Law Debenture stresses that although WMC has been given specific notice of breaches affecting almost a thousand separate loans, it has neither cured nor repurchased a single one of them.

WMC's alleged course of conduct gives rise to Law Debenture's first cause of action, that WMC breached its contractual obligations under the PSA "to cure the breaches" or "repurchase the Defective Loans," Complaint ¶ 86, and to the second cause of action, that "WMC knew or should have known that the Loans breached its representations and warranties, but failed to notify the PSA parties," *id.* ¶ 95.

WMC's litigation position is that at all times its conduct has been honorable, proper, and in full conformity with each obligation imposed upon WMC by the PSA. More specifically, in this summary judgment context, counsel for WMC argued at the hearing that after discovery, Law Debenture had no evidence that WMC engaged in the sort of wrongful conduct *ab initio* that plaintiffs in these case posit. WMC's counsel said at the hearing:

> [T]here is no evidence, none, literally none, that WMC was aware of any breach as to any loan in this trust prior to this lawsuit being filed.[4] They could have – one would think that if WMC was sitting on problems that it knew of and not doing anything, that would have come out at one of these depositions or something like. It's a null set. It just doesn't exist. . . . And so this is not the horror story that one might hypothesize about, you know, taking the ball and going home or something like that. There is no evidence of any hiding of anything with respect to any loan at issue in this case, and I think

---

[4] Law Debenture filed its complaint on October 26, 2012.

that's quite telling several years in.

Tr. 34, 35-36. Moreover, to counter Law Debenture's portrayal of WMC's participation in the garbage business, the Power Point presentation WMC submitted at the hearing [Ct. Ex. 1] included 15 pages intended to show its efforts, at the time of origination of a loan and thereafter, to ensure that the loan did *not* breach the representations and warranties in question. Those pages are collected in a section titled "WMC's Fraud Prevention Measures" and comprised of sub-sections titled "WMC Had a Zero Tolerance Fraud Policy" ; "WMC Took Affirmative Steps to Identify and Prevent Fraud"; and "There is No Evidence in the Record to Support Law Debenture's Allegations." The evidentiary references scattered among these pages include WMC-wide company documents and excerpts from the depositions of certain witnesses during discovery.

Law Debenture's theory of the case is that WMC was indeed creating a "horror story" and was well aware of it. Law Debenture's brief opposing summary judgment [Doc. 142] asserts unapologetically at 21-22 that "The record developed during discovery in this case demonstrates that WMC was actually aware of pervasive breaches in the Trust, but ignored them or was willfully blind to the fact that it was securitizing massive numbers of loans in breach of its own purported underwriting standards." The unflattering picture that emerges portrays WMC as consistently approving loans without regard to the borrower's ability to pay them back.

As evidence for that negative assessment, Law Debenture included in its motion papers excerpts from the depositions of David Riedel, a quality control manager at WMC from 2004 to 2007, and Lisa Mentzer, an AMC underwriter and underwriting manager from 2002 to 2007. That testimony may be contrasted with excerpts WMC included in its submission from depositions of WMC employees Jennifer Shwed, Mark Jackman, Michael Wojcik, and Cathy Hamilton, who

testified to the rectitude of WMC's loan approval protocols.

It is fair, and entirely unsurprising, to say that counsel for both parties engaged in highly selective readings from depositions to support their opposing contentions. The more important point, on this motion for summary judgment, is that a "genuine dispute," as that phrase is used in Rule 56(a), exists on the fact of whether WMC's conduct was shoddy or beyond reproach. The existence of that dispute is manifest and requires no further explication.

The more complicated question is whether this fact, in addition to being genuinely disputed, is also "material," as that term is used in Rule 56(a). To obtain the requested summary dispositions, WMC must show "that there is no genuine dispute as to any *material* fact and the movant is entitled to judgment as a matter of law" (emphasis added). Under the Rule, parties may dispute an issue of fact genuinely, even passionately: the existence of the dispute does not preclude summary judgment if the fact disputed is not "material," a concept defined by the Supreme Court for Rule 56 purposes as a fact that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. A fact that is disputed but not material in that sense is subject, in summary judgment analysis, to "And So What" discard (descending for a moment into the vernacular). In effect, the party moving for judgment says to his adversary: "While I disagree with you, everything you say about that may be true, *and so what*? I am entitled to judgment anyway, because the governing law says so."

Counsel for WMC do not put the proposition exactly that way, but it seems to me that *au fond* this is what it comes down to. The case for Law Debenture is that as the result of WMC's defective loan origination practices, coupled with the subsequent massive and pervasive number of nonperforming mortgages, WMC had actual or constructive knowledge of an epidemic of

breaches of representations and warranties, and did not tell anyone else involved in the Trust about it. With the aid of statistical sampling, Law Debenture bases on that conduct a claim for thousands of nonperforming mortgages in the Trust. WMC responds in effect: We don't agree with Law Debenture's account of events, but even if everything it says is correct, so what? It doesn't matter, WMC seemingly contends, because under the terms of the PSA and the governing law, WMC's liability to Law Debenture is nonetheless limited to the hundreds of loans where Law Debenture proves it gave WMC notice of breaches or WMC discovered them itself: a concept known in the parlance of RMBS cases as "loan-by-loan proof." In consequence, the disputed issue is not material, because its resolution does not affect the outcome of the action.

To state the matter somewhat differently: In order to decide whether the propriety of WMC's conduct is *material* for Rule 56 purposes, the question is whether WMC's liability is limited in the manner prayed for on partial summary judgment, even if Law Debenture could prove that WMC behaved in the improper ways Law Debenture charges. WMC says the answer to that question is "Yes." While an increasing number of cases, state and federal, consider sampling and related issues in one way or another, WMC contends on this motion that the authority squarely in WMC's favor is Judge Castel's opinion after bench trial in *U.S. Bank, National Ass'n v. UBS Real Estate Securities*, 205 F. Supp. 3d 386 (S.D.N.Y. 2016). At the conclusion of the hearing in the case at bar, this exchange occurred between the Court and Mr. Hellman, counsel for WMC:

> THE COURT: One of the arguments that Law Debenture makes in its brief is that the defendant in this case, WMC in this case, *does not cite any case* which holds that a plaintiff can meet its burden of proof only by loan-by-loan proof. It's done so sometimes; sometimes it's sampling. You can have two methods, two protocols, two ways of going about proving what a plaintiff has to prove before the end of the day – loan-by-loan or reasonable sampling. The fact that both exist and one uses one, one uses the other does not give rise to any

19

rules of law of the sort that I think you're putting before us on this motion. That's a question, I guess. (emphasis added).

MR. HELLMAN: And I appreciate the question because I think it is the heart of what we're talking about here today. *Judge Castel's case is that case.*

THE COURT: It's that case.

MR. HELLMAN: Judge Castel was faced with a sample showing a 70 percent breach rate over, actually, frankly, a larger-size sample than this one. And the argument to Judge Castel was, That's enough. We've shown you. We've pulled out the subsection, we've shown you there's problems. Let's go to trial on everything else. That is what Judge Castel rejected. . . . [T]here is a case that squarely addresses it. There's really only one under this contract that actually puts it all together and looks at everything all in one or two opinions – . . . and that is Judge Castel, and he says no. If they [counsel for Law Debenture] were right about how this works, of course they would be able to proceed with every loan in the case in Judge Castel's case because they had a sample showing a high breach rate and said there's a dispute of fact, and you just sort of go on from there; but that is what Judge Castel said they could not do.

Tr. 132-34 (emphasis added). Given the emphasis that WMC puts on Judge Castel's decision in *U.S. Bank*, it is necessary to consider the case with care.

Judge Castel wrote three opinions in the case: denying in part and granting in part the parties' cross-motions for partial summary judgment, 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015) ("*UBS I*"); denying reconsideration of *UBS I*, 2015 WL 797972 (S.D.N.Y. Feb. 25, 2015) ("*UBS II*"); and a comprehensive opinion following a bench trial, 205 F. Supp. 3d 386 (S.D.N.Y. 2016) ("*UBS III*," signed September 6, 2016). The plaintiffs were three trusts that purchased pools of residential mortgage-backed securities from the defendant, UBS Real Estate Securities, Inc. ("UBS"). As in the case at bar, interests in the trusts were sold to investors, who became "certificateholders." The rights and obligations of the parties were governed by PSAs which appear to be identical to those

at bar.

UBS had not originated the loans. "As the sponsor of these transactions, UBS acquired more than 17,000 mortgage-secured loans from various originators, then assembled them into pools and sold them to the Trusts." *UBS I*, 2015 WL 764665, at *1. "UBS did not itself originate the loans. Rather, it acquired the mortgage loans from other originators, having represented to the Trusts that it conducted due diligence on the loans, and that the loans complied with quality standards and underwriting guidelines." *Id*. The Trusts alleged that "the RMBS pools included thousands of loans that were in breach of the PSAs' representations and warranties concerning quality and underwriting standards." Their complaint "asserts one claim, which alleges that UBS breached its obligation to repurchase mortgage loans that it knew violated the representations and warranties. It seeks money damages flowing from the failure to repurchase the purportedly defective loans." *Id*.

Prior to the filing of the trustees' complaint in *UBS*, a non-party, Assured, insurer of the trusts' securities offerings, had sent UBS a series of letters identifying individual loans as being in material breach of representations and warranties and requesting that UBS repurchase them. On the summary judgment motions, the trusts argued that "they are entitled to relief as to all materially defective loans contained in the pools, and not just the loans that Assured identified as being in material breach." *UBS I*, 2015 WL 764665, at *4. To that end, the trusts proposed "a theory of 'pervasive breach,' whereby Assured's letters gave UBS notice of widespread breaches throughout the pools," giving UBS notice of loan defects "sufficient to require UBS to investigate all loans for breaches of the representations and warranties and to repurchase those found to be in breach." *Id*. The trusts further argued that "they should be permitted to prove their 'pervasive breach' theory through statistical sampling performed by their retained experts." *Id*.

Judge Castel's summary judgment opinion held that "the trusts may not recover under a theory of pervasive breach," *UBS I*, 2015 WL 764665, at *10, a ruling in the summary judgment context that I understand to mean that the trusts would not be entitled to judgment on that theory at trial. Judge Castel said on this issue: "The Trusts contend that evidence of this so-called 'pervasive breach' imposes an obligation upon UBS to cure or repurchase all defective loans in the pool. This Court concludes that the terms of the PSAs foreclose" what Judge Castel characterized as "such a broad and improvised remedy." *Id*. He gave three reasons for that conclusion. First, "the PSAs provide that not all breaches trigger a cure or repurchase obligation," only material and adverse breaches do so. *Id*. Second, "the repurchase remedy negotiated by the parties is loan specific." *Id*. at *11. Third, "and most significant, the PSAs expressly provide that cure or repurchase are the 'sole remedies,' and, thus, they foreclose the 'pervasive breach' theory." *Id*. On that point, Judge Castel cited to § 2.03 of the PSA, which appears to be identical in that regard to the agreement in the case at bar.[5]

The trusts in *UBS* moved unsuccessfully for reconsideration. Seeking to revive their "pervasive breach" theory, counsel argued that "based on the complaints' allegations of pervasively defective loans, UBS was put on *constructive notice* of all *materially defective* loans in the Trusts, which triggered UBS's obligation to repurchase all such loans." *UBS II*, 2015 WL 797972, at *3 (emphases in original). Judge Castel was not persuaded. He reasoned:

---

[5] Section 2.03 in the PSA between the Trustee and WMC provides in pertinent part that "the obligation of the Responsible Party under this Agreement to cure, repurchase or substitute any Mortgage Loan as to which a breach of a representation and warranty has occurred and is continuing . . . shall constitute the sole remedies against such Person respecting such breach available to Certificateholders . . . or the Trustee on their behalf." Article I of the PSA defines "Responsible Party" as "WMC Mortgage Corp." and "its successors in interest." Doc. 1-1, at 52 (§ 2.03(k)). The same language appears in the PSA § 2.03 before Judge Castel. 2015 WL 764665, at *11 n.3.

The parties could have, but did not, bargain for an inquiry notice standard. The parties could have, but did not, bargain for an obligation that if the aggregate number of loans in breach exceeded a certain threshold, a duty to reexamine all loans would be triggered. Instead, the specified remedies are the "sole remedies." . . . . When it comes to written, integrated contracts among sophisticated parties, predictable outcomes in accordance with the expressed intentions of the contracting parties is justice and fairness.

*Id* at *4.

It is necessary to note an additional aspect of Judge Castel's reasoning in his first two *UBS* opinions. In *UBS I*, Judge Castel expanded upon the "sole remedy" preclusion of the "pervasive breach" theory by saying this:

> Here, the PSA's cure-or-repurchase remedy is addressed to "such Mortgage Loan" and the Purchase Price mechanism is loan specific. There is no broad carve-out providing that the enumerated remedies are not exclusive of others available to the parties. Rather, section 2.03 describes the "sole remedies." Moreover, the breach notices sent by Assured and U.S. Bank did not assert a pervasive breach across the three trusts, and the Trusts have not cited evidence to indicate that, prior to the filing of the Complaint, Assured, U.S. Bank or the Trusts placed UBS on notice of a claim that all loans should be repurchased because of a pervasive breach, or that the notice requirement was dispensed with because of a pervasive breach. That is not to say that such notice would have permitted it to assert a "pervasive breach," but without such notice, the Trusts' claims certainly fail.

2015 WL 764665, at *12 (footnote omitted). I include that portion of Judge Castel's opinion in this Ruling because, as noted *infra*, Law Debenture contends that this sort of broad-form "pervasive breach" notice was given by the Trustee to WMC before the complaint in the case at bar was filed.

Having denied reconsideration of his summary judgment rulings, Judge Castel conducted a bench trial, which he decided in an exhaustive opinion comprising pages 386-527 of volume 205 of F. Supp 3d. For present purposes, I need only note that Judge Castel took the occasion to drive

the last nail in the "pervasive breach" theory. At trial, "the Trusts no longer use the term 'pervasive breach,' they argue that UBS had 'constructive knowledge' of 'most' breaches," an exercise in semantics that availed them nothing with Judge Castel, who stated briskly that "[t]he Trusts' constructive knowledge argument is little more than a reformulation of their 'pervasive breach' theory." 205 F. Supp. 3d at 424. Judge Castel rejected this repackaged concept because "[t]he Trusts' 'constructive knowledge' theory would create a broader obligation for UBS than the one negotiated by the parties." *Id.* He concluded this point of discussion in his trial opinion with a reprise of the earlier summary judgment opinion:

> The parties could have, but did not, bargain for additional remedies or a notice provision that did not turn on loan-specific knowledge. The Trusts therefore may not rely on evidence of "constructive knowledge" or "pervasive breach" to prove UBS's knowledge of breached warranties.

*Id.* at 425. As far as Judge Castel's management of the *UBS* case is concerned, the plaintiffs' "pervasive breach" theory is a casualty of the "three strikes" (or "three opinions") rule.[6]

I turn to the question of what effect Judge Castel's decisions in *UBS* should have upon this Court's decision on WMC's motion for partial summary judgment in the case at bar. "A great deal," WMC says. "None whatsoever," Law Debenture says. Those reactions are predictable. Judge

---

[6] No more than any district court judge, Judge Castel may not have the last word. RMBS cases are just beginning to find their way to the Second Circuit. An appellate voyage for the *UBS* case, even if contemplated by the parties, cannot begin because a final judgment has not yet been entered in the district court. Under Judge Castel's trial ruling, further litigation concerning mortgages where specific notices of breach were given is in the capable hands of retired S.D.N.Y. Judge Barbara S. Jones, sitting as Special Master. In a letter dated September 27, 2016 [Doc. 513], counsel for defendant UBS asked Judge Castel to request a briefing schedule for an anticipated motion to certify for interlocutory appeal an aspect of the trial decision adverse to UBS. Judge Castel responded with an Endorsed Order dated September 28, 2016 [Doc. 514], stating *inter alia* that "the defendant is welcome to move any time it wishes." According to the docket sheets, no such motion has been made.

Castel's decision is not binding on me, but given his skill and the quality of the *UBS* opinions, their persuasive quotient is notable.

One must observe that, notwithstanding WMC's characterization of *UBS* as on all fours with the case at bar, there are differences between them. First: RMBS trusts are the plaintiffs in both cases, but the defendants are different. WMC, the defendant in this case, was the originator of each of the thousands of mortgages that were subsequently bundled into pools (to mix the accepted metaphors) and securitized. In *UBS*, the defendant UBS did not itself originate the loans; instead, it "acquired more than 17,000 mortgage-secured loans from various originators, then assembled them into pools and sold them to the Trusts." *UBS I*, 2015 WL 764665, at *1. If, at the time of origination of the loans, the lender disregarded or was complicit in the violation of representations and warranties about the loans' quality, WMC participated in that conduct but UBS did not. To be sure, UBS as sponsor of the PSA "represented to the Trusts that it conducted due diligence on the loans, and that the loans complied with quality standards and underwriting guidelines." *Id.* However, if the loans were tainted by breaches *ab initio,* at the time of origination, UBS did not participate in creating that condition and had no direct knowledge of it, while WMC consciously engaged in such conduct and knew all about it. That is not a circumstance with which Judge Castel was confronted.

It should be stressed that the foregoing discussion does not constitute a finding or intimation by the Court that WMC behaved in any particular way at any particular time. But I am commanded, in summary judgment analysis, to view all inferences and ambiguities in favor of Law Debenture as the nonmoving party. Accordingly I accept on this motion the conclusion concerning WMC's conduct that Law Debenture draws from the discovery and deposition evidence available to it.

A second difference between Judge Castel's *UBS* case and the case at bar lies in the breach notices sent by certificateholders or the trusts to the defendants in question. Judge Castel's summary judgment ruling took care to note that "the breach notices sent by Assured and U.S. Bank did not assert a pervasive breach across the three trusts, and the Trusts have not cited evidence to indicate that, prior to the filing of the Complaint, Assured, U.S. Bank or the Trusts placed UBS on notice of a claim that all loans should be repurchased because of a pervasive breach, or that the notice requirement was dispensed with because of a pervasive breach." *UBS I*, 2015 WL 764665, at *12.

The "breach notice" correspondence generated by the present case is different, at least in tone. The differences are illustrated by WMC Ex. AA on this motion. Counsel for a certificateholder sent a letter dated June 8, 2012 to Wells Fargo Bank, the initial Trustee. Copies were sent to an officer and general counsel of WMC. That letter stated, *inter alia,* that "numerous Mortgage Loans in the Trust contain extensive breaches of the Responsible Party's representations and warranties"; "over 80% of the Loans" in a group reviewed by a forensic underwriter "are in breach of the Responsible Party's representations and warranties"; "In light of this extraordinary breach rate, it is clear that the Responsible Party pervasively and systematically violated its representations and warranties within this Trust"; "It is also clear that the Responsible Party has no intention of complying with its cure or repurchase obligations under Section 2.03(d) because the Responsible Party has failed to cure or repurchase a single Non-Compliant Loan identified in the Trustee's Repurchase Demands." Under § 2.03(d) of the PSA, "the Trustee must promptly notify the Responsible Party and request that the Responsible Party repurchase all of the Non-Performing Loans in the Trust at the Repurchase Price." Attached to counsel's letter was "a list of the 163 Non-Compliant Mortgage Loans," as well as a detailed description of the breaches. While that letter, and

a follow-up letter from Law Debenture to WMC dated June 28, 2012, requested WMC to cure or repurchase specified loans, the themes of pervasive breaches of representations and warranties, and WMC's abandonment of its contractual obligations, are stated clearly enough.

Another difference between the *UBS* case and this one is found in the claims asserted by the respective trust plaintiffs. In *UBS,* the trusts' complaint "asserts one claim, which alleges that UBS breached its obligation to repurchase mortgage loans that it knew violated the representations and warranties." *UBS I*, 2015 WL 764665, at *1. Judge Castel's trial opinion expands upon the nature of the trusts' claim and his disposition of it. He said:

> With regard to the discovery or notice requirement, this Court previously held that discovery of a breach by UBS triggered the cure, replace or repurchase 90-day clock, as does actual notice given by another party. [citing *UBS I* and *UBS II*]. But the Court rejected the Trusts' "pervasive breach" theory, which argued that the language of the PSA should be construed to deem UBS on notice of all defective loans based on its knowledge that several loans were defective.
>
> The PSAs were explicit that the "sole remedies" in the event of a breach that materially affected the interests of the Certificateholders were cure, replacement or repurchase. . . . The "sole remedies" provision, however, is a valid and enforceable contractual limitation that forecloses efforts by the Trust to fashion an expedient remedy based solely on the volume of loans at issue.

*UBS III*, 205 F. Supp. 3d at 401-02. In contrast, Law Debenture's complaint in the case at bar asserts two claims, not one. The first cause of action, captioned "Breach of Contract/Breaches of Representations and Warranties," alleges at ¶ 86 : "WMC has breached its contractual obligations under the PSA to (I) cure the breaches of the Representations and Warranties that materially and adversely affect the value of the Defective Loans or (ii) repurchase the Defective Loans." That is the same claim as the sole claim the plaintiff trusts asserted in *UBS*. The Law Debenture complaint asserts a second cause of action, captioned "Breach of Contract/Failure to Notify," which alleges at

¶¶ 94 and 95 that "the PSA requires WMC to give prompt written notice to the other PSA parties (including the Trustee) when it discovers that any Loan breaches its representations and warranties," and "WMC knew or should have known that the Loans breached its representations and warranties, but failed to notify the PSA parties."  Judge Castel did not adjudicate the merits of a "failure to notify" claim in *UBS* because the plaintiff trusts before him did not plead one in their complaint.

On its present motion for partial summary judgment, the position for WMC has to be that it is entitled as a matter of law to a ruling that, in this action against the originator of mortgage loans, who engaged in the problematic conduct Law Debenture alleges, the distinction between Law Debenture's two causes of action is of no moment because the sole remedies provision in the PSA applies to both claims, limiting the first and precluding the second.

I am not cited to an appellate decision binding on this Court which declares that particular proposition.  Judge Castel's opinion in *UBS*, while not binding on me but strongly persuasive owing to its author's stature, did not directly address the effect of the sole remedies provision upon a trust's claim of an originator's failure to notify other PSA parties of multiple and pervasive breaches of representations and warranties in  mortgages the originator negotiated and issued; that claim was not before Judge Castel.  If it be said that Judge Castel's reasoning in rejecting the claim the *UBS* trustees did assert applies, by implication or a proper reading of the PSA, to both claims in the instant case, some doubt arises from recent New York appellate cases.

In *Morgan Stanley Mortgage Loan Trust 2006-13ARX v. Morgan Stanley Mortgage Capital Holdings LLC*, 143 A.D.3d 1, 36 N.Y.S. 3d 458 (1st Dep't 2016) ("*Morgan Stanley*"), an RMBS trustee sued the originator of 1,873 residential mortgage loans which had been securitized and sold to investors pursuant to contracts similar to those at bar.  The trustee, in its action in a New York

State court, sought redress from the originator "for the massive loan defaults that occurred, rendering the residential mortgage backed securities (RMBS) it sold to investors virtually worthless." 143 A.D.3d at 3. In its complaint, the *Morgan Stanley* trustee, "in addition to its other breach of contract claims, alleges that Morgan Stanley breached a contractual duty to notify the Trustee of the defective loans, giving rise to damages not governed by the sole remedies restrictions in the parties' agreements, and also that Morgan Stanley's gross negligence otherwise renders the sole remedies clause unenforceable." *Id.* In support of that claim, the complaint alleged –

> that the Trust has suffered more than $140 million in damages attributable to the falsity of the representations and warranties made by Morgan Stanley with reckless indifference, because it did not adhere to the barest minimum of underwriting standards. The Trustee claims that when it notified Morgan Stanley of the defective loans, demanding that Morgan Stanley repurchase them, Morgan Stanley refused to do so. The Trustee claims that upon conducting a forensic examination of the RMBS, it discovered that there were hundreds of loans that were of lesser quality than what Morgan Stanley had represented. The complaint alleges many of the underlying borrowers obtained their loans by providing basic and critical information on their applications that was inaccurate, if not outright false, and that Morgan Stanley failed to verify such information and statements. . . . The complaint alleges that Morgan Stanley should have notified the Trustee of these breaches because it knew of them, or could have discovered them with due diligence, given its superior access to documents and information about these loans. The Trustee contends that Morgan Stanley made representations to make the loans appear less risky than they were. Despite the sole remedy provision, the complaint alleges that contractual damages will not adequately compensate the Trust for its losses.

143 A.D.3d at 6. The assortment of breaches of representations and warranties cited by trustee's counsel in *Morgan Stanley* is essentially the same as those charged against WMC in the case at bar.

The *Morgan Stanley* trustee was represented by Steven R. Molo, who is also counsel for Deutsche Bank in the three cases originally consolidated with the Law Debenture case before this

Court.[7]  Mr. Molo, joined by Mr. Wolkoff on behalf of Law Debenture, makes the same allegations and claims in this Court that Mr. Molo advanced in the New York courts in *Morgan Stanley*.

The *Morgan Stanley* trial court granted the defendant's motion to dismiss those claims.  The court held that (1) Morgan Stanley's inaction did not constitute an independent breach of contract claim; (2) the claim that Morgan Stanley's conduct constituted gross negligence was limited by the sole remedy provisions in the PSA; and (3) alternatively, even if the sole remedy limitation could be rendered unenforceable by Morgan Stanley's willful misconduct or gross negligence, the complaint did not contain facts to sufficiently support that claim.

The trustee appealed to the Appellate Division, First Department.  The Appellate Division reversed all three holdings below.  That court held, first, that "defendant's alleged breach of its contractual duty to notify the Trustee of defective loans gives rise to an independent, separate claim for breach of the parties' agreements, which should not have been dismissed," 143 A.D.3d at 4, on the ground that "a seller's failure to provide the trustee with notice of material breaches it discovers in the underlying loans states an independently breached contractual obligation, allowing a plaintiff to pursue separate damages," *id*. at 7 (citation omitted).  In reaching that conclusion, the First Department necessarily accepted the trust's contention that those "separate damages" were "not governed by the sole remedies restrictions in the parties' agreements." *Id*. at 3.  In a subsequent case, the First Department made it clear that in the context of an originator's duty to notify, its discovery of a loan's breach encompasses breaches that the originator "already knew about or would have discovered through its own due diligence."  *U.S. Bank Nat'l Ass'n v. GreenPoint Mortg. Funding,*

---

[7] The docket numbers in the *Deutsche Bank* cases are 3:12-cv-933, 3:12-cv-969, and 3:12-cv-1699.

*Inc.*, 147 A.D.3d 79, 85, 45 N.Y.S.3d 11 (1st Dep't 2016) ("*GreenPoint*").

The First Department's opinion in *Morgan Stanley* holds, second, that "the particular facts alleged in the amended complaint are sufficient to support plaintiff's claim of gross negligence." 143 A.d.3d at 4. The Appellate Division was dealing with the trustee's contention that the loan originator's "gross negligence" rendered "the sole remedies clause unenforceable." Its opinion acknowledges that "[c]ourts will generally honor the remedies that the parties have contractually agreed to," but added: "[t]here are exceptions to this rule of law, however, and as a matter of long-standing public policy, a party may not insulate itself from damages caused by its grossly negligent conduct." 143 A.D.3d at 8 (citation and internal quotation marks omitted). Reversing the trial court, the Appellate Division held that "we have recognized that allegations of serious and pervasive misrepresentations regarding the level of risk of an investment with widespread, massive failures will support a claim for contractual gross negligence," and "the allegations in this case are sufficient to support a claim of gross negligence," with the result that "the allegations of gross negligence should not be dismissed." *Id.* at 8-9. The allegations of the originator's misconduct in *Morgan Stanley* mirror those made against WMC in this case.

The defendant in *Morgan Stanley*, continuing to cling to the protection of the PSA's sole remedies clause, argued that in any event, the clause "would make the investors whole by requiring that any such loans be repurchased." 143 A.D.3d at 9 (internal quotation marks omitted). That contention failed to divert the Appellate Division's attention. The court noted that "the actual effect of the sole remedy clause remains to be tested." *Id.* Citing its earlier opinion in *Nomura Home Equity Loan, Inc., Series 2006-FM2 v. Nomura Credit & Capital, Inc.*, 133 A.D. 3d 96 (1st Dep't 2015), for the recognition "that the remedy of specific performance in put-back cases might be

impossible to fulfill," the First Department went on to say in *Morgan Stanley*:

> It is for this reason we left open the possibility that even for ordinary breach of contract claims, equity may require an award of monetary damages in lieu of specific performance. *Nomura* is now pending before the Court of Appeals. The issue of whether the sole remedies clause in these contracts will make the investors whole cannot be ascertained at this stage of the litigation, militating in favor of permitting the allegations of gross negligence to remain.

143 A.D.3d at 9.[8]

The Appellate Division has adhered to its *Morgan Stanley* rationale in a series of subsequent decisions. One of these is *GreenPoint*, 147 A.D.3d 79 (cited in full *supra*). That case considered, as the case at bar does not, the effect of the statute of limitations in an RMBS action. The New York Court of Appeals had held, in *ACE Securities Corp., Home Equity Loan Trust, Series 2006-SL2 v. DB Structured Products, Inc.*, 25 N.Y.3d 581 (N.Y. 2015), an RMBS put-back action, that the cause of action accrued on the date of the closing of the underlying RMBS transaction, which is when the representations and warranties in suit were made. The New York statute of limitations for breach of contract is six years. In *GreenPoint*, another suit by an RMBS trust against the mortgage loans' originator, the trust commenced the action by filing a summons with notice "exactly six years after May 31, 2007, the closing date of the underlying transaction in which the representations and warranties were made." 147 A.D.3d at 83.[9] The Appellate Division continued: "Only after this action was commenced were three breach notices then sent to GreenPoint." *Id*. That brought the statute of limitations into play:

---

[8] The Appellate Division decided *Nomura* in 2015. The Court of Appeals apparently heard the appeal, but has ordered that the case be reargued. 29 N.Y.3d 962 (N.Y. Ct. App. May 9, 2017).

[9] In the case at bar, Law Debenture's complaint was filed on October 26, 2012. The PSA indicates that the effective date of that complicated instrument was also October 26, 2006.

To the extent plaintiff has asserted claims that rely upon GreenPoint's notification by the servicer of nonconforming mortgages, those claims were correctly dismissed because the breach notices were sent too late. Where, as here, a contract specifies a cure period, any claim premised on the failure to effect a cure is premature if it is brought before the expiration of the cure period. Because the breach notices were sent only after the summons with notice was filed, the cure period had not begun, let alone expired, when this action was commenced. These claims are, therefore, premature.

147 A.D.3d at 87 (citations omitted). And not only "premature," but "sent too late": time-barred by the six-year statute of limitations, given the date of accrual established by the Court of Appeals in *ACE*.[10]

The First Department's opinion in *GreenPoint* is instructive in the case at bar because the trustee did not limit its claim to specific mortgages where the defendant originator had received notices of breaches of representations and warranties. The trustee filed a complaint "more than six months after the action was commenced" which "contain[ed] a breach of contract cause of action" based on allegations of the originator's conduct, quoted by the Appellate Division at 147 A.D.3d 83-84 and closely similar to Law Debenture's description of WMC's behavior as originator, with the specifically alleged result that the *GreenPoint* originator "breached its contractual obligations to provide notice to the Trustee of the breaches and, based on its own discovery of the breaches . . . to cure the breaches or repurchase the affected Mortgage Loans." *Id*. at 84. The trustee's suit on behalf of certificateholders sought "specific performance, damages, and rescission, and to the extent rescission is impracticable, . . . rescissory damages in lieu of rescission." *Id*.

The *GreenPoint* defendant moved to dismiss the complaint. The trial court "granted

---

[10]   This circumstance does not arise in the case at bar, where Law Debenture's breach notices to WMC predated the filing of the complaint.

defendant's motion to dismiss the breach of contract claim to the extent the claim is based upon cure demands made on defendant, and denied the motion to dismiss, that claim to the extent it is based upon allegations of defendant's independent discovery of breaches." *Id.* at 89. The Appellate Division, affirming that order, explained the different resolution of the trustee's two breach of contract claims. Under the RMBS contract,

> GreenPoint's obligation to cure a nonconforming loan is triggered in one of two ways. One way is if GreenPoint discovers on its own that a loan it sold breached the representations and warranties contained in the governing documents. The other way is if it is notified by the servicer of a nonconforming loan. We have recognized that these alternative contractual obligations give rise to independent, separate claims for breach of contract. (citing *Morgan Stanley* and *Nomura*).
>
> . . . .
>
> Central to this appeal is whether the notice provision in the repurchase protocol applies to contract claims where a defendant itself knows about the nonconforming mortgages. In other words, is a breach notice still required when the contract claim is predicated on nonconforming mortgages that defendant itself discovered? Relying on the terms of the MLSA repurchase protocol, we find that it would have been wholly illogical for plaintiff to be required to notify Greenpoint about the existence of nonconforming mortgages that GreenPoint already knew about *or would have discovered through its own due diligence*. . . . . [T]his action, to the extent it alleges that GreenPoint's obligation to cure was triggered by its own discovery of nonconforming mortgages, but no cure was effected, is not only timely, but it may also proceed regardless of the validity of the late breach notices.
>
> We also find that the allegation that defendant breached the repurchase protocol under the contract, because it knew *or should have known* that the loans were in breach of the warranties and representations, is sufficient to withstand a motion to dismiss. Plaintiff claims that *as the originator of the mortgage loans*, GreenPoint created and had full access to the loan files and either *could* or did perform pre- and post-closing due diligence.

147 A.D.3d at 85-86 (emphases added).

The language I have emphasized in the *GreenPoint* decision makes plain that, in the

Appellate Division's view, a mortgage loan originator's knowledge of a borrower's breaches of representations and warranties embraces both what the originator knew and what it could have discovered by the exercise of due diligence. That concept resonates in the case at bar because Law Debenture sufficiently alleges that WMC, the loan originator in the case, engaged in fundamental failures of due diligence which mirror the originator's conduct charged in *GreenPoint*.

In *Bank of New York Mellon v. WMC Mortgage, LLC*, 151 A.D.3d 72 (1st Dep't 2017), another RMBS case displaying the same post-2008 real estate market malaise, one of the defendants was JPMorgan Chase Bank, N.A. ("JPM Bank"), the servicer under the governing MLSA and PSA.[11] Section 2.02 of the PSA provided that "should the servicer [defendant JPM Bank], among others, discover any breach of WMC's R&Ws in the MLSA, it was to give prompt written notice to the other parties." 151 A.D.3d at 75. The trial court dismissed all causes of action as time-barred under *ACE*. The complaint's fifth cause of action asserted a claim against JPM Bank "for breach of the PSA by failing to provide notice of defective loans." *Id.* at 76. On appeal, the First Department reversed the dismissal of that cause of action. The court said: "We turn now to the fifth cause of action alleging failure to notify, and based on our recent decision in [*Morgan Stanley*], we reinstate that cause of action as against JPM Bank," and added: "[t]hus, both *Morgan Stanley* and *Nomura* found that the contractual obligation to notify was independent of the warranty obligations and that claims for failure to notify were not claims 'respecting a warranty breach' subject to the 'sole remedy' clause." *Id.* at 81.

Reverting to the case at bar, and WMC's motion for partial summary judgment, I find myself

---

[11] MLSA refers to "Mortgage Loan Sale and Interim Servicing Agreement," the vehicle used to establish the trust whose certificates were sold to investors.

unable to conclude that WMC is entitled to judgment as a matter of law dismissing all Law Debenture's claims with respect to mortgage loans, except for those 893 specific loans for which, on a loan-by-loan analysis, there is evidence of notice to WMC or actual discovery by WMC of breaches of representations and warranties.  No appellate case stands squarely for that proposition.  District Judge Castel's non-binding opinion in *UBS,* while meticulous, is distinguishable on several grounds.

The recent cited decisions in the New York Appellate Division, that a loan originator may be liable for failing to notify an RMBS trustee of mortgage breaches the originator knew *or should have known* about, suggest that Law Debenture's second cause of action against WMC is viable in law, and beyond the reach of the "sole remedy" provision WMC asserts as the basis for partial summary judgment.  That factor militates against the summary relief WMC requests in its motion.

That is so, even though these Appellate Division decisions were rendered on motions to dismiss the complaints.  In Rule 56 summary judgment practice, a fact is *material* if it might affect the outcome of the suit *under governing law*.  RMBS trusts, like the one at bar, typically provide that New York law governs the rights and obligations of the parties.  In consequence, federal courts in RMBS cases routinely look to New York court decisions for the governing law.  In the case at bar, Law Debenture claims in its second cause of action that WMC failed its contractual obligation to notify other PSA parties of loan breaches.  These Appellate Division cases hold that a loan originator's duty to notify others about loan breaches extends to breaches the originator would have discovered by the exercise of due diligence, in addition to those of which it unquestionably had knowledge, and that the duty to notify exists independently of the sole remedy provision in the repurchase context.  Unless subsequently disturbed by the state Court of Appeals, these are

propositions of governing New York law for Rule 56 purposes. Accordingly, WMC's alleged failure to exercise due diligence poses a fact question material to WMC's liability for failure to notify, a question that is, moreover, hotly disputed by the parties. Assuming without deciding that this concept of constructive knowledge does not apply to Law Debenture's first cause of action for failure to cure or repurchase the loans, it is a principle of governing New York law that clearly applies to Law Debenture's failure to notify claim, and that is sufficient to preclude WMC's requested summary relief.

I must also consider WMC's insistence that Law Debenture should not be allowed to proffer statistical sampling as a means of proving liability and damages with respect to the major portion of its claims. In this regard, WMC's motion partakes more of an *in limine* motion than one for summary judgment. Counsel for the parties have argued the propriety of statistical sampling at length in their briefs and oral arguments.

WMC does not contend that statistical sampling is beyond the pale and can never be allowed in the polite company of litigation proof; nor could it do so, given the frequency with which state and federal trial judges refer to statistical sampling with approval and acceptance. "[T]he overwhelming weight of the precedent in the Second Circuit, and in many other jurisdictions," Law Debenture proclaims in its brief [Doc. 142] at 10, "is that RMBS plaintiffs may prove liability with respect to the use of statistical sampling, without providing prior notice of breach for every loan potentially at issue." *Id.* at 10-15 (collecting cases). WMC's riposte, as voiced by Mr. Hellman at the hearing, is that the cases Law Debenture cites are earlier ones, "cases that predate Judge Castel, cases that, like Judge Rakoff's case, have the non-limiting language that does not limit the plaintiff to the most important feature of the contract, in Judge Castel's words, the sole remedy language."

Tr. 106-107.[12]

In WMC's submission, the "sole remedy" provision in the PSA brings § 2.03(d) to bear, which in turn "provides that WMC's obligation to repurchase a materially defective breaching loan is not triggered unless WMC receives notice of the alleged breach, or itself discovers the breach." WMC Brief [Doc. 136-1] at 11.

Thus, the case for WMC is that "Section 2.03 defines the set of loans for which the plaintiff is entitled to seek recovery: the loans for which it has given notice of a breach or shown that the defendant discovered a breach." Reply [Doc. 150] at 6. From that proposition, WMC's argument proceeds:

> Those loans constitute the universe of loans for which the plaintiff can then attempt to actually *prove* liability. In other words, if sampling is allowed, Law Debenture could present the Court with a subset of noticed or discovered breaching loans at trial, ask the Court to determine a breach rate, and then extrapolate that breach rate to the full set of 876 Noticed Loans . . . . But under no circumstances would section 2.03 permit extrapolation to other loans that were never identified nor discovered pursuant to section 2.03.

*Id.* (emphasis in original). WMC refers to this perceived contractual scheme as "the loan-by-loan repurchase protocol." *Id.* at 7. Counsel reiterated that concept in a post-hearing letter brief dated March 23, 2017 [Doc. 161] at 2 n.2: "If this Court wishes to permit Law Debenture to engage in sampling, then any sample must be drawn from, and any breach rate extrapolated to, only the universe of loans the governing contract makes eligible for liability – *i.e.*, the Noticed Loans."[13]

---

[12] Judge Castel's case, referred to by counsel in these remarks, is *UBS III*, 205 F. Supp. 3d 386. Judge Rakoff's case is *Flagstar*, 920 F. Supp. 2d 475.

[13] Presumably, counsel intended to say "if the Court *decides*," rather than "*wishes*"; the Court entertains no wishes about how the case should proceed.

Law Debenture says it has pleaded, and will prove, that WMC, the originator of thousands of residential mortgage loans subsequently securitized into the Trust, failed at the time of negotiating the loans and thereafter to exercise due diligence concerning the loans' quality, to so grossly negligent and reckless a degree that the pool of loans in the Trust is afflicted by a pervasive number of loans whose material breaches of representation and warranties destroy or reduce the loans' value.[14]

"No matter," WMC insists. Even if, WMC contends, Law Debenture can prove all those circumstances (which of course are contested), nonetheless the Court should rule *in limine* that Law Debenture cannot prove liability or damages by statistical sampling yielding extrapolated results among non-notified or non-discovered loans. "Under *no* circumstances," WMC says in its Reply, can Law Debenture's right to compensable damages escape the limiting confines of § 2.03's identified "loan-by-loan repurchase protocol." This is the point of collision between the parties. Under *these* circumstances, Law Debenture responds in effect, it can and should be able to prove those elements of its claims by a form of sampling that extends compensation beyond the boundaries of notified loans.

I decline to hold *in limine* that Law Debenture could prove every aspect of its worst-possible-scenario of WMC's conduct, and still be precluded from establishing loan pool-wide liability and damages by means of statistical sampling. No appellate case forbids sampling in such circumstances. As noted *supra*, there is recent authority in the Appellate Division pointing the other way, at least by inference. The PSA's sole remedy clause is the linchpin of WMC's loan-by-loan

---

[14] In Law Debenture's view, those factors differentiate this case from Judge Castel's in *UBS*, as does the inclusion in Law Debenture's complaint, unlike that in the case before Judge Castel, of a separate claim for "failure to notify."

repurchase protocol, and the First Department said earlier this year that "the contractual obligation to notify was independent of the warranty obligations and that *claims for failure to notify* were not claims respecting a warranty breach subject to the sole remedy clause." *Mellon*, 151 A.D.3d at 81 (emphasis added, internal quotation marks omitted). Given that interpretation of its case law, it seems unlikely that the First Department would bar or limit Law Debenture's use of statistical sampling in aid of its second cause of action, which states against WMC *a claim for failure to notify*.

Trial judges have spoken of sampling with favor in the RMBS context. In my *Daubert* opinion in this case, 2015 WL 9581729, at *7, I had occasion to quote Judge Rakoff (S.D.N.Y.) and Justice Bransten (N.Y. Sup. Ct., N.Y. Cnty.): "Sampling is a widely accepted method of proof in cases brought under New York law, including cases relating to RMBS and involving repurchase claims" (Rakoff, *J.*); "the use of sampling is well-accepted by courts in RMBS cases" and "the overwhelming majority of courts with RMBS cases that have considered sampling have permitted it as a means to present proof at trial" (Bransten, *J.*).[15] In *ACE Securities Corp. Home Equity Loan Trust, Series 2007-HE3 v. DB Structured Products, Inc.*, 5 F. Supp. 3d 543 (S.D.N.Y. 2014), Judge Nathan denied defendants' motion to dismiss an RMBS complaint. Judge Nathan cited cases for the

---

[15] The quotation attributed to Justice Bransten is from her oral ruling in *SACO I Trust 2006-5* v. EMC Mortgage, LLC*, Index No. 651820/2012* (N.Y. Sup. Ct. N.Y. Cnty.), an RMBS case where she granted plaintiff trustees' motion for a ruling that "the use of statistical sampling to prove liability and damages on their claims is consistent with the terms of the contract governing the transactions, including but not limited to the PSAs." *See* 2015 WL 9581729, at *5. The defendant appealed, and in a pre-argument statement to the Appellate Division argued at ¶¶ 7 and 14 that "Under the PSAs, U.S. Bank [the Trustee] has a single and exclusive remedy for breaches of contractual representations and warranties – cure or repurchase of breaching loans," and "the PSAs unambiguously provide that enforcement of the Sole Remedy necessitates loan-specific inquiries, which are incompatible with sampling as a method of proof." WMC makes the same contentions in the case at bar. Justice Bransten rejected these arguments. The *SACO I* case was settled before the appeal of her order was heard.

proposition that "as a matter of pleading sufficiency, a complaint for repurchase need not contain specific allegations regarding each loan at issue," and added: "Those cases lend support to the court's conclusion, which notably does not relieve Plaintiff of its burden of proving loan-by-loan breaches at later stages of litigation." 5 F. Supp. 3d at 560. At that point in the text, Judge Nathan dropped footnote 9, which says: "As Plaintiff notes, many courts have accepted statistical 'sampling' as a means of demonstrating liability in RMBS cases. The Court need not decide now whether that method of proof is appropriate in this case." *Id.* at 560 n.9 (citation omitted). One may detect, I suppose, some degree of tension between Judge Nathan's observations in text and in footnote 9. WMC prefers the text. Law Debenture prefers the footnote. In any event, Judge Nathan's opinion neither holds nor suggests that Law Debenture cannot use statistical sampling at trial in the circumstances of the case at bar, notwithstanding WMC's professed reading of the case that way.

The conclusion I reach about sampling at this stage of litigation in the case at bar is neither compelled nor forbidden by any appellate decision binding upon this Court. Having reflected upon the numerous judicial references to sampling in this burgeoning group of economically significant cases, the Court makes this Ruling:

Where, as here, the Plaintiff RMBS Trustee sues the Defendant Originator of the mortgage loans transferred to the Trust; the Trustee alleges that the Originator's grossly negligent and reckless failure to exercise due diligence regarding the loans' quality resulted in a pervasive number of loans in the Trust being in breach of representations and warranties concerning the loans' quality; and the Trustee claims that the Originator breached its own contractual obligation to notify the Trustee and other parties to the PSA of those pervasive breaches of the loans' representations and warranties; then at trial the Plaintiff, if so advised, may undertake to prove the Defendant's liability and the

Plaintiff's damages by a method of statistical sampling, the samples to be drawn, if Plaintiff elects, from the pool of mortgages that comprise the corpus of the Trust.

It is appropriate to stress again the limited nature of this Ruling. The Court construes this aspect of WMC's motion as a motion *in limine* whose purpose is to test the propriety of the proffered sampling evidence at the trial. A motion *in limine* affects what the trial evidence will consist of. It speaks in the present time. What the trial evidence shows will be revealed in the future, by a jury verdict, or the judge's Rule 52(a) findings and conclusions after bench trial. This *in limine* pre-trial Ruling allows Law Debenture to try to prove its case at trial by statistical sampling, and rejects WMC's efforts to prevent Law Debenture from making that effort or limiting the number of loans that may be sampled. The Ruling intimates no view of the Court about any aspect of the merits. All those issues await the trial. Law Debenture will prove the factual predicate most conducive to statistical sampling, or it will not. Law Debenture's expert witnesses in sampling will be persuasive, or, confronted by the rigors of cross-examination or opposing expert testimony, they will not.

Counsel for Law Debenture, like all trial lawyers, assume the risk of their trial strategies and tactics. In the *Daubert* opinion I quoted Justice Bransten in her *SACO I* case: "There is no guaranty," she said, "that the jury will accept the sampling or that it's a mechanism of proving the liability and/or damages in the case. So that is always the danger of doing it. But I certainly agree that you could do it. Again, whether a jury [or a judge] will find this presentation persuasive is a separate matter." 2015 WL 9581729, at *5. Those were wise words then, they are still. This Ruling holds only that WMC fails to persuade the Court *in limine* that Law Debenture is not entitled to accept "the danger of doing it" – to make the indicated use of sampling at the trial.

**B.**     *The Second Prong of WMC's Motion for Partial Summary Judgment*

I turn now to the second prong of WMC's motion, which counsel characterizes as concerned with "materiality" and focuses upon two particular mortgage loans identified during discovery.

On this aspect of the case, WMC identifies in its motion "two representative mortgage loans" which it also calls "two Exemplar Loans," a useful designation I will adopt in this Ruling. WMC is entitled to partial summary judgment on these Exemplar Loans, the Notice of Motion [Doc. 136] asserts, because "Law Debenture indisputably cannot prove, as required by the governing agreement, that any alleged breach [of the representations and warranties] materially and adversely affects the value of the loan."

The Exemplar Loans, I am told by the briefs of counsel, are two out of a number of disputed sampled loans. While there is comfort in the proverbial expression that "a man's house is his castle,"[16] it may also be his ticket to litigation, particularly if he borrows money to purchase the house and makes representations and warranties in order to procure the loan. It is apparent from the discovery record in the case at bar that questions arise with respect to these two Exemplar Loans: Did breaches of representations or warranties occur? And if so, did the breaches materially and adversely affect the value of the loan? These questions are vigorously debated by expert witnesses retained by the parties: Richard Payne for Law Debenture, and David Abshier for WMC. Each of them knows vastly more about the frequently contentious world of the residential mortgage than a district judge, or most certainly, this one. Messrs. Payne and Abshier submitted written expert opinion reports to their clients, and were thereafter deposed by counsel for the adversary party. The case reveals the full panoply of expert witness discovery contemplated by Rule 26(b)(4). As

---

[16] Attributed by *Bartlett* to Sir Edward Coke's *Third Institute*, published in 1644.

frequently occurs, the experts disagree: in this case, on whether a breach is shown at all, or the effect of a breach, if present, upon the quality of the loan.  These disagreements between qualified experts are legion.  They exist with respect to the two Exemplar Loans.

I am asked by WMC to grant it summary judgment on the two Exemplar Loans because "in doing so, the Court can clarify the legal standard for materiality for other loans going forward." WMC Reply at 8.  The Court unquestionably has that power of clarification, but the propriety of exercising it by means of a Rule 56 summary disposition in this case is another question.  I do not think it would be a proper disposition of these particular issues.  The existence *vel non* of breaches during the life of a particular loan, and the effect of demonstrated breaches upon the quality of that loan, present questions of fact which in this specialized field of controversy cry aloud for the opinions of experts: a cry to which Mr. Payne and Mr. Abshier respond at length.

Payne and Abshier disagree with each other on these questions.  Their disagreements about the two Exemplar Loans are summarized in Law Debenture's brief [Doc. 142] at 34-39.  The differing and contrasting opinions of these two highly qualified experts, in a technical, even esoteric field of knowledge and experience, run like leitmotifs through the broader subject of loan breaches and their effects (including the Exemplar Loans).  Confronted with disagreements between these experts on core issues in the case, I am instructed by Second Circuit authority to tread carefully. "Where, as here, there are conflicting expert reports presented, courts are wary of granting summary judgment." *Harris v. Provident Life & Acc. Ins. Co.*, 310 F.3d 73, 79 (2d Cir. 2002) (citations and internal quotation marks omitted).  I am sufficiently wary to deny WMC's motion for partial summary judgment on this aspect of the case.  That judicial wariness reflects the additional requirements that WMC, as the party moving for summary judgment, must show that it is entitled

to the relief requested as a matter of law, and that all inferences and ambiguities must be viewed in the light most favorable to Law Debenture as the non-moving party.

I think it clear that the better course for the Court, on this bench trial, is to hear what the experts have to say about the loans at issue, including these two Exemplar Loans, and then decide the entire case on the basis of the evidence presented at trial, as ultimately evaluated by the Court as finder of the facts. The challenge of that task will be mitigated by the post-trial submissions of counsel for the parties, whose professional quality has materially assisted the Court in the litigation thus far.

## VIII.  Conclusion

For the foregoing reasons, the Defendant's Motion for Partial Summary Judgment [Doc. 136] is DENIED.

It is So Ordered.

Dated:   New Haven, Connecticut
        August 8, 2017


                                        _/s/Charles S. Haight, Jr._____
                                        CHARLES S. HAIGHT, JR.
                                        Senior United States District Judge