# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| TMI TRUST COMPANY, Solely as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2, <br><br> Plaintiff, <br><br> v. <br><br> WMC MORTGAGE, LLC f/k/a WMC MORTGAGE CORP., <br><br> Defendant. | Civil Action No. <br> 3:12-cv-01538 (CSH) |

## WMC MORTGAGE, LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO PARTIALLY EXCLUDE EXPERT DAMAGES TESTIMONY OF DR. JOSEPH R. MASON

Anthony M. Fitzgerald (ct04167)
Howard K. Levine (ct10555)
CARMODY TORRANCE
SANDAK & HENNESSEY LLP
195 Church St., 18th Floor
New Haven, CT 06509
Phone: 203 777-5501
Fax: 203 784-3199

Barbara S. Steiner (*pro hac vice*)
Megan B. Poetzel (*pro hac vice*)
Michael A. Doornweerd (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Phone: 312 222-9350
Fax: 312 527-0484

Matthew S. Hellman (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Ave NW
Washington, DC 20001-4412
Phone: 202 639-6000
Fax: 202 639-6066

*Attorneys for Defendant WMC Mortgage, LLC*

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................3

I.     The Remedial Provisions of the Parties' Contract. ...................................................3

II.    Dr. Mason's Damages Opinions. ..................................................................5

LEGAL STANDARD ...................................................................................................7

ARGUMENT ...................................................................................................8

I.     Dr. Mason's Rescissory And Benefit of the Bargain Damages Calculations are Irrelevant As A Matter Of Law and Unreliable In Any Case. ...............................................8

        A.    Dr. Mason's Rescissory And Benefit Of The Bargain Damages Calculations Are Barred By The Sole Remedy Provision Of The Contract. ...........9

        B.    TMI Cannot Recover In Excess Of The Repurchase Price On A Gross Negligence Theory. ...............................................13

        C.    TMI Cannot Recover In Excess Of The Repurchase Price On A Failure To Notify Theory. ...............................................17

        D.    Even Apart From The Sole Remedy Clause, Dr. Mason's Rescissory And Benefit Of The Bargain Damages Figures Should Be Excluded. ........................18

               1.    Rescissory Damages And Benefit Of The Bargain Damages Are Unavailable As A Matter Of Law. ...............................................18

               2.    TMI Offers No Opinion As To Causation For Rescissory Damages And Benefit Of The Bargain Damages. ...............................................21

II.    Dr. Mason's "Repurchase Damages" Opinions Should Be Excluded Because They Are Inconsistent With The Repurchase Price Formula In The PSA. ...............................24

        A.    The PSA Provides An Unambiguous Formula For Calculating The Repurchase Price For A Loan In Material Breach. ...............................................25

        B.    Dr. Mason's "Simulation" Of The Repurchase Price Remedy Is Contrary To The Contract And Unreliable. ...............................................26

               1.    Dr. Mason's Inclusion Of Future Losses Is Inconsistent With The PSA. ...............................................26

               2.    Dr. Mason's Inclusion Of Losses From Loan Modifications Is Inconsistent With The PSA. ...............................................28

3.      Dr. Mason Uses The Wrong Balance For Liquidated Loans.....................29

CONCLUSION...............................................................................................................31

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*A.H.A. General Construction, Inc. v. N.Y.C. Hous. Auth.*,
  92 N.Y.2d 20 (1998) ...........................................................................................16

*Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*,
  18 N.Y.3d 675 (2012) ..........................................................................................14

*ACE Sec. Corp. Home Equity Loan Tr., Series 2006-HE4 v. DB Structured
  Prods., Inc.*,
  No. 653394/2012, 2014 WL 1384490 (N.Y. Sup. Ct. Apr. 4, 2014).......................9

*ACE Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 v. DB Structured Prods,
  Inc.*,
  5 F. Supp. 3d 543 (S.D.N.Y. 2014) .....................................................................14

*Allen v. WestPoint-Pepperell, Inc.*,
  945 F.2d 40 (2d Cir. 1991).................................................................................22

*Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*,
  56 N.Y.S.3d 21 (App. Div. 2017) .........................................................................3

*Ambac Assur. Corp. v. EMC Mortg. LLC*,
  121 A.D.3d 514 (N.Y. App. Div. 2014) .................................................................9

*Ashwood Capital, Inc. v. OTG Mgmt., Inc.*,
  948 N.Y.S.2d 292 (App. Div. 2012) ....................................................................11

*Assured Guar. Corp. v. EMC Mortg., LLC*,
  No. 650805/2012, 2013 WL 1442177 (N.Y. Sup. Ct. Apr. 4, 2013)....................10

*Assured Guar. Mun. Corp. v. DB Structured Prods. Inc.*,
  No. 650705/2010, 2014 WL 3282310 (N.Y. Sup. Ct. July 3, 2014) ............9, 18, 19

*Baidu, Inc. v. Register.com, Inc.*,
  760 F. Supp. 2d 312 (S.D.N.Y. 2010)..................................................................14

*Banc of Am. Sec. LLC v. Solow Bldg. Co. II*,
  47 A.D.3d 239 (N.Y. App. Div. 2007) .................................................................14

*Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*,
  951 N.Y.S.2d 19 (App. Div. 2012) ......................................................................11

*Bank of N.Y. Mellon v. WMC Mortg., LLC*,
  No. 1:12-cv-07096-DLC, 2015 WL 4887446 (S.D.N.Y. Aug. 17, 2015) ...........7, 8

*Bank of N.Y. Mellon v. WMC Mortg. LLC*,
   No. 1:12-cv-07096-DLC (S.D.N.Y. Aug. 18, 2015), Dkt. 323 ..................................... passim

*Barkley v. United Homes, LLC*,
   848 F. Supp. 2d 248 (E.D.N.Y. 2012) ...................................................................................20

*Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*,
   517 N.E.2d 1360 (N.Y. 1987)................................................................................................11

*Bernstein v. Cooke*,
   103 A.D.2d 725 (N.Y. App. Div. 1984) ................................................................................19

*Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*,
   No. 13-cv-1582, 2015 WL 4191419 (S.D.N.Y. July 10, 2015)............................................12

*Cirillo v. Slomin's Inc.*,
   196 Misc. 2d 922 (N.Y. Sup. Ct. 2003) ................................................................................14

*Clearview Concrete Prods. Corp. v. Charles Gherardi, Inc.*,
   88 A.D.2d 461 (N.Y. App. Div. 1982) ..................................................................................19

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*,
   75 F. Supp. 2d 235 (S.D.N.Y. 1999), *aff'd*, 314 F.3d 48 (2d Cir. 2002) ...............................23

*Fed. Hous. Fin. Agency v. Morgan Stanley Mortg. Capital Holdings LLC*,
   No. 650291/2013 (N.Y. Sup. Ct. Apr. 25, 2017), ECF No. 169............................................17

*Fiore v. Fiore*,
   389 N.E.2d 138 (N.Y. 1979)..................................................................................................11

*Garza v. Marine Transp. Lines, Inc.*,
   861 F.2d 23 (2d Cir. 1998)....................................................................................................12

*Gross v. Sweet*,
   49 N.Y.2d 102 (1979) ............................................................................................................14

*Home Equity Mortg. Tr. Series 2006-5 v. DLJ Mortg. Capital, Inc.*, No.
   653787/2012, 2013 WL 5314331 (N.Y. Sup. Ct. Sept. 18, 2013).........................................10

*Hooper Assocs., Ltd. v. AGS Computers, Inc.*,
   74 N.Y.2d 487 (1989) ..............................................................................................................3

*Kalisch-Jarcho, Inc. v. City of New York*,
   58 N.Y.2d 377 (1983) ............................................................................................................14

*Koch Indus., Inc. v. Aktiengesellschaft*,
   727 F. Supp. 2d 199 (S.D.N.Y. 2010)...................................................................................22

*Lubell v. Samson Moving & Storage, Inc.*,
307 A.D.2d 215 (N.Y. App. Div. 2003) ...........................................................................14

*Mapinfo Corp. v. Spatial Re-Eng'g Consultants*,
No. 02-cv-1008 (DRH), 2006 WL 2811816 (N.D.N.Y. Sept. 28, 2006)................................23

*MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc.*,
No. 12-cv-7322 (PKC), 2015 WL 764665 (S.D.N.Y. 2015) ...................................................21

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
105 A.D.3d 412 (N.Y. App. Div. 2013) ...............................................................................18

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
No. 602825/08, 2013 WL 1845588 (N.Y. Sup. Ct. Apr. 29, 2013)
(unpublished table decision) .................................................................................................4

*Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007)..................................................................................................22

*Metro. Life Ins. Co. v. Noble Lowndes Int'l*,
643 N.E.2d 504 (N.Y. 1994)...........................................................................................11, 13

*Metro. Life Ins. Co. v. Noble Lowndes Inter'l, Inc.*,
600 N.Y.S.2d 212 (App. Div. 1993), *aff'd*, 643 N.E.2d 504 (N.Y. 1994)..............................13

*Mom's Bagels of New York, Inc. v. Sig Greenebaum, Inc.*,
559 N.Y.S.2d 883 (App. Div. 1990) ....................................................................................11

*Morgan Stanley Mortg. Loan Tr. 2006-10SL v. Morgan Stanley Mortg. Capital Holdings LLC*,
No. 652612/2012, 2014 WL 3924620 (N.Y. Sup. Ct. Aug. 8, 2014) ........................................9

*Morgan Stanley Mortg. Loan Tr. 2006-13ARC v. Morgan Stanley Mortg. Capital Holdings LLC*,
36 N.Y.S.3d 458 (App. Div. 2016) ..........................................................................15, 16, 17

*Morgan Stanley Mortg. Loan Tr. 2006-14SL v. Morgan Stanley Mortg. Capital Holdings LLC*,
No. 652763/2012, 2013 WL 4488367 (N.Y. Sup. Ct. Aug. 16, 2013) ....................................10

*Morgan Stanley Mortg. Loan Tr. 2006-4SL v. Morgan Stanley Mortg. Capital Inc.*,
No. 650579/2012, 2014 WL 3924616 (N.Y. Sup. Ct. Aug. 8, 2014) ........................................9

*Munafo v. Metr. Transp. Auth.*,
No. 00-cv-00134 (ERK), 2003 WL 21799913 (E.D.N.Y. Jan. 22, 2003) ...............................24

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
    392 F.3d 520 (2d Cir. 2004)..................................................................................22

*Nomura Asset Acceptance Corp. Alt. Loan Tr., Series 2006-S4 v. Nomura Credit*
    *& Capital, Inc.*,
    No. 653390/2012, 2014 WL 2890341 (N.Y. Sup. Ct. June 26, 2014).......................9

*Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*,
    19 N.Y.S.3d 1 (App. Div. 2015) ....................................................................17, 18

*R.F.M.A.S., Inc. v. So*,
    748 F. Supp. 2d 244 (S.D.N.Y. 2010)...............................................................8, 23

*SACO I Tr. 2006-5 v. EMC Mortg. LLC*, No. 651820/2012, 2014 WL 2451356
    (N.Y. Sup. Ct. May 29, 2014)...............................................................................9

*Skibs A/S Siljestad v. S/S Mathew Luckenbach*,
    215 F. Supp. 667 (S.D.N.Y. 1963) *aff'd*, 324 F.2d 563 (2d Cir. 1963) ...................8

*Sommer v. Fed. Signal Corp.*,
    79 N.Y.2d 540 (1992) .........................................................................................14

*Terwilliger v. Terwilliger*,
    206 F.3d 240 (2d Cir. 2000)................................................................................22

*U.S. Bank N.A. v DLJ Mortg. Capital, Inc.*,
    No. 651563/2013, 2014 WL 1621046 (N.Y. Sup. Ct., Apr. 21, 2014)...................19

*U.S. Bank Nat. Ass'n v. DLJ Mortg. Capital, Inc.*,
    No. 650369/2013, 2013 WL 6997183 (N.Y. Sup. Ct. Jan. 15, 2014)...................19

*U.S. Bank Nat'l Ass'n ex rel. HarborView Mortg. Loan Tr., Series 2005-10 v.*
    *Countrywide Home Loans, Inc.*, No. 652388/2011, 2014 WL 617548 (N.Y.
    Sup. Ct. Feb. 13, 2014) ......................................................................................10

## OTHER AUTHORITIES

Fed. R. Evid. 702 ......................................................................................3, 8, 25

*MBS 'Putback' Investors Target Big Issuers*, Asset-Backed Alert (Feb. 24, 2012),
    http://www.abalert.com/headlines.php?hid=156068 ...........................................20

Restatement (Third) of Restitution & Unjust Enrichment § 2 (2011) ...........................12

WMC Mortgage, LLC ("WMC") respectfully submits this Memorandum in Support of Its Motion to Partially Exclude Expert Testimony of Dr. Joseph R. Mason, the damages expert of Plaintiff TMI Trust Company, solely as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 ("TMI," solely as Separate Trustee of the "Trust").

## INTRODUCTION

The governing contract in this case sets out with exacting clarity the remedy for a breach. If TMI can prove that a loan is in material breach of the representations and warranties made by WMC and can satisfy other contractual prerequisites, then TMI is entitled to have WMC repurchase the breaching loan at the Repurchase Price. The Repurchase Price is calculated pursuant to a formula defined in the contract, and it is a highly substantial remedy that gives the Trust everything it is owed on the breaching loan, plus interest and more. WMC's damages expert has opined that WMC could owe as much as $97 million under the Repurchase Price remedy.

Notwithstanding the fact that the contract makes repurchase TMI's "sole" remedy, TMI's damages expert, Dr. Mason, has offered opinions that are entirely divorced from that remedy. Dr. Mason offers three measures of damages. Two of Dr. Mason's measures are what he calls "Rescissory Damages" and "Benefit of the Bargain Damages." Dr. Mason calculates each measure to award $906 million, although he freely acknowledges that each measure ignores the contractual formula. No court has *ever* invalidated a sole remedy clause and awarded rescissory relief or its equivalent in an RMBS contract suit. TMI appears to believe that it is entitled to these extraordinary remedies by claiming gross negligence. But leaving aside that TMI's gross negligence claim is factually false, New York courts have consistently recognized that a party cannot invoke gross negligence to avoid a contractual remedy unless that remedy is *non-existent* or offers only a *nominal* recovery. Such adjectives have no place here where the contractual remedy is worth tens if not potentially hundreds of millions of dollars.

Even if the parties had not agreed that repurchase was the sole remedy, Dr. Mason's alternative calculations would still be barred as a matter of law.  Under New York law, rescissory damages and their equivalents are barred on numerous grounds here including that TMI has an alternative legal remedy and rescissory relief would not restore the *status quo*.  Indeed, Dr. Mason has not even attempted to establish the basic requirement for such relief that the alleged breaches, as opposed to market forces or other unrelated events, actually were the cause of any loss at all, let alone a near-billion dollar loss.

Dr. Mason's third damages measure claims to "simulate" the repurchase remedy by creating something he calls "Repurchase Damages," which he finds amount to $354 million.  Dr. Mason's "simulation" of the repurchase remedy is decidedly not the real thing and should be excluded as unreliable.  Among other errors, Dr. Mason would give the Trust tens of millions of dollars of "anticipated" losses based upon his prediction as to how the loans would perform in the future.  The Repurchase Price formula does not award anticipated future losses, but even if it did, Dr. Mason's prediction has been refuted by the real-world performance of the loans, which have performed substantially better than Dr. Mason "anticipated" they would.  In other words, he would have the Court award damages for losses he predicted but indisputably did not materialize.  Dr. Mason's "simulation" also improperly inflates his Repurchase Damages by using the wrong balance for liquidated loans.

As Judge Denise Cote explained in a similar case, New York law respects the remedial choices of "sophisticated commercial entities who negotiated a complex agreement."  (October 6, 2017 Declaration of Matthew S. Hellman in Support of WMC's Motion to Partially Exclude the Expert Damages Testimony of Dr. Joseph Mason ("Hellman Decl."), Ex. A, *Bank of N.Y. Mellon v. WMC Mortg. LLC*, No. 1:12-cv-07096-DLC, at 15 (S.D.N.Y. Aug. 18, 2015), Dkt. 323 ("Cote

Slip Op.").)  Accordingly, Judge Cote excluded the testimony of a damages expert who, like Dr. Mason, did not apply the contractual Repurchase Price formula and thus could not help the trier of fact to determine a fact in issue, as Rule 702 requires.  This Court should reach the same conclusion that Judge Cote did and exclude Dr. Mason's testimony concerning his three putative measures of damages.

## BACKGROUND

## I.     The Remedial Provisions of the Parties' Contract.

The parties' rights and responsibilities in this case are governed by the Pooling and Servicing Agreement.  (Hellman Decl., Ex. B, Pooling and Servicing Agreement for Securitized Asset Backed Receivables LLC Trust 2006-WM2, dated as of October 1, 2006 ("PSA").)  In that agreement, WMC made numerous representations and warranties about the loans in the Trust. (Hellman Decl., Ex. B, PSA Schedule III.)  In the event that TMI believes that a loan is in material breach of one or more of those representations and warranties, it is entitled to seek specified relief from WMC after certain predicates are satisfied.

The contract specifies three "sole" remedies for a material breach: WMC may "cure" the breach, "substitute" another loan, or "repurchase" the loan at the Repurchase Price.  (Hellman Decl., Ex. B, PSA §§ 2.03(d) (identifying Trust's remedies), (k) ("It is understood and agreed that the obligation of the Responsible Party [WMC] under this Agreement to cure, repurchase or substitute any Mortgage Loan [at the Repurchase Price]" in breach of a representation or warranty under the agreement "*shall constitute the sole remedies*" for such a breach) (emphasis added).)[1]

---

[1] The PSA also provides for an indemnification remedy.  (Hellman Decl., Ex. B, PSA § 2.03 (h).) TMI has not invoked that remedy, which would not apply in any case.  *See Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 74 N.Y.2d 487, 492 (1989) (courts will not construe an indemnification clause to cover disputes between contract signatories unless "the intention to do so is unmistakably clear from the language of the promise"); *see also Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 56 N.Y.S.3d 21, 27 (App. Div. 2017) (RMBS indemnification provision like the one

In this action, repurchase is the "sole" remedy at issue because the time for cure or seeking substitution has expired.  (Hellman Decl., Ex. B, PSA § 2.03(d); Hellman Decl., Ex. C, Complaint ¶ 90, Oct. 26, 2012, Dkt. 1 ("The Separate Trustee, on behalf of the Trust, is therefore entitled to specific performance of WMC's obligation to repurchase the Defective Loans . . . .").)

The contract delineates precisely how to calculate the Repurchase Price in the event that repurchase is awarded.  With respect to any "Mortgage Loan," the Repurchase Price is the sum of

(i)     the unpaid principal balance of such Mortgage Loan as of the date of repurchase,

(ii)    interest on such unpaid principal balance of such Mortgage Loan at the Mortgage Rate from the last date through which interest has been paid to the date of repurchase,

(iii)   all unreimbursed Servicing Advances and

(iv)    all expenses incurred by the Trustee arising out of the Trustee's enforcement of the applicable Person's repurchase obligation hereunder or under the Sponsor Representation Letter.

(Hellman Decl., Ex. B, PSA art. I (definition of "Repurchase Price").)

As the concept of "repurchase" suggests, TMI is required to return the materially breaching loan to WMC in exchange for the Repurchase Price.  (*See* Hellman Decl., Ex. B, PSA § 2.03(k) (setting out procedure "to transfer title from the Trustee" "[i]n the event that a Mortgage Loan shall have been repurchased pursuant to this Agreement").)  Indeed, TMI's complaint expressly acknowledged that repurchase is a form of "specific performance" in which TMI returns the loan to WMC in exchange for the Repurchase Price.  (Hellman Decl., Ex. C, Complaint ¶ 90 ("Specific performance is required because the PSA specifically provides for the repurchase of any Loans

_____

here does not cover claims between signatories); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, No. 602825/08, 2013 WL 1845588, at *13-14 (N.Y. Sup. Ct. Apr. 29, 2013) (unpublished table decision) (indemnification provision that covered "any and all reasonable charges" did not meet *Hooper*'s standard to permit claims between signatories).

that breach the Representations and Warranties in a manner that materially and adversely affects the value of such Loans or the corresponding interest of the Certificateholders in the Loans.").)

## II.    Dr. Mason's Damages Opinions.

TMI retained Dr. Mason to provide an opinion about the damages WMC purportedly owes the Trust to the extent TMI can establish liability.  In Part V of his report submitted on May 20, 2016, Dr. Mason offered opinions as to three measures of damages, each of which is discussed in greater detail below.  (Hellman Decl., Ex. D, Expert Report of Dr. Joseph R. Mason, May 20, 2016 ("Mason Report").)

*Rescissory Damages.*  Dr. Mason opines about a damages measure that he calls Rescissory Damages, and claims $906.3 million of such alleged damages.  (Hellman Decl., Ex. D, Mason Report ¶¶ 5, 71.)  Dr. Mason freely acknowledges in his report and in his deposition that his Rescissory Damages calculations are not calculated pursuant to the Repurchase Price formula in the PSA.  (Hellman Decl., Ex. D, Mason Report ¶ 49; Hellman Decl., Ex. E, Excerpts of Dr. Joseph R. Mason Deposition Transcript at 283:14-284:4, Oct. 11, 2016 ("Mason Dep. Tr.").)

Dr. Mason opines that the purpose of his Rescissory Damages calculation is to compensate the Trust for "all losses realized on the WMC loans," including "losses on non-breach loans." (Hellman Decl., Ex. D, Mason Report ¶ 66.)  Dr. Mason calculated these Rescissory Damages by adding the "Remaining Principal Due to the Trust" (the original principal balance of all loans less the principal distributions made to the certificateholders) and "Net Statutory Interest Due to the Trust" on that "Remaining Principal" (9% interest on the "Remaining Principal Due to the Trust" less the interest already paid on the loans in the Trust).  (*Id.* ¶¶ 71-74.)  Dr. Mason then subtracted the principal and interest payments that he expected would be made in the future, with adjustments for his predicted future payments to be reduced to their net present value.  (*Id.*)  Dr. Mason made no attempt to determine if the "losses" he found were caused by the breaches that TMI alleges, or

whether the Trust would have incurred those losses regardless of the breaches alleged.  (Hellman Decl., Ex. F, Expert Report of Ronald F. Greenspan at 38-39, August 19, 2016 ("Greenspan Report").)

*Benefit of the Bargain Damages*.  Dr. Mason also opines that the Trust is entitled to $906.3 million in Benefit of the Bargain Damages.  (Hellman Decl., Ex. D, Mason Report ¶ 5.)  Dr. Mason does not perform a separate calculation for his Benefit of the Bargain damages and opines instead that they are best measured by his Rescissory Damages.  (*Id.* ¶¶ 5, 83.)  Dr. Mason opines that "the loans would have had no value" had WMC's underwriting practices been known at the time of purchase, and that the Trust would therefore receive the benefit of its bargain only by awarding damages that would unwind the deal in a manner equivalent to Dr. Mason's calculation of Rescissory Damages.  (*Id.* ¶ 83.)  Thus, although Dr. Mason has three separate labels for his damages analyses, he offers only two calculations; Rescissory Damages (*supra*) and Repurchase Damages (*infra*).

*Repurchase Damages*.  Finally, Dr. Mason presents Repurchase Damages calculations that he claims are a "simulation" of the Repurchase Price formula in the PSA.  (*Id.* ¶ 60.)  Dr. Mason stated that he did not use the Repurchase Price formula because TMI had not identified which of the Trust loans it contended were in breach.  (*Id.* ¶ 52; Hellman Decl., Ex. E, Mason Dep. Tr. at 218:12-20.)  Instead, he based his calculations on what another of TMI's experts has called a "Breach Ratio," which represents the percentage of loans within a sample of 400 loans (out of the 4,144 loans originally in the Trust that had not paid in full as of July 2015) that TMI's reunderwriting expert opined were in material breach.  (Hellman Decl., Ex. D, Mason Report ¶ 52; Hellman Decl., Ex. G, Amended Report of Nelson R. Lipshutz, Ph.D. ¶ 8, July 20, 2015, Dkt. 92.)

Thus, rather than use the contractually mandated Repurchase Price formula on those loans that TMI's reunderwriting expert concluded were in material breach, Dr. Mason calculated what he claimed were the losses for the entire Trust, in the aggregate, *without* regard to whether those losses were incurred on loans that TMI contended were in breach.  (Hellman Decl., Ex. D, Mason Report ¶ 56.)  Dr. Mason's Repurchase Damages are premised upon the Trust's reported "Realized Losses," a term which is defined in the PSA to have different components than the Repurchase Price.  (Hellman Decl., Ex. B, PSA art. I (definition of "Realized Losses").)  He started with the Trust's aggregate, monthly Realized Losses on liquidated mortgage loans, and then added those Realized Losses to additional losses that are not included in the Repurchase Price formula.  (*Id.* ¶¶ 56-64.)  Dr. Mason's additional losses included purported modifications to existing loans' principal balances, as well as "anticipated future losses" that he predicted would occur after the date he finished his calculations.  (*Id.*)  Dr. Mason then multiplied each component of the Trust's aggregate, adjusted Realized Losses as calculated by the Breach Ratio, to arrive at a Repurchase Damages amount.  Dr. Mason opines that the Trust incurred $354 million in Repurchase Damages. (*Id.* ¶ 64.)

## LEGAL STANDARD

In assessing expert testimony, the district court is a gatekeeper—ensuring that the proponent has made the necessary showing and that the expert's testimony "'both rests on a reliable foundation and is relevant to the task at hand.'" *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 1:12-cv-07096-DLC, 2015 WL 4887446, at *6 (S.D.N.Y. Aug. 17, 2015) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993)).  The proponent must establish by a preponderance of the evidence that the testimony "will help the trier of fact" and that (1) "the testimony is based on sufficient facts or data," (2) "the testimony is the product of reliable

principles and methods," and (3) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

Expert testimony "cannot 'help the trier of fact'" and must be excluded when premised on assumptions that are incorrect as a matter of law.  (Hellman Decl., Ex. A, Cote Slip. Op. at 20 ("Because Crisafulli's opinions on damages rest on the incorrect assumption that the contractual Purchase Price does not provide the proper measure of equitable monetary relief, his testimony and opinions cannot 'help the trier of fact to . . . determine a fact in issue,' Fed. R. Evid. 702(a), and must be excluded." (omission in original)).)

Exclusion is also warranted when the expert's assumptions are based on faulty or otherwise inadequate data.  *Bank of N.Y. Mellon*, 2015 WL 4887446, at *7 ("[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." (quoting *Ruggiero v. Warner–Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted))); *Skibs A/S Siljestad v. S/S Mathew Luckenbach*, 215 F. Supp. 667, 678 (S.D.N.Y. 1963) *aff'd*, 324 F.2d 563 (2d Cir. 1963) (excluding damages experts because "their opinions were based on assumed facts which are contrary to the facts we have found").  Moreover, expert damages testimony lacks a sufficient basis when "the record lacks any evidence that [the expert] actually investigated . . . other possible causes" for the damages alleged.  *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010).

## ARGUMENT

### I. Dr. Mason's Rescissory And Benefit of the Bargain Damages Calculations are Irrelevant As A Matter Of Law and Unreliable In Any Case.

This Court should exclude Dr. Mason's Rescissory Damages calculations (as well as his Benefit of the Bargain Damages, which rest upon the same calculations as his Rescissory

Damages).[2]  No court has ever awarded such damages in an RMBS case, and rightly so.  Those alternative damages calculations are irrelevant as a matter of law because the PSA provides the sole remedy:  repurchase at the Repurchase Price.  Moreover, even if TMI were not limited to the repurchase remedy, Dr. Mason's alternative calculations should still be excluded because they are barred by other legal doctrines and unreliable in all instances.

> **A.  Dr. Mason's Rescissory And Benefit Of The Bargain Damages Calculations Are Barred By The Sole Remedy Provision Of The Contract.**

As explained above, the PSA provides the "sole" remedy in the event that a loan is in material breach of the contract's representations and warranties.  That remedy is "repurchase" at the "Repurchase Price," according to the formula defined in the PSA.  (Hellman Decl., Ex. B, PSA art. I (definition of "Repurchase Price").)  New York law is replete with opinions that have rejected attempts by trustees to obtain Rescissory Damages and other equivalent measures of relief in RMBS actions.  *See, e.g.*, *Ambac Assur. Corp. v. EMC Mortg. LLC*, 121 A.D.3d 514, 517-19 (N.Y. App. Div. 2014); *Morgan Stanley Mortg. Loan Tr. 2006-4SL v. Morgan Stanley Mortg. Capital Inc.*, No. 650579/2012, 2014 WL 3924616, at *5-8 (N.Y. Sup. Ct. Aug. 8, 2014); *Morgan Stanley Mortg. Loan Tr. 2006-10SL v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 652612/2012, 2014 WL 3924620, at *5-8 (N.Y. Sup. Ct. Aug. 8, 2014); *Assured Guar. Mun. Corp. v. DB Structured Prods., Inc.*, No. 650705/2010, 2014 WL 3282310, at *3 (N.Y. Sup. Ct. July 3, 2014); *Nomura Asset Acceptance Corp. Alt. Loan Tr., Series 2006-S4 v. Nomura Credit & Capital, Inc.*, No. 653390/2012, 2014 WL 2890341, at *6-7 (N.Y. Sup. Ct. June 26, 2014); *SACO I Tr. 2006-5 v. EMC Mortg. LLC*, No. 651820/2012, 2014 WL 2451356, at *5 (N.Y. Sup. Ct. May 29, 2014); *ACE Sec. Corp. Home Equity Loan Tr., Series 2006-HE4 v. DB Structured Prods., Inc.*, No.

---

[2] WMC does not move to exclude testimony by Dr. Mason concerning the opinions reflected in Parts I-IV of his report.

653394/2012, 2014 WL 1384490, at \*5-6 (N.Y. Sup. Ct. Apr. 4, 2014); *U.S. Bank Nat'l Ass'n ex rel. HarborView Mortg. Loan Tr., Series 2005-10 v. Countrywide Home Loans, Inc.*, No. 652388/2011, 2014 WL 617548, at \*5-6 (N.Y. Sup. Ct. Feb. 13, 2014); *Home Equity Mortg. Tr. Series 2006-5 v. DLJ Mortg. Capital, Inc.*, No. 653787/2012, 2013 WL 5314331, at \*8 (N.Y. Sup. Ct. Sept. 18, 2013); *Morgan Stanley Mortg. Loan Tr. 2006-14SL v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 652763/2012, 2013 WL 4488367, at \*8 (N.Y. Sup. Ct. Aug. 16, 2013); *Assured Guar. Corp. v. EMC Mortg., LLC*, No. 650805/2012, 2013 WL 1442177, at \*5 (N.Y. Sup. Ct. Apr. 4, 2013).

There is no dispute that the Rescissory and Benefit of the Bargain Damages measures are *not* the repurchase remedy set out in the PSA.  Dr. Mason opines that the quantum of damages under both his Rescissory and Benefit of the Bargain measures is $906.3 million.  (Hellman Decl., Ex. D, Mason Report ¶¶ 5, 71, 83.)  That figure is nearly three times greater than the already inflated figure that Dr. Mason derives when he purports to "simulate" the Repurchase Price remedy.  (*Id.* ¶ 5 ($354.9 million versus $906.3 million).)  In his report, Dr. Mason explains that he calculated his Rescissory and Benefit of the Bargain Damages because he "underst[oo]d that the Trust may not be limited solely to the contractual repurchase remedy."  (*Id.* ¶ 49.)  Furthermore, at his deposition in this action, Dr. Mason agreed that these two calculations are "not part of the sole remedy that is provided for in the PSA" and described them as "potential equitable remed[ies]."  (Hellman Decl., Ex. E, Mason Dep. Tr. at 283:14-284:4.)

Dr. Mason's opinions about these extra-contractual calculations should be excluded.  They are incompatible with the decision by the sophisticated parties here to make the Repurchase Price the exclusive remedy for a material breach.  Under governing New York law, the foundational contract law rule is that "a written agreement that is clear and unambiguous on its face must be

enforced according to the plain meaning of its terms." *Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 951 N.Y.S.2d 19, 24 (App. Div. 2012).  In New York, "courts may not rewrite a term of a contract by 'interpretation' when it is clear and unambiguous on its face." *Fiore v. Fiore*, 389 N.E.2d 138, 138 (N.Y. 1979).  Consistent with this rule, New York law has "long held that parties to a commercial contract, absent any question of unconscionability, may agree to limit the seller's liability for damages." *Mom's Bagels of New York, Inc. v. Sig Greenebaum, Inc.*, 559 N.Y.S.2d 883, 885 (App. Div. 1990).  The New York Court of Appeals has explained that "[a] limitation on liability provision in a contract represents the parties' agreement on the allocation of the risk of economic loss in the event that the contemplated transaction is not fully executed, which the courts should honor." *Metro. Life Ins. Co. v. Noble Lowndes Int'l*, 643 N.E.2d 504, 507 (N.Y. 1994); *see also Bd. of Educ. of Hudson City Sch. Dist. v. Sargent, Webster, Crenshaw & Folley*, 517 N.E.2d 1360, 1365 (N.Y. 1987) ("Parties to a contract have the power to specifically delineate the scope of their liability at the time the contract is formed.  Thus, there is nothing unfair in defining a contracting party's liability by the scope of its promise as reflected by the agreement of the parties.  Indeed, this is required by the very nature of contract law, where potential liability is determined in advance by the parties.").

Here, there is every reason to enforce the black-letter rule that parties are bound to the remedies set forth on the face of the contracts they sign.  *First*, the PSA is a "commercial contract negotiated at arm's length by sophisticated, counseled businesspeople," where the rule that contracts should be enforced according to their terms applies "with even greater force." *Ashwood Capital, Inc. v. OTG Mgmt., Inc.*, 948 N.Y.S.2d 292, 297 (App. Div. 2012).  *Second*, New York courts assume the parties are "cognizant of the customs, practices, usages, and terminology as generally understood" in the industry at hand, and "Repurchase Price" is a standard term in the

11

mortgage-backed securities market, referencing the contractual formula to which the parties agreed. *Garza v. Marine Transp. Lines, Inc.*, 861 F.2d 23, 27 (2d Cir. 1998) (citation omitted). *Third*, the various provisions of the PSA, when read in conjunction with each other, reflect the parties' basic and balanced bargain: strict liability for breaches and no requirement to show the breach caused an injury, but with an exclusive remedy for that liability.  (*Cf.* Hellman Decl., Ex. A, Cote Slip Op. at 15 (refusing to depart from repurchase formula because where there is a complex commercial agreement "[t]he agreement itself becomes the measure of the parties' equities") (alteration in original) (quoting *U.S. Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1548 (2013)).)

Indeed, there is nothing inequitable about limiting the parties to the relief prescribed by the PSA.  By virtue of the fact that the parties agreed to it, the substantial recovery the Repurchase Price affords is both the contractual and the equitable measure of relief.  Restatement (Third) of Restitution & Unjust Enrichment § 2 cmt. c (2011) ("[T]here is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an *actual* agreement covering compensation." (quotation marks omitted)); *see also Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.,* No. 13-cv-1582, 2015 WL 4191419, at *8-9 (S.D.N.Y. July 10, 2015) (in undertaking equitable analysis, "[t]he law favors contractual guideposts" as to "the measure of recovery . . . because a contract makes the parties the masters of their destiny").

To put this in the appropriate context, Dr. Mason has acknowledged that a full 20% of loans in the Trust have paid in full (*i.e.*, the borrower has paid off the 30-year mortgage).  (Hellman Decl., Ex. E, Mason Dep. Tr. at 298:7-12.)  In addition, somewhere between 44% and 56% of the loans that have not paid in full are not in breach (depending on which party's expert testimony the Court credits).  (*Id.* at 298:7-299:19.)  That means a substantial majority of the loans in the Trust

have either paid in full or are not in breach, yet TMI is seeking a 90% recovery of the original principal balance of the loans deposited into the Trust in the form of Rescissory or Benefit of the Bargain Damages.  That is an entirely different deal than the one to which the parties agreed because it allows TMI to recover for both breaching and non-breaching loans alike, and it is why courts have consistently refused to expand the remedies available beyond those unambiguously circumscribed by the controlling contract.

### B.   TMI Cannot Recover In Excess Of The Repurchase Price On A Gross Negligence Theory.

TMI has argued that because it claims that WMC acted with gross negligence in breaching the contract, it is not bound by the repurchase remedy.  That is incorrect.  WMC denies that it engaged in negligence of any sort, and certainly not in gross negligence.  Even if the Court disagrees, however, that would not entitle TMI to rewrite the contract to which it agreed to be bound.  As explained above, New York law enforces contractual remedies and thus "courts should honor" limitations of liability for breaches of contract.  *Metro. Life Ins. Co.*, 643 N.E.2d at 507. Indeed, although it did not happen here, parties are free even to *intentionally* breach their contractual obligations, subject of course to the contractual remedies to which they have agreed. *Metro. Life Ins. Co. v. Noble Lowndes Inter'l, Inc.*, 600 N.Y.S.2d 212, 215 (App. Div. 1993), *aff'd*, 643 N.E.2d 504 (N.Y. 1994); *see also Metro. Life Ins. Co.*, 643 N.E.2d at 509 (holding that "defendant's repudiation of the Agreement . . . motivated exclusively by its own economic self-interest" was "a risk which plaintiff assumed").  The remedy for breach of contract – intentional, negligent, or otherwise – is what the contract provides.

The New York Court of Appeals has carved out a narrow exception to the rule requiring enforcement of contractual remedies:  the gross negligence exception, which is rooted in the public policy that a party cannot insulate itself from damages caused by a tortious breach of duty.  That

exception does not apply here because New York law is crystal clear that it is limited to *exculpatory* clauses, *i.e.*, clauses that "*exonerate* a party from liability" or "limit[] damages to a *nominal sum*." *Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 554 (1992) (emphases added).

Accordingly, the gross negligence doctrine has been applied solely to contracts that either eliminate all damages for liability or cap damages at a trivial sum. *Id.* at 553 (liability capped at "$55.50" for gross negligence that led to building burning down); *Abacus Fed. Sav. Bank v. ADT Sec. Servs., Inc.*, 18 N.Y.3d 675, 681 (2012) ("Both contracts contained clauses that exculpated defendants from liability for their own negligence and limited their liability, under all circumstances, to $250."); *Kalisch-Jarcho, Inc. v. City of New York*, 58 N.Y.2d 377, 380 (1983) (exculpatory clause provided that plaintiff shall "make no claim for damages for delay in the performance of this contract occasioned by any act or omission to act of the [defendant]" (internal quotation marks omitted)); *Gross v. Sweet*, 49 N.Y.2d 102, 105 (1979) (release absolved defendant from "any liability" related to parachute jumping); *Banc of Am. Sec. LLC v. Solow Bldg. Co. II*, 47 A.D.3d 239, 241 (N.Y. App. Div. 2007) (exculpatory provision "waive[d] any claim" for damages (internal quotation marks omitted)); *Lubell v. Samson Moving & Storage, Inc.*, 307 A.D.2d 215, 216 (N.Y. App. Div. 2003) (damages "limited by contract to 30 cents per pound per article, subject to a $1000 deductible"); *Cirillo v. Slomin's Inc.*, 196 Misc. 2d 922, 939 (N.Y. Sup. Ct. 2003) (exculpatory provisions limited liability "under any circumstances" to $250); *Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 315 (S.D.N.Y. 2010) (exculpatory clause provided that defendant "will not be liable, under any circumstances"); *see also ACE Sec. Corp. Home Equity Loan Tr., Series 2007-HE3 v. DB Structured Prods, Inc.*, 5 F. Supp. 3d 543, 555-56 (S.D.N.Y. 2014) (observing that the New York Court of Appeals has applied the public policy exception "equally to contract clauses purporting to exonerate a party from liability and clauses limiting

14

damages to a nominal sum," and that while certain federal cases have extended the Court of Appeals' holdings beyond such clauses, "it is unclear whether the Agreements' sole remedy clauses are subject to attack in the first place," even if plaintiff could allege the requisite type of misconduct (internal quotation marks omitted) (citing *Abacus*, 18 N.Y.3d at 682-83; *Sommer*, 79 N.Y.2d at 554)).

The repurchase remedy provided in the PSA is not even arguably exculpatory. The sole remedy clause is a highly substantial remedy that requires WMC to repurchase the breaching loan at a price that makes the Trust whole for any loss. In doing so, it gives TMI the entirety of the unpaid balance on the loan, interest, the reasonable cost of obtaining the repurchase remedy and unpaid advances. That is complete relief rather than negligible relief, and thus the contractual formula bears no resemblance to the exculpatory clauses to which courts have applied the gross negligence exception, in which a party was insulated from liability altogether or in which damages were limited to a nominal sum. Dr. Mason claims Repurchase Damages of over $350,000,000 not $350, (Hellman Decl., Ex. D, Mason Report ¶ 64), and although WMC disputes Dr. Mason's calculation of these damages, its own expert, Mr. Greenspan calculates Repurchase Damages between $50 million and $97 million, depending on how many loans are found to be in material breach. (Hellman Decl., Ex. F, Greenspan Report at 10.)

The First Department's decision in *Morgan Stanley Mortg. Loan Tr. 2006-13ARC v. Morgan Stanley Mortg. Capital Holdings LLC*, 36 N.Y.S.3d 458 (App. Div. 2016), *on appeal*, No. APL-2016-00240, is not to the contrary. There, the court reaffirmed that the gross negligence exception is limited to a contract clause that "*completely exonerates* a party from liability as well as to a clause limiting damages to *something nominal*." *Id.* at 463 (emphasis added) (citation omitted). Ruling at the motion to dismiss stage, the court found that "under the highly deferential

standard afforded to pleadings," it was too early to determine whether the sole remedy clause was "illusory," in the sense that it would bar the trustee from collecting more than a nominal amount for loans, including liquidated loans that were no longer available for repurchase. *Id.* at 459, 463. Here, it is not too early to see that the Repurchase Price remedy offers a highly substantial remedy, including for loans that have been liquidated. The parties disagree as to the quantum of that recovery, but either way the remedy is not "illusory" or one that is limited to "something nominal." Moreover, the Repurchase Price is not a bar on liability, but a provision that ties TMI's recovery to the remaining balance on the loan: the more the Trust has recovered on the loan, the lower the Repurchase Price is. That is not an exculpatory clause under New York law.

That is precisely what Judge Cote held in her *Daubert* opinion in *Bank of N.Y. Mellon,* which excluded expert damages testimony. (Hellman Decl., Ex. A, Cote Slip Op.) In that opinion, Judge Cote expressly rejected the argument that the repurchase remedy was an exculpatory clause subject to the gross negligence exception. In that case, the repurchase remedy authorized a recovery of up to $13 million for liquidated loans, and the trustee argued that it was entitled to seek hundreds of millions of dollars under the gross negligence doctrine. (*Id.* at 11, 16-17 & n.7.) Judge Cote distinguished the "liability-limiting provisions" that offered no more than a nominal recovery in the gross negligence cases from the repurchase formula, which was "used to . . . fashion appropriate equitable relief" based on the remaining balance on the loans. (*Id.* at 17 n.7.) As the New York Court of Appeals has held, provisions that do not exonerate a defendant from liability, but instead set forth the manner in which a party must establish its claim, are "conditions precedent to suit or recovery, not . . . exculpatory clauses." *A.H.A. General Construction, Inc. v. N.Y.C. Hous. Auth.*, 92 N.Y.2d 20, 30-31 (1998). This Court should reach the same conclusion and hold that TMI cannot avoid the contractual remedy to which the sophisticated parties to the PSA agreed.

16

**C.      TMI Cannot Recover In Excess Of The Repurchase Price On A Failure To Notify Theory.**

TMI's failure to notify claim also does not allow it to recover an amount above the Repurchase Price because TMI has no separate damages from any supposed failure to notify and has never contended otherwise.   Because the contract's sole remedy for a material breach of representations and warranties is the repurchase remedy, *see supra*, WMC's alleged failure to notify TMI of a breach could injure TMI only if WMC's silence somehow deprived TMI of its ability to seek repurchase.   That is indisputably not the case here.   Even assuming that WMC had known about material breaches but failed to give notice to TMI (which WMC disputes), TMI's predecessor still filed a lawsuit that allows TMI to obtain the Repurchase Price for any and all materially breaching loans in the Trust.   Absent proof of a separate injury, TMI has no additional damages on a failure to notify injury.

Again, *Morgan Stanley* is not to the contrary.   In *Morgan Stanley*, as well as in a predecessor case, *Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.,* 19 N.Y.S.3d 1, 6 (App. Div. 2015), the First Department held that a plaintiff was not barred from pursuing "separate damages" for a failure to notify claim.   *Morgan Stanley*, 36 N.Y.S.3d at 462 (citing *Nomura*).   Both decisions, however, arose out of a motion to dismiss where the plaintiff had not yet been required to identify, let alone prove, what separate damages, if any, it allegedly had incurred.[3]   *Id.*; *Nomura*, 19 N.Y.S.3d at 7.   In contrast, factual and expert discovery in this case

---

[3] Indeed, on remand in *Morgan Stanley*, the trial court asked for supplemental briefing from the parties as to whether the plaintiff could point to any separate injury from a failure to notify. Transcript of Oral Argument at 39, *Fed. Hous. Fin. Agency v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 650291/2013 (N.Y. Sup. Ct. Apr. 25, 2017), ECF No. 169.  The issue remains pending before the trial court.

has long been closed, and TMI has not and cannot show any separate harm from a supposed failure to notify.

**D.   Even Apart From The Sole Remedy Clause, Dr. Mason's Rescissory And Benefit Of The Bargain Damages Figures Should Be Excluded.**

**1.   Rescissory Damages And Benefit Of The Bargain Damages Are Unavailable As A Matter Of Law.**

Even if the PSA did not make repurchase TMI's sole remedy, Dr. Mason's Rescissory and Benefit of the Bargain damages calculations should still be excluded as contrary to New York law. As explained above, no court has ever awarded rescissory damages or their equivalent in an RMBS case. Those decisions rest in part on enforcing the parties' agreement to make repurchase the sole remedy, *see supra*, but they also reject rescissory damages on other grounds that are equally applicable here.

Under New York law, rescissory damages are a "very rarely used equitable tool" that is available only where rescission itself (another extraordinary remedy) is warranted but impracticable. *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 105 A.D.3d 412, 413 (N.Y. App. Div. 2013). A legal prerequisite for both rescission and rescissory damages is that TMI have "no alternative legal remedies." *Assured Guar. Mun. Corp. v. DB Structured Prod., Inc.*, No. 650705/2010, 2014 WL 3282310, at *7 (N.Y. Sup. Ct. July 3, 2014). Thus, as many courts have held, rescission and rescissory damages are unavailable in RMBS contracts because parties like TMI have an ample repurchase remedy, even leaving aside whether that repurchase remedy is TMI's sole remedy.

As explained above, the repurchase remedy gives TMI all of the unpaid balance on the allegedly breaching loan in question, plus interest, plus unpaid advances, plus TMI's reasonable expenses in securing that remedy. That is a quintessential "alternative legal remedy." *Nomura*, 19 N.Y.S.3d at 10 ("With respect to plaintiffs' causes of action for rescission, even if [the sole

remedy provision] did not waive plaintiffs' right to seek such relief, rescission would be unwarranted because damages are available."); *U.S. Bank N.A. v DLJ Mortg. Capital, Inc.*, No. 651563/2013, 2014 WL 1621046, at *5-6 (N.Y. Sup. Ct., Apr. 21, 2014) ("The Trust's arguments supporting an award of rescissory damages are unavailing because . . . there is an available alternative remedy."); *Assured Guar. Mun. Corp.*, 2014 WL 3282310, at *7 (same); *U.S. Bank Nat. Ass'n v. DLJ Mortg. Capital, Inc.*, No. 650369/2013, 2013 WL 6997183, at *5 (N.Y. Sup. Ct. Jan. 15, 2014) ("Plaintiff's claim for rescissory damages lacks merit, since Plaintiff has an alternative remedy – repurchase.").

Nor is the availability of an alternative remedy the only legal hurdle that TMI has failed to surmount.  Rescission and rescissory damages are barred where, as here, TMI has continued to accept the benefits of the contract.  As Justice Kornreich explained, "[The defendant] argues the Trust abandoned any claim to rescission or rescissory damages by suing to enforce the PSA . . . . [T]he court agrees. . . ."  *Assured Guar. Mun. Corp.*, 2014 WL 3282310, at *7 (quoting *U.S. Bank Nat. Ass'n v. DLJ Mortg. Capital, Inc.*, 2014 WL 1621046, at *5 (N.Y. Sup. Ct. Apr. 21, 2014)). TMI brought this action years ago and it has both sought relief under the contract (*i.e.*, the repurchase remedy or at least a purported simulation of it), and continued to accept payments throughout this litigation.  New York law does not allow TMI to simultaneously enforce the PSA and seek to rescind it.  *See also Clearview Concrete Prods. Corp. v. Charles Gherardi, Inc.*, 88 A.D.2d 461, 466 (N.Y. App. Div. 1982) (party abandoned right to rescind when "it accepted the benefits of the contract and thereby affirmed it"); *Bernstein v. Cooke*, 103 A.D.2d 725, 728 (N.Y. App. Div. 1984) ("One elects either to continue with the contract fraudulently induced or to rescind it.  If one elects to continue with it, one accepts all the burdens contained in the contract as well as the benefits." (citation omitted)).

Finally, the so-called "Rescissory" Damages Dr. Mason calculates are not rescissory at all, and would provide a windfall.  When "[t]he extraordinary remedy of rescission" applies, "its 'effect is to declare the contract void from its inception and to . . . restore the parties to the status quo.'"  *Barkley v. United Homes, LLC*, 848 F. Supp. 2d 248, 276 (E.D.N.Y. 2012) (quoting *Symphony Space v. Pergola Props.*, 631 N.Y.S.2d 136, 144 (App. Div. 1995)).  Rescission is inappropriate where "the status quo cannot be substantially restored," and rescission "cannot restore a plaintiff to a *better position* than he would have been in" had he not entered into the contract.  *Id.* at 276-77 (emphasis added) (quoting *Singh v. Carrington*, 796 N.Y.S.2d 668, 669 (App. Div. 2005) and *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 49 n.22 (2d Cir. 1978)).

Dr. Mason's opinions violate these requirements in multiple ways.  At the most fundamental level, Dr. Mason does not even know what status quo he is seeking to restore.  The basis of his calculations is his assumption that the Trust investors paid $1 billion to invest, but he conceded that had no knowledge as to whether that figure is accurate.  (Hellman Decl., Ex. D, Mason Report ¶ 67; Hellman Decl., Ex. E, Mason Dep. Tr. at 282:3-14.)  Moreover, TMI has offered no evidence as to when the current investors in the Trust became investors.  It is likely that many, if not all, of the current investors in the Trust bought their certificates for pennies on the dollar after the crash of the housing market.  *See MBS 'Putback' Investors Target Big Issuers*, Asset-Backed Alert (Feb. 24, 2012), http://www.abalert.com/headlines.php?hid=156068. Contrary to Dr. Mason's assumptions, (Hellman Decl., Ex. D, Mason Report ¶ 67), they did not pay $1 billion or anything close to that to invest in the Trust, and giving them $900 million would not restore the status quo but give them a gift of millions of dollars beyond it.

In addition, Dr. Mason "inflates his estimate of Rescissory Damages by awarding Plaintiff interest at the New York statutory rate of 9% while giving WMC credit for interest payments

actually made on the Mortgage Loans at the much lower average rates actually being earned on the Mortgage Loans." (Hellman Decl., Ex. F, Greenspan Report at 32 (citing Hellman Decl., Ex. D, Mason Report ¶ 60).) The result is that the Trust "accrues hundreds of millions more in interest than it would have been entitled to under the terms of the PSA." (Hellman Decl., Ex. F, Greenspan Report at 32.) For example, assuming a portfolio of $1.0 billion, the delta between a 9% accrued interest rate and a rate of 5.07% between November 2006 through March 2016 would be $261.4 million. (*Id.*) Thus, under Dr. Mason's calculation, the Trust would recover more in damages than it would otherwise have been entitled to receive if all of the Mortgage Loans had fully performed. (*Id.*) Again, that is not restoring the status quo as rescissory damages require.

### 2. TMI Offers No Opinion As To Causation For Rescissory Damages And Benefit Of The Bargain Damages.

Dr. Mason's proposed alternative damages measures are also fatally flawed because neither he nor any of TMI's other experts offers any opinion as to whether the breaches alleged were the *cause* of injury to the Trust. As courts have recognized, a key feature of the PSA's Repurchase Price remedy is that TMI does not need to prove that a breach caused the loan to default. *See, e.g.*, *MASTR Adjustable Rate Mortgages Trust 2006-OA2 v. UBS Real Estate Securities Inc.*, No. 12-cv-7322 (PKC), 2015 WL 764665, at *14-15 (S.D.N.Y. 2015) (collecting cases holding that under the repurchase remedy the plaintiff does not need to prove the breach caused a default but merely an increased *risk* of loss). If a loan with a material breach defaults, TMI is entitled to the Repurchase Price even if that default and accompanying loss were due to a separate cause such as the borrower losing his or her job. Thus, under the weight of current authority, the Repurchase Price does not require a nexus between the breach of representation and warranty and the loss experienced by the Trust on that loan. *Id.*

In contrast, if TMI is seeking a recovery *outside* the repurchase protocol, then, under black-letter New York law, it must prove contract damages, including causation, like any other contract plaintiff.  Because neither Dr. Mason nor any of TMI's other experts have opined that any alleged contractual breach caused any injury at all, his alternative theories of damages must be excluded.

Absent an agreed measure of damages like the Repurchase Price, "[c]ausation is an essential element of damages in a breach of contract action," and TMI has the burden to prove that the "defendant's breach *directly and proximately caused* his or her damages."  *Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004) (emphasis added).  A plaintiff that introduces no causation evidence has failed to carry its burden.  *See id.* at 527.

In the context of representations and warranties in particular, this means that a plaintiff is not entitled to recoup losses it would have incurred *even had* the representations been true, and thus it must show the extent to which it would have been better off, if indeed it would have been better off, had the representations been true.  *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007); *see also Koch Indus., Inc. v. Aktiengesellschaft*, 727 F. Supp. 2d 199, 220 (S.D.N.Y. 2010) (causation requires plaintiff to prove how better off they would have been "had the . . . representations and warranties been true.").  These principles hold equally true for rescissory damages and benefit of the bargain calculations.  *See, e.g.*, *Terwilliger v. Terwilliger*, 206 F.3d 240, 248 (2d Cir. 2000) ("In an action for breach of contract in New York the injured party is entitled to the benefit of his bargain as written and is entitled to damages for the loss *caused* by failure to perform the stipulated bargain." (alteration omitted) (emphasis added) (internal quotation marks omitted)); *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (elements of a claim for rescission include "an injury *resulting from* justifiable reliance by the aggrieved party" or fraud (emphasis added)).

Accordingly, courts routinely exclude expert testimony that ignores causation and would permit a plaintiff to recover even for losses it would have incurred regardless of the breach. *See, e.g.*, *R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 273 (S.D.N.Y. 2010) (Experts' "claims that they ruled out other possible causes are demonstrably false and their testimony that defendants' actions caused plaintiff's damages is based on little more than speculation"); *Mapinfo Corp. v. Spatial Re-Eng'g Consultants*, No. 02-cv-1008 (DRH), 2006 WL 2811816, at *6 (N.D.N.Y. Sept. 28, 2006) (Plaintiff's "failure to prove . . . a causal connection between [defendant's] alleged disparagement and any losses by [plaintiff] render [the expert's] testimony on damages irrelevant."); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 75 F. Supp. 2d 235, 238 (S.D.N.Y. 1999), *aff'd*, 314 F.3d 48 (2d Cir. 2002) (witness's damages "expertise is not helpful to the extent that it is based upon a causation assumption that plaintiff cannot prove").

Here, neither Dr. Mason nor any of TMI's other experts has done anything to attempt to establish causation, and Dr. Mason has readily admitted that fact. (Hellman Decl., Ex. E, Mason Dep. Tr. at 227:25-228:5; *see also id.* at 271:17-19 ("When called upon to evaluate causation, I have evaluated causation. In this case, I've been not asked to opine on causation . . . ."); *id.* at 272:5-7 ("My understanding of this case is that issues of causation are not required to be addressed from the plaintiff's side.").) Indeed, Dr. Mason's Rescissory and Benefit of the Bargain damages calculations assume that *all* of the damages are attributable to the alleged breaches of WMC's representations and warranties. This is despite the fact that (1) TMI's own reunderwriting expert has concluded that over 44% of loans in the sample are not in breach, and (2) WMC's experts have offered unrebutted testimony that at least a substantial portion of the losses experienced by the Trust were caused by the impact of housing market forces, changes in borrowers' life

circumstances, and/or TMI's failure to provide prompt notice to WMC of alleged breaches.  (*See* Hellman Decl., Ex. F, Greenspan Report at 12, 36-37.)

Dr. Mason's failure to address these factors, or causation more generally, renders his testimony regarding a money damages calculation inadmissible.  *See, e.g.*, *Munafo v. Metr. Transp. Auth.*, No. 00-cv-00134 (ERK), 2003 WL 21799913, at *18 (E.D.N.Y. Jan. 22, 2003) ("While an expert need not rule out every potential cause in order to satisfy *Daubert*, the expert's testimony must at least address obvious alternative causes and provide a reasonable explanation for dismissing specific alternate factors identified by the defendant." (emphasis omitted)).  This Court should reject TMI's attempt to jettison the contractually-agreed upon measure of damages as well as the standard causation requirements that would otherwise apply to breach-of-contract damages claims.

***

In sum, Dr. Mason's Rescissory and Benefit of the Bargain opinions are barred by the contract as well as accepted principles of New York contract law.  This Court should exclude Dr. Mason's opinions concerning these two measures of relief.

## II.    Dr. Mason's "Repurchase Damages" Opinions Should Be Excluded Because They Are Inconsistent With The Repurchase Price Formula In The PSA.

Dr. Mason also has calculated what he calls "Repurchase Damages."  Dr. Mason claims that these Repurchase Damages "simulat[e]" the Repurchase Price formula in the PSA.  (Hellman Decl., Ex. D, Mason Report ¶ 60.)  The reality, however, is that Dr. Mason's "simulation" departs from the PSA's actual formula in numerous and fundamental ways, which renders it unreliable and unhelpful, and thus, inadmissible.

As Judge Cote opined in *Bank of N.Y. Mellon* in connection with PSA language similar to that at issue here, "[a]ny recovery under Section 2.03 must be limited to the formula set forth in

the PSA. . . . The degree to which bargained for remedies are simple or convoluted is a matter for sophisticated commercial actors to address before the execution of a contract.  It is not something to complain about in subsequent litigation."  (Hellman Decl., Ex. A, Cote Slip Op. at 19-20 (omission in original) (quoting *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 965 N.Y.S.2d 844, 851 (Sup. Ct. 2013), *rev'd on other grounds by* 977 N.Y.S.2d 229 (App. Div. 2013)).)  Because Dr. Mason's Repurchase Damages calculations "rest on the incorrect assumption that the contractual Purchase Price does not provide the proper measure of equitable monetary relief, his testimony and opinions cannot 'help the trier of fact to . . . determine a fact in issue,' Fed. R. Evid. 702(a), and [they] must be excluded."  (Hellman Decl., Ex. A, Cote Slip Op. at 20.)

### A.   The PSA Provides An Unambiguous Formula For Calculating The Repurchase Price For A Loan In Material Breach.

As explained above, the PSA provides a "sole" remedy of repurchase at the Repurchase Price in the event that a mortgage loan is in material breach.  For a loan found to be in material breach, TMI may demand that WMC repurchase the loan at a price equal to the unpaid balance on the loan, plus unpaid interest on that balance, plus unreimbursed Servicing Advances, plus the expenses incurred by TMI in enforcing the repurchase obligation.  *See supra.*  In other words, under the contractual repurchase formula, the Trust gets what it is owed on the loan and in exchange, WMC gets the loan back.

WMC's damages expert calculates that the contractual repurchase formula yields a payment to the Trust of between $50 million and $97 million, depending on whether the Court credits WMC's or TMI's reunderwriting expert as to the number of loans in material breach in the Trust.  (Hellman Decl., Ex. F, Greenspan Report at 10.)

### B.    Dr. Mason's "Simulation" Of The Repurchase Price Remedy Is Contrary To The Contract And Unreliable.

Dr. Mason's calculations are inconsistent with the PSA's repurchase formula in numerous ways. These errors account for a significant portion of the difference between the parties' calculation of damages under the repurchase remedy.

### 1.    Dr. Mason's Inclusion Of Future Losses Is Inconsistent With The PSA.

Dr. Mason's Repurchase Damages include $28 million in his estimates of future losses. (Hellman Decl., Ex. D, Mason Report ¶ 64.) That is, Dr. Mason adjusts his Repurchase Damages upwards to reflect his opinion that loans in the Trust will incur an additional $50 million in losses, of which Mason ascribes $28 million to loans alleged to be in breach. (Hellman Decl., Ex. D, Mason Report ¶ 63.) Not only are those future losses not part of the contractual repurchase formula (or even the PSA's definition of Realized Losses), but Dr. Mason's estimate of those losses is grossly inflated and computationally unsound.

*First*, future losses are simply not part of the contractual repurchase remedy. (Hellman Decl., Ex. E, Mason Dep. Tr. at 219:20-220:8.) That remedy calls for WMC to pay "unpaid principal balance . . . *as of the date of repurchase*" and the interest on such balance up "*to the date of repurchase*." (Hellman Decl., Ex. B, PSA art. I (definition for "Repurchase Price") (emphases added).) There is no provision for paying future losses on the loan. Nor could there be because the remedial formula is predicated on WMC receiving the loan back (in a word, repurchasing it, *see* Hellman Decl., Ex. B, PSA § 2.03(k)), at which point the risk of any actual (as opposed to predicted) future losses is borne by WMC, not the Trust.

*Second*, even if the inclusion of future losses were part of the Repurchase Price formula, Dr. Mason's estimated future losses are dramatically inflated. WMC's damages expert compared Dr. Mason's future damages forecast as of March 2016 to actual results reported by the Trust since

that time.  (Hellman Decl., Ex. F, Greenspan Report at 20-21.)  That comparison shows that Dr. Mason's model produces forecasted loss figures vastly inflated over actual, reported losses.  (*Id.* at 21.)  For the four-month period of April to July 2016, Dr. Mason's model predicts a total of almost $20 million in losses, whereas the Trust reported a total of only $4.5 million.  (*Id.*)  Looking beyond July 2016 to the present, Dr. Mason's future damages forecast remains nearly 350% higher than the actual losses that have been incurred by the Trust.  (Hellman Decl., Ex. H, Aggregate Loan-Level Remittance Report Data for the SABR 2006-WM2 Trust for the period Mar. 2016 – Aug. 2017 ("Aggregate Trust Data").)  This is due in no small part to the fact that the performance of the Trust has *improved* since Dr. Mason conducted his analysis.  (*Id.*; Hellman Decl., Ex. F, Greenspan Report at 21.)  Rather than a loss severity of approximately 81%, which is the figure used by Dr. Mason, the loss severity has been nearly 10% better.  (Hellman Decl., Ex. H, Aggregate Trust Data.)  In other words, after four months, and then again still a year later, Dr. Mason's model yields future losses that are *three and a half times* greater than what has actually occurred.[4]  (*Id.*)  This Court should exclude a methodology that is both barred by the contract and contradicted by reality.

*Third*, Dr. Mason's inclusion of estimated future losses is unreliable because his forecast has a margin of error of unknown magnitude.  When TMI's sampling expert, Dr. Lipshutz, prepared the sample that formed the basis of Dr. Mason's analysis, he opined that the sample could

---

[4] At his deposition, Dr. Mason contended that his model, when excluding the losses on the "seriously delinquent" loans was performing well.  (Hellman Decl., Ex. E, Mason Dep. Tr. at 207:5-209:5.)  Dr. Mason was and remains incorrect.  Excluding the predicted losses on the "seriously delinquent" loans – for which Dr. Mason has over-estimated by nearly 350% to date – Dr. Mason's model assumed that by this point the Trust would have experienced an additional $4.8 million in realized loss.  (Hellman Decl., Ex. H, Aggregate Trust Data.)  To date, however, the actual realized loss experienced by the Trust on the non "seriously delinquent" loans is approximately $30,000, or 1/160th of what Dr. Mason's model had projected.  (*Id.*)

be used to estimate damages with a sufficiently reliable 5.5% margin of error. At his deposition in this action, however, Dr. Lipshutz conceded that including *future* damages could increase the margin of error because of the "uncertainty that is associated with . . . Dr. Mason's estimating of probable losses to the ends of the loans' expected lives," although he did not know the magnitude of the error. (Hellman Decl., Ex. I, Excerpts of Nelson Lipshutz, Ph.D., Deposition Transcript at 79:25-80:20, Sept. 29, 2016 ("I . . . don't know how big it [the additional margin of error] is because I don't know the model in detail.").) Dr. Lipshutz concluded that Dr. Mason would need to account for any additional uncertainty to the extent it was material. (*Id.* at 81:23-82:3.) For his part, though, Dr. Mason conceded that he made no effort to determine the materiality of that additional uncertainty. (Hellman Decl., Ex. E, Mason Dep. Tr. at 205:7-10 ("Q: Did you calculate any sort of independent margin of error around your future damages? A: No.").) Dr. Mason simply does not know if his future damages calculations have a reliable margin of error, and nor does Dr. Lipshutz. Dr. Mason's future damages calculations should therefore be excluded on that basis as well.

### 2. Dr. Mason's Inclusion Of Losses From Loan Modifications Is Inconsistent With The PSA.

Dr. Mason also departs from the contractual Repurchase Price formula when he expands "Realized Losses" to include $32 million in losses "arising from loan modifications on loans." (Hellman Decl., Ex. D, Mason Report ¶¶ 60, 64.) That is, Dr. Mason treats as a recoverable loss a decision by the Servicer to offer principal or interest forgiveness to a borrower. But nothing in the contractual Repurchase Price formula requires WMC to pay TMI for write-downs that the Trust's Servicer chose to make. To the contrary, the Repurchase Price formula expressly calculates the "unpaid principal balance . . . as of the date of repurchase" and certain unpaid interest, "to the date of repurchase." (Hellman Decl., Ex. B, PSA art. I (definition of "Repurchase Price").) If

28

TMI or the Servicer has reduced the principal or interest on a loan prior to the date of repurchase, TMI may not claim that reduction as part of the contractually dictated Repurchase Price.  Indeed, such a recovery is not contemplated even by the definition of Realized Losses.  (Hellman Decl., Ex. B, PSA art. I (definition of "Realized Losses").)  Dr. Mason acknowledges his incongruity:  he notes that the Repurchase Price formula is based on "unpaid principal" and the PSA includes "no specific provision . . . for loss amounts related to Realized Losses that are not accompanied by 'unpaid principal,'" such as due to loan modifications on active loans.  (Hellman Decl., Ex. D, Mason Report ¶ 60.)  But, he nonetheless asserts he is "simulating" the contractual Repurchase Price formula by inflating it based upon loss amounts not included within its four corners.[5]  (*Id.* ¶¶ 52, 60.)

### 3.    Dr. Mason Uses The Wrong Balance For Liquidated Loans.

Dr. Mason's use of "Realized Losses" also departs from the PSA's contractual Repurchase Price formula in another significant way with respect to liquidated loans.  The PSA requires a determination of the loan's unpaid principal balance "as of the date of repurchase."  (Hellman Decl., Ex. B, PSA art. I (definition of "Repurchase Price").)  Liquidated loans have an unpaid principal balance of $0 as of that date because, by definition, once a loan is liquidated – *i.e.*, once the collateral is seized and resold – the loan no longer has a balance and is removed from the monthly loan inventory published by the Trustee.  The Trust's own records reflect this reality: they show that liquidated loans have an "Actual Current Balance" of $0.  (Hellman Decl., Ex. E, Mason Dep. Tr. at 242:4-244:14.)  When that unpaid principal balance of $0 is plugged into the PSA's contractual repurchase formula, it yields a lower recovery because the Trust has already

---

[5] Dr. Mason admitted in his deposition that he did not even know if losses he attributed to write-downs actually were in fact write-downs or were instead mistakes.  (Hellman Decl., Ex. E, Mason Dep. Tr. at 169:5-170:23.)

recovered proceeds on the loan from having liquidated it.  As Judge Cote explained in *Bank of N.Y Mellon.*:

> Before liquidation, the Purchase Price formula boils down to a payment to [the plaintiff] of however much principal on the loan is outstanding, plus interest, plus reimbursement of applicable fees.  After liquidation -- meaning after the Trust has effectively cashed in that loan -- the Purchase Price starts at zero because the Trust has received liquidation proceeds, but WMC has still guaranteed the reimbursement of certain other expenses.

(Hellman Decl., Ex. A, Cote Slip Op. at 16.)

In contrast, Dr. Mason's methodology treats liquidated loans as having a positive unpaid principal balance because he uses the separate concept of Realized Losses to "simulate" the Repurchase Price, even though the Repurchase Price formula is to the contrary.  (Hellman Decl., Ex. D, Mason Report ¶¶ 52, 60.)  In contrast to the Repurchase Price formula, which expressly looks to the unpaid principal balance "as of the date of repurchase," Realized Losses captures the difference between the loan's unpaid principal balance *before* liquidation less the net proceeds received from liquidation.  (Hellman Decl., Ex. B, PSA art. I (definition of "Repurchase Price"); Hellman Decl., Ex. B, PSA art. I (definition of "Realized Losses").)  In other words, Dr. Mason's methodology makes WMC the guarantor of any differential between what the Trust receives for a loan in liquidation and the unpaid principal balance at that time even though the contract is to the contrary.  Although the PSA could have used Realized Losses to calculate the Repurchase Price, it decidedly did not do so.

Judge Cote reached this same conclusion in *Bank of N.Y Mellon*.  In that case, the PSA's contractual formula called for using the loan's "Stated Principal Balance" in calculating the repurchase price, and defined that Stated Principal Balance to be $0 in the case of a liquidated loan.  (Hellman Decl., Ex. A, Cote Slip Op. at 6.)  When TMI's damages expert failed to use that

formula for liquidated loans and instead used the loan's unpaid balance prior to liquidation for his

damages calculation, Judge Cote excluded his testimony as unreliable.  She explained that

> [B]ecause the PSA's Purchase Price formula may be applied in the situation here -
> - where loans have been liquidated -- that formula, to which the parties explicitly
> agreed, guides any calculation of damages.  Put another way, while it is clear that
> BoNY is entitled to some monetary relief with respect to loans that cannot be
> "repurchased," there is no reason for the parties not to follow the formula to which
> they agreed and that dictates in detail the terms of reimbursement with respect to
> liquidated loans.

*(Id.* at 17.)

So too here.  TMI's own records show that the unpaid principal balance on liquidated loans

is $0.  TMI is still entitled to monetary relief under the contractual repurchase formula for those

loans.  WMC's expert calculates that payment to be substantial, ranging from $48 million to $97

million (Hellman Decl., Ex. F, Greenspan Report at 28-29), depending, among other things, on the

percentage of loans that the Court finds to be in breach.  But TMI cannot ignore the contractual

Repurchase Price formula to incorporate losses that the "sophisticated commercial entities who

negotiated" this "complex agreement" did not include.  (Hellman Decl., Ex. A, Cote Slip Op. at

15.)[6]

## CONCLUSION

For the foregoing reasons, WMC respectfully submits that this Court should exclude the

damages opinions in Part V of Dr. Joseph R. Mason's report.

---

[6] WMC also recognizes that this Court has held that the PSA does not bar the use of statistical
sampling as a matter of law.  For the reasons given in its contemporaneously filed Motion *in
Limine*, WMC preserves for appeal the argument that the PSA bars the use of sampling to prove
liability or damages, and thus makes Dr. Mason's sampling-based damages opinions inadmissible.

Dated: October 6, 2017

Respectfully submitted,

**CARMODY TORRANCE SANDAK & HENNESSEY LLP**

 /s/ Howard K. Levine

| | |
|---|---|
| Anthony M. Fitzgerald (ct04167)<br>Howard K. Levine (ct10555)<br>CARMODY TORRANCE<br>SANDAK & HENNESSEY LLP<br>195 Church St., 18th Floor<br>New Haven, CT 06509<br>Phone: 203 777-5501<br>Fax: 203 784-3199 | Barbara S. Steiner (*pro hac vice*)<br>Megan B. Poetzel (*pro hac vice*)<br>Michael A. Doornweerd (*pro hac vice*)<br>JENNER & BLOCK LLP<br>353 N. Clark St.<br>Chicago, IL 60654<br>Phone: 312 222-9350<br>Fax: 312 527-0484<br><br>Matthew S. Hellman (*pro hac vice*)<br>JENNER & BLOCK LLP<br>1099 New York Ave NW<br>Washington, DC 20001-4412<br>Phone: 202 639-6000<br>Fax: 202 639-6066<br><br>*Attorneys for Defendant WMC Mortgage, LLC* |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 6th day of October, 2017, the foregoing **WMC MORTGAGE,**

**LLC'S MEMORANDUM IN SUPPORT OF ITS MOTION TO PARTIALLY EXCLUDE**

**EXPERT DAMAGES TESTIMONY OF DR. JOSEPH R. MASON** was filed electronically

via the Court's CM/ECF system.  Notice of this filing will be sent by e-mail to all parties by

operation of the Court's electronic filing system or by mail to anyone unable to accept electronic

filing.  Parties may access this filing through the court's CM/ECF System.


/s/ Howard K. Levine
Howard K. Levine (ct10555)
Carmody Torrance Sandak & Hennessey LLP
195 Church Street
P.O. Box 1950
New Haven, CT  06509-1950
Tel:  203-777-5501
Fax:  203-784-3199
E-mail:  hlevine@carmodylaw.com