# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| TMI TRUST COMPANY, solely in its capacity as Separate Trustee of the SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-WM2 (SABR 2006-WM2),<br><br>                    Plaintiff,<br><br>        v.<br><br>WMC MORTGAGE, LLC f/k/a WMC MORTGAGE CORP.,<br><br>                    Defendant. | Case No: 3:12-cv-01538-CSH |

### DECLARATION OF KATHRYN E. WILHELM IN SUPPORT OF PLAINTIFF TMI TRUST COMPANY'S MEMORANDUM IN OPPOSITION TO WMC MORTGAGE LLC'S MOTION *IN LIMINE* TO EXCLUDE SAMPLING

Kathryn E. Wilhelm hereby declares, pursuant to 28 U.S.C. § 1746 and under penalty of perjury under the laws of the United States, that the following is true and correct:

1.       I am an associate at the law firm Ropes & Gray LLP, attorneys for TMI National Trust Company, solely in its capacity as Separate Trustee for the Securitized Asset Backed Receivables LLC Trust 2006-WM2 (the "Separate Trustee"), Plaintiff in the above-captioned action.

2.       I submit this declaration in support of Plaintiff TMI Trust Company's Memorandum in Opposition to WMC Mortgage LLC's Motion *in Limine* to Exclude Sampling.

3.       Attached to this declaration are true and correct copies of the following:

        (a)       Exhibit A – Hearing Transcript, *SACO I Trust 2006-5 v EMC Mtge. LLC*, No. 651920/2012 (N.Y. Sup. Ct. Dec. 2, 2015);

(b)      Exhibit B – Interim Order, *Home Equity Mortg. Trust Series 2006-1 v. DLJ Mortg. Capital, Inc.*, No. 156016/2012 (N.Y. Sup. Ct. Nov. 19, 2013);

(c)      Exhibit C – Memorandum and Opinion, *United States v. Americus Mortg. Corp.*, No. 4:12-CV-2676 (S.D. Tex. Sept. 14, 2017);[1]

(d)      Exhibit D – Memorandum and Opinion, *United States v. Americus Mortg. Corp.*, No. 4:12-CV-2676 (S.D. Tex. Sept. 14, 2017);[2] and

(e)      Exhibit E – Judgment, *United States v. Americus Mortg. Corp.*, No. 4:12-CV-2676 (S.D. Tex. Sept. 29, 2017).

Executed:      Boston, MA
               October 20, 2017

                                   */s/ Kathryn E. Wilhelm*
                                   Kathryn E. Wilhelm

---

[1] Exhibit C is the Court's opinion regarding the post-trial damages award.
[2] Exhibit D is the Court's opinion regarding defendants' motion for a new trial.

# Exhibit A

# SUPREME COURT OF THE STATE OF NEW YORK - NEW YORK COUNTY

| | | |
|---|---|---|
| **PRESENT:**   **EILEEN BRANSTEN** | | **PART**   3 |
| *Justice* | | |

SACO I TRUST 2006-5,ISSUER

| | |
|---|---|
| | **INDEX NO.**   651820/2012 |
| - V - | **MOTION DATE**   11/24/2015 |
| **EMC MORTGAGE LLC (FORMERLY** | **MOTION SEQ. NO.**   007 |

The following papers, numbered 1 to ___3___ ,were read on this motion to/for **partial summary judgment**

| | |
|---|---|
| Notice of Motion/Order to Show Cause - Affidavits - Exhibits | No(s).  1 |
| Answering Affidavits - Exhibits | No(s).  2 |
| Replying Affidavits | No(s).  3 |
| Cross Motion | No |

**Upon the foregoing papers, it is ordered that this motion is**

granted for the reasons stated on the November 4, 2015 record (Denise M. Paternoster, RPR).

DATED:   11/ 30 /2015

EILEEN BRANSTEN , J.S.C.

| | | |
|---|---|---|
| 1. CHECK ONE : | ☐ CASE DISPOSED | ☒ NON-FINAL DISPOSITION |
| 2. CHECK AS APPROPRIATE : MOTION IS : | ☒ GRANTED   ☐ DENIED   ☐ GRANTED IN PART | ☐ OTHER |
| 3. CHECK IF APPROPRIATE : | ☐ SETTLE ORDER | ☐ SUBMIT ORDER |
| | ☐ DO NOT POST   ☐ FIDUCIARY APPOINTMENT | ☐ REFERENCE |

651820/2012  Motion No. 007
SACO I TRUST 2006-5,ISSUER VS. EMC MORTGAGE LLC (FORMERLY

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK - CIVIL TERM - PART 3
3  -------------------------------------------------X
   SACO I TRUST 2006-5, issuer of the SACO I
4  TRUST 2006-5 MORTGAGE-BACKED
   CERTIFICATES, SERIES 2006-5, SACO I
5  TRUST 2006-6, issuer of the SACO I TRUST
   2006-6 MORTGAGE-BACKED
6  CERTIFICATES, SERIES 2006-6, SACO I
   TRUST 2006-3, issuer of the SACO I TRUST
7  2006-3 MORTGAGE-BACKED
   CERTIFICATES, SERIES 2006-3, and SACO
8  I TRUST 2007-2, issuer of the SACO I
   TRUST 2007-2 MORTGAGE-BACKED
9  CERTIFICATES, SERIES 2007-2,

10                       Plaintiffs,
                                          Index No.
11        -against-                       651820/2012

12
   EMC MORTGAGE LLC, JPMORGAN CHASE BANK, N.A.
13 and JPMORGAN CHASE & CO.,

14
                         Defendants.
15 -------------------------------------------------X
                         60 Centre Street
16 MOTION                New York, New York
                         November 4, 2015
17

18   B E F O R E:

19        HONORABLE EILEEN BRANSTEN, JUSTICE

20
   A P P E A R A N C E S:
21

22        QUINN EMANUEL URQUHART & SULLIVAN, LLP
          ATTORNEYS FOR THE PLAINTIFFS
23             51 Madison Avenue - 22nd Floor
               New York, New York 10010
24        BY:  PHILIPPE Z. SELENDY, ESQ.
          AND: SEAN BALDWIN, ESQ.
25        AND: ANDREW DUNLAP, ESW.,
          AND: LIZ ROSENSHINE, ESQ.
26
   (Appearances continue.....)
          Denise M. Paternoster, RPR Sr. Court Reporter

2

1

2   A P P E A R A N C E S:

3

4       SULLIVAN & CROMWELL, LLP
    ATTORNEYS FOR DEFENDANTS

5          125 Broad Street
       New York, New York 10004-2498

6       BY:  DARRELL S. CAFASSO, ESQ.,
    AND: MATTHEW L. LIPPERT, ESQ.

7

8

9

10

11

12

13                  DENISE M. PATERNOSTER, RPR
              Senior Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

26

      Denise M. Paternoster, RPR - Senior Court Reporter

3

```
1                          Proceedings
2              THE COURT:  Set up on Saco 1 Trust.
3              (So done.)
4              THE COURT:  For Saco 1 Trust 2006 - 5, et cetera,
5    et cetera, the whole caption, we have representing the
6    plaintiffs from Quinn and Emanuel, I have Philip Selendy.
7              MR. SELENDY:  Yes, your Honor.
8              THE COURT:  I have Andrew Dunlap.
9              MR. DUNLAP:  Yes, your Honor.
10             THE COURT:  I also have Sean Baldwin.
11             MR. BALDWIN:  Yes, your Honor.
12             THE COURT:  Good.
13             MR. SELENDY:  And we have Ms. Rosenshine, as well.
14             COURT REPORTER:  I need a card.
15             THE COURT:  Miss Rosenshine usually sits up front,
16   how come she has been demoted out?
17             MR. SELENDY:  There was a chair taken away.
18             THE COURT:  I'm sure there is another chair for
19   her.
20             All right.  So for defendants, EMC Mortgage, LLC,
21   J.P. Morgan Chase Bank N.A. and J.P. Morgan Chase & Company,
22   from Sullivan and Cromwell, I have Matthew Lippert.
23             MR. LIPPERT:  Good morning, your Honor.
24             THE COURT:  And Darrell Cafasso.
25             MR. CAFASSO:  Good morning, your Honor.
26             THE COURT:  Wait a second.  Sit down, please.
```

Denise M. Paternoster, RPR - Senior Court Reporter

4

1                           Proceedings

2            (So done.)

3            THE COURT:  Mr. Selendy, you will be speaking?

4            MR. SELENDY:  I will.

5            THE COURT:  That is if you speak.

6            So this is Motion Sequence Number 007, which is

7    plaintiff's motion for partial summary judgement.  And I am

8    I'm ready to actually give you a decision on this.  I do

9    have a couple of questions.  Maybe I would be better off

10   asking the questions first.

11           Question number one, which I believe is an

12   overarching question, is:  The last time you were here, I

13   recommended mediation and I think I got kind of like an

14   acquiescence that we will be going to mediation.  Have we

15   gone?

16           MR. SELENDY:  We have a date.  The mediator is set

17   for January 7th, your Honor.

18           THE COURT:  Now, that is a private mediator?

19           MR. SELENDY:  That is correct.

20           THE COURT:  Okay.  Could you give me the name or is

21   that --

22           MR. BALDWIN:  David Jeromus, J-E-R-O-M-U-S.

23           THE COURT:  Good.  January 7th, right?

24           MR. BALDWIN:  January 7th, your Honor.

25           THE COURT:  7th, very good.  Good way to begin a

26   new year.

            Denise M. Paternoster, RPR - Senior Court Reporter

5

1          Proceedings

2          All right.  So I indeed can give you a decision on

3     this case, and I think that will probably even facilitate

4     matters in terms of going to the mediator.

5          So, instead of -- the other way of my doing it is

6     by hearing argument, getting the transcript, my then sitting

7     down and writing an appropriate lengthy decision and coming

8     to the same conclusion as I'm going to come to right now.

9     So this is much quicker, much quicker.

10          This is an RMBS -- this is background.  This is an

11     RMBS case involving four securitizations totalling 42,208

12     loans.

13          Defendant EMC Mortgage, LLC was part of Bear

14     Sterns.  JPMorgan bought EMC as part of its acquisition of

15     some Bear Sterns assets.

16          EMC purchased loans and securitized them.  EMC also

17     services some of the loans.

18          Plaintiffs are Trusts, which allege that 95 percent

19     of the loans in the random sampling of 4,906 loans breached

20     a representations and warrants ("R & W") made by EMC.

21          This action was commenced by summons with notice on

22     May 25, 2012.  A complaint was later filed on October 15,

23     2012.

24          Defendant's motion to dismiss was granted in part

25     on May 29, 2014.  And, obviously, denied in part.

26          In that decision the Court dismissed plaintiffs'

Denise M. Paternoster, RPR - Senior Court Reporter

6

1                              Proceedings

2       requests for consequential and rescissory damages, since the

3       PSAs for the securitizations provided that "cure, repurchase

4       or replacement" of any breaching loans was the only remedy

5       available.

6               Where loans could not be repurchased -- for

7       example, where they already had been liquidated or it was

8       otherwise no longer in the trust, damages in the amount of

9       the purchase price were available.

10              In addition, the Court held that the complaint

11      adequately stated a claim for repurchase of breaching loans,

12      since plaintiffs alleged that EMC discovered breaching loans

13      while conducting post-closing audit and quality reviews.

14      The PSAs required repurchase upon the discovery by any party

15      of a breach of a representation or warranty.  See

16      Defendant's opposition brief at 5, quoting relevant PSA

17      language.

18              This decision was appealed, but the appeal was

19      withdrawn.

20              The parties are now in the midst of discovery.

21              According to the May 26, 2015 status conference

22      order:

23              First, depositions to be completed by November 18,

24      2015.

25              Fact discovery completed by December 18, 2015.

26              End date of all discovery is April 12, 2016.

7

1            Proceedings

2        Note of issue must be filed by May 1, 2016.

3        And I also wrote, "No adjournments of this 2012

4    case."  That is when it is getting closer and closer to

5    completion, when I write down notes; no adjournments, okay?

6        The status conference order also stated that the

7    parties must decide on the form of mediation by August 25,

8    2015.  And I assume it was done by that date.  And, indeed,

9    you have decided on mediation and you will be going to a

10   mediator on January 7, 2016, which is good, and I commend

11   you for that.

12       However, unless I get a request to do so, I'm not

13   changing the dates as of now.  If both of you feel that I

14   must give you more time because you want to be able to

15   prepare for the mediation or you feel that this is going to

16   be an inference with the mediation process, then you have to

17   let me know.  You can do that by letter.

18       If it is something that I agree with, we don't have

19   to see each other again; I will just sign a stipulation.

20   But I really don't want the mediation process to stop this

21   case from going forward, so in case you don't succeed with

22   mediation.  Of.

23       Course, the moment you do succeed with mediation,

24   let me know and I won't hold you to any of the dates.  That

25   is one of the benefits of resolving the case.

26       All right.  We have Motion Sequence Number 007,

Denise M. Paternoster, RPR - Senior Court Reporter

8

```
1                         Proceedings
2     plaintiff's motion for partial summary judgement.
3              The parties came in this summer on Motion Sequence
4     Number 006 seeking an order that plaintiffs be permitted to
5     present their proposed sampling of loans for each trust in
6     support of liability and damages at trial.
7              The Court granted the motion.  As in MBIA, the
8     Court ruled that plaintiffs are permitted to present a
9     statistical sampling as a means to prove liability and
10    damages, although the plaintiffs must still prove all of the
11    elements of their causes of action and damages.
12             And also, with the proviso and understanding this
13    as well, that there is no guaranty that the jury will accept
14    the sampling or that it's a mechanism of proving the
15    liability and/or damages in the case.  So, I mean, we don't
16    know.  We still don't know what a jury is going to think
17    about using sampling.  So that is always the danger of doing
18    it.  But I certainly agree that you could do it.
19             At oral argument, the parties tried to expand the
20    scope of the motion, engaging in a back-and-forth as to
21    whether the parties' agreements, the PSAs, allowed for the
22    use of sampling or whether they required plaintiffs to
23    present loan by loan evidence in order to prevail on their
24    repurchase claims.
25             I instructed the parties to file a motion, which is
26    the motion now before the Court.
```

Denise M. Paternoster, RPR ~ Senior Court Reporter

9

Proceedings

1

2          The plaintiffs now seek a partial summary judgement

3     ruling that, "the use of statistical sampling to prove

4     liability and damages on their claims is consistent with the

5     terms of the contracts governing the transactions, including

6     but not limited to the PSAs."  Plaintiffs moving brief at 1.

7          Plaintiffs later clarified in their reply brief

8     that this motion is limited to liquidated loans, i.e., loans

9     that are no longer in the Trust due to nonpayment issues.

10         So it came outside of the Trust; they have not been

11    repurchased but at the same time are no longer in the trust.

12         Now, defendants oppose, arguing that the PSAs

13    unambiguously require loan-by-loan proof in order to compel

14    repurchase, which foreclose sampling as a valid method of

15    proof.

16         Defendants contend that the repurchase provision

17    requires the return of specific breaching loans to EMC upon

18    payment of a defined, loan-specified price that must be

19    determined on a loan-by-loan basis.

20         The "cure or repurchase" provision cited on page 5

21    of the Defendant's opposition brief states that if EMC

22    cannot cure a breach, it was required to:  One, remove the

23    loan from the Trust and substitute a replacement loan in its

24    stead or, two, repurchase the affected loan from the Trust

25    at a contractually specified purchase price.

26         The purchase price provision is included on pages

          Denise M. Paternoster, RPR - Senior Court Reporter

10

1                          Proceedings

2       5-6 of the Defendant's brief.

3              The purchase price calculation involves a

4       consideration of the outstanding principal balance of the

5       mortgage loan, the accrued interest, and any costs and

6       damages incurred by the Trust as a result of any violation

7       by the mortgage loan of any anti-predatory lending lae.

8              According to Defendants, sampling cannot answer the

9       question of which specified loans outside the sampling meet

10      the contractual requirements for repurchase.

11             Now, Plaintiffs argue -- and I say correctly --

12      that the cure and repurchase provisions of the PSAs do not

13      require loan-by-loan proof.

14             First, defendants' arguments appear aimed at loans

15      remaining in the Trust.

16             However, Plaintiffs are clear on reply that this

17      motion pertains only to liquidated loans -- i.e. loans no

18      longer in the Trust.

19             Therefore, the mortgage loan at issue could not be

20      returned to EMC or substituted.

21             But here is another question I do have.  And that

22      is:  Because of that statement, does that mean that this

23      motion pertains only to liquidated loans; are these loans

24      the only ones at issue in the case at trial?

25             MR. SELENDY:  Yes.

26             THE COURT:  Yes.

                Denise M. Paternoster, RPR - Senior Court Reporter

```
 1                        Proceedings
 2            MR. SELENDY:  Yes, your Honor.  There are tens of
 3   thousands of potentially breaching loans.  Twenty-two
 4   thousand of those loans, virtually all of them have been
 5   liquidated or charged-off or released, as those terms are
 6   understood in the Nomura opinion which issued during
 7   defendant's briefing that we have here.
 8            There is a small set of loans, which include loans
 9   that may have been modified or that are performing but will
10   result in loss in the future, that are still in the case.
11   But for purposes of achieving our trial objectives and
12   streamlining the case and using sampling for that end, our
13   motion is restricted to just the liquidated, charged-off or
14   released loan.
15            Thus, if you grant the motion on sampling, we'll be
16   prepared to prove up the case using sampling for that
17   population of loans and then using other mechanisms for the
18   modified or performing loans.
19            THE COURT:  Okay.
20            MR. CAFASSO:  May I respond, your Honor?
21            THE COURT:  Yes, of course.
22            MR. CAFASSO:  Well, first of all, that is a new
23   argument that they raised for the first time in their reply.
24   We have been here multiple times on sampling.  All along
25   they have said that their sampling motion is based both on
26   liquidated loans and on performing loans that may have a
```

12

1                              Proceedings

2       breach.  In fact, the sampling that they presented to you

3       the last time we were here is drawn from that population of

4       loans.

5              But beyond that, your Honor, what I think you were

6       implying in your decision is actually incorrect.  Liquidated

7       loans can be repurchased, there is no dispute about that.

8       We have never argued to the contrary.  There is nothing in

9       the contract that says a liquidated loan is not subject to

10      repurchase.

11             In fact, if you go to Paragraph 140 of their

12      complaint, they say: "Upon information and belief, it is,

13      and has been, the custom and practice in the industry for

14      sellers and sponsors to repurchase or provide may call

15      payments for mortgage loans that have been charged off,

16      released from securitization or liquidated loss."  These are

17      their allegations.

18             They go on to say:  "Upon information and belief,

19      repurchase of such loans are indeed commonplace in the

20      industry."

21             Your Honor, we agree.  We have never argued that

22      liquidated loans cannot be repurchased.  The reason that is,

23      is that the purchase price can still be calculated for a

24      liquidated loan.  We still get something back.  We still get

25      the mortgage file back.  Liquidated loans still have value.

26             Judge Sherwood said in that they don't.  He might

                Denise M. Paternoster, RPR - Senior Court Reporter

13

<table>
<tr><td>1</td><td>Proceedings</td></tr>
</table>

1                            Proceedings

2   have been right in that case, I don't know what rights

3   Blackstar (phonetic) had.  But here EMC has rights against

4   third-party originators that sold them the loans for

5   indemnification and for repurchase.  They don't dispute

6   that.  I need the loan back in order to enforce those

7   rights.

8             THE COURT:  I'm not saying you're right or wrong or

9   in between.  What I'm saying is that it's not the subject of

10   this particular motion.

11             MR. CAFASSO:  And I'm saying it doesn't matter

12   whether they're talking about liquidated loans or not, the

13   argument still applies.  And all the reasons why sampling is

14   problematic still applies.

15             And beyond that -- this is what we argued in our

16   papers -- at best, for them the contract is ambiguous.

17   There is no way this court can conclude that the contracts

18   unambiguously --

19             THE COURT:  I'm not doing a summary judgement

20   motion here.  We are doing a partial summary judgement only

21   on the issue of whether sampling should apply.

22             MR. CAFASSO:  The partial summary judgement motion

23   is on the issue of contract interpretation.  In order to

24   rule for them, you have to find that the contract is

25   susceptible to only one plausible reading.

26            That's the standard.  They skip over the standard,

Denise M. Paternoster, RPR - Senior Court Reporter

14

1

2   but that's the standard before the Court, your Honor.  I

3   came in today and honestly I didn't think this was a close

4   call.  The contract at best for them is ambiguous, they've

5   presented no evidence.

6           THE COURT:  Sir, I was in the middle of a decision.

7   I asked one specific issue from both sides and I got an

8   answer.

9           MR. CAFASSO:  Understood, your Honor.

10          THE COURT:  Thank you.

11          Second, the language of the PSA offered no bar to

12  the use of sampling evidence at trial.

13          As this Court has held in this case, and the First

14  Department recently stated in another, Plaintiffs may pursue

15  monetary damages with respect to any defective mortgage loan

16  in those instances where cure or repurchase is impossible.

17  And that does cite to Nomura, N-O-M-U-R-A, Home Equity Loan,

18  Incorporated v. Nomura Credit & Capital, Incorporated, which

19  has been recently decided by the First Department on October

20  13, 2015.  I have no official cite yet, but it has been

21  recorded.

22          The purchase price provision quoted above presents

23  the measure of damages, as explicitly provided in the

24  "cure-or-repurchase" provision of the PSA.

25          Plaintiffs explain the manner in which their

26  experts will calculate a damages figure based on an

Denise M. Paternoster, RPR - Senior Court Reporter

15

|     |                                                              |
| --- | ------------------------------------------------------------ |
| 1   |                     Proceedings                              |
| 2   | aggregate purchase price for the liquidated loans in the     |
| 3   | pool and the breach rate in Plaintiff's loan sample.         |
| 4   |        There is nothing in the PSA that bar Plaintiffs       |
| 5   | from proceeding in this manner.                              |
| 6   |        Again, whether a jury will find this presentation     |
| 7   | of proof persuasive is a separate and -- is a separate       |
| 8   | matter.                                                      |
| 9   |        Defendants contend that PSAs' silence as to           |
| 10  | sampling means that this summary judgement motion cannot be  |
| 11  | granted.                                                     |
| 12  |        However, they misinterpret the summary judgement      |
| 13  | burden.  Plaintiffs have demonstrated that as a matter of    |
| 14  | law, the PSAs "cure-and-repurchase provision" does not bar   |
| 15  | sampling as a vehicle for proof.  Defendants offer nothing   |
| 16  | compelling to rebut that showing.                            |
| 17  |        Accordingly, Plaintiff's motion is granted.           |
| 18  |        Finally, allowing the use of sampling is              |
| 19  | well-accepted by courts in RMBS cases.                       |
| 20  |        This Court allowed it in MBIA.                         |
| 21  |        Likewise, the overwhelming majority of courts with    |
| 22  | RMBS cases that have considered sampling have permitted it   |
| 23  | as a means to present proof at trial.  See Assured Guarantee |
| 24  | Municipal Corp. v. Flagstar Bank, FSB, 920 F.Supp.2d 475, at |
| 25  | page 412/13, Southern District of New York, 2013, Judge      |
| 26  | Rakoff presiding, says: "Sampling is a widely accepted       |

Denise M. Paternoster, RPR - Senior Court Reporter

|  | Proceedings |
|---|---|
| 1 |  |
| 2 | method of proof in cases brought under New York law, |
| 3 | including in cases relating to RMBS and involving repurchase |
| 4 | claims....  Although, Flagstar argues that the fact |
| 5 | determination of material breach in any given instance |
| 6 | requires consideration of an entire loan file renders the |
| 7 | loans ill-suited to proof by statistical sampling, this |
| 8 | argument is unpersuasive.  The very purpose of creating a |
| 9 | representative sample of sufficient size is so that, despite |
| 10 | the unique characteristics of individual members populating |
| 11 | the underlying pool, the sample is nonetheless reflective of |
| 12 | the proportion of the individual members in the entire pool |
| 13 | exhibiting any given characteristic." |
| 14 | So, again, there is another case, Assured Guaranty |
| 15 | Municipal Corp. v. DB Structured Products, Incorporated, 44 |
| 16 | Misc.3d1206(A) at *6, which is Supreme Court New York |
| 17 | County, 2014 case.  "This court held (as it has in other |
| 18 | cases) that forcing Assured to re-underwrite all of the |
| 19 | loans is commercially unreasonable and that sampling may be |
| 20 | used to compute damages." |
| 21 | The Court adopts this consensus reasoning here. |
| 22 | Accordingly, Plaintiffs' motion for partial summary |
| 23 | judgement seeking a ruling that "the use of statistical |
| 24 | sampling to prove liability and damages on their claims is |
| 25 | consistent with the terms of the contract governing the |
| 26 | transactions, including but not limited to the PSAs" is |

```
 1                       Proceedings
 2   therefore granted.
 3            That constitutes the Decision and Order of the
 4   Court.
 5            It will become an appealable decision once I get
 6   the minutes of the decision.  I'll give you a grey sheet so
 7   you can appeal it, if you wish.
 8            But, again, I cannot urge more strongly than
 9   anything to resolve this.  This is, I think, ultimately a
10   resolvable issue.  Much more so than it may be ultimately a
11   provable issue.  So that also may be a consideration.
12            Mr. Selendy thinks it is provable.
13            MR. SELENDY:  Yes, I do, your Honor.
14            THE COURT:  I don't think you agree.
15            MR. CAFASSO:  We disagree.
16            THE COURT:  So I have two sides here.  But I do
17   think a better way of going is getting it resolved.  Like
18   every good resolution, nobody should be happy; all right?
19   Somebody should go home licking their wounds saying, if only
20   I had, et cetera.  That is how you get a good place to be.
21            Because like everything else, it is very, very
22   expensive case to prosecute and to defend.  And, you know,
23   it just takes a lot of time.  It is not going to be
24   something that is easily done.
25            I know you have already retained your experts, but
26   you haven't really crunched down on expert discovery.  So at
```

Denise M. Paternoster, RPR - Senior Court Reporter

18

```
 1                              Proceedings
 2       this point it is still in a status that you could really
 3       benefit from getting it resolved, despite the fact that it
 4       may not be the best thing for either side; all right?
 5              So that's my thinking.  Happy Thanksgiving wish to
 6       you.
 7              MR. SELENDY:  Thank you, your Honor.
 8              THE COURT:  So make sure I get the minutes, all
 9       right?  Thank you.
10
11              *  *  *  *  *  *  *  *  *
12
13  Certified to be a true and accurate transcription of the minutes
14  taken in the above-captioned matter.
15
16       _____
17              Denise M. Paternoster, RPR
18              Senior Court Reporter
19
20
21
22
23
24
25
26
```

Denise M. Paternoster, RPR - Senior Court Reporter

1

**0**

006 [1] - 8:4
007 [2] - 4:6, 7:26

**1**

1 [4] - 3:2, 3:4, 7:2, 9:6
10004-2498 [1] - 2:5
10010 [1] - 1:23
12 [1] - 6:26
125 [1] - 2:4
13 [1] - 14:20
140 [1] - 12:11
16 [1] - 5:22
18 [2] - 6:23, 6:25

**2**

2006 [1] - 3:4
2006-3 [3] - 1:6, 1:7, 1:7
2006-5 [3] - 1:3, 1:4, 1:4
2006-6 [3] - 1:5, 1:5, 1:6
2007-2 [3] - 1:8, 1:8, 1:9
2012 [5] - 5:22, 5:23, 7:3
2013 [1] - 15:26
2014 [2] - 5:25, 16:18
2015 [6] - 1:16, 6:21, 6:24, 6:25, 7:8, 14:20
2016 [3] - 6:26, 7:2, 7:10
22nd [1] - 1:23
25 [2] - 5:22, 7:7
26 [1] - 6:21
29 [1] - 5:25

**3**

3 [1] - 1:2

**4**

4 [1] - 1:16
4,906 [1] - 5:19
412/13 [1] - 15:25
42,208 [1] - 5:11
44 [1] - 16:16
475 [1] - 15:25

**5**

5 [3] - 3:4, 6:16, 9:20
5-6 [1] - 10:2
51 [1] - 1:23

**6**

6 [1] - 16:17
60 [1] - 1:15
651820/2012 [1] - 1:11

**7**

7 [1] - 7:10
7th [4] - 4:17, 4:23, 4:24, 4:25

**9**

920 [1] - 15:25
95 [1] - 5:18

**A**

able [1] - 7:14
above-captioned [1] - 18:15
accept [1] - 8:13
accepted [2] - 15:19, 16:2
according [2] - 6:21, 10:8
accordingly [2] - 15:17, 16:23
accrued [1] - 10:5
accurate [1] - 18:14
achieving [1] - 11:11
acquiescence [1] - 4:14
acquisition [1] - 5:14
action [2] - 5:21, 8:11
addition [1] - 6:10
adequately [1] - 6:11
adjournments [2] - 7:3, 7:5
adopts [1] - 16:22
affected [1] - 9:24
aggregate [1] - 15:2
agree [4] - 7:18, 8:18, 12:21, 17:15
agreements [1] - 8:21
aimed [1] - 10:14
allegations [1] - 12:17
allege [1] - 5:18
alleged [1] - 5:19
allowed [2] - 8:21, 15:20
allowing [1] - 15:18
ambiguous [2] - 13:16, 14:4
amount [1] - 6:8
AND [4] - 1:24, 1:25, 1:25, 2:6
ANDREW [1] - 1:25
Andrew [1] - 3:8

answer [2] - 10:8, 14:8
anti [1] - 10:7
anti-predatory [1] - 10:7
appeal [2] - 6:18, 17:8
appealable [1] - 17:6
appealed [1] - 6:18
appear [1] - 10:14
Appearances [1] - 1:26
applies [2] - 13:13, 13:14
apply [1] - 13:21
appropriate [1] - 5:7
April [1] - 6:26
argue [1] - 10:11
argued [3] - 12:8, 12:21, 13:15
argues [1] - 16:5
arguing [1] - 9:12
argument [5] - 5:6, 8:19, 11:23, 13:13, 16:8
arguments [1] - 10:14
assets [1] - 5:15
assume [1] - 7:8
Assured [3] - 15:24, 16:15, 16:19
ATTORNEYS [2] - 1:22, 2:4
audit [1] - 6:13
August [1] - 7:7
available [2] - 8:5, 6:9
Avenue [1] - 1:23

**B**

back-and-forth [1] - 8:20
BACKED [4] - 1:4, 1:5, 1:7, 1:8
background [1] - 5:10
balance [1] - 10:4
BALDWIN [4] - 1:24, 3:11, 4:22, 4:24
Baldwin [1] - 3:10
Bank [2] - 3:21, 15:25
BANK [1] - 1:12
bar [3] - 14:11, 15:4, 15:14
based [2] - 11:25, 14:26
basis [1] - 9:19
Bear [2] - 5:13, 5:15
become [1] - 17:6
begin [1] - 4:25
belief [2] - 12:12, 12:18
benefit [1] - 18:4
benefits [1] - 7:25

best [3] - 13:16, 14:4, 18:5
better [2] - 4:9, 17:18
between [1] - 13:9
beyond [2] - 12:5, 13:15
Blackstar [1] - 13:3
bought [1] - 5:14
BRANSTEN [1] - 1:19
breach [5] - 6:15, 9:22, 12:2, 15:3, 16:5
breached [1] - 5:19
breaching [5] - 6:4, 6:11, 6:12, 9:17, 11:3
brief [5] - 6:16, 9:6, 9:7, 9:21, 10:2
briefing [1] - 17:7
Broad [1] - 2:4
brought [1] - 16:3
burden [1] - 15:13
BY [2] - 1:24, 2:5

**C**

Cafasso [1] - 3:24
CAFASSO [8] - 2:5, 3:25, 11:20, 11:22, 13:11, 13:22, 14:9, 17:16
calculate [1] - 14:26
calculated [1] - 12:23
calculation [1] - 10:3
cannot [5] - 9:22, 10:8, 12:22, 15:10, 17:9
Capital [1] - 14:18
caption [1] - 3:5
captioned [1] - 18:15
card [1] - 3:14
case [16] - 5:3, 5:11, 7:4, 7:21, 7:25, 8:15, 10:24, 11:10, 11:12, 11:16, 13:2, 14:13, 16:15, 16:16, 17:23
cases [5] - 15:19, 15:22, 16:2, 16:3, 16:19
causes [1] - 8:11
Centre [1] - 1:15
certainly [1] - 8:18
CERTIFICATES [4] - 1:4, 1:6, 1:7, 1:9
Certified [1] - 18:14
cetera [3] - 3:4, 3:5, 17:21
chair [2] - 3:17, 3:18
changing [1] - 7:13
characteristic [1] -

16:14
characteristics [1] - 16:10
charged [3] - 11:5, 11:13, 12:15
charged-off [2] - 11:5, 11:13
CHASE [2] - 1:12, 1:13
Chase [2] - 3:21
cite [2] - 14:17, 14:20
cited [1] - 9:20
CIVIL [1] - 1:2
claim [1] - 6:11
claims [3] - 8:24, 9:4, 16:25
claims... [1] - 16:4
clarified [1] - 9:7
clear [1] - 10:16
close [1] - 14:3
closer [2] - 7:4
closing [1] - 6:13
CO [1] - 1:13
coming [1] - 5:7
commenced [1] - 5:21
commend [1] - 7:10
commercially [1] - 16:20
commonplace [1] - 12:19
Company [1] - 3:21
compel [1] - 9:13
compelling [1] - 15:16
complaint [3] - 5:22, 6:10, 12:12
completed [2] - 6:23, 6:25
completion [1] - 7:5
compute [1] - 16:21
conclude [1] - 13:17
conclusion [1] - 5:8
conducting [1] - 6:13
conference [2] - 6:21, 7:6
consensus [1] - 16:22
consequential [1] - 6:2
consideration [3] - 10:4, 16:6, 17:12
considered [1] - 15:22
consistent [2] - 9:4, 16:26
constitutes [1] - 17:4
contend [2] - 9:16, 15:9
continue... [1] - 1:26
contract [6] - 12:9, 13:16, 13:23, 13:24, 14:4, 16:26
contracts [2] - 9:5,

13:17
contractual [1] - 10:10
contractually [1] - 9:25
contrary [1] - 12:8
Corp [2] - 15:24, 16:16
correct [1] - 4:19
correctly [1] - 10:11
costs [1] - 10:5
COUNTY [1] - 1:2
County [1] - 16:18
couple [1] - 4:9
course [2] - 7:23, 11:21
COURT [27] - 1:2, 3:2, 3:4, 3:8, 3:10, 3:12, 3:14, 3:15, 3:18, 3:24, 3:26, 4:3, 4:5, 4:18, 4:20, 4:23, 4:25, 10:26, 11:19, 11:21, 13:8, 13:19, 14:6, 14:10, 17:15, 17:17, 18:9
Court [13] - 2:13, 5:26, 6:10, 8:7, 8:8, 8:26, 14:2, 14:13, 15:20, 16:17, 16:22, 17:5, 18:19
court [2] - 13:17, 16:18
courts [2] - 15:19, 15:21
creating [1] - 16:9
Credit [1] - 14:18
Cromwell [1] - 3:22
CROMWELL [1] - 2:3
crunched [1] - 18:2
cure [7] - 6:3, 9:20, 9:22, 10:12, 14:16, 14:24, 15:14
cure-and-repurchase [1] - 15:14
cure-or-repurchase [1] - 14:24
custom [1] - 12:13

## D

damages [13] - 6:2, 6:8, 8:6, 8:10, 8:11, 8:15, 9:4, 10:6, 14:15, 14:23, 14:26, 16:21, 16:25
danger [1] - 8:17
Darrell [1] - 3:24
DARRELL [1] - 2:5
date [3] - 4:16, 8:26, 7:8
dates [2] - 7:13, 7:24

David [1] - 4:22
DB [1] - 16:16
December [1] - 6:25
decide [1] - 7:7
decided [2] - 7:9, 14:19
Decision [1] - 17:4
decision [9] - 4:8, 5:2, 5:7, 5:26, 6:18, 12:6, 14:6, 17:6, 17:7
defective [1] - 14:15
defend [1] - 17:23
defendant [1] - 5:13
Defendant's [3] - 6:16, 9:21, 10:2
defendant's [2] - 5:24, 11:7
Defendants [2] - 1:14, 10:8
DEFENDANTS [1] - 2:4
defendants [5] - 3:20, 9:12, 9:16, 15:9, 15:15
defendants' [1] - 10:14
defined [1] - 9:18
demonstrated [1] - 15:13
demoted [1] - 3:16
denied [1] - 5:25
Denise [1] - 18:18
DENISE [1] - 2:13
Department [2] - 14:14, 14:19
depositions [1] - 6:23
despite [2] - 16:10, 18:4
determination [1] - 16:5
determined [1] - 9:19
disagree [1] - 17:16
discovered [1] - 6:12
discovery [5] - 6:14, 6:20, 6:25, 8:26, 18:2
dismiss [1] - 5:24
dismissed [1] - 5:26
dispute [2] - 12:7, 13:5
District [1] - 15:26
done [4] - 3:3, 4:2, 7:8, 17:25
down [4] - 3:26, 5:7, 7:5, 18:2
drawn [1] - 12:3
due [1] - 9:9
DUNLAP [2] - 1:25, 3:9
Dunlap [1] - 3:8

during [1] - 11:6

## E

easily [1] - 17:25
EILEEN [1] - 1:19
either [1] - 18:5
elements [1] - 8:11
Emanuel [1] - 3:6
EMANUEL [1] - 1:22
EMC [12] - 1:12, 3:20, 5:13, 5:14, 5:16, 5:20, 6:12, 9:17, 9:21, 10:20, 13:3
enforce [1] - 13:6
engaging [1] - 8:20
entire [2] - 16:6, 16:13
Equity [1] - 14:17
ESQ [5] - 1:24, 1:24, 1:25, 2:5, 2:6
ESW [1] - 1:25
et [3] - 3:4, 3:5, 17:21
evidence [3] - 8:23, 14:5, 14:12
example [1] - 6:7
exhibiting [1] - 16:13
expand [1] - 8:19
expensive [1] - 17:23
expert [1] - 18:2
experts [2] - 14:26, 17:26
explain [1] - 14:25
explicitly [1] - 14:23

## F

F.Supp.2d [1] - 15:25
facilitate [1] - 5:3
fact [5] - 6:25, 12:2, 12:11, 16:5, 18:4
figure [1] - 14:26
file [3] - 8:25, 12:25, 16:6
filed [2] - 5:22, 7:2
finally [1] - 15:18
first [6] - 4:10, 6:23, 10:14, 11:22, 11:23
First [2] - 14:13, 14:19
flagstar [1] - 15:24
Flagstar [1] - 16:4
Floor [1] - 1:23
FOR [2] - 1:22, 2:4
forcing [1] - 16:19
foreclose [1] - 9:14
form [1] - 7:7
forth [1] - 8:20
forward [1] - 7:21
four [1] - 5:11
front [1] - 3:15

FSB [1] - 15:25
future [1] - 11:10

## G

given [2] - 16:6, 16:13
governing [2] - 9:5, 16:26
grant [1] - 11:15
granted [5] - 5:24, 8:7, 15:11, 15:17, 17:3
grey [1] - 17:7
Guarantee [1] - 15:24
guaranty [1] - 8:13
Guaranty [1] - 16:15

## H

happy [1] - 17:19
Happy [1] - 18:6
hearing [1] - 5:6
held [3] - 6:10, 14:13, 16:18
hold [1] - 7:24
Home [1] - 14:17
home [1] - 17:20
honestly [1] - 14:3
Honor [15] - 3:7, 3:9, 3:11, 3:23, 3:25, 4:17, 4:24, 11:2, 11:20, 12:5, 12:21, 14:2, 14:9, 17:14, 18:8
HONORABLE [1] - 1:19

## I

i.e [2] - 9:8, 10:17
ill [1] - 16:7
ill-suited [1] - 16:7
implying [1] - 12:6
impossible [1] - 14:16
include [1] - 11:8
included [1] - 9:26
including [3] - 9:5, 16:3, 17:2
Incorporated [3] - 14:18, 16:16
incorrect [1] - 12:6
incurred [1] - 10:6
indeed [3] - 5:2, 7:8, 12:19
indemnification [1] - 13:5
Index [1] - 1:10
individual [2] - 16:10, 16:12
Industry [2] - 12:13, 12:20

inference [1] - 7:16
information [2] - 12:12, 12:18
instance [1] - 16:6
instances [1] - 14:16
instead [1] - 5:5
instructed [1] - 8:25
interest [1] - 10:5
interpretation [1] - 13:23
involves [1] - 10:3
involving [2] - 5:11, 16:4
issue [8] - 7:2, 10:19, 10:24, 13:21, 13:23, 14:7, 17:11, 17:12
issued [1] - 11:6
issuer [4] - 1:3, 1:5, 1:6, 1:8
issues [1] - 9:9

## J

J-E-R-O-M-U-S [1] - 4:22
J.P [2] - 3:21
January [4] - 4:17, 4:23, 4:24, 7:10
Jeromus [1] - 4:22
JPMorgan [1] - 5:14
JPMORGAN [2] - 1:12, 1:13
Judge [2] - 12:26, 15:26
judgement [9] - 4:7, 8:2, 9:2, 13:19, 13:20, 13:22, 15:10, 15:12, 16:24
jury [3] - 8:13, 8:16, 15:6
JUSTICE [1] - 1:19

## K

kind [1] - 4:13

## L

lae [1] - 10:7
language [2] - 6:17, 14:11
last [2] - 4:12, 12:3
law [2] - 15:14, 16:3
lending [1] - 10:7
lengthy [1] - 5:7
letter [1] - 7:17
liability [5] - 8:6, 8:9, 8:15, 9:4, 16:25
licking [1] - 17:20
likewise [1] - 15:21

limited [3] - 9:6, 9:8, 17:2
LIPPERT [2] - 2:6, 3:23
Lippert [1] - 3:22
liquidated [15] - 6:7, 9:8, 10:17, 10:23, 11:5, 11:13, 11:26, 12:6, 12:9, 12:16, 12:22, 12:24, 12:25, 13:12, 15:2
LIZ [1] - 1:25
LLC [3] - 1:12, 3:20, 5:13
LLP [2] - 1:22, 2:3
Loan [1] - 14:17
loan [22] - 8:23, 9:13, 9:18, 9:19, 9:23, 9:24, 10:5, 10:7, 10:13, 10:19, 11:14, 12:9, 12:24, 13:6, 14:15, 15:3, 16:6
loan-by-loan [3] - 9:13, 9:19, 10:13
loan-specified [1] - 9:18
loans [38] - 5:12, 5:16, 5:17, 5:19, 6:4, 6:6, 6:11, 6:12, 8:5, 9:8, 9:17, 10:9, 10:14, 10:17, 10:23, 11:3, 11:4, 11:8, 11:17, 11:18, 11:26, 12:4, 12:7, 12:15, 12:19, 12:22, 12:25, 13:4, 13:12, 15:2, 16:7, 16:20
loss [2] - 11:10, 12:16

**M**

Madison [1] - 1:23
majority [1] - 15:21
manner [2] - 14:25, 15:5
material [1] - 16:5
matter [4] - 13:11, 15:8, 16:13, 18:15
matters [1] - 5:4
MATTHEW [1] - 2:6
Matthew [1] - 3:22
MBIA [2] - 8:7, 15:20
mean [2] - 8:15, 10:22
means [3] - 8:9, 15:10, 15:23
measure [1] - 14:23
mechanism [1] - 8:14
mechanisms [1] - 11:17
mediation [9] - 4:13,

4:14, 7:7, 7:9, 7:15, 7:16, 7:20, 7:22, 7:23
mediator [4] - 4:16, 4:18, 5:4, 7:10
meet [1] - 10:9
members [2] - 16:11, 16:13
method [2] - 9:14, 16:2
middle [1] - 14:8
midst [1] - 6:20
might [1] - 12:26
minutes [3] - 17:7, 18:9, 18:14
Misc.3d1206(A [1] - 16:17
misinterpret [1] - 15:12
miss [1] - 3:15
modified [2] - 11:9, 11:18
moment [1] - 7:23
monetary [1] - 14:15
Morgan [2] - 3:21
morning [2] - 3:23, 3:25
mortgage [6] - 10:5, 10:7, 10:19, 12:15, 12:25, 14:15
MORTGAGE [5] - 1:4, 1:5, 1:7, 1:8, 1:12
Mortgage [2] - 3:20, 5:13
MORTGAGE-BACKED [4] - 1:4, 1:5, 1:7, 1:8
Motion [3] - 4:6, 7:26, 8:3
MOTION [1] - 1:16
motion [19] - 4:7, 5:24, 8:2, 8:7, 8:20, 8:25, 8:26, 9:8, 10:17, 10:23, 11:13, 11:15, 11:25, 13:10, 13:20, 13:22, 15:10, 15:17, 16:23
moving [1] - 9:6
MR [22] - 3:7, 3:9, 3:11, 3:13, 3:17, 3:23, 3:25, 4:4, 4:16, 4:19, 4:22, 4:24, 10:25, 11:2, 11:20, 11:22, 13:11, 13:22, 14:9, 17:14, 17:16, 18:8
multiple [1] - 11:24
Municipal [2] - 15:24, 16:16
must [5] - 7:2, 7:7,

7:14, 8:10, 9:18

**N**

N.A [2] - 1:12, 3:21
name [1] - 4:20
need [2] - 3:14, 13:6
never [2] - 12:8, 12:21
NEW [2] - 1:2, 1:2
new [2] - 4:26, 11:22
New [9] - 1:16, 1:23, 2:5, 15:26, 16:3, 16:17
nobody [1] - 17:19
NOMURA [1] - 14:17
Nomura [2] - 11:6, 14:17, 14:18
nonetheless [1] - 16:12
nonpayment [1] - 9:9
note [1] - 7:2
notes [1] - 7:5
nothing [3] - 12:8, 15:4, 15:15
notice [1] - 5:21
November [2] - 1:16, 6:23
Number [3] - 4:6, 7:26, 8:4
number [1] - 4:11

**O**

objectives [1] - 11:11
obviously [1] - 5:25
October [2] - 5:22, 14:19
OF [3] - 1:2, 1:2
offer [1] - 15:15
offered [1] - 14:11
official [1] - 14:20
once [1] - 17:6
one [5] - 4:11, 7:25, 9:22, 13:25, 14:7
ones [1] - 10:24
opinion [1] - 11:6
oppose [1] - 9:12
opposition [2] - 6:16, 9:21
oral [1] - 8:19
Order [1] - 17:4
order [7] - 6:22, 7:6, 8:4, 8:23, 9:13, 13:6, 13:23
originators [1] - 13:4
otherwise [1] - 6:8
outside [2] - 9:10, 10:9
outstanding [1] - 10:4
overarching [1] - 4:12

overwhelming [1] - 15:21

**P**

page [2] - 9:20, 15:25
pages [1] - 9:26
papers [1] - 13:16
Paragraph [1] - 12:11
part [4] - 5:13, 5:14, 5:24, 5:25
PART [1] - 1:2
partial [6] - 4:7, 8:2, 9:2, 13:20, 13:22, 16:23
particular [1] - 13:10
parties [5] - 6:20, 7:7, 8:3, 8:19, 8:25
parties' [1] - 8:21
party [2] - 6:14, 13:4
paternoster [1] - 18:18
PATERNOSTER [1] - 2:13
payment [1] - 9:18
payments [1] - 12:15
percent [1] - 5:18
performing [3] - 11:9, 11:18, 11:26
permitted [3] - 8:4, 8:8, 15:22
persuasive [1] - 15:7
pertains [2] - 10:17, 10:23
Philip [1] - 3:6
PHILIPPE [1] - 1:24
phonetic [1] - 13:3
place [1] - 17:21
plaintiff's [2] - 4:7, 8:2
Plaintiff's [2] - 15:3, 15:17
plaintiffs [12] - 3:6, 5:18, 6:12, 8:4, 8:8, 8:10, 8:22, 9:2, 9:6, 9:7, 14:25, 15:13
Plaintiffs [5] - 1:10, 10:11, 10:16, 14:14, 15:4
PLAINTIFFS [1] - 1:22
Plaintiffs' [1] - 16:23
plaintiffs' [1] - 5:26
plausible [1] - 13:25
point [1] - 18:3
pool [3] - 15:3, 16:11, 16:13
populating [1] - 16:11
population [2] - 11:17, 12:3
post [1] - 6:13
post-closing [1] - 6:13

potentially [1] - 11:3
practice [1] - 12:13
predatory [1] - 10:7
prepare [1] - 7:15
prepared [1] - 11:16
present [4] - 8:5, 8:8, 8:23, 15:23
presentation [1] - 15:6
presented [2] - 12:2, 14:5
presents [1] - 14:22
presiding [1] - 15:26
prevail [1] - 8:23
price [6] - 6:9, 9:18, 9:25, 9:26, 10:3, 12:23, 14:22, 15:2
principal [1] - 10:4
private [1] - 4:18
problematic [1] - 13:14
proceeding [1] - 15:5
process [2] - 7:16, 7:20
Products [1] - 16:16
proof [6] - 9:13, 9:15, 10:13, 15:7, 15:15, 15:23, 16:2, 16:7
proportion [1] - 16:12
proposed [1] - 6:5
prosecute [1] - 17:23
provable [2] - 17:12, 17:13
prove [6] - 8:9, 8:10, 9:3, 11:16, 16:25
provide [1] - 12:14
provided [2] - 6:3, 14:23
proving [1] - 8:14
provision [6] - 9:16, 9:20, 9:26, 14:22, 14:24, 15:14
provisions [1] - 10:12
proviso [1] - 8:12
PSA [4] - 6:16, 14:11, 14:24, 15:4
PSAs [8] - 6:3, 6:14, 8:21, 9:6, 9:12, 10:12, 15:14, 17:2
PSAs' [1] - 15:9
purchase [7] - 6:9, 9:25, 9:26, 10:3, 12:23, 14:22, 15:2
purchased [1] - 5:16
purpose [1] - 16:8
purposes [1] - 11:11
pursue [1] - 14:14

## Q

quality [1] - 6:13
questions [2] - 4:9, 4:10
quicker [1] - 5:9
QUINN [1] - 1:22
Quinn [1] - 3:6
quoted [1] - 14:22
quoting [1] - 6:16

## R

raised [1] - 11:23
Rakoff [1] - 15:26
random [1] - 5:19
rate [1] - 15:3
re [1] - 16:19
re-underwrite [1] - 16:19
reading [1] - 13:25
ready [1] - 4:8
really [3] - 7:20, 18:2, 18:3
reason [1] - 12:22
reasoning [1] - 16:22
reasons [1] - 13:13
rebut [1] - 15:16
recently [2] - 14:14, 14:19
recommended [1] - 4:13
recorded [1] - 14:21
reflective [1] - 16:12
relating [1] - 16:3
released [3] - 11:5, 11:14, 12:16
relevant [1] - 6:16
remaining [1] - 10:15
remedy [1] - 6:4
remove [1] - 9:22
renders [1] - 16:7
replacement [2] - 6:4, 9:23
reply [3] - 9:7, 10:16, 11:23
Reporter [2] - 2:13, 18:19
REPORTER [1] - 3:14
representation [1] - 6:15
representations [1] - 5:20
representative [1] - 16:9
representing [1] - 3:5
repurchase [18] - 6:3, 6:11, 6:14, 8:24, 9:14, 9:16, 9:20, 9:24, 10:10, 10:12,

12:10, 12:14, 12:19, 13:5, 14:16, 14:24, 15:14, 16:4
repurchased [4] - 6:6, 9:11, 12:7, 12:22
request [1] - 7:12
requests [1] - 6:2
require [2] - 9:13, 10:13
required [3] - 6:14, 8:22, 9:22
requirements [1] - 10:10
requires [2] - 9:17, 16:6
resclssory [1] - 6:2
resolution [1] - 17:19
resolvable [1] - 17:11
resolve [1] - 17:10
resolved [2] - 17:18, 18:4
resolving [1] - 7:25
respect [1] - 14:15
respond [1] - 11:20
restricted [1] - 11:13
result [2] - 10:6, 11:10
retained [1] - 17:26
return [1] - 9:17
returned [1] - 10:20
reviews [1] - 6:13
rights [3] - 13:2, 13:3, 13:7
RMBS [5] - 5:10, 5:11, 15:19, 15:22, 16:4
ROSENSHINE [1] - 1:25
Rosenshine [2] - 3:13, 3:15
RPR [2] - 2:13, 18:18
rule [1] - 13:24
ruled [1] - 8:8
ruling [2] - 9:3, 16:24

## S

Saco [2] - 3:2, 3:4
SACO [8] - 1:3, 1:4, 1:5, 1:6, 1:6, 1:7, 1:8
sample [3] - 15:3, 16:9, 16:11
sampling [27] - 5:19, 8:5, 8:9, 8:14, 8:17, 8:22, 9:3, 9:14, 10:8, 10:9, 11:12, 11:15, 11:16, 11:24, 11:25, 12:2, 13:13, 13:21, 14:12, 15:10, 15:15, 15:18, 15:22, 16:2, 16:8, 16:20, 16:25
scope [1] - 8:20

SEAN [1] - 1:24
Sean [1] - 3:10
second [2] - 3:26, 14:11
securitization [1] - 12:16
securitizations [2] - 5:11, 6:3
securitized [1] - 5:16
see [2] - 6:15, 7:19
See [1] - 15:24
seek [1] - 9:2
seeking [2] - 8:4, 16:24
SELENDY [11] - 1:24, 3:7, 3:13, 3:17, 4:4, 4:16, 4:19, 10:25, 11:2, 17:14, 18:8
Selendy [3] - 3:6, 4:3, 17:13
sellers [1] - 12:14
senior [1] - 18:19
Senior [1] - 2:13
separate [2] - 15:7
Sequence [3] - 4:6, 7:26, 8:3
SERIES [4] - 1:4, 1:6, 1:7, 1:9
services [1] - 6:17
set [3] - 3:2, 4:16, 11:8
sheet [1] - 17:7
Sherwood [1] - 12:26
showing [1] - 15:16
side [1] - 18:5
sides [2] - 14:7, 17:17
sign [1] - 7:19
silence [1] - 15:9
sit [1] - 3:26
sits [1] - 3:15
sitting [1] - 5:6
size [1] - 16:9
skip [1] - 13:26
small [1] - 11:8
sold [1] - 13:4
Southern [1] - 15:25
speaking [1] - 4:3
specific [2] - 9:17, 14:7
specified [3] - 9:18, 9:25, 10:9
sponsors [1] - 12:14
standard [3] - 13:26, 14:2
STATE [1] - 1:2
statement [1] - 10:22
states [1] - 9:21
statistical [4] - 8:9, 9:3, 16:7, 16:24
status [3] - 6:21, 7:6,

18:3
stead [1] - 9:24
Sterns [2] - 5:14, 5:15
still [10] - 8:10, 8:16, 11:10, 12:23, 12:24, 12:25, 13:13, 13:14, 18:3
stipulation [1] - 7:19
stop [1] - 7:20
streamlining [1] - 11:12
Street [2] - 1:15, 2:4
strongly [1] - 17:9
Structured [1] - 16:16
subject [2] - 12:9, 13:9
substitute [1] - 9:23
substituted [1] - 10:20
succeed [2] - 7:21, 7:23
sufficient [1] - 16:9
suited [1] - 16:7
Sullivan [1] - 3:22
SULLIVAN [2] - 1:22, 2:3
summary [9] - 4:7, 8:2, 9:2, 13:19, 13:20, 13:22, 15:10, 15:12, 16:23
summer [1] - 8:3
summons [1] - 5:21
support [1] - 8:6
SUPREME [1] - 1:2
Supreme [1] - 16:17
susceptible [1] - 13:25

## T

tens [1] - 11:2
TERM [1] - 1:2
terms [4] - 5:4, 9:5, 11:5, 16:26
Thanksgiving [1] - 18:6
THE [27] - 1:2, 1:22, 3:2, 3:4, 3:6, 3:10, 3:12, 3:15, 3:18, 3:24, 3:26, 4:3, 4:5, 4:25, 10:26, 11:19, 11:21, 13:8, 13:19, 14:6, 14:10, 17:15, 17:17, 18:9
therefore [2] - 10:19, 17:3
they've [1] - 14:4
thinking [1] - 18:6
thinks [1] - 17:13
third [1] - 13:4

third-party [1] - 13:4
thousand [1] - 11:4
thousands [1] - 11:3
today [1] - 14:3
totalling [1] - 6:11
transactions [2] - 9:5, 17:2
transcript [1] - 5:6
transcription [1] - 18:14
trial [5] - 8:6, 10:24, 11:11, 14:12, 15:23
tried [1] - 8:19
true [1] - 18:14
Trust [9] - 3:2, 3:4, 9:9, 9:10, 9:23, 9:24, 10:6, 10:15, 10:18
trust [3] - 6:8, 8:5, 9:11
TRUST [8] - 1:3, 1:4, 1:5, 1:6, 1:8, 1:8
Trusts [1] - 5:18
twenty [1] - 11:3
twenty-two [1] - 11:3
two [3] - 9:24, 11:3, 17:17

## U

ultimately [2] - 17:10, 17:11
unambiguously [2] - 9:13, 13:18
under [1] - 16:3
underlying [1] - 16:11
understood [2] - 11:6, 14:9
underwrite [1] - 16:19
unique [1] - 16:10
unless [1] - 7:12
unpersuasive [1] - 16:8
unreasonable [1] - 16:20
up [3] - 3:2, 3:15, 11:16
urge [1] - 17:9
URQUHART [1] - 1:22

## V

valid [1] - 9:14
value [1] - 12:25
vehicle [1] - 15:15
violation [1] - 10:6
virtually [1] - 11:4

## W

wait [1] - 3:26

5

warrants [1] - 5:20
warranty [1] - 6:15
well-accepted [1] -
  15:19
whole [1] - 3:5
widely [1] - 16:2
wish [2] - 17:8, 18:6
withdrawn [1] - 6:19
wounds [1] - 17:20
write [1] - 7:5
writing [1] - 5:7
wrote [1] - 7:3

## Y

year [1] - 4:26
YORK [2] - 1:2, 1:2
York [9] - 1:16, 1:23,
  2:5, 15:26, 16:3,
  16:17

Denise M. Paternoster, RPR Sr. Court Reporter

# Exhibit B

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK : PART 45

-----------------------------------------------------------------------x
HOME EQUITY MORTGAGE TRUST SERIES 2006-1,  :
HOME EQUITY MORTGAGE TRUST SERIES 2006-3,  :
and HOME EQUITY MORTGAGE TRUST SERIES      :
2006-4,                                    :
                                           :
                        Plaintiffs,        :          Index No. 156016/2012
                                           :
          -against-                        :          INTERIM ORDER
                                           :
DLJ MORTGAGE CAPITAL, INC., and SELECT     :
PORTFOLIO SERVICING, INC.,                 :
                                           :
                        Defendants.        :
-----------------------------------------------------------------------x

**MELVIN L. SCHWEITZER, J.:**

    After review of plaintiffs' November 11, 2013 correspondence, the court agrees that

plaintiffs' use of statistical sampling to prove liability and damages would streamline the trial,

promote judicial economy, and conserve the resources of the parties and the court.  Accordingly,

it is hereby

    ORDERED that plaintiffs may use a statistical sampling to prove liability and damages

on all of their claims; and it is further

    ORDERED that the parties shall meet and confer as to the sample to be used.

Dated: November 18, 2013

                ENTER:

                        J.S.C.

                              **MELVIN L. SCHWEITZER**

# Exhibit C

United States District Court
Southern District of Texas
**ENTERED**
September 14, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-2676 |
| | § | |
| AMERICUS MORTGAGE | § | |
| CORPORATION, *et al.*, | § | |
| | § | |
| Defendant. | | |

## MEMORANDUM OPINION AND ORDER

This case arises from the operation of mortgage lending businesses by Allied.[1] At the conclusion of a five-week trial, the jury found Allied liable for multiple violations of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, and the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), 12 U.S.C. § 1833a. *See* Dkt. 435. The Court subsequently denied Allied's renewed motion for judgment as a matter of law (Dkt. 539) and motion for new trial (Dkt. 540).

Now pending before the Court is The United States of America's Post-Trial Motion for Treble Damages and Entry of the Judgment (Dkt. 479); and associated responsive pleadings.[2] Based on the motion, responses, replies, and various supplemental

---

[1] "Allied" includes Americus Mortgage Corporation (formerly known as Allied Home Mortgage Capital Corporation) ("Allied Capital"), Allquest Home Mortgage Corporation (formerly known as Allied Home Mortgage Corporation) ("Allied Corporation"), and Jim C. Hodge ("Hodge").

[2] Responsive pleadings include The United States of America's Post-Trial Memorandum of Law in Support of Treble Damages and Civil Penalties (Dkt. 468); Allied Defendants' Opposition to Government's Position Concerning Treble Damages and Civil Penalties (Dkt. 492); The United States of America's Post-Trial Reply Memorandum of Law in Further Support of Treble Damages and Civil Penalties (Dkt. 500); the Corrected Declaration of Joseph N. Cordaro in Support of the United States' Post-Trial Memorandum of Law (Dkt. 516); and the

briefings; the applicable law; and the arguments of counsel, the Court finds Allied liable for treble damages and civil penalties under the FCA, as well as for civil penalties under FIRREA. For the reasons set forth in detail below, the Court enters judgment in favor of the United States of America ("United States").

**ANALYSIS**

**I. Treble Damages and Civil Penalties for FCA Violations**

A defendant who violates the FCA is liable to the United States for civil penalties of "not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). The jury found that Allied Capital and Jim Hodge submitted or caused to be submitted 103 insurance claims, in violation of 31 U.S.C. § 3729(a)(1)(B), and that the Federal Housing Administration (FHA) thereby sustained damages of $7,370,132 because Allied Capital and Jim Hodge falsely represented that their branches were registered by HUD. The jury further found that Allied Corporation submitted or caused to be submitted 1,192 insurance claims in violation of 31 U.S.C. § 3729(a)(1)(A) and (B), and that the FHA thereby sustained damages of $256,837,929 because Allied Corporation recklessly underwrote loan applications. Pursuant to the FCA, the United States now asks the Court to award treble damages as well as civil penalties against Allied.

---

United States of America's Post-Trial Reply Memorandum of Law in Further Support of Treble Damages and Civil Penalties (Dkt. 517).

## A. FCA Treble Damages

Treble damages are mandatory under the FCA. *See* 31 U.S.C. § 3729(a)(1)(G). However, Allied argues that there are no damages to treble because the United States failed to prove that the FCA violations were the proximate cause of the losses that it suffered. Allied also argues that the United States improperly seeks to treble "gross"— rather than "net"—damages. Dkt. 492, p. 1.

### *i. Causation*

First, Allied argues that the United States cannot recover treble damages because it failed to prove that Allied's FCA violations proximately caused the damages it suffered. According to Allied, the United States relied solely upon a "but for" theory of actual causation throughout the case, and "*made no attempt* to prove that any loan loss was proximately caused by either 'reckless underwriting' or because a loan was 'originated' from a branch office not registered with HUD." Dkt. 492, p. 5 (emphasis added). In support of the argument, Allied asserts that the United States' experts' conceded that "they were not instructed to analyze or otherwise determine or opine upon causation." The Court finds that this argument is without merit.

Allied's arguments ignore both the definition of proximate cause that was submitted to the jury and the evidence that was presented at trial. To recover damages, the United States must show that a defendant's false statement or fraudulent course of conduct "caused the government to pay out money or to forfeit money due (i.e., that involved a claim)." *United States ex rel. Longhi v. United States*, 575 F.3d 458, 467 (5th Cir. 2009) (quoting *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d

370, 376 (4th Cir. 2008)); *see also United States v. Miller*, 645 F.2d 473, 476 (5th Cir. 1981). While the Fifth Circuit has not articulated a specific causation standard applicable to FCA claims, the parties agree that the proximate cause standard applies to the claims asserted by the United States in this case. Dkt. 492, p. 5; Dkt. 537. *See e.g.*, *United States v. Abbott Labs*, No. 3:06-CV-1769-M, 2016 WL 80000, at *6 (N.D. Tex. Jan. 7, 2016).

Proximate causation carries a more stringent standard of proof than does actual (i.e., "but for") causation. However, it is not so stringent as to require elimination of all alternative possible causes. *See United States v. Spicer*, 57 F.3d 1152, 1159 (D.C. Cir. 1995) ("It is undoubtedly true that in each case other factors also 'caused' the buyer's default, but that is of no moment, for as long as Spicer's misrepresentations were a material and proximate cause, they need not have been the sole factor causing HUD's losses."). "Proximate cause is often explicated in terms of foreseeability." *Paroline v. United States*, —— U.S. ——, 134 S.Ct. 1710, 1719-20, 188 L.Ed.2d 714 (2014). Thus, as courts have held, "Defendants' conduct may be found to have caused [the FCA violation] if the conduct was (1) a substantial factor in inducing providers to submit claims ... and (2) if the submission of claims ... was reasonably foreseeable or anticipated as a natural consequence of Defendants' conduct." *Abbott Labs*, 2016 WL 80000 at *6.

Here, the Court gave the following jury instructions requiring the United States to establish proximate causation to recover damages in this action:

> In order for the United States to recover damages in a lawsuit under the
> False Claims Act, the allegedly false or fraudulent claim must have caused
> the United States to have suffered damages it otherwise would not have
> suffered. The United States has the burden to prove the damages it
> suffered. This means that the United States must show by a preponderance
> of the evidence that Allied's conduct was a *substantial factor* causing the
> United States to suffer damages, and that the amount of damages suffered
> by the United States was a *foreseeable consequence* of the allegedly false
> statements, false claims, or fraudulent course of conduct.

Dkt. 482, pp. 6-7, 18 (emphasis added).[3] Even a cursory review of the trial record

reflects that the United States presented significant and credible evidence from multiple

sources from which the jury could conclude that Allied's conduct of recklessly

underwriting and originating loans from unregistered branch offices was a substantial

factor in the submission of claims. *See, e.g.*, Dkt. 401, pp. 21-23 (transcript, testimony of

HUD representative Julie Shaffer). There was also significant and credible evidence

presented through exhibits and both fact and expert witness testimony that the damages

suffered by the United States were the foreseeable consequence of Allied's misconduct.

Accordingly, the Court finds that the jury properly found damages upon which it can base

an award of treble damages.

### ii. Gross v. Net Damages

Next, Allied argues that the United States is seeking to improperly treble

"gross"—rather than "net"—damages. Allied argues that only net damages—the

difference between the amount the United States paid on the claims and any payment

back to the United States as a result of those claims—should be trebled under the FCA.

The Court disagrees. It is well established in this circuit that the damages awarded by the

---

[3] Allied concedes that the jury charge was a correct statement of the law. Dkt. 492, p. 5.

jury are to be tripled *before* any subtractions to the award are made for compensatory payments previously received by the Government from any source. *See Longhi*, 575 F.3d, at 473 (specifically rejecting the argument that, when calculating damages under the FCA, the trial court must first subtract value of benefit that defendants conferred on Government from amount Government paid to defendants and then treble this "actual-damages" figure).[4] Accordingly, the Court finds that the jury's FCA damages award must be trebled as follows:

- **Allied Capital and Jim Hodge** violated 31 U.S.C. § 3729(a)(1)(B), causing the government to sustain damages in the amount of $7,370,132. Pursuant to 31 U.S.C. § 3729(a)(1)(G), Allied Capital and Hodge are therefore jointly and severally liable to the United States for **$22,110,396**.

- **Allied Corporation** violated 31 U.S.C. § 3729(a)(1)(A) and (B), causing the government to sustain damages in the amount of $85,612,643. Pursuant to 31 U.S.C. § 3729(a)(1)(G), Allied Corporation is therefore liable to the United States for **$256,837,929**.

## B. FCA Civil Penalty

In addition to the mandatory trebling of damages, the Court may at its discretion assess civil penalties of between $5,000 and $11,000 per FCA violation. 31 U.S.C. § 3729(a)(1)(G). In enacting the FCA, Congress "afforded the federal trial courts considerable discretion in calculating damages and ascertaining the amount of the civil penalty component, within the statutory range." *U.S. ex rel. Rigsby v. State Farm Fire & Cas. Co.*, No. 1:06CV433-HSO-RHW, 2014 WL 691500, at *6 (S.D. Miss. Feb. 21,

---

[4] The Court declines to follow Allied's suggestion to disregard this clear precedent in favor of contrary precedent from other jurisdictions. *See, e.g., United States v. Anchor Mortgage Corp.*, 711 F.3d 745, 750 (7th Cir. 2013).

2014). Under the FCA, "[e]ach individual false claim or statement triggers the statute's civil penalty." *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995). FCA civil penalties exist—at least partly—to combat and deter fraud. *Hudson v. United States*, 522 U.S. 93, 102 (1997).

The FCA provides no specific formula or list of factors to consider when determining a civil penalty. Accordingly, in determining an appropriate civil penalty, courts consider the "totality of the circumstances" which necessarily encompasses the various considerations employed by other courts and recommended by the parties. *See, e.g., United States v. Saavedra*, 661 F. App'x 37, 46 (2d Cir. 2016) (unpublished) (considering defendant's willingness to accept responsibility); *United States ex rel. Drakeford v. Tuomey*, 792 F.3d 364, 389 (4th Cir. 2015) (considering whether violations were isolated or recurrent); *U.S. ex rel. Miller v. Bill Herbert Intern. Const., Inc.*, 501 F. Supp. 2d 51, 56 (D.D.C. 2007) (including seriousness of misconduct, scienter, amount of damages suffered in totality of circumstances approach).

After carefully considering the trial record, the Court finds that penalties toward the high end of the spectrum are warranted in this case. The evidence presented at trial showed that this conduct resulted in a large number of claims submitted and considerable resulting damage to the United States. *See Drakeford*, 792 F.3d, at 389 ("[W]hile the penalty is certainly severe, it is meant to reflect the sheer breadth of the fraud … perpetrated upon the federal government."). Rather than making an isolated or occasional mistake, Allied engaged in a prolonged, consistent enterprise of defrauding the United States.

### i. 103 'Unregistered Branches' Violations

The jury found that Allied Capital and Jim Hodge violated the False Claims Act by knowingly representing to HUD that certain FHA-insured loans were originated from HUD-approved Allied Capital branches, and were therefore eligible for FHA insurance, when in fact they were not. Dkt. 435, p. 2. These violations caused the submission of 103 claims, resulting in $7,370,132 in damages to the FHA.

The damages suffered by the United States arose from the loan origination and processing operations of the Allied Capital and Jim Hodge. In 2007, the United States Department of Housing and Urban Development ("HUD") began enforcing a rule that only Federal Housing Administration ("FHA")-registered branches could originate FHA-insured loans. Evidence shows that Allied Capital and Hodge engaged in a campaign of subterfuge and noncompliance with this rule. Specifically, Allied Capital and Hodge developed corporate policies whereby its unregistered North Carolina branches would continue to originate and process loans. These branches did so by using false registration numbers—namely, those assigned to Allied Capital's registered branches. At trial, several managers even testified that their signatures had been forged.

HUD became aware of the Allied's North Carolina branches' disproportionately high loan default rates. A 2011 HUD audit identified eight loans that had originated from unregistered branches. When given the opportunity to explain, Allied Capital—in a letter signed by Hodge—insisted that their corporate policy required strict adherence to HUD regulations and that these eight loans originating from unregistered branches were

aberrations. Notably, Hodge's letter failed to notify HUD of its other loans that originated from unregistered branches.

The fact that Allied Capital and Hodge's actions resulted in over seven million dollars of damages speaks for itself regarding the harm to the public that was caused by the violations. Further, Allied Capital and Hodges' failure to address the unregistered-branch loans that were not discovered by the HUD audit demonstrates both an increased level of scienter as well as a patent unwillingness to accept responsibility for their actions. Accordingly, the Court orders that the assessment of a civil penalty against Allied Capital and Hodge, jointly and severally, in the amount of $10,000 for each of the 103 violations, for a total civil penalty of **$1,030,000**.[5]

### ii. 1,192 'False Underwriting' Violations

The jury found that Allied Corporation also violated the FCA by knowingly representing to HUD that certain FHA-insured loans had been underwritten with due diligence and were eligible for FHA insurance when they were not. Dkt. 435, pp. 4-6. These violations caused the submission of 1,192 claims resulting in $85,612,643 in damages to the FHA.

Allied Corporation argues for a civil penalty for these violations on the low end of the spectrum because "[m]ost of the FCA finding of liability against Allied Corporation

---

[5] Allied argues that the civil penalty should be decreased for Mr. Hodge because there is relatively little evidence of his wrongdoing in violating the FCA. The Court disagrees. The jury found both Hodge and Allied Capital liable for an equal number of violations and amount of damages and there was significant evidence presented at trial that Hodge was well aware of—and participated in—these violations. Specifically, the evidence taken as a whole reflects that the violations were all part of a scheme overseen by Hodge to defraud the United States.

is based on a 'reckless underwriting' theory," and "recklessness" is at the low end of the *mens rea* spectrum. *See* Dkt. 492, p. 9. The Court disagrees.

Assuming *arguendo* that the recklessness mental state favors a lenient civil penalty, the degree of scienter is but one factor that the Court may consider in its analysis.[6] Additionally, the Court may consider the systematic and consistent nature of Allied Corporation's culpable actions and the decade-long span of the 1,192 violations. *See, e.g.*, Dkt. 297-2, p. 108 (expert report of Dr. Ensor in which "[t]he population of loans considered for the stratified samples ranged in closing dates from the year 2001 through the year 2011"). Here, the evidence at trial reflected that Allied Corporation's approach to underwriting FHA loans under the direct endorsement lender program was custom-designed to flout the very program that relied upon Allied Corporation's diligence and compliance. There was evidence that Allied Corporation's underwriters were subjected to unrealistic quotas, bullying, and even threats of removal for attempting to comply with regulations. Just as insidiously, there was evidence that Allied Corporation's quality control department was designed to rubber-stamp—rather than

---

[6] Furthermore, the jury could have based its finding under the FCA on more than merely "reckless conduct." The jury was instructed that:

> Under the False Claims Act, the term "knowingly" means that a person, with respect to information, (i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth; or (iii) acts in reckless disregard of the truth or falsity of the information. It is not necessary for the United States to prove that Allied acted with the specific intent to defraud anyone. However, mere errors or negligent mismanagement alone are not enough to create liability under the False Claims Act.

Dkt. 434; *see U.S., ex rel. Johnson v. Kaner Med. Grp., P.A.*, 641 F. App'x 391, 394 (5th Cir. 2016).

check—the underwriters' loans. Allied Corporation's actions resulted in a large number of claims and significant harm to both the United States and its citizens.

Next, Allied argues that a low civil penalty is appropriate because there is a possibility that the jury found Allied liable for loans that were underwritten based on "honest mistakes … and simple negligence." Dkt. 492, p. 15. The Court disagrees. This argument completely ignores the instructions given to the jury—specifically the instructions regarding mere errors or negligence. *See supra* note 6.

Considering the totality of the circumstances surrounding Allied's conduct, the Court imposes a civil penalty upon Allied Corporation in the amount of $10,000 for each of the 1,192 violations, for a total civil penalty of **$11,920,000**.

In summary, the Court finds Allied liable for the following damages and civil penalties under the FCA:

| Defendant(s) | Statute | Damages sustained by FHA | Treble damages awarded | Claims submitted | Civil penalty per claim awarded | Total civil penalty awarded | Total |
|---|---|---|---|---|---|---|---|
| Allied Capital, Jim Hodge | 3729(a)(1)(B) | $7,370,132 | $22,110,396 | 103 | $10,000 | $1,030,000 | **$23,140,396** |
| Allied Corporation | 3729(a)(1)(A) and (B) | $85,612,643 | $256,837,929 | 1,192 | $10,000 | $11,920,000 | **$268,757,929** |

## II. FIRREA Civil Penalty

Allied violated FIRREA by submitting or causing the submission of nine separate false annual certifications to HUD concerning Allied's compliance with HUD's quality

control requirements.[7]  Dkt. 435, pp. 8-9.  The United States requests that the Court impose a total civil penalty of $9,900,000 against Allied collectively for these violations.[8]  Dkt. 468, p. 21.  Allied violated FIRREA by submitting or causing the submission of false quality control documents to HUD.  Dkt. 435, pp. 8-11.  The United States requests that the Court impose a civil penalty of $1,100,000 each against Jim Hodge, Allied Capital, and Allied Corporation.  Dkt. 468, p. 25.

FIRREA requires the Court to assess a civil penalty for Allied's violations.  While the assessment of a penalty is mandatory, the amount of the penalty is discretionary with the Court.  12 U.S.C. § 1833a(a).  The general maximum penalty is $1,100,000 per violation.[9]  FIRREA also provides a special penalty for continuing violations, which is capped at $5,500,000.

As a preliminary matter, Allied argues an award of a FIRREA civil penalty in addition to an FCA civil penalty would violate the Eighth Amendment of the United States Constitution.  Specifically, Allied argues—without providing any case law

---

[7] Allied makes a sub-argument that the United States failed to produce evidence of Allied Corporation's false annual certifications for fiscal years 2006 and 2007.  Allied's argument is not supported by the record. *See, e.g.*, Dkt. 467-4, pp. 239-259 (email from Lorie Hiatt of Allied Corporation with attached incomplete FY07 reverifications); Dkt. 467-6, pp. 264-272 (email from Lorie Hiatt of Allied Corporation with attached incomplete FY06 reverifications); Dkt. 467-32, p. 486 (FY07 Allied Corporation Title II Annual Verification Report); Dkt. 467-33, p. 488 (FY06 Allied Corporation Title II Annual Verification Report).

[8] These penalties include: 1) $4,400,000 for Allied Capital and Jim Hodge, jointly and severally; and 2) $5,500,000 for Allied Corporation and Jim Hodge, jointly and severally.

[9] *See* 28 C.F.R. § 85.3(a)(6).

support—that it is being subjected to multiple punishments under different statutes for the same conduct. The Court disagrees.

The evidence establishes that Allied independently and without overlap violated both the FCA and FIRREA. The FCA violations at issue are directed toward the combined 1,295 insurance claims that Allied caused to be submitted. Allied caused these claims by either falsely stating that the loans originated from HUD-registered branches or by underwriting ineligible loans. The FIRREA penalties, in contrast, are directed toward the submission of false annual certifications over the course of nine years. These annual certifications, if submitted in good faith, were to serve as a separate and independent quality check on the branches, whose actions led to the FCA violations. Unlike the FCA violations, which often physically originated at the employee level, the annual certifications resulting in FIRREA violations were signed directly by either a president or vice president. Accordingly, the Court finds that an award of civil penalties under the FCA and FIRREA in this case would not be unconstitutional.[10]

## A. Annual False Certification Violations

FIRREA provides no factors for courts to consider when determining an appropriate civil penalty and there is a dearth of case law regarding the assessment of FIRREA civil penalties. The parties have presented only two federal district court cases that have considered this subject. *See United States v. Luce*, No. 11 C 05158, 2016 WL

---

[10] As a further sub-argument, Allied also argues that no FIRREA civil penalty can be based on the FY09 annual certification because this exhibit was never sent to the jury during deliberations. The Court finds this argument unpersuasive. Although the FY09 annual certification was not submitted to the jury, there was testimonial evidence presented to the jury regarding its contents.

6892857 (N.D. Ill. Nov. 23, 2016); *United States v. Menendez*, No. CV 11-06313 MMM (JCGx), 2013 WL 828926 (C.D. Cal. Mar. 6, 2013).

Courts ruling on statutes that mandate discretionary penalties but that do not provide factors for consideration have traditionally turned to the factors used to analyze other statutes requiring discretionary civil penalties. Both *Luce* and *Menendez* adopted this approach. This Court does so as well, considering the following factors when determining an appropriate civil penalty:

> (1) the good or bad faith of the defendant and the degree of his scienter; (2) the injury to the public, and whether the defendant's conduct created substantial loss or the risk of substantial loss to other persons; (3) the egregiousness of the violation; (4) the isolated or repeated nature of the violation; and (5) the defendant's financial condition and ability to pay.

*Menendez*, 2013 WL 828926, at *5 (citing *Fed. Election Comm'n v. Furgatch*, 869 F.2d 1256, 1258 (9th Cir. 1989)). Accordingly, the Court will consider these factors in the context of the "totality of the circumstances" surrounding the Allied's conduct. *See Saavedra*, 661 Fed. App'x 37, at 46.

At trial there was clear evidence of Allied's bad faith and knowledge regarding the filing of false annual certifications. They were aware of their non-compliance with HUD requirements prior to signing the annual certifications. Jeanne Hammond-Stell, who had worked for Allied since 1998, rose to the position of Executive Vice President and Director of Compliance. She personally signed and submitted four of the nine annual certifications. Her testimony demonstrates the degree of scienter involved in submitting the false annual HUD certifications:

**Q** Who told you to sign those certifications?

**A** Well, it was part of my job duties to ensure that these were submitted to HUD.

**Q** And who informed you that this was part of your job duties?

**A** Jim Hodge

**Q** Did Mr. Hodge tell you why it was your responsibility to sign these certifications to HUD?

**A** Well, he wanted to make sure that they were submitted to HUD so that the company could remain open.

**Q** Was Allied in compliance with HUD's quality control rules when you signed each of these certifications?

**A** No.

**Q** Were these certifications true and correct when you signed them?

**A** No.

**Q** Did—to your knowledge, did Mr. Hodge know that these certifications were not true when you signed these and submitted them to HUD?

**A** He knew that the company did not follow the—the required rules.

**Q** For quality control?

**A** Yes.

**Q** So why did you sign these?

....

**A** I should have had the backbone not to do it, but I—I didn't. I knew that if I refused, I would lose my job, and I needed my job.

Dkt. 457, pp. 240-43. Further, there is ancillary evidence of chronic noncompliance. Such obvious noncompliance—in the form of false reports and uncompleted audits and reverifications—further renders the annual certifications as false. The evidence leaves little doubt that such noncompliance was at the behest of Allied's upper management. *See* Dkt. 453, p. 209 ("It is noted that no reverifications or appraisals have been ordered since March, 2008 up [through] the present per instructions from management."). In short, the scienter and egregiousness factors weigh heavily against Allied.

The risk of significant loss and injury to the public from the filing of false annual certifications was clearly apparent to Allied. HUD required annual certifications to provide an extra level of quality control after the underwriting phase. As with the FCA

civil penalty analysis, Allied's false annual certifications were instrumental in injuring the public to a degree that cannot be overstated. This injury arrived in the form of multiple defaults and foreclosures for Allied's borrowers as well as elevated mortgage insurance premiums for the general public due to such foreclosures. The Court notes that these injuries span nearly a decade. Finally, the Court finds that Allied's purported financial situations weighs slightly in favor of a less than maximum allowable FIRREA civil penalty.

The circumstances in *Luce* and *Menendez* are distinguishable from the facts of this case. Unlike in *Luce*, the United States has not urged—nor has the Court determined—that Allied is unable to pay a civil penalty. *See Luce*, 2016 WL 6892857, at *5. Unlike in *Menendez*, Allied's violations were neither isolated nor relatively benign. 2013 WL 828926, at *2. Here, unlike in *Menendez*, there is no easy determination of the amount that Allied profited from their violations. Further, their actions were reckless, egregious, and widely injurious. *Id.* Accordingly the Court declines to impose in this case penalties similar to the amounts imposed by the courts in *Luce* and *Menendez*.

Having considered the above factors, the Court assesses Jim Hodge, Allied Capital, and Allied Corporation with separate FIRREA civil penalties of **$1,100,000** each with respect to the false annual certification violations.

## B. False Quality Control Violations

These violations occurred in connection with an email sent from compliance specialist and assistant vice president Cynthia Ann Coolger to HUD employee Odell Freeman in 2009. Attached to the email was the January 2009 Management Summary.

The Summary explained that Allied's quality control staff was utilizing "software for individual file audits, the tracking of review credit reports, review appraisals, and re-verifications" called TENA. Dkt. 516-3, p. 3. The Summary contained eighteen false TENA reports.

Utilizing the *Menendez* factors above, the Court finds that, once again, Allied's actions reflect a high level of scienter and egregiousness. The eighteen false reports further show that Allied's actions were not isolated. Allied's false quality control documents also caused injury upon their clients and the general public, as discussed above. Having considered the above factors, the Court assesses Jim Hodge, Allied Capital, and Allied Corporation with separate FIRREA civil penalties of **$1,100,000** each with respect to the false quality control documents.

## CONCLUSION

It is hereby **ORDERED** that the United States' Motion is **GRANTED**. The Court directs entry of Judgment in favor of the United States: (i) awarding FCA treble damages of $22,110,396 and penalties of $1,030,000, for a combined amount of $23,140,396, against Allied Capital and Hodge, jointly and severally; (ii) awarding FCA treble damages of $256,837,929 and penalties of $11,920,000, for a combined amount of $268,757,929, against Allied Corporation; and (iii) imposing FIRREA penalties of $2,200,000 each against Allied Capital, Allied Corporation, and Jim Hodge.

SIGNED at Galveston, Texas, this 14th day of September, 2017.

George C. Hanks, Jr.
United States District Judge

# Exhibit D

United States District Court
Southern District of Texas
**ENTERED**
September 14, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. 4:12-CV-2676 |
| | § | |
| AMERICUS MORTGAGE | § | |
| CORPORATION *et al*, | § | |
| | § | |
| Defendant. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the Court is Allied's Motion for New Trial. Dkt. 505. "The court may, on motion, grant a new trial on all or some of the issues—and to any party ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." FED. R. CIV. P. 59(a)(1)(A). "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (footnotes omitted). *See also Beckham v. La. Dock Co., L.L.C.*, 124 Fed. App'x. 268, 270 (5th Cir. 2005); *Vackar v. Sentry Supply Inc.*, No. CIV.A. H-12-3716, 2015 WL 338616, at *2 (S.D. Tex. Jan. 26, 2015).

A Rule 59 motion is not granted "unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done, and the burden of showing harmful error rests on the party seeking the new trial." *Sibley v. Lemaire*, 184 F.3d 481, 487 (5th Cir. 1999) (quotation marks omitted). "Unless justice requires

otherwise, no error in admitting or excluding evidence—or any other error by the court or a party—is ground for granting a new trial .... At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." FED. R. CIV. P. 61. In determining whether to grant a motion for new trial, the court must view the evidence "in a light most favorable to the jury's verdict." *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

Significant deference is owed to the jury's verdict; "a new trial should not be granted unless the verdict is against the great weight of the evidence, not merely the preponderance of the evidence." *Dresser–Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 838-39 (5th Cir. 2004) (internal citation omitted); *see also Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir. 1998) (explaining that courts affirm the verdict unless the evidence "points so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary conclusion." (internal citations and quotation marks omitted)).

The Court finds that Allied has not shown that the trial was unfair or that prejudicial error crept into the proceedings. Further, the Court finds that the great weight of the evidence favors the verdict. Accordingly, Allied's motion for a new trial is **DENIED**. To the extent that, as a part of this pending motion, Allied argues that the Court failed to adequately explain its denial of Allied's *Daubert* motion regarding expert witness Richard Payne, the Court restates its analysis and ruling below.

In denying the *Daubert* motion, the Court found that Payne's expert testimony was both relevant and reliable and that he was abundantly qualified to testify to whether

certain mortgage loans were eligible for FHA insurance. *See* Dkt. 297-2. The Court also found that his testimony would help the jury to understand the evidence in a large-scale mortgage fraud case. The Court found that the methodology utilized by Payne—which included his reliance on data produced from statistical sampling and the subsequent extrapolation of his findings—rested on a reliable foundation. This methodology has been widely adopted by the Fifth Circuit as well as other circuits in cases involving a large amount of data. *See, e.g., In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997) ("The applicability of inferential statistics have long been recognized by the courts."); *United States v. Lahey Clinic Hospital, Inc.*, 399 F.3d 1, 18 n.19 (1st Cir. 2005) ("[S]ampling of similar claims and extrapolation from the sample is a recognized method of proof."); *Ratansen v. Cal. Dept. of Health Servs.*, 11 F.3d 1467, 1471 (9th Cir. 1993).

SIGNED at Galveston, Texas, this 14th day of September, 2017.

George C. Hanks, Jr.
United States District Judge

# Exhibit E

United States District Court
Southern District of Texas

**ENTERED**

September 29, 2017

David J. Bradley, Clerk

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, | 12 Civ. 02676 (GCH) |
| Plaintiff-Intervenor, | |
| v. | **FINAL JUDGMENT** |
| ALLQUEST HOME MORTGAGE CORPORATION, f/k/a/ ALLIED HOME MORTGAGE CORPORATION, AMERICUS MORTGAGE CORPORATION, f/k/a/ ALLIED HOME MORTGAGE CAPITAL CORPORATION, JIM C. HODGE, and JEANNE L. STELL, | |
| Defendants. | |

Whereas in a trial before this Court, the jury having found defendants Allquest Home

Mortgage Corporation, formerly known as Allied Home Mortgage Corporation ("Allied

Corporation"), Americus Mortgage Corporation, formerly known as Allied Home Mortgage

Capital Corporation ("Allied Capital"), and Jim C. Hodge ("Hodge"), liable under the False

Claims Act, as amended, 31 U.S.C. § 3729 *et seq.*, and the Financial Institutions Reform,

Recovery, and Enforcement Act of 1989, 12 U.S.C. § 1833a; this Court now having to determine

what treble damages and civil penalties should be imposed on defendants for violations of those

statutes; and the Court on September 14, 2017, having rendered its Opinion and Order directing

the Clerk of the Court to enter Final Judgment against Allied Corporation, Allied Capital, and

Hodge as specified below, it is:

ORDERED, ADJUDGED AND DECREED that for the reasons stated in the Court's Opinion and Order dated September 14, 2017, that the United States of America is awarded a judgment in the sum of:

(a) $268,037,929 as against Allquest Home Mortgage Corporation, formerly known as Allied Corporation;

(b) $25,340,396 as against Americus Mortgage Corporation, formerly known as Allied Capital, of which $23,140,396 is owed jointly and severally with Hodge;

(c) $25,340,396 as against Hodge, of which $23,140,396 is owed jointly and severally with Americus Mortgage Corporation, formerly known as Allied Capital.

Dated: Galveston, Texas
       September 29 2017

Hon. George C. Hanks, Jr.
United States District Judge

2