**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| TMI TRUST COMPANY, solely in its capacity as Separate Trustee of the SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-WM2 (SABR 2006-WM2),<br><br>Plaintiff,<br><br>      v.<br><br>WMC MORTGAGE, LLC f/k/a WMC MORTGAGE CORP.,<br><br>Defendant. | Civil Action No.<br>3:12-cv-01538 (CSH) |

**WMC MORTGAGE, LLC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE CERTAIN TESTIMONY OF WMC'S EXPERT WITNESSES**

Anthony M. Fitzgerald (ct04167)
Howard K. Levine (ct10555)
CARMODY TORRANCE
SANDAK & HENNESSEY LLP
195 Church St., 18th Floor
New Haven, CT 06509
Phone: 203 777-5501
Fax: 203 784-3199

Barbara S. Steiner (*pro hac vice*)
Megan B. Poetzel (*pro hac vice*)
Michael A. Doornweerd (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Phone: 312 222-9350
Fax: 312 527-0484

Matthew S. Hellman (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Ave NW
Washington, DC 20001-4412
Phone: 202 639-6000
Fax: 202 639-6066

*Attorneys for Defendant WMC Mortgage, LLC*

ORAL ARGUMENT REQUESTED

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................1

LEGAL STANDARD........................................................................................3

ARGUMENT ......................................................................................................3

I.    Dr. Leamer's Opinions Are Admissible. ..................................................3

      A.    Dr. Leamer's Qualifications And Methodology. ....................................3

      B.    Dr. Leamer's Opinion About The Considerations That Should Go Into
            Picking A Sample Size Is Reliable. ........................................................5

II.   Mr. Abshier's Testimony Is Admissible. ..................................................8

      A.    Mr. Abshier's Qualifications And Methodology. ...................................9

      B.    Mr. Abshier's Opinions ████████████████ Are Relevant..............10

      C.    Mr. Abshier's Opinions ████████████████ Are Relevant. ...........17

      D.    Mr. Abshier's Opinions Do Not Rest On Unreliable Speculation.........19

III.  Mr. Olasov's Opinions Are Admissible................................................21

      A.    Mr. Olasov's Qualifications And Methodology. ..................................21

      B.    Mr. Olasov's Testimony Is Relevant If TMI Is Allowed To Pursue
            Damages Not Set Forth In The PSA. ...................................................23

      C.    Mr. Olasov's Testimony Is Based On A Reliable Methodology. ..........24

CONCLUSION.................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) .......................................................................................................3

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
    104 F. Supp. 3d 441 (S.D.N.Y. 2015)) ...........................................................15, 16

*Green v. City of New York*,
    359 F. App'x 197 (2d Cir. 2009) .................................................................................15

*In re Digital Music Antitrust Litigation*,
    06-md-1780 (LAP), 2017 WL 3037577 (S.D.N.Y. 2017)................................21, 27

*MASTR Adjustable Rate Mortgs. Trust 2006-OA2 v. UBS Real Estate Sec. Inc.*,
    No. 12-cv-7322 (PKC), 2015 WL 764665 (S.D.N.Y. Jan. 9, 2015).......................13

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*,
    392 F.3d 520 (2d Cir. 2004)......................................................................................25

*Trouble v. Wet Seal, Inc.*,
    179 F. Supp. 2d 291 (S.D.N.Y. 2001).........................................................................3

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*,
    205 F. Supp. 3d 386 (S.D.N.Y. 2016)......................................................15, 16, 18

*United States v. Hatfield*,
    795 F. Supp. 2d 219 (E.D.N.Y. 2011) .........................................................................8

*Wald v. Costco Wholesale Corp.*,
    No. 03-cv-6308 (JSR), 2005 WL 425864 (S.D.N.Y. Feb. 22, 2005) ........................3

**OTHER AUTHORITIES**

Fed. R. Evid. 702 .............................................................................................................3

Defendant WMC Mortgage, LLC ("WMC") respectfully submits this opposition to the Motion *in Limine* To Exclude Certain Testimony of WMC's Expert Witnesses and accompanying Memorandum in Support ("TMI Brief") filed by Plaintiff TMI Trust Company, solely as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2 ("TMI," as Separate Trustee of the "Trust").

## INTRODUCTION

TMI seeks to bar three of WMC's experts from offering certain opinions at trial. TMI's arguments are not just without merit, they frequently attack the very techniques that TMI itself relies upon and ignore TMI's own legal theories.

***Dr. Edward Leamer***. TMI seeks to exclude a single narrow opinion from WMC's statistics expert, Dr. Leamer. TMI's liability and damages case rests on a 400-loan sample drawn by its statistics expert, Dr. Lipshutz. TMI uses that sample to extrapolate a breach rate and damages for the 4,144 Trust loans that had not paid in full as of the time of Dr. Lipshutz's report. One of Dr. Leamer's opinions is that the better statistical practice in this case would have been to use a larger sample to obtain a smaller margin of error. As Dr. Leamer explains, the modest cost of obtaining a larger sample would have been negligible compared to the value of the additional accuracy it would afford. TMI contends that Dr. Leamer's opinion on this point is unhelpful, but Dr. Leamer's opinion rests on textbook statistical guidance for constructing samples, and has proven correct given that each percentage point added to the margin of error has made TMI's damages calculation less precise by millions of dollars. Indeed, even Dr. Lipshutz has subsequently acknowledged that he does not know if his sample provides an adequate margin of error to reliably estimate the damages TMI is claiming.

***Mr. David Abshier***. ████████████████████████████████████

████████████████████████████████████████████████████████████████████

1



**Mr. Brian Olasov.** Mr. Olasov is WMC's servicing expert ███████████████ ███████████████████████████████████████████ TMI remarkably claims that Mr. Olasov's testimony is irrelevant because TMI does not need to prove that a breach caused a default to recover the contractual Repurchase Price. TMI's point about how the Repurchase Price works is correct, but TMI overlooks the fact that it is seeking nearly a billion dollars in damages based on theories that its damages expert concedes have nothing to do with the Repurchase Price. As WMC has explained in its own *Daubert* motion papers, these "Rescissory Damages" and "Benefit of the Bargain Damages" are barred by the contract. If this Court agrees, WMC will withdraw the ███████████ related portions of Mr. Olasov's testimony. But if this Court were to permit TMI to seek any remedy outside the Repurchase Price unambiguously set out in the contract the parties executed (and it should not), then TMI must prove causation like other contract plaintiffs. So long as TMI is pursuing its improper damages theories, Mr. Olasov's ████████ testimony remains highly relevant.

2

**LEGAL STANDARD**

Determining the admissibility of expert testimony under Rule 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), requires a district court to "determine that (1) the expert is qualified, (2) the testimony is relevant, and (3) . . . the testimony is reliable." *Wald v. Costco Wholesale Corp.*, No. 03-cv-6308 (JSR), 2005 WL 425864, at *5 (S.D.N.Y. Feb. 22, 2005) (citing *Daubert*, 509 U.S. at 592-97 and Fed. R. Evid. 702). The Court's inquiry into the reliability of an expert's method focuses "not on the substance of the expert's conclusions, but on whether those conclusions were generated by a reliable methodology." *Trouble v. Wet Seal, Inc.*, 179 F. Supp. 2d 291, 301 (S.D.N.Y. 2001).

**ARGUMENT**

I.    **Dr. Leamer's Opinions Are Admissible.**

      A.    **Dr. Leamer's Qualifications And Methodology.**

      Dr. Leamer is the Chauncey J. Medberry Professor of Management, Professor of Economics, and Professor of Statistics as the University of California at Los Angeles. (Declaration of Matthew S. Hellman in Support of WMC Mortgage, LLC's Memo in Opposition to Plaintiff's Motion *in Limine*, Oct. 20, 2016 ("Hellman Opp'n Decl."), Ex. A, Expert Report of Edward Leamer, Ph.D. ¶ 1, Feb. 13, 2015 ("Leamer Report").) He earned a B.A. in Mathematics from Princeton University in 1966 and a Masters in Mathematics and Ph.D. in Economics from the University of Michigan in 1970. (*Id.*) Prior to holding his current faculty position, he served as Chair of the Department of Economics and Area Head of Business Economics at UCLA, and held faculty positions at Harvard University and Yale University. (*Id.*) He has also held visiting faculty positions at several universities, including the University of Chicago, the University of Basel, the Central European University in Prague, the Institute for Advanced Studies in Vienna, and the Universidad de San Andreas in Buenos Aires. (*Id.*) His extensive academic work has been

3

published in the fields of econometric methodology and statistical analysis, international economics, and macro-economic forecasting—including authoring five books and over 90 academic articles. (*Id.* ¶ 2.) In the four years preceding his expert report in this case, he was retained as an expert in eight cases, and his testimony has never been excluded as unreliable. (*Id.* at Ex. 3.)

In this case, Dr. Leamer was asked to opine on the extent to which Dr. Lipshutz's sample design permitted the reliable estimation of breach rate and damages. (*Id.* ¶ 13.) Dr. Leamer provided his first expert report on February 13, 2015, which was before the loans in the sample were reunderwritten and before TMI's damages expert, Dr. Mason, attempted to estimate damages using the sample breach rate. (*Id.*) In that first report, Dr. Leamer opined, among other things, that a statistician needs to design a sample that lines up with the circumstances and objectives for the sample's use. (*Id.* ¶ 14.) Dr. Leamer further opined that given the relatively modest costs of reviewing the loans in comparison to the amount of damages that TMI was going to seek, a larger sample—which would improve the accuracy and reliability of any estimate based on the sample— was appropriate. (*Id.* ¶ 16.) Moreover, Dr. Leamer opined that, because Dr. Lipshutz did not know how damages would be calculated, Dr. Lipshutz could not at that time opine that his sample could be used to estimate damages with any specific degree of precision. (*Id.* ¶ 19.)

After the reunderwriting work was completed and Dr. Mason made his estimate of damages based on Dr. Lipshutz's breach rate, Dr. Leamer provided a rebuttal report in which he examined Dr. Lipshutz's opinion that the margin of error for the sample original-loan-balance-based breach rate was ±5.5%. (Hellman Opp'n Decl., Ex. B, Rebuttal Report of Edward Leamer, Ph.D., Responding to Second Expert Report of Nelson R. Lipshutz, Ph.D. ¶ 13 Aug. 19, 2016 ("Leamer Rebuttal Report").) In his rebuttal report, Dr. Leamer conclusively demonstrated that Dr.

Lipshutz's calculation of the margin of error was wrong, and, therefore, unreliable. (*Id.* ¶ 34.) Dr. Lipshutz has tacitly conceded the validity of Dr. Leamer's criticism—after reviewing Dr. Leamer's rebuttal report, Dr. Lipshutz provided the result of a new "rough calculation" of the margin of error at his deposition—which resulted in a wider margin of error of ±5.95%. (Hellman Opp'n Decl., Ex. C, Excerpts of Nelson Lipshutz Ph.D., Deposition Transcript at 122:21-123:22, 130:14-131:2, Sept. 29, 2016 ("Lipshutz Sept. 29, 2016 Dep. Tr.").)   The margin of error translates into significant dollar amounts.  For example, under Dr. Mason's lowest damages theory, which he calls "Repurchase Damages," a 1% increase in the margin of error makes the margin of error wider by approximately ±\$3.6 million.  (*See* Hellman Opp'n Decl., Ex. D, Expert Report of Dr. Joseph R. Mason ¶ 5, May 20, 2016 ("Mason Report") (asserting that the Trust was entitled to \$354.9 million in "Repurchase Damages").)

Dr. Leamer additionally opined in his rebuttal report that, even if Dr. Lipshutz had calculated the margin of error correctly (which Dr. Lipshutz did not do), Dr. Lipshutz's calculation still would not have been an accurate reflection of the reliability of Dr. Mason's damages estimate because Dr. Lipshutz failed to account for the uncertainty arising from Dr. Mason's estimate of future losses.  (Hellman Opp'n Decl., Ex. B, Leamer Rebuttal Report ¶ 33.)   Here again, Dr. Lipshutz admitted that he did nothing to quantify the uncertainty associated with Dr. Mason's estimation of future damages and did not know whether the uncertainty associated with Dr. Mason's estimate of future losses was "tolerable or not tolerable."  (Hellman Opp'n Decl., Ex. C, Lipshutz Sept. 29, 2016 Dep. Tr. at 73:22-74:9.)

### B.   Dr. Leamer's Opinion About The Considerations That Should Go Into Picking A Sample Size Is Reliable.

In its motion, TMI says nothing about Dr. Leamer's opinions demonstrating how Dr. Lipshutz's margin of error calculation was wrong, or any of the other opinions expressed in his

rebuttal report. Instead, TMI seeks to exclude only a narrow slice of Dr. Leamer's opinions expressed in his first report. (TMI Brief at 5-9, Dkt. 181.) In that first report, Dr. Leamer opined that Dr. Lipshutz should have better understood the circumstances and objectives for the sample's use before selecting his sample. (Hellman Opp'n Decl., Ex. A, Leamer Report ¶ 14.) As one part of that critique—which is the only opinion of Dr. Leamer's that TMI seeks to exclude— Dr. Leamer opined that the better statistical practice called for using a larger sample size to yield a narrower margin of error because the cost of obtaining a larger sample in this case was low relative to the value of the increased accuracy it would yield. (*Id.* ¶ 16) Specifically, Dr. Leamer explained that if Dr. Lipshutz had increased his sample size to 1,500 loans, it would have reduced the margin of error for the count-based breach rate to just ±0.02, or 2%, at a cost of an additional $330,000-440,000.[1] (*See* Hellman Opp'n Decl., Ex. F, Declaration of Edward E. Leamer, Ph.D. ¶ 12, June 12, 2015; Ex. A, Leamer Report ¶ 16 n.14.) This $330,000-440,000 amount turned out to be approximately 0.1% of the damages TMI seeks under its theory yielding the least amount of claimed damages.[2] (*See* Hellman Opp'n Decl., Ex. D, Mason Report ¶ 5) (asserting that the Trust

---

[1] As Dr. Leamer notes, the per-loan cost of re-underwriting analysis has been calculated at approximately $300-$400. (*See* Hellman Opp'n Decl., Ex. A, Leamer Report ¶ 16. n.14 (citing *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, No. 11-cv-6188 (DLC), 2012 WL 6000885, at *1 (S.D.N.Y. Dec. 3, 2012)).) This analysis of the necessary sample size to meet a ±2% margin of error was based on a count-based breach rate, which was the only breach rate that Dr. Lipshutz had proposed to calculate at that time. (*See* Hellman Opp'n Decl., Ex. E, Amended Report of Nelson R. Lipshutz, Ph.D. ¶ 9, July 20, 2015; Ex. B, Leamer Rebuttal Report ¶¶ 9-12.)

[2] Dr. Leamer illustrated the additional precision gained by the use of a narrower margin of error, in the context of a count-based breach rate, which was the only breach rate that Dr. Lipshutz had proposed to calculate in his report. Dr. Leamer explained that assuming a breach rate of 50% of the 4,170 total loans in the pool that had not yet paid in full from which Dr. Lipshutz drew his sample of 400, a 5% margin of error means the true breach rate is between 45% and 55%, or between 1,877 and 2,294 loans. (Hellman Opp'n Decl., Ex. A, Leamer Report ¶¶ 13, 18.) The 417 loan difference between those two figures—representing the magnitude of error tolerated in Dr. Lipshutz's study—is greater than the entire sample Dr. Lipshutz examined. (*Id.* ¶ 18.) Note that, although the total number of loans that had not been paid in full as of the date of Dr. Lipshutz's July 20, 2015 report (which is the current operative report) is 4,144, Dr. Leamer used the 4,170

was entitled to $354.9 million in "Repurchase Damages").) While Dr. Leamer does not contend

that Dr. Lipshutz's decision to employ a sample size with a ±5% margin of error by itself

invalidates his study, he opines that the better practice here would have been to use a larger sample

size for the sake of greater accuracy.

This critique is not unreliable speculation as TMI would have it, rather it is textbook

statistical guidance, which Dr. Leamer cited in his report. As Dr. Leamer explained, Dr. Lipshutz's

failure to address the possibility of obtaining a substantially more accurate sample at a small cost

relative to the damages at stake amounted to an "obvious" omission as a matter of best statistical

practice. (Hellman Opp'n Decl., Ex. A, Leamer Report ¶ 16 n.13 (citing William G. Cochran,

*Sampling Techniques* 83-85 (3d ed. 1977) ("purpose in taking [a] sample is to diminish th[e] loss"

through error that is expected to result from a given sample size)); *id.* ¶ 14 (citing Steven K.

Thompson, *Sampling* 1-4 (3d ed. 2012)).) Indeed, even Dr. Lipshutz admitted that "any sampling

text points out that there is a trade-off between how much it costs to do it and how much the

improvement in the precision . . . is." (Hellman Opp'n Decl., Ex. G, Excerpts of Nelson R.

Lipshutz, Ph.D. Deposition Transcript at 67:9-68:12, Jan. 21, 2015.) TMI appears to be contending

that because Dr. Leamer's critique on this point is that Dr. Lipshutz's study is suboptimal rather

than invalid, his opinion cannot help the trier of fact. But this Court is free to give—and should

give—less weight to a study that is inaccurate or suboptimal.[3]  *See e.g.*, *United States v. Hatfield*,

---

number for his illustration because that 4,170 number was initially used by Dr. Lipshutz. (*See*
Hellman Opp'n Decl., Ex. G, Excerpts of Nelson R. Lipshutz, Ph.D. Deposition Transcript at 49:9-
14, Jan. 21, 2015.) The number changed from 4,170 to 4,144 due to an error made by Dr. Lipshutz
when he identified the population of loans that were not yet paid in full, and because more loans
became paid in full in the time between the two relevant reports by Dr. Lipshutz. (*See* Hellman
Opp'n Decl., Ex. H, Excerpts of Nelson R. Lipshutz, Ph.D. Deposition Transcript at 231:23-234:3,
185:6-9, Sept. 3, 2015.)

[3] TMI criticizes Dr. Leamer for not knowing the precise amount of TMI's damages calculations
at his deposition. (TMI Brief at 8, Dkt. 181.) But TMI had not even offered a damages calculation

795 F. Supp. 2d 219, 241 (E.D.N.Y. 2011) ("In light of the P/E study's imperfections, the Court affords it less weight.").

Moreover, Dr. Leamer's opinion on sample size is closely related to his opinion that Dr. Lipshutz should have understood, before creating the sample, how TMI was going to calculate damages. Both opinions are part of the larger critique that Dr. Lipshutz failed to understand the circumstances and objectives for the sample's use. (Hellman Opp'n Decl., Ex. A, Leamer Report ¶ 14.) Dr. Leamer's critique proved prescient. As WMC has explained in its motion to exclude the testimony of Dr. Mason, Dr. Lipshutz has acknowledged that to the extent that TMI seeks to recover "future damages" on loans—*i.e.*, to estimate the losses that the loans in breach will incur in the future—his 400-loan sample may not provide an adequate margin of error to deal with the uncertainty of future damages. (WMC's Memo in Support of its Motion to Partially Exclude the Expert Testimony of Dr. Joseph R. Mason at 26-28, Oct. 6, 2016, Dkt. 185 ("Mason *Daubert*").) Dr. Lipshutz testified at his deposition that he would rely on Dr. Mason to solve this problem, but Dr. Mason did nothing about it when he estimated the future damages on the loan. (*Id.* at 27-28, 27 n.4.) WMC submits that Dr. Mason's inclusion of future damages should be excluded on multiple grounds, but the salient point here is that Dr. Lipshutz's sampling methodology resulted in a sample that was too small to meet the margin of error that he set out to meet, and Dr. Leamer's critique has been validated.

## II.     Mr. Abshier's Testimony Is Admissible.

TMI seeks to exclude three aspects of the opinions offered by WMC's reunderwriting expert, Mr. Abshier. Mr. Abshier's opinions are soundly grounded in standard reunderwriting

---

at the time of Dr. Leamer's deposition, and the key—and indisputable—point for Dr. Leamer's critique is that the claimed damages are large relative to the cost of obtaining additional accuracy.

practices. That conclusion should come as no surprise to TMI given that its own expert, Mr. Payne,

based his own opinions on similar practices.

### A.   Mr. Abshier's Qualifications And Methodology.



**B.** **Mr. Abshier's Opinions** ███████████████ **Are Relevant.**





███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████        A material breach is a breach of a representation and warranty that

significantly increases the risk of loss on a loan. *MASTR Adjustable Rate Mortgs. Trust 2006-OA2*

*v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (PKC), 2015 WL 764665, at *10 (S.D.N.Y. Jan. 9,

2015). ██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

---

6 Pooling and Servicing Agreement for Securitized Asset Backed Receivables LLC Trust 2006-WM2, dated as of October 1, 2006.



    The Second Circuit decision that TMI cites for the proposition that Mr. Abshier's opinions are impermissible "post-hoc justifications" demonstrates why TMI is wrong.  (TMI Brief at 16, Dkt. 181 (quoting *Green v. City of New York*, 359 F. App'x 197, 199 (2d Cir. 2009)).)  In *Green*,

the expert was not allowed to invoke "objective medical evidence" supporting the defendant's actions because that evidence did "not speak to the *subjective intent inquiry* required by the [governing law]." *Green*, 359 F. App'x at 199 (emphasis added). ███████████████

████████████████████████████████████████████████████████████████

████████████████████████████

The other case law TMI invokes to support its position is inapposite. TMI cites two cases—one from Judge Castel and the other from Judge Cote—in contending that ███████████████

████████████████████████████████████████ (TMI Brief at 12-13, Dkt. 181

(citing *U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*, 205 F. Supp. 3d 386 (S.D.N.Y. 2016) and *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441 (S.D.N.Y. 2015)).) TMI fails to mention that both *UBS* and *Nomura* were decisions rendered *after* a bench trial where the courts had heard from the experts on what constituted proper reunderwriting; those cases provide no support for excluding expert testimony in advance of trial. Here, what the Court will hear from *each* side's underwriting experts is that proper reunderwriting in this case includes

████████████████████████████████████████████████████████████████

████████████████████████

TMI also fails to mention that both of those cases concerned underwriting guidelines that *required* the originator to document any compensating factors warranting an exception from the guidelines. In *UBS*, "[t]he Guidelines themselves, which include certain technical manuals used by the underwriters, required the individual underwriter to document guidelines exceptions in writing." 205 F. Supp. at 449. Accordingly, Judge Castel did not credit the opinion of an underwriting expert who contended that exceptions did not need to be documented because such reasoning was "inconsistent with the language of the PSAs as informed by the Originator's

guidelines." *Id.* at 450.  Likewise, in *Nomura*, the court emphasized that it would not consider unidentified compensating factors precisely because "[u]nderwriting guidelines required . . . that exceptions to underwriting criteria be documented."  104 F. Supp. 3d at 524.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████ His opinions on this matter should not be excluded.

**C.     Mr. Abshier's Opinions** ████████████████████████ **Are Relevant.**

TMI's second challenge to Mr. Abshier concerns his opinions ████████████████

████████████████ Again, Mr. Abshier's opinions are consistent with the PSA and the practices of

TMI's own expert.  There is no basis for excluding them.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████

████████████ As Judge Castel has explained, if the borrower was receiving that income, then the missing document did not actually make the loan more likely to suffer a loss. *See UBS,* 205 F. Supp. 3d at 467-68 (quoting *MASTR Adjustable Rate Mortgs. Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, No. 12-cv-7322 (PKC), 2015 WL 797972, at *3 (S.D.N.Y. Feb. 25, 2015)) ("[T]he failure to obtain written verification of the salary and employment of a borrower may be a material deviation from underwriting standards, but if the borrower, in fact, was paid the exact salary and had the exact employment that he claimed, the material deviation would not 'materially and adversely affect the interests of the Certificateholders . . . .'" (internal quotation marks omitted)).

██████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
████████████████
███████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████
██████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████ TMI should not be heard to complain about practices that its own expert employs, let alone to insist upon a "heads we win, tails you lose" rule.

**D.      Mr. Abshier's Opinions Do Not Rest On Unreliable Speculation.**

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████



▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒   That disagreement should be explored at trial, and not resolved in a *Daubert* motion. *See In re Digital Music Antitrust Litigation*, 06-md-1780 (LAP), 2017 WL 3037577, at *10 (S.D.N.Y. 2017) (citing *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 316 (S.D.N.Y. 2015)) ("Where expert witnesses disagree on the interpretation of evidence properly admitted before the Court, it is not the Court's role to resolve the dispute through exclusion of one of the expert's opinions.").

**III.    Mr. Olasov's Opinions Are Admissible.**

    **A.    Mr. Olasov's Qualifications And Methodology.**

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒

---

7 ▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒
▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒▒



████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████

    █████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

**B.      Mr. Olasov's Testimony Is Relevant If TMI Is Allowed To Pursue Damages Not Set Forth In The PSA.**

TMI seeks to exclude Mr. Olasov's opinions ████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

WMC agrees that if TMI were seeking to recover only under the contract, pursuant to the PSA's Repurchase Price formula, then Mr. Olasov's ████████████ testimony would not be necessary.  However, TMI's damages claims are not so limited.  TMI seems to have forgotten that its damages expert, Dr. Mason, offers *three* damages theories, two of which have nothing to do

23

with the Repurchase Price.  In addition to seeking damages pursuant to what Dr. Mason calls a "simulation" of the Repurchase Price formula, Dr. Mason also opines regarding two additional measures of damages—"Rescissory Damages" and "Benefit of the Bargain Damages" —which he claims warrant over $900 million in damages.  (Hellman Opp'n Decl., Ex. D, Mason Report ¶ 5.) Dr. Mason freely acknowledges that his Rescissory Damages and Benefit of the Bargain calculations are not calculated pursuant to the Repurchase Price formula in the PSA:  "I understand that the Trust may not be limited solely to the contractual repurchase remedy.  Thus, in addition to Repurchase Damages, I have been asked to calculate Rescissory Damages and assess Benefit of the Bargain Damages."  (*Id.* ¶ 49.)  Dr. Mason confirmed at his deposition that these damages calculations are not set forth in the contract.  (Hellman Opp'n Decl., Ex. S, Excerpts of Dr. Joseph R. Mason Deposition Transcript at 283:14-284:4, Oct. 11, 2016 ("Mason Dep. Tr.").)

WMC believes that these extra-contractual damages theories should be excluded for the reasons set forth in its motion to exclude Dr. Mason's testimony regarding those damages claims. (Mason *Daubert* at 8-21, Dkt. 185.) ███████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

Dr. Mason's damages theories are fundamentally flawed.

**C.       Mr. Olasov's Testimony Is Based On A Reliable Methodology.**

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████ TMI's argument is inaccurate and misunderstands TMI's burden of proof in this case.

As WMC has explained, if TMI is seeking recover outside the contractual repurchase protocol, then *it* has the burden to prove contract damages, including causation, like any other contract plaintiff. *See Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004); *see also* Mason *Daubert* at 22, Dkt. 185. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████

    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████



8



In addition, TMI's disagreement
is premised on a partial reading or misunderstanding of
Mr. Olasov's conclusions and analyses and is simply an instance of experts disagreeing, a matter
which should be resolved at trial. *See In re Digital Music Antitrust Litigation*, 2017 WL 3037577,
at *10 (S.D.N.Y. 2017).

████████████████   Mr. Olasov's testimony is relevant to this question and based on a reliable methodology.

## CONCLUSION

For the foregoing reasons, WMC respectfully submits that this Court should deny TMI's Motion *in Limine*.

Dated: October 20, 2017

Respectfully submitted,

**CARMODY TORRANCE SANDAK & HENNESSEY LLP**

  /s/ Howard K. Levine       

Anthony M. Fitzgerald (ct04167)
Howard K. Levine (ct10555)
CARMODY TORRANCE
SANDAK & HENNESSEY LLP
195 Church St., 18th Floor
New Haven, CT 06509
Phone: 203 777-5501
Fax: 203 784-3199

Barbara S. Steiner (*pro hac vice*)
Megan B. Poetzel (*pro hac vice*)
Michael A. Doornweerd (*pro hac vice*)
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
Phone: 312 222-9350
Fax: 312 527-0484

Matthew S. Hellman (*pro hac vice*)
JENNER & BLOCK LLP
1099 New York Ave NW
Washington, DC 20001-4412
Phone: 202 639-6000
Fax: 202 639-6066

*Attorneys for Defendant WMC Mortgage, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October, 2017, the foregoing **WMC MORTGAGE, EEC'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION IN LIMINE TO EXCLUDE CERTAIN TESTIMONY OF WMC'S EXPERT WITNESSES** was filed electronically via the Court's CM/ECF system. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the court's CM/ECF System.

/s/ Howard K. Levine
Howard K. Levine (ct10555)
Carmody Torrance Sandak & Hennessey LLP
195 Church Street
P.O. Box 1950
New Haven, CT  06509-1950
Tel:  203-777-5501
Fax:  203-784-3199
E-mail:  hlevine@carmodylaw.com