# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| TMI TRUST COMPANY, solely in its capacity as Separate Trustee of the SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-WM2 (SABR 2006-WM2), <br><br> Plaintiff, <br><br> v. <br><br> WMC MORTGAGE, LLC f/k/a WMC MORTGAGE CORP., <br><br> Defendant. | Case No: 3:12-cv-01538-CSH <br><br><br><br><br><br><br><br><br> December 15, 2017 |

## JOINT PRETRIAL MEMORANDUM

The Parties hereby submit this joint memorandum addressing the topics set forth in the

Court's Joint Trial Memorandum Instructions.

## 1.      TRIAL COUNSEL

### *For Plaintiff*

Harvey J. Wolkoff (phv 01103)
Daniel V. Ward (phv 05850)
Kathryn E. Wilhelm (phv 08528)
Stacylyn M. Doore (phv 07627)
Ropes & Gray LLP
800 Boylston Street
Prudential Tower
Boston, MA 02199-3600
Tel.: (617) 951-7703
Fax: (617) 951-7050
harvey.wolkoff@ropesgray.com
daniel.ward@ropesgray.com
kathryn.wilhelm@ropesgray.com
stacylyn.doore@ropesgray.com

Elizabeth Bierut (phv 09372)
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
Tel.: (212) 596-9000
Fax: (212) 596-9090
elizabeth.bierut@ropesgray.com

Thomas D. Goldberg (ct 04386)
Kevin C. Brown (ct 29774)
DAY PITNEY LLP
One Canterbury Green
201 Broad Street
Stamford, Connecticut 06901
Tel.: (203) 977-7300
Fax: (203) 977-7301
tgoldberg@daypitney.com
kbrown@daypitney.com

***For Defendant***

Megan B. Poetzel (phv 05551)
Michael A. Doornweerd (phv 06819)
Matthew J. Thomas (phv 08560)
Michael T. Brody (phv 08543)
David P. Saunders (phv 08177)
Justin C. Steffen (phv 08544)
Stephen R. Brown (phv 08542)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, Illinois 66054
Tel: (312) 222-9350
Fax: (312) 527-0484
Mpoetzel@jenner.com
Mdoornweerd@jenner.com
Mthomas@jenner.com
Mbrody@jenner.com
Dsaunders@jenner.com
Jsteffen@jenner.com
Stephenbrown@jenner.com

Howard K. Levine (ct 10555)
Anthony M. Fitzgerald (ct 04167)
Amanda C. Nugent
CARMODY TORRANCE SANDAK &
HENNESSEY LLP

195 Church Street, 18th Floor
P.O. Box 1950
New Haven, CT 06509
Tel: (203) 777-5501
Fax: (203) 784-3199
afitzgerald@carmodylaw.com
hlevine@carmodylaw.com
anugent@carmodylaw.com

## 2.      JURISDICTION

The Parties agree that this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(a)(2) because there is complete diversity of citizenship between the Parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.  The parties do not contest that this Court has personal jurisdiction over the Parties.  The Parties do not dispute that venue is proper in this district.

## 3.      WHETHER THE CASE IS TO BE TRIED WITH OR WITHOUT A JURY

The case is to be tried without a jury.

## 4.      LENGTH OF TRIAL

The Parties estimate that the trial in this matter will take approximately four weeks, assuming trial days from 9 a.m. to 5 p.m., with breaks, every day of the week.

## 5.      FURTHER PROCEEDINGS

WMC respectfully requests a telephonic conference with the Court prior to January 1, 2018 for the purpose of discussing certain logistics related to the trial.

## 6.      NATURE OF CASE

### By the Plaintiff

WMC Mortgage, LLC ("WMC") breached its contractual obligations under the Pooling and Servicing Agreement ("PSA") for the SABR 2006-WM2 Trust (the "Trust") by selling to the

Trust thousands of mortgage loans that failed to comply with WMC's underwriting guidelines, contained material misrepresentations and pervasively breached WMC's representations and warranties set forth in the PSA (the "Defective Mortgage Loans"). TMI Trust Company's (the "Separate Trustee's") expert Mr. Richard Payne has reviewed a statistically significant sample of 400 mortgage loans in the Trust (the "Mortgage Loans") and determined that 56% of the loans breached WMC's representations and warranties in the PSA (the "Representations and Warranties"). The Separate Trustee's statistical expert, Dr. Nelson Lipshutz, has opined that the 56% breach rate may be extrapolated to the remaining loans in the Trust to a high degree of statistical confidence. WMC's own expert, Mr. Abshier, does not contest the Separate Trustee's contention that over 33 percent of the loans in the relevant sample were in material breach of WMC's underwriting guidelines, a breach rate higher than any he admittedly had seen before in his experience as a Federal bank examiner.

Mr. Payne's analysis is far from the first notice WMC received regarding pervasive breaches of its Representations and Warranties. Prior to initiating this action, and in accordance with the PSA, on September 16, 2011, May 30, 2012, June 7, 2012, and June 28, 2012, the Trustee or the Separate Trustee, at the direction of certain Certificateholders, promptly notified WMC of breaches of the Representations and Warranties uncovered in prior re-underwriting analyses conducted at the request of certain Certificateholders, and demanded that WMC cure those breaches or repurchase the breaching loans ("Defective Mortgage Loans"). In total, the Trustee or Separate Trustee provided specific notice to WMC of breaches of representations and warranties with regard to at least 689 Mortgage Loans in the Trust. Through these breach notices, WMC was also notified that it "pervasively and systematically violated its representations and warranties within this Trust" as a direct result of WMC's lax underwriting,

due diligence and quality control practices.  *See*, *e.g.*, Pl.'s Ex. 56.  Despite WMC's own expert's findings as well as the Separate Trustee's numerous requests that WMC repurchase the Defective Mortgage Loans, WMC has continued to refuse to repurchase even a single Defective Mortgage Loan.

Moreover, WMC leadership was made aware of fraudulent origination practices by a number of now former employees at the time the Trust loans were being originated.  WMC's response was "Fraud pays."  David Gitson and several of the Separate Trustee's witnesses will set the stage for this Court on the environment at WMC when these loans were originated: twenty-somethings without experience raking in hundreds of thousands of dollars a year to fund as many loans as they could regardless of the borrower's ability to repay.  Based on numerous complaints and concerns raised by its own employees, WMC knew or should have known that the Mortgage Loans breached its Representations and Warranties, but WMC failed to notify the other parties to the PSA, despite its contractual obligation to do so.  Because WMC was the entity that originated and conducted pre-securitization re-underwriting reviews of the Mortgage Loans, it was uniquely positioned to be aware of breaches of the Representations and Warranties.

The Trustee and the Separate Trustee, acting on behalf of the Trust, have performed all conditions, covenants and promises required on their part to be performed in accordance with the terms and conditions of the PSA, specifically by promptly notifying WMC of discovered breaches.  WMC is obligated to pay the Trust damages based on the PSA's Repurchase Price as a result of WMC's breaches of Representations and Warranties that materially and adversely affect the value of such Mortgage Loans or corresponding interest of the Certificateholders in the Mortgage Loans.  The PSA's Repurchase Price is calculated based on "unpaid principal balance," and thus the Separate Trustee's damages expert's, Dr. Joseph Mason's, repurchase

damages calculation correctly includes liquidated loans, for which the unpaid principal balance is greater than zero.  Based upon the re-underwriting results for a statistically significant sample of Mortgage Loans in the Trust, Dr. Joseph Mason has calculated the aggregate Repurchase Price owed to the Trust in accordance with the terms of the PSA as a result of WMC's breaches.

WMC must also pay the damages caused by WMC's failure to notify the Trustee (and the Separate Trustee) and other PSA parties of breaches of WMC's Representations and Warranties in the Mortgage Loans.  The Separate Trustee seeks rescissory damages compensating for the Trust's losses relating to WMC's failure to notify the Trustee and the Separate Trustee of its breaches of Representations and Warranties relating to the Defective Mortgage Loans. Rescissory damages are appropriate because WMC repudiated its obligations under the PSA by failing to notify the Trustee and Separate Trustee that Mortgage Loans breached the Representations and Warranties.  The Separate Trustee is also entitled to the reimbursement of all expenses incurred to enforce WMC's repurchase obligations, including attorneys' fees and costs.

### *By the Defendant*

This is a breach of contract case, and both of Plaintiff's claims allege breaches of the governing contract.  The governing contract is the Pooling and Servicing Agreement, dated as of October 1, 2006 among WMC, Securitized Asset Backed Receivables LLC ("SABR"), HomEq Servicing Corporation, as Servicer, and Wells Fargo Bank, National Association ("Wells Fargo"), as Trustee (the "PSA").  In the PSA, WMC made representations and warranties with respect to 5,162 mortgage loans (the "Mortgage Loans") originally held by the Securitized Asset Backed Receivables 2006-WM2 Trust (the "Trust").  WMC originated or acquired all of the

Mortgage Loans, and sold them in July 2006 to non-party Sutton Funding ("Sutton").  Sutton subsequently assigned them to its affiliate and non-party, SABR, which ultimately transferred the Mortgage Loans to the Trust pursuant to the PSA.  The PSA contains a sole remedies clause by which the Trustee or its assignee can seek repurchase of certain, identified Mortgage Loans from WMC at the contractually defined "Repurchase Price," provided certain contractual prerequisites to repurchase are met.  The PSA also obligates each party to the contract, upon discovering a breach of any party's representations or warranties that materially and adversely affects the value of a Mortgage Loan or the interest of the certificateholders therein to provide prompt notice to the other deal Parties of the alleged breach.

Plaintiff's contract claims allege that WMC breached the PSA by:  (1) failing to repurchase an unidentified set of Mortgage Loans that purportedly materially and adversely breach WMC's representation and warranties (the "Repurchase Claim"); and (2) failing to notify the other deal Parties of an unidentified set of Mortgage Loans that were alleged to be in breach of WMC's representations and warranties of which WMC was the first party to discover the alleged breach ("The Failure to Notify Claim").

The Parties' contract offers Plaintiff a full and complete recovery for each and every loan for which it can prove liability.  The Parties disagree about the number of loans for which that is the case, and WMC looks forward to demonstrating that Plaintiff has substantially overstated the number of loans in material breach for which it is entitled to recover.  WMC's re-underwriting expert has candidly admitted where he does not contest a finding of material breach, but he will also persuasively demonstrate the many instances where Plaintiff's re-underwriting expert is incorrect.

Plaintiff's true contention to this Court, however, is not that it should award relief to Plaintiff under the contract, but that it should ignore it, both in terms of proof and in terms of remedy. Rather than providing proof of loans in material breach, Plaintiff makes generalized allegations of gross negligence. And rather than accepting the contractual Repurchase Price to which it agreed, Plaintiff demands nearly a billion dollars in "rescissory damages." Plaintiff's contentions of gross negligence are based on anecdotes taken from WMC's geographically-dispersed operations. WMC does not dispute that its underwriting practices were imperfect, but the trial record will show that WMC took substantial and reasonable steps to enforce a "zero-fraud tolerance" policy, including creating Quality Management and Risk Departments and firing employees found to have possibly committed fraud. In fact, at the time the Mortgage Loans at issue in this case were originated, WMC – notwithstanding its financial incentives to originate mortgage loans – funded only approximately 50% of the loan applications it received.

In the end, Plaintiff's account of this case does not hold up. It castigates WMC for not immediately repurchasing loans on demand, when Plaintiff refused to answer even the most basic questions about those demands and was subsequently forced to withdraw many of them. Plaintiff makes sweeping allegations of gross negligence, but cannot establish liability save for a fraction of the loans at issue. And Plaintiff seeks rescissory relief that literally no New York court has ever awarded for similar RMBS claims, and that a dozen courts have expressly rejected. Plaintiff's claims are thus factually and legally flawed, and this Court should enforce the PSA as written.

To prevail on its contractual Repurchase Claim, Plaintiff must prove by a preponderance of the evidence the following elements for each Mortgage Loan that it seeks to have repurchased:

(i)    **Material and Adverse Breach:** For each Mortgage Loan at issue, whether one or more breaches of the representations and warranties set forth in the PSA materially

and adversely affects the value of the Mortgage Loan or the interest of the Trustee or certificateholders therein.

(ii) **Prompt Notice or Actual Discovery:** Whether WMC had actual knowledge of or received prompt written notice, as described in the PSA, that each Mortgage Loan at issue materially and adversely breached the representations and warranties set forth in PSA.

(iii) **The Trustee's/Separate Trustee's Material Compliance with the PSA:** In order to recover based on a claim of breach of contract, Plaintiff must prove that the Trustee and the Separate Trustee complied with their obligations under the PSA.

(iv) **The Amount of the Repurchase Price or Entitlement to Contract Damages:** The amount of the "Repurchase Price" as defined by the PSA, or, in the event that Plaintiff is permitted to obtain general contract damages, (i) the amount of damages sought by Plaintiff and (ii) that the alleged breaches by WMC caused all of the damages that Plaintiff seeks.

To prevail on its contractual Failure to Notify Claim, Plaintiff must prove by a preponderance of the evidence the following elements for each Mortgage Loan that it seeks to have repurchased:

(i) **Material and Adverse Breach:** For each Mortgage Loan for which WMC allegedly failed to provide notice of material breach, whether one or more breaches of the representations and warranties set forth in the PSA materially and adversely affects the value of the Mortgage Loan or the interest of the Trustee or certificateholders therein.

(ii) **Actual Discovery**: Whether WMC had actual knowledge, on a loan-by-loan basis, that each Mortgage Loan at issue allegedly had materially and adversely breached the representations and warranties set forth in the PSA.

(iii) **WMC's Failure to Provide Notice:** That, after having achieved actual knowledge of an alleged breach of WMC's representations and warranties as to a Mortgage Loan that would have triggered WMC's repurchase obligation, that WMC failed to provide notice to the other Parties to the PSA. The Plaintiff must also demonstrate that the Trustee or its agents did not already have notice of the alleged breach at the time that WMC allegedly discovered the alleged breach.

(iv) **The Trustee's/Separate Trustee's Material Compliance with the PSA:** In order to recover based on a claim of breach of contract, Plaintiff must prove that the Trustee and the Separate Trustee complied with their obligations under the PSA.

    (v)    **The Amount of the Repurchase Price or Entitlement to Contract Damages:** The amount of the "Repurchase Price" as defined by the PSA, or, in the event that Plaintiff is permitted to obtain general contract damages, (i) the amount of damages sought by Plaintiff and (ii) that the alleged breaches by WMC caused all of the damages that Plaintiff seeks.

WMC contends that Plaintiff will fail to meet its burden of proof at trial with respect to each element of its Repurchase and Failure to Notify Claims for nearly all of the Mortgage Loans at issue in the case. To the extent the Court finds that Plaintiff meets its burden with respect to any Mortgage Loans, however, WMC contends that Plaintiff's recovery should be reduced or offset for its failure to mitigate its damages and seeking recovery for amounts associated with unreasonable servicing fees or incurred due to improper servicing practices. In addition, WMC contends that time-based equitable defenses bar all or part of Plaintiff's claims because Plaintiff delayed in notifying WMC of alleged breaches of WMC's representations and warranties after Plaintiff and the Servicer learned of the bases of those allegations and after the Servicer liquidated many of the Mortgage Loans.

## 7.    TRIAL BY MAGISTRATE JUDGE

The Parties have not agreed to a trial by a Magistrate Judge.

## 8.    EVIDENCE

## A.    WITNESSES

### *By the Plaintiff:*

Plaintiff expects to call the following witnesses at trial. Plaintiff reserves the right to call any witness whose testimony is needed for rebuttal.

    1.    <u>Plaintiff's Fact Witnesses</u>[1]

---

[1] In addition to the witnesses here, the Separate Trustee had also intended to call Jason Tammelleo, a former Business Development Representative in the Woburn, MA office of WMC, as a witness at trial. However, on December 14, 2017, the Separate Trustee learned that Mr.

a.  Tina Ganwani (by deposition)
    i.  Ms. Ganwani's designated deposition testimony has been
        submitted to the Court in connection with this Joint Pretrial
        Memorandum.  Ms. Ganwani was a Vice President in WMC's
        Secondary Markets division.
    ii. Ms. Ganwani's deposition designation packet is appended as
        Exhibit C-4.

b.  David Gitson (by deposition)
    i.  Mr. Gitson's trial testimony, taken pursuant to a *de been esse*
        deposition, has been submitted to the Court in connection with this
        Joint Pretrial Memorandum.  Mr. Gitson was a Vice President in
        the Risk Department at WMC.
    ii. Mr. Gitson's deposition transcript is appended as Exhibit C-5.

c.  Cathy Hamilton (by deposition)
    i.  Ms. Hamilton's designated deposition testimony has been
        submitted to the Court in connection with this Joint Pretrial
        Memorandum.  Ms. Hamilton was a loan analyst at WMC in the
        San Ramon office.
    ii. Ms. Hamilton's deposition designation packet is appended as
        Exhibit C-7.

d.  Marcelle Heagy
    i.   Address: c/o Stephen Stone, 120 South State Street, Suite 400,
         Chicago, IL 60603
    ii.  Expected Duration of Testimony: Half a day.
    iii. Summary of Anticipated Testimony: Ms. Heagy was an
         underwriter at the Woburn branch of WMC.  She is expected to
         testify that, as an underwriter, she observed that WMC funded
         many loans that she had identified as noncompliant with WMC's
         underwriting guidelines.  Ms. Heagy is also expected to testify that
         she raised concerns regarding WMC's fraudulent origination
         practices to the manager of the Woburn office, but that she was
         ignored.
    iv.  Ms. Heagy is likely to testify.

e.  Lisa Mentzer (by deposition)
    i.  Ms. Mentzer's designated deposition testimony has been submitted
        to the Court in connection with this Joint Pretrial Memorandum.
        Ms. Mentzer was a senior underwriter in WMC's Burbank office.
    ii. Ms. Mentzer's deposition designation packet is appended as
        Exhibit C-10.

---

Tammelleo passed away on December 9, 2017.  The Separate Trustee reserves the right to call a
substitute Business Development Representative at trial.

f.  Rosie Nguyencuu (by deposition)
    i.  Ms. Nguyencuu designated deposition testimony has been
        submitted to the Court in connection with this Joint Pretrial
        Memorandum.  Ms. Nguyencuu was WMC's Repurchase Leader
        and handled WMC's response to repurchase requests.
    ii. Ms. Nguyencuu's deposition designation packet is appended as
        Exhibit C-12.

g.  Glen Pizzolorusso
    i.   Address: c/o Dan Gitner at Lankler Siffert & Wohl, 500 Fifth
         Avenue, New York, NY 10110
    ii.  Expected Duration of Testimony: 1 hour.
    iii. Summary of Anticipated Testimony: Mr. Pizzolorusso was a sales
         representative at WMC's Orangeburg, NY office.  Mr.
         Pizzolorusso reported to National Public Radio that WMC
         operated like the movie *Boiler Room*, and originated loans for
         people without the ability to repay.
    iv.  Mr. Pizzolorusso will testify only if the need arises.

h.  Gail Roman
    i.   Address: 8 Guymard Tpke., Middletown NY 10940
    ii.  Expected Duration of Testimony: Half a day.
    iii. Summary of Anticipated Testimony: Ms. Roman worked in
         Quality Control at the Orangeburg branch of WMC.  She is
         expected to testify that WMC ended its Quality Control ("QC")
         reviews for compliance with underwriting guidelines in
         Orangeburg during the time period when the loans in the Trust
         were originated.  She is expected to testify that the QC Department
         raised multiple red flags to WMC management about
         misrepresentations in loans that were ultimately funded.  Ms.
         Roman is expected to testify as to the underwriting environment at
         WMC, including that she was present when an underwriter coined
         the phrase, "Have a pulse, get a loan."
    iv.  Ms. Roman is likely to testify.

i.  Robert Rothleder (by deposition)
    i.  Mr. Rothleder's designated deposition testimony has been
        submitted to the Court in connection with this Joint Pretrial
        Memorandum.  Mr. Rothleder is the Vice President of Production
        Operations at WMC.
    ii. Mr. Rothleder's deposition designation packet is appended as
        Exhibit C-13.

j.  Jim Zollo (by deposition)

    i. Mr. Zollo's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Mr. Zollo was the CEO for WMC.

    ii. Mr. Zollo's deposition designation packet is appended as Exhibit C-15.

  k. Anastacia Cates (Fed. R. Evid. 1006 Summary Witness)
    i. Address: c/o Harvey J. Wolkoff, Ropes & Gray LLP, 800 Boylston Street, Boston, MA 02199
    ii. Expected Duration of Testimony: 1 hour.
    iii. Summary of Anticipated Testimony: If necessary, Ms. Cates will testify that she has reviewed voluminous data produced by WMC and compiled such information in summary form.

  l. WMC Keeper of the Records
    i. Will be called only if the need arises to lay foundation for documents produced by WMC throughout the litigation.

  2. <u>Plaintiff's Expert Witnesses</u> – Copies of the expert reports of Mr. Payne, Dr. Lipshutz, Dr. Mason, Mr. Brazier, and Mr. Ross have been submitted to the Court in connection with this Joint Pretrial Memorandum.  The expert report for each witness includes the expert's CV and sets forth the opinions to be expressed, a brief summary of the basis of such opinions, and a list of all materials upon which the witnesses intend to rely.

    a. **Richard W. Payne III,** c/o Harvey Wolkoff, Esq., Ropes & Gray, 800 Boylston Street, Prudential Tower, Boston, MA 02199-3600, (617) 951-7000

Mr. Richard Payne is the managing partner of Payne Advisory, LLC.  He has over 37 years of experience in the financial industry, with a focus on the mortgage sector.  Prior to founding Payne Advisory, LLC, he served as President and CEO of three mortgage companies that were subsidiaries of publicly traded financial institutions, and also was in charge of the mortgage capital divisions for two savings and loan associations.

Mr. Payne performed a forensic review of loan files and other documents for a statistically significant sample of 400 Mortgage Loans that were selected by Dr. Nelson Lipshutz

from the population of loans in the Trust.  Mr. Payne found that 224,[2] or 56%, of the Mortgage

Loans he reviewed contain one or more defects that constitute breaches of representations and

warranties and that such breach(es) of representations and warranties materially and adversely

affected the value of the loan and the interest of the Trustee.

Mr. Payne's expert report is appended as Exhibit D-1.

Counsel estimates that Mr. Payne will testify for approximately five days.

> **b.  Dr. Nelson R. Lipshutz,** c/o Harvey Wolkoff, Esq., Ropes & Gray,
> 800 Boylston Street, Prudential Tower, Boston, MA 02199-3600,
> (617) 951-7000

Dr. Nelson R. Lipshutz is the President of Regulatory Research Corporation, which

specializes in the application of statistics, economics, and financial theory to legal and regulatory

issues.  He holds a Ph.D. in theoretical physics from the University of Chicago, and an MBA in

finance from the Wharton School of the University of Pennsylvania. Previously, he has served as

an Assistant Professor of Physics at Duke University, a senior consultant in Regulation and

Economics at Arthur D. Little, Inc., and a lecturer in economics at Northeastern University.

Dr. Lipshutz developed a statistically significant, random sample of 400 Mortgage Loans

which had not been paid in full from the population of loans originated by WMC and sold to the

Trust.  Additionally, Dr. Lipshutz calculated the count-based and dollar-weighted breach rates in

the sample based on Mr. Payne's re-underwriting analysis.

Dr. Lipshutz's expert reports are appended as Exhibit D-2.

Counsel estimates that Dr. Lipshutz will testify for approximately half a day.

---

[2] Mr. Payne's report indicates that he found 225 Mortgage Loans in the sample in
material breach.  On October 20, 2016, Mr. Payne withdrew his finding of material breach as to
Loan #11561931.  Trial Ex. 91.

      **c.  Dr. Joseph R. Mason,** c/o Harvey Wolkoff, Esq., Ropes & Gray, 800 Boylston Street, Prudential Tower, Boston, MA 02199-3600, (617) 951-7000

Dr. Joseph R. Mason is a Professor of Finance and the Hermann Moyse, Jr./Louisiana Bankers Association Endowed Chair of Banking at the Ourso School of Business, Louisiana State University, and Senior Fellow at the Wharton School at the University of Pennsylvania. He has a Masters of Science and Ph.D from the University of Illinois at Urbana-Champaign (Monetary Economics and Financial Institutions).  Previously, he has held visiting appointments at the Federal Reserve Bank of Atlanta, the Federal Deposit Insurance Corporation, and the Federal Reserve Bank of Philadelphia. He has testified before numerous Congressional Committees, the European Parliament, and the Federal Reserve Board.  He previously served as a Financial Economist at the Office of the Comptroller of the Currency.

      Dr. Mason computed the damages estimated to have been incurred by the Trust as a result of Defendant's failure to repurchase defectively underwritten loans in a timely manner according to the PSA, and failure to notify the PSA parties about breaches of representations and warranties.  Dr. Mason computed the damages incurred by the Trust under three alternative damages theories: (i) the damages incurred by the Trust based on WMC's breach of its obligation to repurchase mortgage loans in the Trust that breached WMC's representations and warranties made in connection with the sale of the loans to the Trust ("Repurchase Damages"); (ii) monetary relief sufficient to place the Trust back into the position it would have been in had the WMC loans not been purchased by the Trust ("Rescissory Damages"); and (iii) the damages incurred by the Trust resulting from their purchase of the WMC loans at a price above the actual value of those loans ("Benefit of the Bargain Damages").  As of the date of his expert report in May 2016, Dr. Mason calculated Repurchase Damages to the Trust in the amount of $354.9

million, using the breach rate calculated by Dr. Lipshutz based on Mr. Payne's re-underwriting analysis.  Additionally, Dr. Mason calculated Rescissory Damages and Benefit of the Bargain Damages in the amount of $906.3 million.

Prior to trial, Dr. Mason will provide updated damages calculations based upon the same methodology outlined in his May 2016 expert report.  Dr. Mason will also offer testimony regarding how to use his methodology to arrive at an appropriate damages figure depending on the final breach rate accepted by the Court.

Dr. Mason may also be called as a rebuttal witness in response to Defendant's expert, Mr. Brian Olasov, regarding his opinions related to loan servicing.  Dr. Mason has reviewed Mr. Olasov's purported servicing analysis and, if needed, will provide rebuttal testimony.

Dr. Mason's expert reports are appended as Exhibit D-3.

Counsel estimates that Dr. Mason will testify for approximately one day.

> **d.    Peter M. Ross,** c/o Harvey Wolkoff, Esq., Ropes & Gray, 800
> Boylston Street, Prudential Tower, Boston, MA 02199-3600, (617)
> 951-7000 (rebuttal only)

Mr. Peter M. Ross may be called as a rebuttal witness in response to Defendant's expert, Mr. Brian Olasov, regarding his opinions related to loan servicing.  Mr. Ross is the President of PMR Consulting Group, LLC, which provides consulting and management development services to assist mortgage banking companies and financial institutions.  He has more than three decades of mortgage banking industry experience, including managing three of the then-largest mortgage servicing operations in the country.  He has a Bachelors of Arts from Hamilton College and a PMD from Harvard Business School.  Mr. Ross has reviewed Mr. Olasov's purported servicing analysis and, if needed, will provide rebuttal testimony regarding the appropriate standard for

evaluating servicer conduct and his responses to Mr. Olasov's conclusions regarding specific loans.

Mr. Ross's expert report is appended as Exhibit D-4.

> **e.   Nigel D. Brazier,** c/o Harvey Wolkoff, Esq., Ropes & Gray, 800 Boylston Street, Prudential Tower, Boston, MA 02199-3600, (617) 951-7000 (rebuttal only)

Mr. Nigel D. Brazier may be called as a rebuttal witness in response to Defendant's expert, Mr. Brian Olasov, regarding his opinions related to so-called borrower "change-of-life events." Mr. Brazier is a consultant to the mortgage industry and the Chief Executive Officer of NBNB, LLC ("NBNB"), a financial services consulting firm, which provides consulting, acquisition, due diligence assistance, and advisory services in the areas of residential mortgage originations and loan servicing, mortgage capital markets, and securitization and credit policy. Prior to founding NBNB, he had a long career in operational and financial roles at several large financial institutions, including at General Electric for 18 years. He has a Bachelor of Science degree in accounting from the Central Washington University and the University of Washington, and an MBA in Finance from Miami University.

Mr. Brazier has reviewed Mr. Olasov's purported servicing analysis and, if needed, will offer rebuttal opinions, including that the "change of life events" identified by Mr. Olasov as the reason for borrower's defaults were merely ordinary live events, and reflected the kinds of risks for which WMC's underwriting guidelines were intended to manage.

Mr. Brazier's expert report is appended as Exhibit D-5.

***Objections by the Defendant to Plaintiff's Witnesses:***

WMC is saddened to learn of the unfortunate recent passing of Mr. Tammelleo. WMC reserves all of its rights to object to any witness not identified on the Separate Trustee's current

witness list, including any "substitute Business Development Representative witness."  Subject to WMC's pending *Daubert* motions, WMC does not otherwise object to Plaintiff calling the above-identified witnesses.  However, WMC reserves its rights to object to irrelevant, unfairly prejudicial, or otherwise inadmissible and/or improper testimony at trial.

### By the Defendant:

A list of WMC's fact and expert witnesses that are likely to testify or which may be called only if the need arises, including the addresses of each witness to be called at trial, a brief summary of the anticipated testimony, and the expected duration of the witness's testimony, is below.

1. <u>Defendant's Fact Witnesses Likely to Testify</u>

**<u>Matthew Greenblatt (Summary Witness)</u>**: Matthew Greenblatt is employed as a Senior Managing Director of Forensic and Litigation Consulting at FTI Consulting.  He is a Certified Public Accountant and a Certified Fraud Examiner, and is Certified in Financial Forensics.  WMC expects that if called, Mr. Greenblatt will testify as a summary witness, pursuant to FRE 1006.  Specifically, WMC expects that Mr. Greenblatt may summarize voluminous materials related to:  due diligence performed on the loans sold by WMC to Sutton Funding in July 2006; performance data related to the loans in the Trust; and data related to loans that appear on certain quality control reports generated by WMC.  WMC expects that its direct examination of Mr. Greenblatt will last approximately three to four hours.  Mr. Greenblatt can be contacted through Jenner & Block LLP, 353 N. Clark St. Chicago, IL 60654.

**<u>Ken Huber</u>**: Mr. Huber was Senior Vice President of WMC's Risk department.  WMC expects that, if called, Mr. Huber will testify regarding:  his background in Risk management,

credit policy, and the mortgage industry; the structure and staffing levels of WMC's Risk department; WMC's efforts to ensure loan quality and detect and prevent fraud as well as the resources that WMC devoted to those efforts; WMC's engagement of third-party vendors, including CoreLogic, to prevent fraud; WMC's "CoreLogic SWAT Team," which was a cross-functional team that utilized CoreLogic tools to detect and prevent fraud; WMC's use of reports generated by David Gitson; and WMC's credit and underwriting policies.  Mr. Huber is likely to testify, and WMC expects that his direct testimony will last approximately three to four hours.  Mr. Huber can be contacted through Jenner & Block LLP, 353 N. Clark St. Chicago, IL 60654.

**Patrick McGovern**:  Mr. McGovern was Regional Vice President of WMC's Orangeburg, New York office.  WMC expects that, if called, Mr. McGovern will testify regarding:  WMC's Orangeburg office, including but not limited to, his managerial role; the interactions between sales staff and WMC's Quality Management staff; WMC's underwriting processes and procedures; WMC's efforts to ensure loan quality; and WMC's management of brokers.  Mr. McGovern is likely to testify, and WMC expects that his direct testimony will last approximately two to three hours.  Mr. McGovern can be contacted through David Scheffel, Dorsey & Whitney LLP, 51 West 52nd Street New York, New York 10019.

**Anthony Miguel**:  Mr. Miguel is the current CFO of WMC.  If called, WMC expects Mr. Miguel will testify about how to determine WMC's net revenue on its July 2006 loan sale to Sutton Funding.  Mr. Miguel is likely to testify, and WMC expects his direct testimony will last approximately thirty minutes.  Mr. Miguel can be contacted through Jenner & Block LLP, 353 N. Clark St. Chicago, IL 60654.

**Ian Mitchell**:  Mr. Mitchell worked at GE, serving in a variety of roles, including New Product Fraud Manager and Senior Risk Manager of GE Money Americas Fraud Policy and Strategy, and performing the duties of GE Money Americas' Interim Fraud Leader for WMC.  WMC expects that if called, Mr. Mitchell will testify regarding:  his background and work related to WMC; WMC's fraud detection and prevention efforts, including WMC's engagement of third-party vendors, including CoreLogic and BasePoint; his organizing and running a May 2006 Fraud Boot Camp; his interactions with David Gitson and David Riedel, including but not limited to, Mr. Gitson and Mr. Riedel's participation in and presentation at Fraud Boot Camp; his efforts to enhance WMC's existing fraud detection and prevention processes and strategies; and WMC's devoting substantial resources to fraud detection and prevention.  Mr. Mitchell is likely to testify, and WMC expects his direct testimony will last approximately two hours.  Mr. Mitchell can be contacted through Susman Godfrey LLP, 1301 Avenue of the Americas, New York, NY 10019-6023.

**Robert Rothleder**: Mr. Rothleder is WMC's head of Production Operations.  If called, WMC expects that Mr. Rothleder will testify regarding:  (a) WMC's history and operations; (b) WMC's guidelines, practices and procedures regarding, among other things: loan origination, including through broker and correspondent lender channels; fraud detection; the contents of WMC's loan files and loan origination system; and the sale of loans and transfer of the related loan files, including the due diligence performed on the loans; and (c) WMC's ability to remedy certain alleged defects with respect to a loan in cases where WMC was provided prompt notice of an alleged defect, including when such allegations were made as a result of due diligence reviews of mortgage loans.  WMC expects that Mr. Rothleder will also serve as WMC's custodian of records, and provide testimony establishing that certain documents produced by

WMC and relied upon by WMC at trial are WMC's business records.  Mr. Rothleder is likely to testify, and WMC expects his direct testimony will last approximately four to five hours.  Mr. Rothleder can be contacted through Jenner & Block LLP, 353 N. Clark St. Chicago, IL 60654.

2.  Defendant's Fact Witnesses to be Called if the Need Arises

**Donna Harden**: Donna Harden is a former WMC employee, who previously worked as an Assistant Vice President of Credit Policy in WMC's Burbank office.  At WMC, Ms. Harden's responsibilities included developing and drafting all underwriting and pricing policy guidelines.  WMC expects that Ms. Harden will testify regarding the content and application of WMC's Underwriting Guidelines, Credit Policy Updates, Credit Policy Memorandums, and Credit Matrices that were operative during the period of time in which the Mortgage Loans were originated.   WMC expects that its direct examination of Ms. Harden, if called, will last approximately four to five hours. Ms. Harden can be contacted through Jenner & Block LLP, 353 N. Clark St. Chicago, IL 60654.

**Rosie Nguyencuu**:   Ms. Nguyencuu is a former WMC employee, who previously worked as a Repurchase Leader.  In that role, she was responsible for, among other things, evaluating and responding to breaches of WMC's R&Ws alleged by third-parties.  WMC expects that if called, Ms. Nguyencuu would testify regarding the operations, practices and policies of WMC's Repurchase Department, including the size of WMC's Repurchase Department, the types of repurchase claims and the volume of repurchase claims received by WMC, as well as the process engaged in by WMC to evaluate and respond to the repurchase requests that it received.  WMC expects its direct examination of Ms. Nguyencuu will last approximately two to three hours. Ms. Nguyencuu can be contacted through Jenner & Block LLP, 353 N. Clark St. Chicago, IL 60654.

**Glen Pizzolorusso**: Mr. Pizzolorusso was a Business Development Representative and Area Sales manager in WMC's Orangeburg, NY office.  WMC expects that, if called, Mr. Pizzolorusso will testify regarding:  WMC's Orangeburg office, including but not limited to, his role as a Business Development Representative and Area Sales Manager; the interactions between sales staff and WMC's Quality Management staff; WMC's efforts to ensure loan quality; WMC's management of brokers; and, if admitted, how Plaintiff's Trial Exhibit 63 is misleading and lacks necessary context and background.  Mr. Pizzolorusso will only testify if the need arises.  WMC expects that his direct testimony will last approximately one to two hours.  Mr. Pizzolorusso can be contacted through Abby Rosen, Lankler Siffert & Wohl LLP, 500 Fifth Avenue New York, NY 10110.

**Heather Thach**:  Ms. Thach began working at WMC as an independent contractor, and was hired by WMC as a full-time Repurchase Analyst.  Ms. Thach is currently a Client Services Representative at WMC.  While working at WMC, she has been, and is responsible for, among other things, evaluating and responding to breaches of WMC's R&Ws alleged by third-parties.  WMC expects that if called, Ms. Thach would testify regarding the operations, practices and policies of WMC's Repurchase Department, including the size of WMC's Repurchase Department, the types of repurchase claims and the volume of repurchase claims received by WMC, as well as the process engaged in by WMC to evaluate and respond to the repurchase requests that it received.   WMC expects its direct examination of Ms. Thach will last approximately two to three hours.  Ms. Thach can be contacted through Jenner & Block LLP, 353 N. Clark St. Chicago, IL 60654.

**Jim Zollo**: Mr. Zollo is WMC's former President and CEO, and was WMC's Vice President of Capital Markets at the time the loans originally held by the Trust were originated or

acquired.  WMC expects that if called, Mr. Zollo will testify regarding:  his role in WMC's loan sales and securitizations operations during the relevant time period; WMC's understanding of its contractual obligations under the PSA; WMC's sale of the Mortgage Loans to Sutton Funding, including the due diligence that was performed by Sutton Funding in advance of the sale, the performance of the certificates issued by the Trust; repurchase requests received by WMC related to the Trust and WMC's responses thereto; and WMC's lack of knowledge regarding the breaches of representations and warranties alleged by Plaintiff.  WMC expects that its direct examination of Mr. Zollo, if called, will last approximately four to five hours.  Mr. Zollo can be contacted through Cahill Gordon & Reindel LLP, 80 Pine Street, New York, NY 10005.

**Barclays Bank PLC Record Custodian**:  WMC expects that if called, Barclays' Records Custodian will authenticate and establish the foundation for the admission of documents produced by Barclays in this litigation.  Barclays' Record Custodian will only be called if the need arises, and if called, WMC anticipates that the examination will last approximately thirty minutes or less.  Barclays can be contacted through Ellen Hu, Barclays, 745 7th Avenue, New York, NY 10019.

**Ocwen Loan Servicing LLC Record Custodian**:  WMC expects that if called, Ocwen's Records Custodian will authenticate and establish the foundation for the admission of documents produced by Ocwen in this litigation.  Ocwen's Record Custodian will only be called if the need arises, and if called, WMC anticipates that the examination will last approximately thirty minutes or less.  Ocwen can be contacted through Brian Wagner, Houser & Allison, APC, 9970 Research Drive, Irvine, CA 92618.

**Wells Fargo Record Custodian**:  WMC expects that if called, Wells Fargo's Records Custodian will authenticate and establish the foundation for the admission of documents

produced by Wells Fargo in this litigation.  Wells Fargo's Record Custodian will only be called if the need arises, and if called, WMC anticipates that the examination will last approximately thirty minutes or less.  Wells Fargo can be contacted through W. Clark Goodman, Womble Bond Dickinson, One Wells Fargo Center, Suite 3500, Charlotte, NC 28202.

**Law Debenture Company of New York Record Custodian**:  WMC expects that if called, Law Debenture's Records Custodian will authenticate and establish the foundation for the admission of documents produced by Law Debenture in this litigation.  Law Debenture's Record Custodian will only be called if the need arises, and if called, WMC anticipates that the examination will last approximately thirty minutes or less.  Law Debenture's address is 801 2nd Avenue, Suite 403, New York, NY 10017.

### 3.   Defendant's Witnesses by Deposition Designation

**Daniel Cohen**:  Mr. Cohen's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Mr. Cohen is a CPS Special Accounts Consultant with Wells Fargo.  Mr. Cohen's deposition designation packet is appended as Exhibit C-2.

**Julie Eichler**:  Ms. Eichler's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum. Ms. Eichler is a Client Services Manager in the Trust Administration division of Wells Fargo.   Ms. Eichler's deposition designation packet is appended as Exhibit C-3.

**Tina Ganwani**:  Ms. Ganwani's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Ms. Ganwani was an Assistant Vice President of Secondary Marketing at WMC.  Ms. Ganwani's deposition designation packet is appended as Exhibit C-4.

**Nicole Gostebski**:  Ms. Gostebski's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Ms. Gostebski is a Senior Analyst at Ocwen.  Ms. Gostebski's deposition designation packet is appended as Exhibit C-6.

**James Heaney**:  Mr. Heney's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Mr. Heaney is a Managing Director with Law Debenture.  Mr. Heaney's deposition designation packet is appended as Exhibit C-8.

**Mark Jackman**:  Mr. Jackman's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Mr. Jackman was the Regional Vice President for WMC's San Ramon and Orange County territories.  Mr. Jackman's deposition designation packet is appended as Exhibit C-9.

**Thomas Musarra**:  Mr. Musarra's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Mr. Musarra is a Senior Vice President in the Corporate Trust division of Law Debenture.  Mr. Musarra's deposition designation packet is appended as Exhibit C-11.

**Rosie Nguyencuu** (if not called live):  Mr. Nguyencuu's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Ms. Nguyencuu was WMC's repurchase leader.  Ms. Nguyencuu's deposition designation packet is appended as Exhibit C-12.

**Mary Sohlberg**:  Ms. Sohlberg's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Ms. Sohlberg was a Vice President at Wells Fargo.  Ms. Sohlberg's deposition designation packet is appended as Exhibit C-14.

**Jim Zollo** (if not called live):  Mr. Zollo's designated deposition testimony has been submitted to the Court in connection with this Joint Pretrial Memorandum.  Mr. Zollo is WMC's former President and CEO, and was WMC's Vice President of Capital Markets at the time the loans originally held by the Trust were originated or acquired.   Mr. Zollo's deposition designation packet is appended as Exhibit C-15.

### 4.  Defendant's Expert Witnesses

**David Abshier**:  Mr. Abshier is WMC's underwriting expert.  Mr. Abshier has over thirty years of experience in the financial services industry as a bank chief credit officer, bank compliance manager, federal regulator, and consultant.  His experience includes underwriting loans, as well as reviewing and re-underwriting tens of thousands of loans, including nonprime residential mortgages.  Mr. Abshier will testify regarding:  his process and opinions related to his re-underwriting of the Sample Loans; the flaws Mr. Abshier identified in Plaintiff's underwriting expert's report; and any other topic covered by his expert report, which is attached hereto as Exhibit D-7.  The materials that Mr. Abshier relied on in formulating his opinions are identified in Appendix B to his expert report and many have been included on the Exhibit List as Exhibits 1-17, 502, 505, 574-605, 1001-1440, 1767-1835, and 1840-1856.  Mr. Abshier's opinions are admissible because he is a qualified expert, who applied an appropriate re-underwriting methodology and considered all of the appropriate, credible information that was reasonably available to him.  Despite his qualifications, Plaintiff has submitted a motion *in limine* asking the Court to exclude certain of Mr. Abshier's conclusions. (Dkt. 181.)  Mr. Abshier's conclusions and opinions are admissible for the reasons set forth in WMC's Memorandum in Opposition to

Plaintiff's Motion *in Limine* to Exclude Certain Testimony of WMC's Expert Witnesses. (Dkt. 202.) Mr. Abshier's CV as of August 2016 is included as Appendix A to his expert report.

Mr. Abshier is likely to be called, and WMC expects that if called, his direct testimony will last approximately one to three days.

**Dr. Edward Leamer**: Edward Leamer is WMC's statistics expert. Dr. Leamer is a Chair in Management, Professor of Statistics, and Professor of Economics at the University of California at Los Angeles. Dr. Leamer has a B.A. degree in Mathematics from Princeton University, and a Master's degree in Mathematics and a Ph.D. degree in Economics from the University of Michigan. Dr. Leamer has published extensively in the fields of econometric methodology and statistical analysis, in international economics, and in macro-economic forecasting. He also is an elected fellow of two of the most important honorific societies in his field: the American Academy of Arts and Sciences and the Econometric Society. Dr. Leamer has been a consultant for the Federal Reserve Board of Governors, the Department of Labor, the Department of Energy, the International Monetary Fund, the World Bank, the Inter-American Development Bank, and the Treasury of New Zealand.

WMC expects that, if called, Dr. Leamer will testify regarding the loan sample designed by Plaintiff's expert, Dr. Lipshutz. Dr. Leamer will opine that: (i) in designing a sample, it is necessary to consider the circumstances and objectives of the sample's use, and, here, the cost of re-underwriting- loans is relatively modest as compared to the amount of damages that Plaintiff is claiming; accordingly, a larger sample would have made an estimate based on the sample more precise by millions of dollars and only increased the re-underwriting costs by a small fraction of that amount; and (ii) the margin of error that Dr. Lipshutz calculated is not correct, and Dr. Lipshutz has provided no basis on which to conclude that Dr. Mason's estimate of damages

based on the original-loan-balance-based breach rate is reliable.  Dr. Leamer also may opine on any other topic covered by his reports in this action, as well as any other trial testimony or new opinions offered by Plaintiff or its experts that relate to the role and use of sampling in this action and the implications thereof.

The materials that Dr. Leamer relied on in formulating his opinions are cited in Exhibit 2 to his report dated February 13, 2015 and in Exhibit 2 to his report dated August 19, 2016, and Dr. Leamer also may rely on Exhibits 536 to 540.  Dr. Leamer's CV as of August 2017 is attached hereto as Exhibit D-6.  Copies of Dr. Leamer's reports in this action are attached hereto as Exhibits D-6.

Plaintiff has submitted a motion *in limine* asking the Court to exclude certain of Dr. Leamer's conclusions.  (Dkt. 181.)  Dr. Leamer's conclusions and opinions are admissible for the reasons set forth in WMC's Memorandum in Opposition to Plaintiff's Motion *in Limine* to Exclude Certain Testimony of WMC's Expert Witnesses.  (Dkt. 202.)

Dr. Leamer is likely to be called, and WMC expects that, if called, his direct testimony will last approximately one to two hours.

**Ronald Greenspan**: Ronald Greenspan is WMC's damages expert.  Mr. Greenspan has over 35 years of experience in the residential real estate finance industry, including the origination, underwriting, securitization, and servicing of residential mortgage loans.  He has extensive experience valuing residential mortgage representation and warranty claims, including during his time as the liquidation trustee of a $10 billion mortgage backed securitization company.  Mr. Greenspan will offer opinions regarding (i) the flaws in the opinions offered by Plaintiff's damages expert, Dr. Joseph R. Mason, and (ii) the correct calculations of the Repurchase Price pursuant to the terms of the PSA.

With respect to Dr. Mason's opinions, Mr. Greenspan will opine that Dr. Mason's opinions and calculations are fundamentally flawed and contrary to industry practice because Dr. Mason incorrectly assumes that an underwriter such as WMC bears 100% of the risk of loss on loans it originated under all circumstances.  Mr. Greenspan will also opine that Dr. Mason's "Repurchase Price Damages" calculation is methodologically flawed because, among other things, it (a) seeks to recover for amounts that are not part of the Repurchase Price in the PSA; (b) fails to perform a loan-by-loan calculation, and (c) does not actually mirror or provide an equitable equivalent to the contractual Repurchase Price.  Mr. Greenspan will further opine that Dr. Mason's Rescissory Damages and Benefit of the Bargain calculations are methodologically flawed both because they lack an evidentiary basis and because of how Dr. Mason has chosen to calculate those damages.  Moreover, Mr. Greenspan will opine that Dr. Mason's calculations are fundamentally flawed because they fail to account for other factors that caused at least some of the losses experienced by the Trust.  Based on the work of WMC's servicing expert, Mr. Olasov, Mr. Greenspan will opine that the trust suffered millions of dollars in losses as a result of the Servicer's conduct.  Based on his own analysis of the real estate market during the Great Recession, Mr. Greenspan will also opine that the Trust suffered in excess of $100 million in losses attributable to the housing market decline.  Because of these several flaws, all of Dr. Mason's calculations are overstated and unreliable.

With respect to the correct calculation of the Repurchase Price, Mr. Greenspan will opine that the use of sampling is contrary to the loan-by-loan contractual remedy to which the Parties agreed in the PSA.  Mr. Greenspan will testify that by using sampling, the Parties are substituting estimates and approximations for what was meant to be a defined remedy in the contract. Without conceding that it is the proper method for calculating the contractual Repurchase Price,

Mr. Greenspan will use the breach ratios calculated by Mr. Payne and Mr. Abshier, or a different ratio selected by the Court following trial, to calculate the contractual Repurchase Price.

In submitting these opinions, Mr. Greenspan will rely on those materials set forth in Appendix A of his expert report, the monthly remittance reports published by the Trustee through November 25, 2017, any updated damages calculations produced by Dr. Mason prior to trial, and his own updated damages calculations. Mr. Greenspan's CV as of August 2016 is included as Appendix C to his expert report. A copy of Mr. Greenspan's expert report is attached hereto as Exhibit D-8.

Mr. Greenspan is likely to be called, and WMC expects that if called, his direct testimony will last approximately three to four hours.

**Brian Olasov**: Mr. Olasov is WMC's servicing expert. Mr. Olasov has over 30 years of experience in the mortgage lending and servicing industries, including extensive experience analyzing residential mortgage loan servicing, during his tenure at a number of banks, his experience with a trade association, and his work as a consultant. He is frequently retained to provide expert witness testimony as well as consulting services in mortgage securities disputes involving loan underwriting and mortgage loan servicing, and he has been qualified to testify as an expert on loan servicing and other mortgage backed securities issues in a number of matters. Mr. Olasov will offer opinions regarding whether: (1) HomEq Servicing Corporation and its successor, Ocwen Loan Servicing, LLC (together, the "Servicer") complied with the applicable servicing standard in servicing loans in the Trust; (2) the Servicer provided prompt notice of alleged breaches of representations and warranties to WMC; and (3) there is evidence in the servicing records demonstrating that any of the subject loans defaulted because of post-origination "change-of-life events" unrelated to the alleged breaches.

Mr. Olasov will opine that the actions of a mortgage loan servicer can – and in this case did – have an adverse impact on loan performance and that the Servicers' servicing of the loans that were originally deposited into the Trust did not comply with the applicable servicing standard.  Mr. Olasov will opine that the Servicer allowed loans to linger in default and failed to act promptly once loans became delinquent, failed to investigate and pursue potential repurchase claims, failed to make prudent loan modification decisions, failed to consider other loss mitigation alternatives, resulting in increased timelines and expense, and failed to obtain market value when marketing REO Properties, all of which increased realized losses.  In addition, Mr. Olasov will opine that the written notice WMC received of alleged breaches was, in many instances, not prompt and that there was evidence in the servicing records for over three hundred loans that change-of-life events contributed to or caused defaults.

In submitting these opinions, Mr. Olasov will rely on those materials set forth in Exhibit C of his expert report, including the monthly remittance reports and loan-by-loan schedules published by the Trustee, the Servicer's files, comments, transaction histories, policies, and other materials produced by the Servicer in this action, monthly servicer reporting summaries, and industry materials included on the Exhibit List.  (Exs. 64-67)  Mr. Olasov's CV as of August 2016 is included as Exhibit A to his expert report.  A copy of Mr. Olasov's amended expert report is attached hereto as Exhibit D-9.

Plaintiff has submitted a motion *in limine* asking the Court to exclude certain of Mr. Olasov's conclusions.  (Dkt. 181.)  Mr. Olasov's conclusions and opinions are admissible for the reasons set forth in WMC's Memorandum in Opposition to Plaintiff's Motion *in Limine* to Exclude Certain Testimony of WMC's Expert Witnesses.  (Dkt. 202.)

Mr. Olasov is likely to be called, and WMC expects that if called, his direct testimony will last approximately three to four hours.

***Objections by the Plaintiff to Defendants' Witnesses:***

The Separate Trustee objects to the trial testimony of WMC's witnesses who had not previously been disclosed in accordance with Rule 26, to the extent WMC fails to comply with the terms of the Court's Order dated December 7, 2017 (Docket No. 238).

The Separate Trustee filed a combined motion *in limine* to exclude certain testimony of Dr. Leamer, Dr. Abshier, and Mr. Olasov.  Dkt. No. 180-1.  With respect to Mr. Leamer, the Separate Trustee argued that his opinions do not assist the trier of fact and are not the product of reliable methodology.  *Id.*  With respect to Mr. Abshier, the Separate Trustee argued that he impermissibly considered undocumented "compensating factors" to find that certain loans are not in breach.  *Id.*   With respect to Mr. Olasov, the Separate Trustee objected that his opinions are irrelevant and thus do not assist the trier of fact, and that his methodology was unreliable.  *Id.*

## B.    EXHIBITS

The proposed exhibits are numerous and are set forth in a separate exhibit list and incorporated by reference.  The Parties' exhibit list is appended hereto as Exhibit E, and is organized as follows:

- Exhibits 1-142:  Plaintiff's Exhibits
- Exhibits 201-298:  Excerpts of Materials Relevant to Parties' Re-Underwriting Experts' Analyses of Disputed Loan Files (offered by Plaintiff)
- Exhibits 299-406:  Materials Relevant to Parties' Re-Underwriting Experts' Analyses of Disputed Loan Files (offered by Plaintiff)
- Exhibits 1001-1400:  Loan Files of 400 Sample Loans (offered by Plaintiff)
- Exhibits 500-639:  Defendant's Exhibits

- Exhibits 1401-2344:  Defendant's Exhibits, including credit policy memoranda, credit matrices, remittance reports, servicing comments, servicing file excerpts, and copies of Form 332 for various loans.

In light of the Court's December 7, 2017 Order (Dkt. No. 238) permitting additional discovery on WMC's newly-identified trial witnesses, the Separate Trustee reserves the right to supplement its exhibit list with additional materials pending receipt of the information WMC was ordered to produce.

WMC also reserves its right to supplement its exhibit list with additional materials as the circumstances may require.

Inclusion of any proposed exhibit may be for a specific purpose, and therefore both Parties reserve their rights, and do not waive any objection to the use of a proposed exhibit for any other purpose.  The Parties agree that either Party may use the other Party's proposed exhibits.

In addition, the Parties made their objections to each other's exhibits without having had the opportunity to meet and confer and without each Party identifying the purpose for which it intends to offer its proposed exhibits.  As a result, the Parties reserve their rights to withdraw or revise their respective objections based on subsequent meet and confer discussions.

## C.    DEPOSITION TESTIMONY

Plaintiff expects the following witnesses to testify by designation:  Tina Ganwani, David Gitson, Cathy Hamilton, Lisa Mentzer, Rosie Nguyencuu, Robert Rothleder, and Jim Zollo. Defendant expects the following witnesses to testify by designation: Daniel Cohen, Julie Eichler, Tina Ganwani, Nicole Gostebski, James Heaney, Mark Jackman, Thomas Musarra, Rosie Nguyencuu (if not called to testify live), Mary Sohlberg, and Jim Zollo (if not called to testify live).

The Parties' deposition designations, counter-designations, objections, responses, marked up copies of the deposition transcripts, and a legend explaining the abbreviations used by the Parties are attached as Exhibits C-1 through C-15.  The parties agree that, if admitted into evidence, either Party may use the other Party's designated testimony.

**9.    STIPULATIONS AND PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND EVIDENTIARY MATTERS**

The Parties have agreed to certain stipulations of fact, law, and evidence, which are attached as Exhibit A.

<u>**PLAINTIFF'S PROPOSED FINDINGS OF FACT AND LAW**</u>

TMI's Proposed Findings of Fact and Conclusions of Law are attached hereto as Exhibit B-1.

<u>**DEFENDANT'S PROPOSED FINDINGS OF FACT AND LAW**</u>

WMC's Proposed Findings of Fact and Conclusions of Law are attached as hereto Exhibit B-2.

**10.   ANTICIPATED EVIDENTIARY PROBLEMS**

WMC has filed three motions *in limine*, seeking to exclude the testimony of Dr. Mason, Mr. Ross, and Mr. Brazier.  WMC also moved *in limine* to preclude the use of sampling by Plaintiff at trial.  The basis for WMC's motions *in limine* are set forth in its moving papers.  Dkt. Nos. 184-1, 185-1, 186-1, 187-1.  The Separate Trustee opposed these motions for the reasons set forth in its memoranda in opposition.  Dkt. Nos. 192-95.  WMC filed replies.  Dkt. Nos. 211-14

The Separate Trustee filed a combined motion *in limine* to exclude certain testimony of Dr. Leamer, Dr. Abshier, and Mr. Olasov.  Dkt. No. 180-1.  With respect to Mr. Leamer, the

Separate Trustee argued that his opinions are not the product of reliable methodology.  Dkt. No.

*Id.*  Specifically, Mr. Leamer improperly opined that Dr. Lipshutz should have drawn a larger

sample based on the substantial dollar amount at issue.  *Id.*  With respect to Mr. Abshier, the

Separate Trustee argued that he impermissibly considered undocumented "compensating factors"

to find that certain loans are not in breach.  *Id.*  With respect to Mr. Olasov, the Separate Trustee

objected that he improperly opined that post-closing "life events" purportedly impacted

borrowers by causing loans to default or contributing to the magnitude of losses.  *Id.*   WMC

opposed these motions for the reasons set forth in its memorandum in opposition.  See Dkt. No.

200.  The Separate Trustee filed a reply.  Dkt. No. 208.

***By the Plaintiff:***

The Separate Trustee anticipates evidentiary issues with respect to the following

proposed exhibits:

### A.    Pl.'s Ex. 71 – "Fraud and Folly" Article

WMC has objected to the Separate Trustee's inclusion of an article from the Center for

Public Integrity entitled, "Fraud and Folly: The Untold Story of General Electric's Subprime

Debacle," dated January 6, 2012.  In the article, several former WMC employees reported that

WMC "embraced fraud" in origination.  *See* Pl.'s Ex. 71 at 1.  WMC has objected on the grounds

of relevance (FRE 401), prejudice (FRE 403), hearsay (FRE 801), and foundation (FRE 602).

The article bears directly on WMC's actual knowledge of fraud.  It is therefore relevant to the

Separate Trustee's failure to notify claim.  In addition, the Separate Trustee is not offering the

article for its truth but as evidence that several WMC employees were on notice of WMC's

problematic origination practices as early as 2005.  Finally, the testimony by David Gitson and Jim Zollo will lay sufficient foundation for the Article.

Trial Exhibit 71 is appended as Exhibit F-1.

**B.      Pl.'s Ex. 73 – "Ombudsman Documents"**

The Ombudsman Documents contain detailed complaints by WMC employees regarding fraudulent origination practices.  WMC has stipulated that it will not object to the Ombudsman Documents for lack of foundation and that the Separate Trustee may introduce them as business records at trial for the purpose of satisfying Federal Rule of Evidence 803(6).  Based on this stipulation, the Separate Trustee agreed to forego the depositions of certain WMC employees whose complaints are included in the Ombudsman Documents.  However, WMC has now objected to the Ombudsman Documents based on relevance (FRE 401) and prejudice (FRE 403), and "reserved its rights" to object to the Ombudsman Documents on the grounds that they include hearsay within hearsay.  The Ombudsman Documents bear directly on WMC's actual knowledge of fraud. They are therefore relevant to the Separate Trustee's failure to notify claim. The Ombudsman Documents contain the complaints of seven then-current WMC employees.  As WMC employees, their complaints are non-hearsay and fall squarely within the ambit of Federal Rule of Evidence 801(d)(2).

Trial Exhibit 73 is appended as Exhibit F-2.

**C.      Pl.'s Ex. 63 – "This American Life" Episode**

The This American Life Transcript is a transcript of a radio interview of Glen Pizzolorusso, a former sales representative at WMC.  WMC has objected on the grounds of relevance (FRE 401), prejudice (FRE 403), hearsay (FRE 801), and foundation (FRE 602).  At trial, Mr. Pizzolorusso will testify that WMC operated like a "boiler room" and funded loans for

borrowers that could not afford to repay them.  He will lay foundation for the transcript of his interview.  In addition, we intend to offer the statements not for the truth but for notice to WMC, and we intend to offer a transcript that will be certified by a court reporter.

Trial Exhibit 63 is appended as Exhibit F-3.

### D.      Pl.'s Exs. 1001-1400 – Sample Loan Files

WMC has objected on hearsay grounds to each of the 400 exhibits.  As an initial matter, WMC cannot dispute that under Federal Rule of Evidence 803(6), these exhibits are business records that WMC produced.  In any event, the Separate Trustee does not necessarily intend to rely on the exhibits for the truth of the matters asserted therein.  Instead, the loan files contain a record of materials submitted by borrowers and collected by WMC.  The loan files reflect the materials available to and considered by WMC's underwriters, and were relied upon by the parties' re-underwriting experts under Federal Rule of Evidence 702.  And, in fact, the Separate Trustee's re-underwriting expert will opine that many of the exhibits include misrepresentations.

### E.      Pl.'s Exs. 200-298 – Disputed Loan Excerpts

For the Court's convenience, the Separate Trustee has prepared packets containing the relevant excerpts of voluminous documents for each of the 98 sample loans in dispute.  The excerpts contain relevant portions of the loan files, servicing files, underwriting guidelines, credit matrices, and other materials relied upon by the parties' re-underwriting experts under Federal Rule of Evidence 703.  They are intended as summaries under Federal Rules of Evidence 1006.  As set forth above, under Federal Rule of Evidence 803(6), these exhibits contain excerpted portions of business records.  In any event, the Separate Trustee does not intend to rely on the

summary exhibits for the truth of the matters asserted therein.  Instead, the summaries contain a record of materials available to and relied upon by the parties' re-underwriting experts.

### F.      Servicing Exhibits

WMC's exhibit list contains numerous exhibits that are relevant, if at all, only to the servicing opinions rendered by WMC's servicing expert Brian Olasov (and related opinions by WMC's damages expert, Ronald Greenspan).  For all of the reasons outlined in the Separate Trustee's motion *in limine* and accompanying memorandum (Docket No. 180-1 at 19-27), Mr. Olasov's testimony is legally irrelevant and will not assist the trier of fact.  Accordingly, the Separate Trustee objects under Federal Rule of Evidence 401 to all exhibits that relate only to the servicing opinions.

Moreover, nearly all of the servicing exhibits contain hearsay-within-hearsay.  For example, the hardship letters were written by borrowers to the servicer.  *See* Exhibits 1914-2118.  These out-of-court statements by non-party borrowers are not admissible for their truth.  Fed. R. Evid. 802.


### *By Defendant:*

This is a contract case with the sole remedy of repurchase.  As a result, proffered evidence should relate to the Mortgage Loans in the Trust.  Plaintiff appears to take the position that its "failure to notify" claim and "gross negligence" allegations make admissible *any* allegation of a problem or misdeed at WMC.  Plaintiff is wrong.  The evidence it offers concerning WMC's origination practices must be relevant and otherwise admissible under the Federal Rules of Evidence ("FRE").

In particular, the probative value of unsubstantiated employee complaints, or anecdotes supplied by former employees, of purported misdeeds by certain WMC employees at particular branch offices is at best minimal in evaluating the nation-wide origination practices of WMC at the relevant time (early-to-mid 2006). Such evidence is easily and substantially outweighed by the danger of unfair prejudice to WMC under FRE 403. Even if such evidence were admitted, FRE 404 would prevent it from being used to prove how all WMC employees acted across WMC offices.

Moreover, Plaintiff claims that its presentation of evidence concerning alleged misconduct should not be limited to testimony from witnesses with personal knowledge who are subject to cross-examination concerning their recollections and biases. Specifically, Plaintiff seeks to rely on a number of documents, including articles, that are unconnected to the Mortgage Loans or Trust, and published years after WMC ceased operations. (See, e.g., Exs. 63, 71). These documents refer to unsubstantiated and unproven allegations of misconduct at WMC. Plaintiff is not calling the authors of the documents to testify as to the foundation or accuracy of the allegations contained in them, and has not identified a competent witness who can testify as to a proper foundation. They are textbook cases of hearsay. To avoid FRE Rule 802, Plaintiff disingenuously claims that documents are not being offered for the truth of the allegations made therein, but rather to show WMC was on notice of problematic origination practices as early as 2005. But that theory of admissibility is flawed because the documents at issue were created years after WMC ceased all lending operations. In any event, the documents should not be admitted under FRE 401, 403 and 404 because they are not relevant and because admitting them – and like documents and testimony – is unfairly prejudicial and would be improper.

Defendant also anticipates potential evidentiary problems relating to Plaintiff's effort to proffer loan files and selective loan excerpts. The loan files are replete with hearsay statements of borrowers, brokers and other third parties. Plaintiff cannot establish a proper foundation for all of the statements in the loan files as WMC business records because, among other reasons, WMC did not itself make or prepare most of the documents contained in the loan files. Plaintiff cannot resolve these obvious hearsay issues with the equivocal claim that it "does not necessarily intend to rely on the exhibits for the truth of the matters asserted therein." To the extent Plaintiff does purport to admit the loan files for the truth of the matters asserted therein, the loan files are inadmissible hearsay. Moreover, Plaintiff's plan to submit selective excerpts of documents culled from loan files for purposes presenting a one-sided view of WMC's lending decision is not a proper summary under Federal Rule of Evidence 1006, and lacks any foundation whatsoever for a hearsay exception under Federal Rule of Evidence 803. While the experts can testify regarding the materials they relied upon in forming their opinions, that does not make the materials admissible in evidence.

Further, Plaintiff seeks to exclude servicing materials from evidence. (*See, e.g.*, *Exs.* 1835-2345.) As WMC explained in its Response to Plaintiff's Motion *in limine* to exclude WMC's servicing expert, among other experts, the servicer's failure to properly servicing the Mortgage Loans contributed to the losses experienced by this Trust Plaintiff seeks general contract damages, which require proof of causation. Plaintiff's failure to offer any such proof does not render servicing or the servicing records irrelevant.

WMC incorporates by reference the objections and arguments raised in the Exhibit List, the Parties' deposition designations, in its previously filed motions *Daubert* motions and motions *in limine*, and in WMC's responses to Plaintiff's motion in limine.

Dated: December 15, 2017                                     Respectfully submitted,


PLAINTIFF TMI TRUST COMPANY, solely          DEFENDANT WMC MORTGAGE, LLC
in its capacity as Separate Trustee of the
Securitized Asset Backed Receivables LLC
Trust 2006-WM2


/s/ Harvey J. Wolkoff                                        By: /s/  Howard K. Levine
Harvey J. Wolkoff (*phv* 01103)                             Anthony M. Fitzgerald (ct 04167)
Daniel V. Ward (*phv* 05850)                                Howard K. Levine (ct 10555)
Kathryn E. Wilhelm (*phv* 08528)                            CARMODY TORRANCE SANDAK &
Stacylyn M. Doore (*phv* 07627)                             HENNESSEY LLP
ROPES & GRAY LLP                                            195 Church Street, 18th Floor
Prudential Tower                                            P.O. Box 1950
800 Boylston Street                                         New Haven, CT 06509
Boston, MA 02199-3600                                       Tel: (203) 777-5501
Tel.: (617) 951-7703                                        Fax: (203) 784-3199
Fax: (617) 951-7050                                         Email: afitzgerald@carmodylaw.com
harvey.wolkoff@ropesgray.com                               Email: hlevine@carmodylaw.com
daniel.ward@ropesgray.com
kathryn.wilhelm@ropesgray.com
stacylyn.doore@ropesgray.com                                JENNER & BLOCK LLP
                                                            Barbara S. Steiner
                                                            Megan B. Poetzel
Elizabeth Bierut (phv 09372)                                Michael A. Doornweerd
Ropes & Gray LLP                                            353 N. Clark Street
1211 Avenue of the Americas                                 Chicago, Illinois 66054
New York, NY 10036-8704                                     Tel: (312) 222-9350
Tel.: (212) 596-9000                                        Fax: (312) 527-0484
Fax: (212) 596-9090                                         Email: BSteiner@jenner.com
elizabeth.bierut@ropesgray.com                             Email: Mpoetzel@jenner.com
                                                            Email: Mdoornweerd@jenner.com

Thomas D. Goldberg (ct 04386)
Kevin C. Brown (ct 29774)                                   *Attorneys for Defendant*
DAY PITNEY LLP
One Canterbury Green
201 Broad Street
Stamford, Connecticut 06901
Tel.: (203) 977-7300
Fax: (203) 977-7301
tgoldberg@daypitney.com
kbrown@daypitney.com


*Attorneys for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 15, 2017, the foregoing Joint Pretrial Memorandum was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's CM/ECF system.

<u>/s/ Kevin C. Brown</u>
Kevin C. Brown