# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| TMI TRUST COMPANY, solely in its capacity as Separate Trustee of the SECURITIZED ASSET BACKED RECEIVABLES LLC TRUST 2006-WM2 (SABR 2006-WM2), | Case No: 3:12-cv-01538-CSH |
| Plaintiff, | |
| v. | |
| WMC MORTGAGE, LLC f/k/a WMC MORTGAGE CORP., | |
| Defendant. | March 22, 2018 |

## PLAINTIFF TMI TRUST COMPANY'S POST-TRIAL BRIEF

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION. ................................................................................................ 3

    A.   Counts Against WMC ................................................................................ 3

    B.   The Witnesses ............................................................................................ 5

II.     WMC'S CORPORATE CULTURE UNDERMINED PRUDENT
    UNDERWRITING. .............................................................................................. 9

    A.   WMC Experienced Explosive Growth. ..................................................... 9

    B.   "Fraud Pays" for WMC BDRs. ............................................................... 11

    C.   WMC's "Team" Structure Contributed to Its Faulty Underwriting. ........ 14

    D.   Quality Control Could Not Stop Defective Loans. ................................... 15

III.    WMC EITHER KNEW ABOUT OR TURNED A BLIND EYE TO BREACHES
    OF ITS REPRESENTATIONS AND WARRANTIES IN THE PSA. ............ 17

IV.     WMC'S INTERNAL CONTROLS WERE INEFFECTIVE. ........................... 21

V.      WMC IGNORED ITS OWN UNDERWRITING GUIDELINES IN AN EFFORT
    TO ORIGINATE MORE LOANS ................................................................... 23

VI.     WMC REFUSED TO REPURCHASE MATERIALLY BREACHING LOANS .......... 27

VII.    THE SEPARATE TRUSTEE'S USE OF SAMPLING TO PROVE LIABILITY
    AND DAMAGES IS SOUND ......................................................................... 29

    A.   Sampling Is Permissible and Appropriate in this Case ............................ 29

    B.   Dr. Lipshutz's Methodology Is Reliable. ................................................ 31

    C.   Dr. Leamer's Analysis Is Flawed. ........................................................... 33

VIII.   THIS COURT SHOULD ACCEPT MR. PAYNE'S EXPERT OPINIONS AS TO
    EACH OF THE 99 DISPUTED LOANS. ....................................................... 34

    A.   Mr. Payne's Methodology Appropriately Evaluated the Sample Loans for
        Material Breaches. ................................................................................... 35

        1.   Background on WMC's Underwriting Methodology ...................... 36

        2.   Mr. Payne Conducted a Reliable Re-Underwriting Review of the Sample
            Loans ............................................................................................ 38

        3.   Mr. Payne Appropriately Interpreted and Applied the PSA's
            Representations and Warranties ..................................................... 40

            (a)   Representation (lll) – Underwriting Methodology ................... 40

            (b)   Representation (x) – Underwriting Guidelines ........................ 42

            (c)   Representation (m) – "No Fraud" ........................................... 43

B.   By Contrast, Mr. Abshier Made Critical Errors that Undercut the Reliability of his Re-Underwriting Work. ................................................................................ 44

    1.   Mr. Abshier Performed the Wrong Inquiry in Evaluating Whether WMC Breached its Representations and Warranties ................................................... 45

        (a)   Other Courts Have Rejected Analogous Re-Underwriting Expert Opinions when Evaluating Breaches of Representations and Warranties................ 46

        (b)   This Issue Pervaded Mr. Abshier's Work................................................. 48

    2.   Mr. Abshier Excused Breaches Based on Information Unavailable to WMC at the Time of Origination ........................................................................ 52

C.   Mr. Abshier Unreasonably Accepted WMC's "Approvals" on the Loan Files' Condition Forms. ....................................................................................................... 54

D.   Mr. Abshier's Methodology Otherwise Excused Significant Problems with WMC's Underwriting. ................................................................................................ 59

    1.   Mr. Abshier Ignored that WMC Frequently Made Convenient "Mistakes" in Calculating Borrower's Debt-to-Income Ratios.......................... 59

    2.   Mr. Abshier Did Not Reliably Evaluate Whether a Borrower's Stated Income Was Reasonable ........................................................................................ 60

E.   WMC Cross-Examined Mr. Payne on Only 16 of the 99 Disputed Loans................ 63

IX.   THIS COURT SHOULD AWARD DAMAGES TO TMI AS CALCULATED BY TMI'S EXPERT, DR. MASON. ........................................................................... 69

A.   Benefit of the Bargain Damages. ............................................................................... 69

    1.   Benefit of the Bargain Damages Are Available as a Remedy for WMC's Breach of Its Duty to Notify and as a Result of WMC's Grossly Negligent Conduct ............................................................................................... 69

    2.   Dr. Mason Appropriately Calculated Benefit of the Bargain Damages ............. 71

B.   Repurchase Damages. ................................................................................................. 77

    1.   Dr. Mason Correctly Calculated Repurchase Damages ..................................... 77

    2.   Dr. Mason Properly Included Future Losses in his Calculation of the Repurchase Damages........................................................................................... 78

    3.   Dr. Mason Appropriately Included Paid-in-Full Loans in his Calculation of Repurchase Damages ..................................................................................... 79

    4.   The Separate Trustee Does Not Need to Prove Causation to Recover Repurchase Damages........................................................................................... 80

    5.   WMC's Contention that Liquidated Loans Should Be Assigned a Value of $0 Is Obviously Incorrect ................................................................................ 80

    6.   Dr. Mason Properly Included Losses from Loan Modifications when Determining the Repurchase Damages ............................................................... 83

7.   This Court Can and Should Rely on Dr. Mason's Damages Calculator to Determine the Appropriate Repurchase Damages Figure ................................. 84

X.   WMC CANNOT RELY ON IMPROPER SERVICING OR OTHER POST-CLOSING EVENTS TO OFFSET DAMAGES. ............................................. 86

A.   Mr. Olasov's Testimony Regarding Post-Closing Events and Causation Is Legally Irrelevant.......................................................................................... 86

B.   Mr. Olasov Ignored the PSA's Servicing Standard. ................................. 87

C.   Mr. Olasov's Methodology Is Unreliable. ................................................. 89

XI.   CONCLUSION............................................................................................... 91

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACE Sec. Corp. v. DB Structured Prods., Inc.*,
  25 N.Y.3d 581 (2015) ...........................................................................................86

*ACE Sec. Corp. v. DB Structured Prods., Inc.*,
  965 N.Y.S.2d 844 (N.Y. Sup. Ct. 2013) ..............................................................81

*Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*,
  920 F. Supp. 2d 475 (S.D.N.Y. 2013)...................................................................29

*Bank of New York Mellon v. WMC Mortg., LLC*,
  39 N.Y.S.3d 892 (N.Y. Sup. Ct. 2016) .................................................................70

*Bank of New York Mellon v. WMC Mortg., LLC*,
  No. 12-cv-7096 (DLC), 2015 WL 2449313 (S.D.N.Y. May 22, 2015) ..........81, 82

*Caruolo v. John Crane, Inc.*,
  226 F.3d 46 (2d Cir. 2000)....................................................................................89

*Dennis v. N.Y.C. Police Dep't*,
  89-CV-7810 (LJF), 1992 WL 177157 (S.D.N.Y. July 13, 1992) ...........................89

*Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1 v. DB Structured Prods.,*
  *Inc.*, 958 F. Supp. 2d 488 (S.D.N.Y. 2013) .........................................................81

*Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*,
  810 F.3d 861 (2d Cir. 2015)..................................................................................86

*Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*,
  14-cv-3020 (KBF), 2018 WL 357315 (S.D.N.Y. Jan. 10, 2018)...............................4

*Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*,
  14-cv-3020 (KBF), 2018 WL 583116 (S.D.N.Y. Jan. 25, 2018)................. 30, 31, 70

*Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., et al.*,
  No. 11 Civ. 6188 (DLC) *et al.*, 2012 WL 6000885 (S.D.N.Y. Dec. 3, 2012) .................30, 32

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. May 11, 2015) ........................................32, 46, 47

*Fed. Hous. Fin. Agency v. Morgan Stanley ABS Capital I Inc., et al.*,
  No. 650291/2013, 2018 WL 1187676 (N.Y. Sup. Ct. Mar. 6, 2018) .....................70

*Fin. Guar. Ins. Co. v. Morgan Stanley ABS Capital I Inc.*,
54 N.Y.S.3d 610, 2017 WL 593142 (N.Y. Sup. Ct. 2017) .................................................. 78

*Grdinich v. Bradlees*,
187 F.R.D. 77 (S.D.N.Y. 1999) ........................................................................................... 33

*Green v. City of New York*,
359 F. App'x 197 (2d Cir. 2009) ......................................................................................... 47

*Greenwich Capital Fin. Prods. Inc. v. Negrin*,
903 N.Y.S.2d 346 (1st Dep't 2010) ..................................................................................... 84

*In re Ore Cargo, Inc.*,
544 F.2d 80 (2d Cir. 1976) ........................................................................................... 82, 83

*Law Debenture Tr. Co. of New York v. WMC Mortg., LLC*,
No. 3:12-cv-1538 (CSH), 2017 WL 3401254 (D. Conn. Aug. 8, 2017) ......................... 69, 70

*MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*,
958 N.Y.S.2d 647, 2010 WL 5186702 (N.Y. Sup. Ct. Dec. 22, 2010) ............................ 29, 30

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
500 F.3d 171 (2d Cir. 2007) ......................................................................................... 73, 87

*Morgan Stanley Mortg. Loan Tr. 2006-13ARX v. Morgan Stanley Mortg. Capital
Holdings LLC*, 36 N.Y.S.3d 458 (1st Dep't 2016) ............................................................ 4, 69

*Nomura Asset Acceptance Corp. Alt. Loan Tr. v. Nomura Credit & Capital, Inc.*,
31 N.Y.S.3d 863 (1st Dep't 2016) ...................................................................................... 86

*Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*,
19 N.Y.S.3d 1 (1st Dep't 2015) ..................................................................................... 69, 80

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
992 N.Y.S.2d 687 (2014) ................................................................................................... 82

*R.F.M.A.S., Inc. v. So*,
748 F. Supp. 2d 244 (S.D.N.Y. 2010) ................................................................................. 33

*Sparta Commercial Servs., Inc. v. DZ Bank*,
680 F. App'x 17 (2d Cir. 2017) .......................................................................................... 33

*Syncora Guarantee Inc. v. EMC Mortg. Corp.*,
No. 09 Civ. 3106 (PAC), 2011 WL 1135007 (S.D.N.Y. Mar. 25, 2011) ............................ 30

*U.S. Bank, Nat'l Ass'n v. UBS Real Estate Sec. Inc.*,
205 F. Supp. 3d 386 (S.D.N.Y. 2016) ......................................................................... *passim*

## PRELIMINARY STATEMENT

Plaintiff TMI Trust Company (the "Separate Trustee" or "TMI"), solely in its capacity as Separate Trustee of Securitized Asset Backed Receivables LLC Trust 2006-WM2 (the "Trust"), respectfully submits this post-trial brief pursuant to the Court's Memorandum and Order of February 13, 2018 (ECF No. 297).

In 2007, WMC originated and sold more than 5,000 residential mortgage loans to the Trust. Every loan was underwritten and approved by WMC employees, purportedly in accordance with WMC's own underwriting guidelines.  After the sale to the Trust, the loans began to default, resulting in extraordinary losses to the Trust's investors.  A forensic review of a statistically significant sample of 400 loans in the Trust by the Separate Trustee's re-underwriting expert, Richard Payne, has revealed that more than half of the loans – 57.8% – materially breached WMC's representations and warranties under the governing Pooling and Servicing Agreement (the "PSA").  The trial record demonstrates how such pervasive breaches, and the resulting catastrophic losses, could have happened.  WMC and its employees focused on growth and loan origination volume at the expense of underwriting standards.  WMC's top sales representatives earned exorbitant commissions and lived lavish lifestyles, while pressuring underwriters to approve defective loans.  Some of those underwriters spoke up and alerted management to this problem, only to be ignored by WMC.

As a result, WMC failed to follow its own underwriting guidelines, and the loans in the Trust are riven with defects.  The evidence shows that WMC's employees, including its senior management, knew of or recklessly disregarded serious deficiencies in WMC's underwriting process at the time.  However, they turned a blind eye to the pervasive failure to follow their own guidelines because volume was the "top priority" and "fraud pays."  WMC failed to implement

even basic systems or processes that could have prevented these defective loans from closing. WMC ignored specific reports prepared by a senior member of its risk management team revealing misrepresentations by borrowers.  And WMC marginalized its quality control staff, outsourcing part of the job to India and pressuring those that remained to sign off on bad loans.

While WMC attempted to move these faulty loans off its books quickly through the process of securitization, it also gave a "money back guarantee" in the form of representations and warranties regarding the quality of the loans – including most fundamentally that each of the loans had been underwritten in accordance with WMC's guidelines.  However, the Separate Trustee's forensic review of the loans and the evidence at trial prove that WMC's representations and warranties were routinely breached.  WMC itself admits that at least one-third of the loans in the sample contain material breaches.  But while the Trustee and the Separate Trustee notified WMC in 2011 and 2012 of nearly 700 breaching Trust loans, WMC refused – and continues to refuse – to repurchase a single one, in violation of its guarantee.

WMC also violated its separate contractual obligation to notify the Trustee when it became aware of breaches.  The trial evidence demonstrates that WMC and its senior management were aware of pervasive flaws in WMC's underwriting process, but remained silent.  The damages resulting from WMC's breach of its duty to notify are approximately $983 million, and the damages for failing to repurchase loans in material breach of WMC's representations and warranties total more than $380 million.  Accordingly, the Separate Trustee respectfully requests that the Court enter judgment in favor of the Trust, and award damages as specified herein.

## I.     INTRODUCTION

### A.     Counts Against WMC

The first count of the Separate Trustee's Complaint is for breach of contract based on WMC's material breach of its representations and warranties, as set forth in the PSA.  Trial Ex. 136 (Complaint) at 027-29.  Dr. Nelson Lipshutz, an expert statistician, designed a random, representative sample of 400 loans (with a 95% confidence interval and a 5% margin of error) from loans in the Trust that had not yet paid in full (the "Sample").  *See generally* Trial Ex. 168 (2015 Lipshutz Report).  Richard Payne, the Separate Trustee's expert on mortgage loan underwriting, then reviewed the 400 loans in the sample, and concluded that 231 of the 400 loans were in material breach at the time of origination.  Trial Ex. 160 (Payne Report) at 008-09.  Based on Mr. Payne's re-underwriting review, Dr. Lipshutz opined to a degree of statistical certainty that 57.8% of the loans in the pool were in material breach of WMC's representations and warranties.  Trial Ex. 161 (2017 Lipshutz Report) at 002-03.  As set forth in Section 2.03(d) of the PSA, the remedy for such breaches is the payment of the "Repurchase Price," as defined in Article I of the PSA.  Trial Ex. 1 (PSA) at 049.  The Separate Trustee's damages expert, Dr. Joseph Mason, applied the 57.8% breach rate and the express definition of "Repurchase Price" to calculate the repurchase damages owed by WMC as a result of its breaches of representations and warranties.  Dr. Mason calculated those repurchase damages as $380.4 million.  Trial Ex. 159 (Mason Report) at 020-24.

The second count of the Complaint is for breach of WMC's contractual duty to provide "prompt written notice" to the Trustee and other parties to the PSA upon discovering a material breach of the representations and warranties.  Trial Ex. 136 at 029-30.  Compelling evidence demonstrates that WMC knew or should have known that its loans were in material breach, and yet WMC stayed silent.  *See*, *e.g.*, Tr. 631:17-632:21 (Jan. 17, 2018, Mentzer); Tr. 853:19-854:19 (Jan. 18, 2018, Roman).  Later, when the Trustee or Separate Trustee notified WMC about almost

700 loans in material breach, WMC adhered to its corporate policy of refusing to repurchase a single loan.  Tr. 1081:12-1082:11, 1112:22-1113:7 (Jan. 22, 2018, Nguyencuu).  WMC's own re-underwriting witness, David Abshier, agreed that one-third of the loans in the Sample are in breach of WMC's representations and warranties.  But WMC never notified anyone of these breaches, or agreed to repurchase a single loan.  Trial Ex. 653 (Abshier Report) at 007.

As a result of WMC's failure to notify and grossly negligent conduct, the Separate Trustee is entitled to "benefit of the bargain" damages.  Trial Ex. 159 at 026-31.  Benefit of the bargain damages, as calculated by Dr. Mason, are intended to make the Trust whole for the value of a pool of loans that the Trust never would have purchased from WMC had the true quality of the loans been known at the time.  *Id.* at 029.  Dr. Mason calculated those damages by starting with the original principal balance of all loans in the Trust, and subtracting all payments of principal and interest received over the life of the loans, and applying interest to the remaining amount.  *Id.* at 030.  As Dr. Mason explained at trial, such damages do not represent a "windfall" to Certificateholders because the calculation of benefit of the bargain damages nets out all payments already received by investors.  *Id.* at 028-29.  Such damages are legally available because the Complaint alleges that WMC acted with gross negligence and violated its duty to notify the other parties to the PSA of such breaches in accordance with Section 2.03(c) of the PSA, Trial Ex. 136 at 029, which is an independent breach of the contract, separate and apart from WMC's breach of representations and warranties.  *See Morgan Stanley Mortg. Loan Tr. 2006-13ARX v. Morgan Stanley Mortg. Capital Holdings LLC*, 36 N.Y.S.3d 458, 462 (1st Dep't 2016); *Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC,* 14-cv-3020 (KBF), 2018 WL 357315, at *2-3 (S.D.N.Y. Jan. 10, 2018) (Forrest, J.).  Notably, the PSA does not limit the remedy available for breach of the independent duty to notify.  Because WMC's breach of its duty to notify

is not subject to the "sole remedies" provision, and because the evidence demonstrates that WMC's conduct was grossly negligent, the Trust is not limited to the repurchase remedy, and is entitled to recover benefit of the bargain damages.

**B.    The Witnesses**

At trial, the Separate Trustee called witnesses from all relevant departments at WMC, and from different WMC offices across the country:

1.    <u>David Gitson</u>: Mr. Gitson was vice president of risk management in WMC's home office in Burbank, CA.  Tr. 220:3-14, 225:12-228:18.  (Jan. 16, 2018, Gitson).  Mr. Gitson supervised a team of risk analysts, *id.* at 223:23-224:20, and prepared "multiple submissions reports," which tracked borrowers who had submitted multiple loan applications for loans separated by only brief periods of time.  Tr. 411:5-16 (Jan. 17, 2018, Gitson).  These reports revealed that borrowers submitted revised second loan applications that suddenly met WMC's criteria, including "income figures that mysteriously grew from one application to the next." *Id.* at 411:11-412:22; *see also* Trial Exs. 37, 38, 39.  In one instance, a borrower submitted two applications within a span of three weeks, stating that his income had grown by a stunning 159%.  Tr. 430:4-433:5 (Jan. 17, 2018, Gitson); Trial Ex. 37 at 003.  WMC funded the loans anyway.  Tr. 434:5-19, 442:9-443:15 (Jan. 17, 2018, Gitson).  As Mr. Gitson quickly learned, WMC management espoused the slogan: "fraud pays." *Id.* at 333:4-334:2.

2.    <u>Lisa Mentzer</u>: Ms. Mentzer was a territory manager overseeing WMC's underwriters in the Burbank, CA office, and for a time served as the team manager of a WMC CoreLogic "SWAT team" intended to identify certain types of mortgage fraud.  Tr. 626:6-11, 646:18-19 (Jan. 17, 2018, Mentzer); Tr. 2227:9-14 (Jan. 29, 2018, Huber).  As a territory manager, Ms. Mentzer tried to identify fraudulent loans, underwriting deficiencies and other inappropriate conduct, and formally notified WMC management about these issues.  Tr. 633:18-635:3 (Jan. 17, 2018, Mentzer).  In response, WMC demoted her from her position as territory manager. *Id.* at 627:12-17, 665:12-14.  As for Ms. Mentzer's complaints, they were "shoved under the rug just like everything else."  Tr. 696:10-16 (Jan. 18, 2018, Mentzer).

3.    <u>Cathy Hamilton</u>: Ms. Hamilton was a loan analyst in WMC's San Ramon, CA office.  Tr. 751:8-752:7 (Jan. 18, 2018, Hamilton).  Ms. Hamilton refused to sign off on loans that did not meet WMC's guidelines, and as a result, she was removed from her team. *Id.* at 739:2-740:23.  WMC proceeded to fund the loans anyway. *Id.* at 741:5-10, 742:9-19.  On each of her teams, Ms. Hamilton continued to raise red flags with management, but was instructed to "go with the flow" or her next move would be "out the door." *Id.* at 716:3-717:24, 742:4-8.

4.    Marcelle Heagy: Ms. Heagy was an underwriter in WMC's Woburn, MA office. Tr. 760:5-14 (Jan. 18, 2018, Heagy).  Ms. Heagy was one of the few employees in the office with any experience in the mortgage industry.  *Id.* at 764:5-12.  The manager of the Woburn office, Dave Rufo, was a former police officer who stocked the office with his friends, none of whom had any mortgage experience (including Mr. Rufo).  *Id.* at 768:7-25.  During her loan reviews, Ms. Heagy saw "red flags" on a daily basis, and reported them to management.  *Id.* at 770:2-25.  But management told her to "move forward," and they approved the loans anyway.  *Id.* at 777:23-778:19.

5.    Gail Roman: Ms. Roman worked in quality control ("QC") in WMC's Orangeburg, NY office.  Tr. 838:10-12, 840:11-25 (Jan. 18, 2018, Roman).  As a member of QC, Ms. Roman faced pressure from the WMC sales force to review and rubberstamp loans as quickly as possible.  *Id.* at 849:5-850:20.  Ms. Roman testified that at the end of each month, WMC held "blue light specials" where management would set up a disco light and approve any loans brought to them – even those with outstanding conditions that borrowers had yet to comply.  *Id.* at 861:5-16.  WMC's atmosphere was "have a pulse, get a loan."  *Id.* at 866:9-17.

6.    Tina Ganwani: Ms. Ganwani worked as a vice president in WMC's secondary markets department, where she was responsible for pre-securitization due diligence.  Tr. 919:25-920:24, 921:25-922:16 (Jan. 18, 2018, Ganwani).  During the due diligence process, investors identified problems and "kicked" certain loans. *Id.* at 958:10-20.  When an investor "kicked" a defective loan, WMC was supposed to drop it from the final loan pool.  *Id.* at 925:23-926:2.  In practice, however, WMC securitized these defective loans into other pools for purchase by other investors, including some in the Trust.  *Id.* at 958:21-959:22.

7.    Jim Zollo: Mr. Zollo was the former president and CEO of WMC.  Tr. 993:16-17 (Jan. 22, 2018, Zollo).  Mr. Zollo acknowledged that WMC had an "ombudsman" who received complaints about loan origination problems from WMC employees, but could not say that anyone at WMC ever investigated these complaints.  *Id.* at 1025:17-1026:6, 1038:25-1039:6.  Mr. Zollo further admitted that he had read an article entitled "Fraud and Folly: the Untold Story of General Electric's Subprime Debacle," which detailed employee concerns about WMC's fraudulent origination practices, around the time it was published in 2012 (while he was CEO).  *Id.* at 1021:17-1022:16; Trial Ex. 71.  Yet, apart from talking to human resources, he did not take any steps to investigate the claims in the article.  *Id.* at 1024:13-1025:16. Mr. Zollo confirmed that WMC tried to avoid repurchasing defective loans.  *Id.* at 1055:11-1056:5.

8.    Rosie Nguyencuu: Ms. Nguyencuu was WMC's "repurchase leader," who was responsible for reviewing and evaluating breach claims submitted by trustees or investors to determine whether WMC would repurchase the loans.  Tr. 1071:16-1072:9 (Jan. 22, 2018, Nguyencuu).  Ms. Nguyencuu testified that it was WMC's

corporate policy to rebut every repurchase demand it received.  *Id.* at 1081:18-1082:11.

9.   <u>Glen Pizzolorusso</u>: Mr. Pizzolorusso was a business development representative ("BDR") in WMC's Orangeburg, NY office, who described WMC as like the movie "Boiler Room" during an interview. Tr. 3324:13-21, 3264:16-3265:11 (Feb. 1, 2018, Pizzolorusso); Trial Ex. 143 at 030-31.  In 2005, Mr. Pizzolorusso made $780,000 by handing out loans to borrowers who he said "didn't have a pot to piss in."  *Id.* at 3223:20-3224:8, 3277:21-25.  Although Mr. Pizzolorusso was originating over five hundred loans per month, he was not familiar with WMC's quality standards. *Id.* at 3299:17-3300:4.  It is no coincidence that Mr. Pizzolorusso was the BDR on a number of loans in the Trust with material misrepresentations, whited-out information, and outstanding federal tax liens in excess of $150,000. *Id.* at 3262:25-3263:24, 3248:2-15.

In contrast to the parade of witnesses testifying for the Separate Trustee, WMC presented very few of its own.  Absent from WMC's case were any key employees in senior management, such as WMC's CEO, Amy Brandt; GE America's Fraud Leader, Ian Mitchell (despite WMC's last-minute request to call him, after omitting him from their Rule 26 disclosures); and David Boysen, WMC's former head of QC.

WMC called as a witness only one WMC employee, Robert Rothleder, a company man who stretched to testify about matters that he never actually dealt with, including due diligence, loan securitization, and underwriting.   Tr.  2048:16-25,  2051:25-2053:12  (Jan. 25, 2018, Rothleder).  With respect to WMC's underwriting policy, Mr. Rothleder testified that underwriters could rely on compensating factors that were not logged as long as the loan file contained the relevant "source documents." *Id.* at 2048:8-15.  However, his testimony was directly contradicted by that of Kenneth Huber, who was responsible for overseeing the drafting of the WMC underwriting guidelines and credit policy memos during the relevant time period.  Mr. Huber testified that WMC had always required its underwriters to "write out or log" compensating factors.  Tr. 2350:7-2353:25 (Jan. 29, 2018, Huber).

Mr. Huber, WMC's other main witness, was a GE employee who was temporarily seconded to WMC for less than three years. Tr. 2166:21-2167:5 (Jan. 28, 2018, Huber). Mr. Huber was the senior vice president of risk in WMC's Burbank office from November 2004 to March 2007. Tr. 2245:8-13, 2267:25-2268:4 (Jan. 29, 2018, Huber). During his two years and four months at WMC, Mr. Huber was supervised by five different risk managers from GE, one of whom commuted to Burbank from Atlanta (as did Mr. Huber for a year). *Id.* at 2251:19-2252:16, 2252:24-2253:3. Mr. Huber supervised Mr. Gitson in the risk department, but was unaware that Mr. Gitson had led a fraud boot camp presentation that revealed rampant fraud in the WMC loan origination process. *Id.* at 2333:8-20; Trial Ex. 72 at 014. Although Mr. Huber "champion[ed]" the introduction of a low-cost quality management system to detect fraud, Mr. Huber could not remember its ever being implemented. Tr. 2316:23-2320:14 (Jan. 29, 2018).

Finally, WMC presented the testimony of two former WMC regional vice presidents, Patrick McGovern and Mark Jackman. Mr. McGovern worked in the Orangeburg office and supervised BDRs. Tr. 2368:8-11, 2438:23-2349:16, 2452:3-6 (Jan. 29, 2018, McGovern). Mr. McGovern testified that the BDRs had "heated" discussions with QC about loans they wanted to fund. *Id.* at 2431:16-2432:9. And although Mr. McGovern testified at trial that he had "respect" for the QC department, email correspondence from 2006 between Mr. McGovern and a colleague reflected their view, at the time, that meeting with QC was like "going to the pits of hell to see the devil." *Id.* at 2427:6-2429:25. Mr. McGovern directly supervised Glen Pizzolorusso, who analogized the atmosphere at WMC to that of the movie "Boiler Room." Tr. 2368:8-11, 2439:9-16, 2452:3-6 (Jan. 29, 2018, McGovern); Tr. 3264:16-3265:11, 3324:13-21 (Feb. 1, 2018, Pizzolorusso). Mark Jackman, the regional vice president of the San Ramon office, had, at best, a nonchalant attitude toward QC. Tr. 2065:10-23, 2071:8-12 (Jan. 25, 2018, Jackman). Mr.

Jackman was not surprised to learn that QC had conducted an audit and found fraud in 22% of the loans originated by his office, nor had he conducted any investigation to look for fraud in other loans in his region.  *Id.* at 2116:4-2117:4.

At the end of the trial, WMC presented deposition testimony from a series of witnesses from Wells Fargo as the Trustee,[1] Law Debenture as the former separate trustee,[2] and Ocwen as the servicer.[3]  Insofar as these witnesses testified about the duties of the Trustee, their testimony is legally irrelevant.  Under Article VIII of the PSA, "[t]he trustee shall not be bound to make any investigation into the facts or matters," and "no implied covenants or obligations shall be read into the agreement against the trustee."  Trial Ex. 1 at 090-91.

## II.   WMC'S CORPORATE CULTURE UNDERMINED PRUDENT UNDERWRITING.

### A.   WMC Experienced Explosive Growth.

In the early 2000s, WMC was a relatively small mortgage lender, then known as Weyerhaeuser Mortgage Company.  Tr. 1842:18-23 (Jan. 25, 2018, Rothleder).  In 2004, WMC was acquired by General Electric ("GE").  Trial Ex. 72 at 004.  After the acquisition, the volume of subprime loans at WMC exploded.  *Id.*  WMC went from generating $8 billion worth of subprime loans in 2003 to $32 billion in 2005.  *Id.* at 004, 008.  By 2006, WMC was originating 190,000 mortgages per year on a pathway to making $48 billion in mortgage loans that year.  Tr. 2264:3-15 (Jan. 29, 2018, Huber).  Although WMC was increasingly aware of fraud and mounting

---

[1] From Wells Fargo, WMC presented deposition testimony of Julie Eichler and Daniel Cohen.

[2] From Law Debenture, WMC presented deposition testimony of James Heaney and Thomas Musarra.

[3] From Ocwen, WMC presented deposition testimony of Nicole Gostebeski.

repurchase requests, WMC reminded its employees in 2006 that "volume will always be a top priority." Trial Ex. 155 at 006.

Not only did WMC's loan volume explode during this time period, but WMC also doubled its staff, from 1,100 full-time employees in 2004 to 2,400 full-time employees ("FTE") in 2005. Trial Ex. 72 at 004. These new hires were not veterans in the mortgage industry. Rather, WMC filled its ranks with former police officers, used car salesmen, pool cleaners, horse trainers, and fast food workers. Tr. 242:12-25 (Jan. 16, 2018, Gitson); Tr. 768:7-16 (Jan. 18, 2018, Heagy); Tr. 2264:20-2265:12 (Jan. 29, 2018, Huber). Even top management at WMC had no prior mortgage experience. Amy Brandt, WMC's thirty-one year old CEO, was preoccupied with her music career and recording studio. Tr. 355:8-358:25 (Jan. 17, 2018, Gitson). She stocked senior management with her husband, sister, and sorority sisters. *Id.* at 355:24-356:18, 368:8-369:10; Tr. 2262:12-2263:18 (Jan. 29, 2018, Huber). Even the senior risk management executives brought in from GE lacked experience in the subprime mortgage sector. For example, before he arrived at WMC, only about 1% of Mr. Huber's professional experience had involved subprime mortgages. Tr. 2249:12-22 (Jan. 29, 2018, Huber). In early 2007, WMC began cutting back, and by spring, WMC had laid off most of its employees. Tr. 225:17-22 (Jan. 16, 2018, Gitson); Tr. 2464:5-8 (Jan. 29, 2018, McGovern).

This "boom and bust" at WMC can be attributed to its corporate culture. WMC was a "flow through" company, meaning that it would originate and sell loans to investors, but avoid the financial hit if and when the loans defaulted by getting the loans off its books through the process of securitization. Tr. 222:17-22 (Jan. 16, 2018, Gitson); Tr. 2246:8-21 (Jan. 29, 2018, Huber). As a result, WMC had every incentive to encourage its employees to close as many loans as possible, as fast as possible. Management sent out regular emails instructing employees to "fund fund

fund!!!" and "Fund Early & Fund Often!!!" Trial Ex. 68 at 001; Trial Ex. 135 at 001. This "rah rah" culture began with senior management, and reverberated at every level of the company. Tr. 2269:6-13, 2271:17-23 (Jan. 29, 2018, Huber). Underwriters experienced pressure to "just close the loan." Tr. 788:6-14 (Jan. 18, 2018, Heagy). Many questionable loans were closed before QC had a chance even to review them. Tr. 848:7-21, 850:9-20 (Jan. 18, 2018, Roman). As WMC employees began to realize, the company had an unwritten policy: "have a pulse, get a loan." *Id.* at 866:6-17.

    **B.**    **"Fraud Pays" for WMC BDRs.**

    WMC paid its BDRs on commission based on the number of loans the BDRs closed. Tr. 2430:4-10 (Jan. 29, 2018, McGovern). At the end of each month, WMC held sales contests for its top BDRs. Tr. 2268:22-2269:5 (Jan. 29, 2018, Huber); Tr. 2442:5-20 (Jan. 29, 2018, McGovern). In Orangeburg, one of WMC's largest offices, WMC held monthly "blue light specials" in order to meet sales targets. Tr. 861:5-864:14 (Jan. 18, 2018, Roman). Although Patrick McGovern, a regional vice president in Orangeburg, claimed not to recall the "blue light specials," another Orangeburg employee – Glen Pizzolorusso – described a red "ticker" on the office wall that announced "corporate funding numbers." Tr. 3297:5-14 (Feb. 1, 2018, Pizzolorusso).

    In this "anything goes" environment, BDRs in their twenties were making hundreds of thousands of dollars per year and driving expensive cars, including customized BMWs and Mercedes. Tr. 246:2-20 (Jan. 16, 2018, Gitson); Tr. 3223:20-3224:12 (Feb. 1, 2018, Pizzolorusso). WMC's risk manager – David Gitson – drove a Honda. Tr. 246:24-25 (Jan. 16, 2018, Gitson). Because BDRs believed that "fraud pays," their primary allegiance was to the corporate policy of maximizing volume. Tr. 333:4-334:2 (Jan. 17, 2018, Gitson). WMC's guidelines required underwriters to take into account the borrower's ability to repay, but internal reports to management show that WMC was aware that its top-ranking BDRs got to the top by bribing

brokers in cash, doctoring loan applications with white out and X-Acto knives, and operating their own brokerage firms on the side.  Tr. 656:19-657:22 (Jan. 17, 2018, Mentzer); Trial Ex. 73 at 007. Loans closed with employment misrepresentations, income misrepresentations, fraudulent verifications of deposit, and fraudulent CPA letters.  Tr. 633:18-635:3 (Jan. 17, 2018, Mentzer).

Mr. Gitson, identified these issues and attempted to sound the alarm to WMC's management – but was ignored.  For example, Mr. Gitson circulated his multiple submissions reports to management, but was told not to look at loans that had already been funded because if he did, WMC could be charged with "constructive knowledge" of fraud.  Tr. 343:8-346:21 (Jan. 17, 2018, Gitson).  Eventually, WMC cut off funding that supported his risk-management work. *Id.* at 444:23-446:11.  As Mr. Gitson testified, "I was blocked."  Tr. 275:19-276:3 (Jan. 16, 2018, Gitson).

Underwriters also saw "red flags" in loan applications on a daily basis.  Tr. 770:2-12, 788:3-5 (Jan. 18, 2018, Heagy); *see also* Tr. 634:2-635:3 (Jan. 17, 2018, Mentzer); Tr. 725:4-25 (Jan. 18, 2018, Hamilton).  They saw a surprising number of wage-earners applying for stated income loans, which did not require evidence of borrower income.  Tr. 797:7-799:5 (Jan. 18, 2018, Heagy).  Frequently, when underwriters would reject an application for a stated income loan because the borrower had insufficient income, they would receive a revised application with an inexplicably higher income shortly thereafter.  Tr. 642:19-643:14 (Jan. 17, 2018, Mentzer).  WMC underwriters also saw red flags when attempting to verify the borrower's place of employment, as required by WMC's underwriting guidelines.  Tr. 725:4-25 (Jan. 18, 2018, Hamilton).  Mr. Gitson once witnessed an attempt to call and verify a borrower's employment that resulted in the phone ringing on a nearby WMC employee's desk.  Tr. 321:3-10 (Jan. 17, 2018, Gitson).  In one stated income loan application reviewed by Ms. Heagy of WMC's Woburn office, the borrower had listed

his employment as "museum curator."  Tr. 781:3-12 (Jan. 18, 2018, Heagy).  When Ms. Heagy attempted to verify the borrower's employment by calling the employer on the application, a hair salon receptionist answered, claiming that there was a museum "in the back room" of the hair salon.  *Id.* at 781:13-25.  Ms. Heagy raised concerns about that loan with management, but was instructed to approve it.  *Id.* at 782:2-17.  Ms. Hamilton, too, struggled to verify borrowers' employment, and often saw borrowers lying about their employment on stated income loans.  Tr. 725:4-25 (Jan. 18, 2018, Hamilton).  For example, she reviewed one loan application where the borrower was a janitor purporting to earn between $150,000 and $174,000 per year.  *Id.* at 746:15-749:2.  Despite his high stated income, the borrower had less than $3,000 in his bank account.  *Id.* at 749:3-12.  Such a low balance compared to a high income would be considered a significant "red flag."  *Id.*  ("Because if he makes that kind of money then he should have money in the bank.")

When WMC managers learned that BDRs were pushing these fraudulent loans, they looked the other way.  In one instance, Mr. Huber received a report that a top salesman, Kevin Dunning, had originated multiple fraudulent files from the same broker, but he could not recall anyone investigating Mr. Dunning.  Tr. 2285:22-2288:12 (Jan. 29, 2018, Huber).  When Ms. Mentzer told her manager that she had observed Pat Lynch doctoring a loan file with white out and a photocopier, her manager "shoved [her complaint] under the rug."  Tr. 694:15-696:16 (Jan. 18, 2018, Mentzer).  These BDRs were never sanctioned.  Joint Pretrial Memo, Ex. A at 12 (ECF No. 244); Tr. 2285:22-2288:12 (Jan. 29, 2018, Huber).

In mid-2006, Mr. Gitson, and David Riedel, a QC manager, led a presentation about fraud for senior executives at GE, but had to end it early because none of the GE executives were "familiar with the mortgage industry."  Tr. 261:25-263:16, 268:24-269:6 (Jan. 16, 2018, Gitson).  No one from WMC attended the presentation, and Mr. Gitson's supervisor, Mr. Huber, did not

even know it had occurred. *Id.* at 263:12-16, Tr. 2333:8-23 (Jan. 29, 2018, Huber). A fraud detection company named BasePoint Analytics ("BasePoint"), made a pitch to WMC executives in July 2006 in an attempt to alert WMC to the rising levels of fraud. Trial Ex. 172; Tr. 2327:21-2329:23 (Jan. 29, 2018, Huber). BasePoint told WMC that "WMC fraud rates are significantly higher than other lenders that we have worked with in the past," and that "[a]t least half of the fraudulent loans are slipping through the current risk controls." Trial Ex. 172 at 024; Tr. 2329:15-23 (Jan. 29, 2018, Huber). Nevertheless, WMC declined to retain BasePoint at that time. Tr. 2330:7-11 (Jan. 29, 2018, Huber).

### C.   WMC's "Team" Structure Contributed to Its Faulty Underwriting.

WMC perpetuated its corporate culture in another way: by organizing its employees in "hierarchical teams" that posed inherent conflicts. Tr. 384:12-386:5 (Jan. 17, 2018, Gitson). At the top of each team was a regional vice president or team lead, and then the BDRs. *Id.* at 384:12-25; Tr. 2372:25-2374:4 (Jan. 29, 2018, McGovern). Beneath the BDRs were the underwriters, who were there to "support" the BDRs. Tr. 626:23-627:3 (Jan. 17, 2018, Mentzer); Tr. 766:7-14 (Jan. 18, 2018, Heagy). Mr. McGovern admitted that in his 29 years in the mortgage industry, he had never worked at any other firm where underwriters and BDRs worked on the same team and reported to the same supervisor. Tr. 2440:7-2441:25 (Jan. 29, 2018, McGovern).

This unusual "team structure" created obvious conflicts. In some instances, BDRs "controlled" underwriters. Tr. 646:25-647:24 (Jan. 17, 2018, Mentzer). For example, Pat Lynch – one of WMC's top BDRs – had a personal underwriter "reporting to him" who would talk to brokers and sign off on any loan files that he received. Trial Ex. 147 at 028; Tr. 645:6-17 (Jan. 17, 2018, Mentzer). Other BDRs bribed underwriters with cash payments, a problem apparently so pervasive that WMC's human resources department had to circulate a memo about it – although WMC never produced the memo. Tr. 2281:25-2283:6 (Jan. 29, 2018, Huber). In other instances,

BDRs would simply pressure underwriters and even territory managers to sign off on loans.  Tr. 385:25-387:17 (Jan. 17, 2018, Gitson); Tr. 632:2-7, 649:17-22 (Jan. 17, 2018, Mentzer).

Not everyone was complacent about the fraudulent practices transpiring at WMC.  Cathy Hamilton, Lisa Mentzer, Marcelle Heagy, and David Gitson all complained to management, but they were all ignored, demoted, or fired.  Ms. Hamilton identified red flags in loan applications, but management transferred her from team to team and told her to "go with the flow" or she would be "out the door."  Tr. 717:17-718:2, 742:4-8 (Jan. 18, 2018, Hamilton).  Ms. Mentzer complained about Pat Lynch's fraudulent practices, but was ignored and demoted to credit manager.  Tr. 656:25-657:22 (Jan. 17, 2018, Mentzer) ("I don't know what credit manager actually means.  Because I was put there when I complained to HR about their fraudulent practices.  So what it meant for me was I was sitting in a room calling to track down unsigned loan applications and HUD ones.").  Ms. Heagy also raised red flags with management, but like Ms. Hamilton, was repeatedly transferred to different teams.  Tr. 788:18-790:14 (Jan. 18, 2018, Heagy).  Eventually, after she rejected a loan file that was missing required documentation, Ms. Heagy was terminated.  *Id.* at 790:15-791:25.  And Mr. Gitson and his multiple submissions reports were ignored.  Tr. 343:8-346:21 (Jan. 17, 2018, Gitson).

### D.     Quality Control Could Not Stop Defective Loans.

Separate from the "teams" of BDRs and underwriters, WMC had a QC department, which was supposed to perform the crucial role of preventing fraudulent or defective loans from funding.  Tr. 2199:24-2200:13 (Jan. 29, 2018, Huber).  The "quality assurance" review was intended to ensure that loans were underwritten in accordance with WMC's guidelines, and the "quality control" review was intended to check for any material misrepresentations made in connection with a loan application.  Tr. 842:24-844:7 (Jan. 18, 2018, Roman).

15

From a sales perspective, however, QC posed a threat: a BDR would not receive his or her commission if QC stopped a loan from funding.  Tr. 2431:16-2432:9 (Jan. 29, 2018, McGovern). To circumvent this, BDRs would pressure QC to finish reviews hastily, withhold documents from QC, and argue with QC about its findings.  Tr. 846:7-847:2, 849:5-15 (Jan. 18, 2018, Roman). BDRs often confronted QC, and in at least one instance, a BDR "physically threatened" and "harassed" a QC leader, Karen Most, for simply "doing her job."  Tr. 423:20-424:23 (Jan. 17, 2018, Gitson); Tr. 2431:16-2432:9 (Jan. 29, 2018, McGovern).

Despite this dynamic, QC received little support from management.  For example, despite admitting that he observed "heated" conversations between BDRs and the QC team, Mr. McGovern, the regional vice president in Orangeburg, never asked Ms. Most or others in QC if they were feeling pressure from BDRs.  Tr. 2431:16-2434:5 (Jan. 29, 2018, McGovern).  Despite the important role QC should have played, the group was often dismissed as the "bad guy."   Tr. 839:22-840:4 (Jan. 18, 2018, Roman); Tr. 2428:6-2429:18 (Jan. 29, 2018, McGovern); Trial Ex. 153 at 001 ("Oh, my God, we have to go the pits of hell to see the devil.").

QC was thus marginalized, and rendered functionally "nonexistent."  Tr. 642:8-645:23 (Jan. 17, 2018, Mentzer).  By late 2005, WMC had outsourced quality assurance reviews to India, and QC began to receive fewer and fewer loan files for review.  Tr. 840:21-841:25, 845:2-849:4 (Jan. 18, 2018, Roman); Tr. 644:14-18 (Jan. 17, 2018, Mentzer) ("[Pat Lynch] told me that taking a file to QC was brain dead and I shouldn't do it again.").  Internal WMC documents show that of the more than 170,000 loans that were originated in 2006, fewer than 3% were "voluntarily submitted" to QC for review.  Trial Ex. 67 at 009; Tr. 1995:13-1999:7 (Jan. 25, 2018, Rothleder). In fact, underwriters would refuse to relinquish loan files for QC's review and "lock[ed] their desk drawers" so QC could not access them.  Tr. 846:7-14 (Jan. 18, 2018, Roman).  Even when QC was

able to review a loan file and identify a "material misrepresentation," management would often override that finding and decide to fund the loan anyway.  Tr. 854:12-19 (Jan. 18, 2018, Roman); Tr. 3247:3-20 (Feb. 1, 2018, Pizzolorusso).  In this way, WMC continued funding as many loans as possible without regard to the loans' quality or borrowers' ability to repay.  Tr. 3264:22-3266:9 (Feb. 1, 2018, Pizzolorusso).

Despite complaints from QC, WMC did not even begin to "watch list" and terminate problematic brokers until late 2006 – after the Trust loans at issue were originated.  Trial Ex. 155; Tr. 2448:3-21 (Jan. 29, 2018, McGovern).  And even GE did not rein in misconduct at WMC.  In 2006, GE sent a senior risk management team to WMC to audit WMC's risk controls.  Tr. 2300:11-19 (Jan. 29, 2018, Huber).  The team recommended replacing David Boysen as the head of QC, but WMC never did.  *Id.* at 2301:5-16.

## III.   WMC EITHER KNEW ABOUT OR TURNED A BLIND EYE TO BREACHES OF ITS REPRESENTATIONS AND WARRANTIES IN THE PSA.

WMC was the underwriter of every loan in the Trust.  Joint Pretrial Memo, Ex. A at 2. Accordingly, WMC's employees reviewed every loan file prior to closing – and WMC was therefore aware of, or willfully blind to, breaches of its representations and warranties.  *Id.*; *see also* Tr. 1863:6-1865:10 (Jan. 25, 2018, Rothleder).  Ms. Roman, Ms. Mentzer, Ms. Heagy, Ms. Hamilton, and Mr. Gitson all testified that they frequently observed "red flags" in loan files, and reported them to their managers.  Tr. 878:7-23 (Jan. 18, 2018, Roman); Tr. 631:24-633:21 (Jan. 17, 2018, Mentzer); Tr. 777:19-779:3 (Jan. 18, 2018, Heagy); Tr. 716:14-718:7 (Jan. 18, 2018, Hamilton); Tr. 270:17-275:13 (Jan. 16, 2018, Gitson); Tr. 377:14-380:19 (Jan. 17, 2018, Gitson). Ms. Roman and her colleagues in QC frequently identified loans with material misrepresentations by coding them "18," which should have stopped them from funding – but management would override their decisions at the request of the BDRs.  Tr. 854:12-19, 870:21-25, 884:5-12 (Jan. 18,

2018, Roman).   Ms. Mentzer futilely reported her discovery of fraudulent loans to Juativa Spurlock, a vice president of operations; Emily Staats, a BDR manager (and sister of WMC's CEO, Amy Brandt); and several other high-ranking employees in human resources.  Tr. 631:24-633:21 (Jan. 17, 2018, Mentzer).  None of them appeared at the trial, and Ms. Mentzer's testimony stands unrebutted.  Similarly, Ms. Heagy reported red flags to her manager, Dave Rufo, who was also absent from trial.  Tr. 777:19-779:3 (Jan. 18, 2018, Heagy).  Ms. Roman and Ms. Mentzer later repeated their concerns to a journalist from the Center for Public Integrity, which published the "Fraud and Folly" article in 2012.  Trial Ex. 71 at 005-06.  Mr. Zollo, the WMC CEO in 2012, admitted that he read the article when it was published, but did nothing to investigate the claims raised therein.  Tr. 1021:17-1024:21 (Jan. 22, 2018, Zollo).

Mr. Gitson reported borrower fraud and income misrepresentation to WMC's chief credit officer, Mark Walter; GE America's Fraud Leader, Ian Mitchell; WMC's senior vice president of risk, Ken Huber, and WMC's CEO, Jim Zollo.  Tr. 270:17-275:13 (Jan. 16, 2018, Gitson); Tr. 339:7-14, 377:14-380:19 (Jan. 17, 2018, Gitson).  Neither Mr. Walter nor Mr. Mitchell appeared at trial, and Mr. Zollo appeared only by deposition as a witness for TMI, not WMC.  And nothing in the testimony of Mr. Huber or Mr. Zollo touched Mr. Gitson's testimony.  Mr. Huber admitted that WMC did not keep track of Mr. Gitson's multiple submissions reports.  Tr. 2314:4-25 (Jan. 29, 2018, Huber).  Mr. Zollo (incredibly) claimed he did not recall speaking with Mr. Gitson about fraud, despite working "down the hall" – but otherwise did not contradict Mr. Gitson's testimony.  Tr. 1022:17-21, 1024:4-12 (Jan. 22, 2018, Zollo).

Mr. Gitson's multiple submission reports revealed one borrower who had submitted two applications within three weeks – and supposedly, the borrower's income had increased by 159% in that short time, enough to qualify for the loan.  Tr. 430:4-434:19 (Jan. 17, 2018, Gitson); Trial

Ex. 37.  Mr. Gitson circulated such reports – which are highly indicative of borrower fraud – to his superiors and other executives at WMC and GE, including David Boysen (the head of WMC's QC department), Ken Huber (GE's senior vice president of risk overseeing WMC), David Riedel (a WMC QC manager), and Daniel Wu (the head of WMC's risk group at the time).  Tr. 415:11-416:2 (Jan. 17, 2018, Gitson).  However, Mr. Huber admitted that he "probably" stopped looking at the reports in May 2006, and did not know if anyone in QC ever reviewed them.  Tr. 2295:7-15, 2314:7-25 (Jan. 29, 2018, Huber).  Ms. Roman confirmed that she never received Mr. Gitson's multiple submission reports.  Tr. 850:21-25 (Jan. 18, 2018, Roman).

Mr. Gitson's efforts did not stop there.  In mid-2006, he reported at a "fraud boot camp" presentation that 78% of the loans reviewed during an audit were "deemed fraudulent."  Tr. 261:25-263:24 (Jan. 16, 2018, Gitson); Trial Ex. 72 at 014.  After his presentation, Mr. Gitson and his colleague, David Riedel, went to dinner with Mr. Mitchell and Tom Brennan, another GE executive, during which Mr. Gitson and Mr. Riedel voiced their concerns about "straw buyers," income misrepresentation, and multiple submissions.  Tr. 270:17-272:24 (Jan. 16, 2018, Gitson).  Yet, nothing was done.  Tr. 321:23-325:14 (Jan. 17, 2018, Gitson).  Neither Mr. Mitchell nor Mr. Brennan appeared at the trial on behalf of WMC, and Mr. Gitson's testimony about the information he shared with those executives stands unrebutted.

WMC also had an official "ombudsman" system, which allowed employees to raise complaints to management.  Tr. 1025:17-1026:6 (Jan. 22, 2018, Zollo).  The file of reports to the ombudsman's office introduced into evidence, Trial Exhibit 73, shows that these employee complaints were often sent to WMC's corporate directors and senior management, including the CEO, Amy Brandt.  *See* Trial Ex. 73 at 007, 035-36.  One report about WMC's top-ranking BDR,

Aussy Manuhu, stated:

> Wanted to tell you what is happening at WMC Mortgage San
> Ramon, California Office, a GE Money Company.  A sales rep
> named Aussy Manuhu is head of a team.  She is pressuring her sales
> people and underwriting people to do bad loans.

*Id.* at 007.  Another complaint about Pat Lynch (the highly ranked BDR whom Lisa Mentzer had

observed using an X-Acto knife and white out on loan files) stated:

> [T]here have been numerous complaints about his conduct and
> integrity with others, his drinking/coming to work intoxicated, his
> approach and bad communication skills, his condescending tone,
> he's been caught in the act paying brokers and employees – he
> purchase[d] a vehicle for his underwriters [sic] daughter, and now
> he is paying Tabitha Tata under the table . . . [H]ow much more do
> we have to take with Pat Lynch?

*Id.* at 035.  Despite these complaints, neither Aussy Manuhu nor Pat Lynch was sanctioned, but

rather they both continued to work at WMC until WMC shut its doors at the end of 2007.  *See*

Joint Pretrial Memo, Ex. A at 12.  WMC's senior managers like Mr. Huber, the vice president of

risk, and Mr. Rothleder, the vice president of production operations, did nothing to investigate

these BDRs.  Tr. 2024:16-2029:8 (Jan. 25, 2018, Rothleder); Tr. 2277:4-2279:25 (Jan. 29, 2018,

Huber).

Moreover, before loans were securitized into a trust, WMC received due diligence reports

from investors, which informed WMC of defects in the loans (*i.e.*, that the loans did not meet

underwriting or other criteria).  Tr. 924:14-925:22 (Jan. 18, 2018, Ganwani).  When an investor

"kicked" a defective loan, WMC was supposed to drop it from the final loan pool.  *Id.* at 925:23-

926:2.  In practice, however, WMC would securitize "kicked" loans into other pools for purchase

by other investors.  *Id.* at 958:10-959:22.  As Ms. Heagy explained, "kicked" loans were simply

"rebundle[d]" into other deals so WMC could still make money.  Tr. 811:16-19 (Jan. 18, 2018,

Heagy).  In fact, 182 loans that were "kicked" by investors were ultimately securitized in the Trust – including 13 Sample loans.[4]  Trial Ex. 178; *see also* Trial Ex. 25.

## IV.   WMC'S INTERNAL CONTROLS WERE INEFFECTIVE.

Despite this evidence of WMC's gross negligence, WMC asserts that it was not a "boiler room" because it purportedly had "internal controls" in place to detect and prevent fraud.  Tr. 133:10-17, 136:11-17, 138:21-25, 141:5-24, 145:5-22 (Jan. 16, 2018, WMC Opening).  This is demonstrably false, given that more than half of the loans in the representative Sample are in material breach of WMC's representations and warranties.  *See* Trial Ex. 160 at 008-010.  Mr. Huber had championed a project to improve WMC's internal controls to "prevent[] unwanted and fraudulent loans from funding," but after performing a cost-benefit analysis, WMC decided not to implement the system.  Tr. at 2316:23-2317:15, 2320:9-14 (Jan. 29, 2018, Huber); Trial Ex. 171 at 002.  Given that the project would have cost only $52,250, and that WMC was on a pathway to originating $48 billion of loans per year, WMC's decision not to expend that relatively paltry sum to improve its "internal controls" is inexcusable.  *Id.* at 2264:3-6, 2320:9-14.

WMC lacked any system for reviewing or tracking Mr. Gitson's multiple submissions reports, which revealed many instances of borrowers (or brokers) re-submitting rejected loan applications on behalf of the same individuals that suddenly met WMC's underwriting criteria.  Tr. 2316:3-2319:7 (Jan. 29, 2018, Huber).  Mr. Gitson's reports went unnoticed by QC, the risk department, and Mr. Huber himself.  Tr. 850:21-25 (Jan. 18, 2018, Roman); Tr. 2295:7-15, 2314:7-25 (Jan. 29, 2018, Huber).  BasePoint made a pitch to WMC in mid-2006, in which it reported that "WMC fraud rates are significantly higher than other lenders we have worked with in the past,"

---

[4] Of these Sample loans, WMC's re-underwriting witness, David Abshier, concedes that nine of them are in material breach, but continues to contest one of them, even though WMC stipulated that the loans had been identified as "defective" during due diligence.  Trial Ex. 178.

and that "[a]t least half of the fraudulent loans are slipping through [WMC's] current risk controls." Trial Ex. 172 at 001, 024.  But WMC declined to retain BasePoint, purportedly because WMC had decided to retain an appraisal firm called CoreLogic instead.  Tr. 2330:9-11, 2357:10-13 (Jan. 29, 2018, Huber).  But in fact, by September 2006 – well *after* all the loans in the Trust were originated – WMC had only started a "pilot" program with CoreLogic.  *Id.* at 2215:20-2216:4, 2340:13-24. And the pilot program was inherently limited – CoreLogic's system related only to appraisals, and lacked the capability to identify borrower misrepresentations or loan applications that had been doctored by WMC employees.  *Id.* at 2341:3-20.  Although WMC appointed a "SWAT team" to review the CoreLogic reports, the team was staffed with only three people – one of whom was Lisa Mentzer, who was demoted after notifying WMC management about the fraudulent practices she had observed.  Tr. 627:8-20 (Jan. 17, 2018, Mentzer); Tr. 2348:22-2349:8 (Jan. 29, 2018, Huber); Trial Ex. 510 at 004.

Without appropriate controls, WMC failed to respond when informed that its bad actors were running rampant.  *See generally* Trial Ex. 73.  Aussy Manuhu – the top BDR in the company, who pushed defective loans and privately operated her own illicit brokerage shop – originated numerous loans securitized in the Trust, including 27 loans in the Sample, 11 of which WMC admits are in breach.  Trial Ex. 73 at 007; Court Ex. 1.  Yet, Ms. Manuhu continued to work at WMC without consequence.  Joint Pretrial Memo, Ex. A at 12.  Pat Lynch – another top BDR who sent checks to brokers, offered cash to employees, and altered loans with white out and X-Acto knives – originated multiple Trust loans, including five in the Sample,  two of which WMC admits are in breach.  Trial Ex. 73 at 036; Court Ex. 1.  Despite this, Mr. Lynch was permitted to continue working at WMC.  Trial Ex. 73 at 036; Joint Pretrial Memo, Ex. A at 12.  And Kevin Dunning – a sales representative who originated multiple fraudulent loan files from the same broker – was

responsible for originating at least four Sample loans, two of which WMC admits are in breach. Tr. 2285:22-2288:12 (Jan. 29, 2018, Huber); Trial Ex. 170 at 003; Court Ex. 1.  Mr. Dunning was never even reprimanded, let alone sanctioned or terminated.  Tr. 2285:22-2288:12 (Jan. 29, 2018, Huber).

Even if WMC had developed "internal controls" or retained outside firms to identify defective loans, WMC management was not physically there to listen.  For the first year that he worked at WMC, Mr. Huber, the senior vice president of risk, commuted to the Burbank office from Atlanta.  *Id.* at 2250:3-6.  His supervisor, Gene Thorncroft, the head of risk at the time, continued to live in Atlanta while working a second job for GE.  *Id.* at 2251:19-2252:11.  And although Mr. Rothleder claimed at trial that he "walk[ed] the floors" of WMC's Burbank office, he knew nothing about the fraud boot camp, the CoreLogic reports, the pitch by BasePoint, or GE's audit of WMC – or about any other of WMC's supposedly robust "internal controls."  Tr. 1989:4-7, 2000:21-2001:20, 2015:24-2016:4 (Jan. 25, 2018, Rothleder).

## V.  WMC IGNORED ITS OWN UNDERWRITING GUIDELINES IN AN EFFORT TO ORIGINATE MORE LOANS.

It was against this backdrop in 2006 that WMC underwrote the loans that were securitized in the Trust.  Joint Pretrial Memo, Ex. A at 2-3 (nearly all of the Trust loans originated in 2006; 90% originated in May and June 2006).  These loans were subprime loans, making adherence to WMC's underwriting guidelines all the more important.[5]  The Trust included a high proportion of "stated income" loans.  Trial Ex. 3; Trial Ex. 502 at 047, 163.  Stated income loans allow the borrower to represent his or her income on a loan application, without submitting a W-2 or other

---

[5] "Subprime" mortgage loans generally require less documentation and permit lower credit scores, and higher loan-to-value ratios ("LTVs") than "prime" loans.  Trial Ex. 502 at 010; Tr. 688:18-689:9 (Jan. 18, 2018, Mentzer); Tr. 760:15-761:2, 764:13-21 (Jan. 18, 2018, Heagy).

documentation verifying their income.  Tr. 776:4-12 (Jan. 18, 2018, Heagy).  As a result, stated income loans carry higher interest rates than full documentation loans.  *Id.* at 796:8-13.  Of the 99 loans in dispute, 67% are "stated income" loans.  Court Ex. 2.  While nearly half of the borrowers on these stated income loans claimed to make over $100,000 per year, many of them reported that they had less than $10,000 in liquid assets – inconsistent with such a high stated income.  *Id.* Moreover, 65% of those borrowers were wage-earners who should have had supporting documentation like W-2s and paystubs, but nevertheless applied for "stated income" loans – raising the question of why they would willingly pay a higher interest rate for a stated income loan if they were actually employed, with ready access to supporting income documentation.  *Id.*

In addition, 73% of the 99 loans in dispute had combined loan-to-value ratios ("CLTVs") of 100% or more.  *Id.*  CLTV is the ratio of mortgage debt on a property to the appraised value of the property.  Tr. 1473:4-22 (Jan. 23, 2018, Payne).  A loan with a CLTV of 100% indicates that the borrower received a loan with no down payment, and thus had no equity in the property (*i.e.*, no "skin in the game").  *Id.*  And nearly half of the 99 loans in dispute had debt-to-income ("DTI") ratios of 45% or more, meaning that the borrower devoted nearly half of his or her pre-tax income to pay the mortgage and other outstanding debts.  Court Ex. 2; Tr. 1480:2-18 (Jan. 23, 2018, Payne).

These loans should have raised red flags at WMC, and warranted careful scrutiny for compliance with all of WMC's applicable underwriting guidelines and other representations and warranties.  WMC's response is that investors in the Trust knew and accepted these inherent risks when they chose to invest in a pool of subprime loans.  Tr. 167:23-170:3 (Jan. 16, 2018, WMC Opening).  But WMC represented and warranted in the PSA that all the loans in the Trust – including subprime loans – were originated in accordance with its underwriting guidelines.  Trial

Ex. 1 at 116 (representation (x)).  WMC also warranted that its underwriting methodology was based on objective factors, and that WMC had made "a reasonable determination that at the time of origination" the borrower had the "ability to make timely payments" on the loan.  Trial Ex. 1 at 121 (representation (lll)).  WMC's underwriting guidelines – which were incorporated into the PSA – required WMC to verify that the borrower's income was reasonable and that the borrower had the ability to repay.  *E.g.*, Trial Ex. 14 at 014-15; Trial Ex. 15 at 014-15, 041; Tr. 763:12-20 (Jan. 18, 2018, Heagy).  WMC made over 70 other representations and warranties about the quality of those subprime loans when it entered the PSA.  Trial Ex. 1 at 111-24 (Scheds. III, IV).  Yet, in the end, 57.8% of the Trust loans materially breached the PSA's representations and warranties. Trial Ex. 160 at 008-010.

WMC also contends that "exceptions" to its underwriting guidelines were permitted.  But WMC's internal policies and procedures, including the guidelines themselves, required that "exceptions" only be made if "compensating factors" were present to offset the risk from such exceptions.  *E.g.*, Trial Ex. 14 at 014-15, 019-20; Trial Ex. 15 at 014, 017-18.  Importantly, "[a] compensating factor should be something in the loan above and beyond meeting underwriting requirements[.]"  Tr. 658:10-18 (Jan. 17, 2018, Mentzer); Tr. 1335:16-25 (Jan. 23, 2018, Payne) ("[C]ompensating factors should enhance the loan.").  Under the guidelines, exceptions could only be approved by authorized senior management at WMC.  Tr. 659:18-24 (Jan. 17, 2018, Mentzer); Trial Ex. 14 at 019-20; Trial Ex. 15 at 017-18.  For this reason, it was crucial that underwriters document or log exceptions in writing.  Tr. 737:14-738:10 (Jan. 18, 2018, Hamilton); Tr. 867:25-868:7 (Jan. 18, 2018, Roman).  WMC witnesses, Mr. Huber and Mr. McGovern, agreed that this was WMC's policy.  Tr. 2351:21-2352:18, 2353:21-2354:4 (Jan. 29, 2018, Huber); Tr. 2462:14-25 (Jan. 29, 2018, McGovern).  In particular, Mr. Huber testified that he was responsible for

overseeing the drafting of the WMC underwriting guidelines and credit policy memos during the relevant time period.  Tr. 2350:7-25 (Jan. 29, 2018, Huber).  He confirmed that underwriters were required to "write out or log" their reasons for listing compensating factors and granting exceptions.  *Id.* at 2351:21-2352:18.  Indeed, WMC's May 2006 underwriting guidelines spell out this requirement.  Trial Ex. 14 at 014 ("Exceptions and overrides require proper approval and documentation[.]").  In November 2005, WMC also released a credit policy memo stating: "Underwriting Guideline Overrides MUST be documented thoroughly and approved by someone with sufficient delegated authority.  Appropriate documentation includes the compensating factors that justify the decision to approve an override."  Trial Ex. 87 at 003.  Mr. Huber acknowledged that this policy remained in place "forever."  Tr. 2351:16-20 (Jan. 29, 2018, Huber).

Despite all this, one WMC witness, Mr. Rothleder, insisted that the guidelines required only that the loan file contain "source documents" for the compensating factors relied upon by the underwriter (WMC's re-underwriting witness, David Abshier, later referred to this as "inconsistent testimony").  Tr. 2048:8-15 (Jan. 25, 2018, Rothleder); Tr. 2648:5-14 (Jan. 30, 2018, Abshier).  Mr. Rothleder further testified that the November 2005 credit policy memo had been superseded by later guidelines and policy memos.  Tr. 2046:10-24 (Jan. 25, 2018, Rothleder).  However, Mr. Rothleder admitted that he was not, at any time, either an underwriter or someone responsible for reviewing WMC's underwriting practices.  *Id.* at 2048:16-2049:12.  He could not explain why WMC revised its guidelines in June 2006 to delete the requirement that exceptions must be documented.  *Id.* at 2049:2-2050:5; *compare* Trial Ex. 14 (May 2006 guidelines) at 014, *with* Trial Ex. 15 (June 2006 guidelines) at 014-15.  The only rational explanation is that WMC wanted the ability to originate loans without regard to quality and at the same time, avoid leaving a paper trail.

Disregarding its own written policies and guidelines is what WMC routinely did: when a loan did not meet the underwriting guidelines, management instructed underwriters to mark the condition as "approved" on WMC's internal condition decisions form and simply "move on."  Tr. 772:2-18 (Jan. 18, 2018, Heagy).  Sometimes, management would simply remove required closing "conditions" from the checklist in the file so that it looked like the loan complied with the underwriting guidelines.  Tr. 732:3-25 (Jan. 18, 2018, Hamilton).  Mr. Rothleder admitted that WMC loan files were often missing important documents like W-2s and other employment verifications.[6]  Tr. 1931:16-22 (Jan. 25, 2018, Rothleder); *see also* Tr. 2669:19-2671:5 (Jan. 30, 2018, Abshier); Trial Ex. 653 at 023-24; Tr. 946:13-20 (Jan. 18, 2018, Ganwani).  Nevertheless, WMC looked the other way and sold those loans to other investors.  *See id.* at 1951:14-1952:3.

## VI.    WMC REFUSED TO REPURCHASE MATERIALLY BREACHING LOANS.

In contrast to WMC, the Trustee has limited duties enumerated in the PSA.[7]  Under Section 2.03(c) of the PSA, a party that discovers a breach of a Trust loan "shall give prompt written notice to the others."  Trial Ex. 1 at 049.  The Trustee (and later, the Separate Trustee) fulfilled this duty

---

[6] Mr. Rothleder testified that these documents were scanned into WMC's computer system, and suggested that the "monster imaging machines" may have occasionally "eat[en] the paper," thus causing certain documents to be missing from the loan file.  Tr. 1927:16-1929:20 (Jan. 25, 2018, Rothleder).  Mr. Rothleder offered no explanation as to why the "monster" machines seemed to repeatedly "eat" the same types of key documents in the loan file, like verifications of employment or verifications of deposit.

[7] Section 8.02(d) provides that "the Trustee shall not be bound to make any investigation into the facts or matters stated in any . . . notice, request, . . . or other document."  Trial Ex. 1 at 091.  And Section 8.01(a) provides that "the duties and obligations of the Trustee shall be determined solely by the express provisions of this agreement[.]  [T]he Trustee shall not be liable except for the performance of the duties and obligations specifically set forth in this agreement[.]  [N]o implied covenants or obligations shall be read into the Agreement against the Trustee[.]"  Trial Ex. 1 at 090.

when they sent five repurchase letters to WMC, notifying it of nearly 700 loans in material breach. Trial Exs. 76, 77, 78, 79, 80; Joint Pretrial Memo, Ex. A at 5-9.

WMC deflected these repurchase letters with a barrage of excuses.  In some cases, WMC requested "additional information" from the Trustee, including payment histories and servicing comments, even though the PSA does not require the Trustee to provide such information.  Tr. 1095:14-1098:18 (Jan. 22, 2018, Nguyencuu); Trial Ex. 1 at 091.  WMC's repurchase leader, Rosie Nguyencuu, also admitted that WMC made no effort to obtain the information.  Tr. 1099:5-1100:4 (Jan. 22, 2018, Nguyencuu).  WMC was able to provide point-by-point rebuttals on a number of loans listed in one of the Trustee's repurchase letters without receiving any "additional information" that it later (pretextually) claimed was necessary.  *Id.* at 1100:5-1101:12; Trial Ex. 55 at 002-04.  Other times, WMC admitted that a loan was "suspicious," but insisted upon "undeniable proof" – a standard nowhere articulated in the PSA or any other agreement.  Trial Ex. 117 at 002.  WMC often searched for a contractual "out" to avoid repurchase, arguing that the loan had been liquidated or that some other "contractual prerequisite[]" had not been met – although neither Ms. Nguyencuu nor anyone else from WMC identified any applicable "prerequisite."  Tr. 1085:9-1086:24, 1112:22-1113:7 (Jan. 22, 2018, Nguyencuu).

Setting pretext aside, WMC was simply following its corporate policy: to rebut every repurchase demand.  *Id.* at 1081:24-1082:11; Trial Ex. 50 at 009 (reciting corporate policy: "Every effort is made to rebut the repurchase demand, if possible").  As GE President and CEO Mark Begor stated in 2010, "[i]f you've seen some of our results you know that we refute every loan." Trial Ex. 122 at 020.  So, although WMC received and reviewed the repurchase letters from the

Trustee and Separate Trustee, WMC has not repurchased a single loan from the Trust.[8]  Tr. 1117:9-16 (Jan. 22, 2018, Nguyencuu) (admitting that WMC may not have repurchased a single loan from any transaction since 2011).  The Sample contains 57 loans that were identified in the repurchase letters as in material breach, and WMC's re-underwriting witness, Mr. Abshier, conceded that 22 of them are in material breach – yet to this day, WMC has not repurchased a single loan in the Trust.  *See* Joint Pretrial Memo, Ex. A at 10.

## VII.   THE SEPARATE TRUSTEE'S USE OF SAMPLING TO PROVE LIABILITY AND DAMAGES IS SOUND.

### A.   Sampling Is Permissible and Appropriate in this Case.

The Separate Trustee retained Dr. Nelson Lipshutz, an expert in the field of statistical sampling, to draw a statistically significant, random sample of 400 loans from the Trust.  Dr. Lipshutz opined that the Sample was representative of the overall Trust to an appropriate degree of statistical confidence.

The use of statistical sampling here is fully in line with many other courts that have considered this issue, including in the RMBS space.  First, sampling is widely accepted as a reliable and representative method of proof.  *See, e.g.*, *Assured Guar. Mun. Corp. v. Flagstar Bank, FSB*, 920 F. Supp. 2d 475, 512 (S.D.N.Y. 2013) (remarking that the purpose of sampling is "so that, despite the unique characteristics of the individual members populating the underlying pool, the sample is nonetheless reflective of the proportion of the individual members in the entire pool exhibiting any given characteristic"); *MBIA Ins. Corp. v. Countrywide Home Loans, Inc.*, 958 N.Y.S.2d 647, 2010 WL 5186702, at * 6 (N.Y. Sup. Ct. Dec. 22, 2010) ("[T]he use of sampling is

---

[8] Although WMC claimed that a "Repurchase Audit" from 2006 revealed that WMC repurchased 320 loans, there is no evidence that WMC repurchased loans from the Trust.  Tr. 135:12-136:2 (Jan. 16, 2018, WMC Opening); Tr. 579:3-580:4 (Jan. 17, 2018, David Gitson).

widespread as a valid method to prove cases with large amounts of underlying data.").  As Judge Forrest recently explained in an RMBS case, "proper statistical sampling is not a shot in the dark— it is a well-established and scientifically sound method of inferring (to varying degrees of certainty) how many <u>individual</u> loans in the pool contain material breaches." *Deutsche Bank Nat'l Tr. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, No. 14-cv-3020 (KBF), 2018 WL 583116, at *15 (S.D.N.Y. Jan. 25, 2018) (emphasis in original).  WMC's own re-underwriting witness, Mr. Abshier, testified that he routinely used sampling when he worked at the federal Office of Thrift Supervision, and that the federal regulator relied on the results of those samples. Tr. 2546:3-16 (Jan. 30, 2018, Abshier).

Second, sampling promotes judicial economy.  As several courts have observed, re-underwriting every loan is extremely time-consuming not only for the parties, but also for the court.  *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co., et al.*, No. 11-cv-6188 (DLC) *et al.*, 2012 WL 6000885, at *3 (S.D.N.Y. Dec. 3, 2012) (J. Cote) (explaining that the re-underwriting process is "costly and time-consuming"); *Syncora Guarantee Inc. v. EMC Mortg. Corp.*, No. 09 CIV. 3106 (PAC), 2011 WL 1135007, at *6 n.4 (S.D.N.Y. Mar. 25, 2011) (J. Crotty) ("[Defendant] cannot reasonably expect the Court to examine each of the 9,871 transactions to determine whether there has been a breach, with the sole remedy of putting them back one by one.").  Not surprisingly, both the Freddie Mac and Fannie Mae underwriting guidelines (cited by WMC's statistical witness Dr. Leamer) recognize that it is "not feasible to review" every loan that a company originates.  *See* Trial Ex. 93 at 004; Trial Ex. 94 at 007.  Mr. Abshier acknowledged that his team spent "thousands of hours" re-underwriting the 400 loans in the Sample, Tr. 2548:13-2549:3 (Jan. 30, 2018, Abshier), and that he personally spent 600 hours reviewing the 400 loans.  *Id.* at 2546:24-2547:4.

If the parties had been required to re-underwrite each of the 5,162 loans in the Trust, the re-underwriting process would have taken years. *See id.* at 2548:3-25.

*U.S. Bank, National Association v. UBS Real Estate Securities Inc.* illustrates the perils of a loan-by-loan approach. 205 F. Supp. 3d 386, 526 (S.D.N.Y. 2016). There, Judge Castel held a bench trial in which only 20 out of 9,342 loans at issue were fully analyzed. *See id.* at 478-526. Because of "the sheer volume of loans, several thousand for which findings and conclusions [we]re necessary," Judge Castel appointed a special master (former District Judge Barbara S. Jones) to conduct an individual review of each loan. *Id.* at 526. The special master ordered the parties to fully brief each disputed loan at a rate of 400 loans per month. *See Deutsche Bank Nat'l Tr. Co.*, 2018 WL 583116, at *13. As Judge Forrest remarked, "[t]hat review process will be ongoing for the foreseeable future, and the final cost, both in terms of time and resources expended, will be extraordinary." *Id.*

### B.    Dr. Lipshutz's Methodology Is Reliable.

Dr. Nelson Lipshutz opined that his Sample was representative of the loans in the Trust. Tr. 1650:8-1652:23 (Jan. 24, 2018, Lipshutz).[9]  As Dr. Lipshutz explained,

> [T]he idea is to get a measure that's unbiased of a population that's highly representative of the total population. You don't get that automatically just because it's random. And we tested for that very extensively. That sample is big enough to give an unbiased estimate that is reliable and has been reliable.

---

[9] Although the pool included both paid-in-full and non-paid-in-full loans and Dr. Lipshutz excluded the former from the Sample, all loans in the pool were originated using the same underwriting process. Tr. 1578:4-17 (Jan. 23, 2018, Lipshutz). Thus, Dr. Lipshutz concluded that the Sample should be "highly representative of the population as a whole." *Id.* at 1580:5-1581:14.

*Id.* at 1647:21-1648:3.  First, Dr. Lipshutz drew a Sample of 400 loans, which he calculated would be sufficient to achieve a margin of error of ± 5% at a confidence level of 95%.  *Id.* at 1635:10-1636:3.  Dr. Lipshutz then used chi-square tests to compare the distribution in the Sample to 20 different variables, including loan amount, interest rate, the loan-to-value ("LTV") ratio, the combined loan-to-value ratio ("CLTV"), and others.  *Id.* at 1650:18-1651:16.  Because Dr. Lipshutz drew a representative sample, he was able to extrapolate the results to the entire pool with accuracy.  *Id.* at 1652:16-23.

WMC's statistical expert, Edward Leamer, testified that Dr. Lipshutz should have considered drawing a larger sample based on the amount of damages at stake.  Tr. 3013:6-21 (Jan. 31, 2018, Leamer).  However, Dr. Leamer conceded that Dr. Lipshutz used a "textbook approach" and acknowledged the statistical accuracy and reliability of Dr. Lipshutz's work.  *Id.* at 3029:7-3031:16.  Indeed, courts have repeatedly held that a sample size calculated based on a 95% confidence level and a margin of error of ± 5% (here, 400 loans) is sufficiently large to produce reliable results in RMBS cases, and satisfies the plaintiff's burden of proof.  *See, e.g.*, *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 494 (S.D.N.Y. 2015) ("*FHFA II*") (permitting a sample of 100 loans with a 10% margin of error); *MBIA Ins. Corp.*, 2010 WL 5186702, at *5.  In fact, in *Fed. Hous. Fin. Agency v. JPMorgan Chase & Co.*, Judge Cote allowed the plaintiff to draw a sample with a 10% margin of error.  2012 WL 6000885, at *9 (endorsing the plaintiff's sample which will "enable it to predict with 95% confidence the breach rate . . . within a margin of error of +/- 10%").  As Dr. Lipshutz explained at trial, a smaller margin of error may be "more precise but no more accurate."  Tr. 1532:11-17 (Jan. 23, 2018, Lipshutz); *see also* Tr. 1644:25-1646:24 (Jan. 24, 2018, Lipshutz) (illustrating the difference between accuracy and

precision based on two estimates of the distance of the witness stand to the back of courtroom, one precise (but wrong) and the other accurate (but less precise)).

Further undermining Dr. Leamer's critique is the fact that he did no independent work to determine the appropriate sample size.  Tr. 3013:17-3014:21 (Jan. 31, 2018, Leamer).  As Dr. Leamer himself admitted, his critique of Dr. Lipshutz has no real basis in statistics.  *Id.* at 3016:4-3017:15.  Because Dr. Leamer failed to perform his own analysis, his testimony about sample size and margin of error are merely "speculative."  *See Sparta Commercial Servs., Inc. v. DZ Bank*, 680 F. App'x 17, 19 (2d Cir. 2017) (citing *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008)) ("'An expert's opinions that are without factual basis and are based on speculation or conjecture' should be excluded from consideration at summary judgment or trial.").  Though Dr. Leamer opined that a 2% margin of error should have been considered, he admitted that he was unaware of any instance in which a 2% margin of error was, in fact, used in sampling mortgage loans.  Tr. 3023:8-12 (Jan. 31, 2018, Leamer).

Dr. Leamer's opinion that drawing a larger sample might have been "worth the additional cost" given the damages at issue is also grounded in legal argument, not statistics.  *Id.* at 3016:16-3017:2.  Such opinions are prohibited under Rule 702 of the Federal Rules of Evidence, and in any event are not persuasive.  *See R.F.M.A.S., Inc. v. So*, 748 F. Supp. 2d 244, 269 (S.D.N.Y. 2010) (experts not qualified to offer testimony when did not "draw on their areas of actual expertise," but instead "employed common sense"); *see also Grdinich v. Bradlees*, 187 F.R.D. 77, 81-82 (S.D.N.Y. 1999) (excluding expert opinion allegedly based on industry standards as unsupported speculation where only basis for standard were general "common-sense" guidelines).

### C.  Dr. Leamer's Analysis Is Flawed.

To the extent that Dr. Leamer conducted any analysis, it was fatally flawed.  In his most recent report, Dr. Leamer opined that Dr. Lipshutz had misapplied a textbook formula, called the

"Cochran" formula, to calculate the margin of error.  Trial Ex. 652 at 004-09.  Dr. Leamer

concluded that Dr. Lipshutz miscalculated the standard deviation and therefore "underestimate[d]

the true margin of error."  Tr. 3061:13-17 (Jan. 31, 2018, Leamer); Trial Ex. 652 at 008 n.22.  As

Dr. Lipshutz testified, however, Dr. Leamer erroneously assumed that Dr. Lipshutz had calculated

the standard deviation of the *mean of the sample* when in fact Dr. Lipshutz had correctly calculated

the standard deviation of *the sample*.  Tr. 1623:10-1624:2 (Jan. 24, 2018, Lipshutz); Tr. 3061:13-

3062:11 (Jan. 31, 2018, Leamer).  While taking his oath, Dr. Leamer admitted that his

misapplication of the Cochran formula was an "embarrassing mistake."  Tr. 3062:13-16 (Jan. 31,

2018, Leamer).  In fact, Dr. Leamer testified that the paragraph of his report regarding the Cochran

formula should be "removed," along with the associated footnotes, "because they are erroneous."

*Id.* at 3061:22-3062:4.  As a result of this "mistake," Dr. Leamer's core criticisms of Dr. Lipshutz's

work are "dead wrong" and entitled to no weight.  Tr. 1623:10-1624:2 (Jan. 24, 2018, Lipshutz).

## VIII.  THIS COURT SHOULD ACCEPT MR. PAYNE'S EXPERT OPINIONS AS TO EACH OF THE 99 DISPUTED LOANS.

The parties' re-underwriters reviewed the 400 loans in Dr. Lipshutz's statistically

significant sample.  TMI's re-underwriting expert, Richard Payne, determined that 231 of the 400

loans (57.8%) were in material breach of the representations and warranties of the PSA.[10]  Trial

Ex. 160 at 008-09.  WMC's re-underwriter, David Abshier agreed that 132 of those 400 loans

(33%) were in material breach.[11]  Trial Ex. 653, at 007.  Defendant's admission thus strikes at

---

[10] Both sides agree on the definition of materiality.  *See infra* Part VIII.A.2.

[11] For those 132 loans, Mr. Abshier used the designations "Not Contested" and "Not Supported." *See* Trial Ex. 653 at 054-62.  The uncontested loans "were materially defective or there was insufficient information in the loan files to determine that they were reasonable credit extensions . . . ."  Tr. 2490:16-19 (Jan. 30, 2018, Abshier); *see also* Trial Ex. 653 at 020 (defining "unsupported" similarly).

heart of its defense that WMC had sufficient controls in place to comply with WMC's contractual representations and warranties. *See* Tr. 1525:19-23 (Jan. 23, 2018, Payne) ("Now, I will say I've never had a case where the other expert came as close to agreeing to my breach rate as Mr. Abshier . . . which I think supports my breach rate.").

Only 99 of the 400 Sample loans remain in dispute between the parties. *See id.* at 1404:5-8. Because Mr. Payne used a reliable methodology and correctly identified material breaches in each of the 99 disputed loans, the Court should accept Mr. Payne's expert opinion that 231 of the 400 Sample loans were in material breach. *Id.* at 1521:5-24. By contrast, Mr. Abshier's methodology was fundamentally flawed in a number of key ways; his critical errors render his opinions as to the 99 disputed loans unreliable.

### A. Mr. Payne's Methodology Appropriately Evaluated the Sample Loans for Material Breaches.

Mr. Payne performed a forensic review "to render an opinion on whether the loans materially and adversely breached certain representations and warranties ('R&Ws') made by WMC." Trial Ex. 160 at 006. Mr. Payne determined whether, *at the time of origination*, the loans "were properly evaluated to determine whether they were likely to be repaid." *Id.* at 007; Tr. 1137:24-1138:9 (Jan. 22, 2018, Payne) ("What I instructed [the re-underwriting team] to do is put themselves in the place of the underwriter at the time of origination . . . to determine whether the underwriter at the time of origination made a reasonable determination of the borrower's ability to repay the loan."). His expert evaluation was reasonable, consistent, and reliable, and stands in stark contrast to the work performed by WMC's re-underwriter, Mr. Abshier.

### 1.    Background on WMC's Underwriting Methodology.

At WMC, a loan application would proceed to an underwriter, whose job was to evaluate whether the borrower's loan application met WMC's underwriting guidelines.[12]  Tr. 761-19-762:17 (Jan. 18, 2018, Heagy).  WMC had different loan "programs," for which varying amounts of documentation were required from borrowers.  Trial Ex. 15 at 080-86.  For example, for a "full documentation" loan, the guidelines required borrowers to provide sufficient documentation to verify their employment and income (such as paystubs and W2s).  Tr. 762:24-763:11 (Jan. 18, 2018, Heagy); Trial Ex. 15 at 082.  WMC also offered a "stated income" loan program, in which borrowers were not required to provide documentation verifying their purported income.[13]  For a stated income loan, the underwriter was required by the guidelines to evaluate the borrower's purported employment and income for "reasonableness" – meaning that the amount of income claimed by the borrower had to be reasonable in light of the type of employment and the geographical location.  Tr. 762:24-763:11 (Jan. 18, 2018, Heagy); Tr. 1411:2-20 (Jan. 23, 2018, Payne); Trial Ex. 15 at 084.  For all of WMC's programs, it was a key requirement to determine

---

[12] WMC's representations and warranties in the PSA incorporated underwriting guidelines and represented the loans met the guidelines.  Trial Ex. 1 at 116 (representation (x)).

[13] The interest rate offered by WMC for a "stated income" loan was higher than the interest rate for a "full documentation" loan, reflecting the greater degree of risk associated with a loan made without supporting documentation.  Tr. 776:4-12, 796:5-19 (Jan. 18, 2018, Heagy).  While the "stated income" loan program was originally intended for self-employed borrowers without traditional documentation of income like paystubs or W-2s, many of the loans in this Trust were made on a "stated income" basis to borrowers who were employed – raising the question of why someone who had ready access to income verification would voluntarily apply for a loan with a higher interest rate.  Court Ex. 2.  The reason, of course, is that many of these borrowers overstated the amount of their income in order to qualify for larger loans – as discussed at length in Mr. Payne's report.

whether the borrowers had the ability to repay the loans for which they applied.  Tr. 763:12-20 (Jan. 18, 2018, Heagy); Trial Ex. 15 at 014-15; Trial Ex. 1 at 121 (representation (lll)).

Upon review, the underwriter would "condition the file" by noting any outstanding conditions that the borrower would have to meet before the loan could be originated.  Tr. 798:9799:22 (Jan. 18, 2018, Heagy); Tr. 716:14-717:16 (Jan. 18, 2018, Hamilton).  These "conditions" were noted on a document entitled the "Notice of Conditional Approval and Underwriting Requirements," referred to colloquially as the "conditions worksheet."  Tr. 738:7-17 (Jan. 18, 2018, Hamilton); *see, e.g.*, Trial Ex. 45 at 114-18.  The testimony of WMC's former underwriters and QC personnel established that WMC management would often waive or approve the conditions and approve the loans, even if the required "conditions" had not been satisfied.  Tr. 771:2-16 (Jan. 18, 2018, Heagy); Tr. 861:8-862:2 (Jan. 18, 2018, Roman).  The loan would then move on to the closing department, which would draw up closing documents for the borrower to sign.  Tr. 771:17-772:14, 808:4-809:4 (Jan. 18, 2018, Heagy).

Other times, management would send the list of outstanding conditions to the broker so that he or she could provide the missing documentation.  Tr. 716:14-717:16 (Jan. 18, 2018, Hamilton).  If the broker returned inaccurate documents or if required documents remained missing, the underwriter was supposed to note an issue with the loan in LoanQuest, a computer tracking program at WMC.  *Id.* at 718:21-719:18.  But because LoanQuest comments could not be removed by management, management instructed underwriters not to document anything in LoanQuest, *id.* at 719:14-25, and instead to send the loan application directly to managers for approval.  *Id.* at 722:11-23.  The loan would then proceed to closing.  Tr. 772:2-18 (Jan. 18, 2018, Heagy).

### 2.    Mr. Payne Conducted a Reliable Re-Underwriting Review of the Sample Loans.

Mr. Payne leveraged his considerable experience in the mortgage industry to review the Sample loan files,[14] along with data from various other third-party sources, against WMC's underwriting guidelines and the standards identified in WMC's representations and warranties in the PSA.  *See* Trial Ex. 160 at 007-08.  He was assisted in the first instance by a team of re-underwriters from the Barrent Group.  Mr. Payne took care to manage and direct their review by vetting the team, conducting prior on-site visits to Barrent's office in Iowa, communicating with the team on a regular basis, creating and implementing instructions for the review, and monitoring the team's progress.  *Id.* at 071-73.  The details of the re-underwriting review performed by Barrent, which was supervised and later reviewed by Payne Advisory, were discussed in detail in Mr. Payne's direct testimony.  *See id.* at 073-78.  However, Mr. Payne made the ultimate determination as to each and every material breach asserted in his report, including as to all 99 disputed loans.  *Id.* at 073 ("I ultimately reached my own opinions abut the re-underwriting team's factual findings.  The ultimate conclusions about the significance of the underwriting defects for each of the Mortgage Loans are my own"); *see also id.* at 076, 078; Tr. 1152:21-1153:25 (Jan. 22, 2018, Payne) ("I determined whether – not just a material breach, whether the loan itself – overall loan was a materially increased risk.").

---

[14] Mr. Payne's qualifications are outlined in his direct testimony and in his curriculum vitae.  Trial Ex. 160 at 011-20, 100-02.  He has significant experience in underwriting and re-underwriting mortgage loans, developing and applying underwriting guidelines, managing securitizations, and evaluating and overseeing loan repurchase requests – both from a demand and purchase perspective.  *See id.*  He has also served as an expert in litigation in a number of similar matters; no court has ever rejected his qualification to testify or excluded his opinions as unreliable.  *Id.* at 017-20.

Mr. Payne determined that a breach was material where the defect "significantly increases the risk of loss with respect to the loan." Trial Ex. 160 at 008. Mr. Abshier adopted this same definition of materiality: "For purposes of my analysis, I used the same definition of 'materially and adversely affects the value of any Mortgage Loan' as Mr. Payne and considered a breach to be material and adverse if it significantly increased the risk of loss with respect to the loan." Trial Ex. 653 at 020-21; *see also* Tr. 2532:24-2533:6 (Jan. 30, 2018, Abshier). And, as Mr. Abshier acknowledged, breaches of certain representations are "Deemed Material and Adverse" by the PSA, and thus "do not require a materiality assessment and cannot be offset by compensating factors." Trial Ex. 653 at 019; *see also* Tr. 1156:17-22 (Jan. 22, 2018, Payne) ("[T]he PSA document itself deemed certain breaches to be automatically material."). This included representation (lll). Trial Ex. 1 at 121.

In rendering his opinions, Mr. Payne reviewed all potential defects reflected in the loan file, and assessed the impact of the defects on the total credit risk of the loan. Trial Ex. 160 at 078. He also accounted for the issue of "layered risk," *i.e.*, "when a borrower's loan application has multiple risk factors, which, in combination, increase the risk of the loan by a greater degree than each individual risk factor would in isolation." *Id.* Said otherwise, layered risk looks at the overall risk profile of the loan, rather than viewing any individual defect in isolation, divorced from the context of the borrower's creditworthiness. Mr. Abshier conceded that layered risk is an appropriate concept for evaluating loans in re-underwriting. *See* Tr. 2533:19-2534:2 (Jan. 30, 2018, Abshier).

### 3. Mr. Payne Appropriately Interpreted and Applied the PSA's Representations and Warranties.

Mr. Payne evaluated whether each of the 400 loans in the Sample contained any material breach of WMC's representations and warranties in the PSA. Among the many representations, three are key to evaluating the 99 disputed loans: subparagraphs (lll), (x), and (m).[15]

#### (a)   Representation (lll) – Underwriting Methodology

As highlighted at trial, representation (lll) of the PSA provides, in relevant part, that WMC's underwriting methodology employed objective criteria to evaluate the borrower's "credit history, income, assets or liabilities," and:

> based on such methodology, the Mortgage Loan's ***originator made a reasonable determination that <u>at the time of origination</u> the Mortgagor had the ability to make timely payments*** on the Mortgage Loan. Such underwriting methodology confirmed that at the time of origination (application/approval) the related Mortgagor had a reasonable ability to make timely payments on the Mortgage Loan.

Trial Ex. 1 at 121 (emphasis added). WMC represented, in plain language, that as to each loan in the Trust, the originator reasonably determined the borrower had the ability to repay. *See id.*; *see*

---

[15] Mr. Payne offered a more detailed explanation of certain of the various representations and warranties made by WMC in the PSA in his direct testimony. Trial Ex. 160 at 038-70. He "mapped" every violation he identified in re-underwriting to one or more representations and warranties that were breached as a result of that violation. *See generally* Trial Ex. 1 at 111-24 (Scheds. III, IV); Trial Ex. 160 at 104-819 (Payne Ex. 2). The breached PSA representations and warranties appear in italics in the left-most column of each row in Exhibit 2 to his report. *See, e.g.*, Trial Ex. 160 at 104 (Mr. Payne identified an "Asset Violation" as the finding, and determined that that asset violation breached representations (x), (ddd), (lll), and (kk) of the PSA). A single breach narrative identified by Mr. Payne was typically "mapped" to multiple representations. For example, where Mr. Payne found an "income misrepresentation" in connection with a loan, he typically identified a number of PSA representations and warranties that were all breached as a result of that particular finding. *See, e.g.*, Trial Ex. 653 at 263 (Loan No. 11579496, "Income Misrepresentation – Same Year with Red Flags – (m), (ddd), (lll), (c), (s), (x), (kk)"). The specific representations and warranties that he mapped to any particular finding were tailored to the circumstances of that breach finding.

*also* Tr. 1155:17-22 (Jan. 22, 2018, Payne) (representation (lll) "required that the underwriter determined that there was a reasonable ability for the borrower to make repayments"). The plain language of representation (lll) provided that any breach of this representation would be "Deemed Material and Adverse," meaning it automatically is considered to "materially and adversely affect the value of such Mortgage Loan and the interests of the Trustee and Certificateholders in such Mortgage Loan." Trial Ex. 1 at 049, 121; *see also* Tr. 1155:4-8 (Jan. 22, 2018, Payne); Tr. 2531:19-22 (Jan. 30, 2018, Abshier); Tr. 2964:10-15 (Jan. 31, 2018, Abshier).

To determine whether a particular loan breached this representation, "the direction of the re-underwrit[er] should only be to put yourself in the shoes of the origination underwriter." Tr. 1165:3-5 (Jan. 22, 2018, Payne). Said otherwise, the appropriate re-underwriting exercise to determine whether this representation was breached is to look at whether WMC's underwriter complied with an appropriate underwriting methodology – including following WMC's policies, procedures, and underwriting guidelines – *at the time of origination*. *See* Tr. 1332:6-10 (Jan. 23, 2018, Payne) (as to a particular breach, it "still maps to LLL, and there was no evidence in the file that [WMC] ever did what the originator at the time of origination should do to determine whether [the borrowers] have a reasonable ability to repay"). Mr. Payne followed this path but, as explained *infra*, Mr. Abshier did not.

Mr. Payne determined that each of the 99 disputed loans contained one or more breaches of representation (lll) – a result that is not surprising in light of the overwhelming evidence of fraud and recklessness on the part of WMC.[16] Such breaches are deemed material and adverse by the plain terms of the PSA. Trial Ex. 1 at 121. Because Mr. Abshier failed to offer any opinion *at all* as to whether WMC's underwriters made a reasonable determination *at the time of origination* that

---

[16] *See* App. A, Mr. Payne's Breaches of Representation (lll) in the 99 Disputed Loans.

the borrower was able to repay the loan, but instead substituted his own *post-hoc*, independent judgment about whether the loan was a reasonable extension of credit, Mr. Payne's conclusions as to each of the breaches of (lll) identified on Appendix A are unrebutted.[17]

Mr. Payne's interpretation and application of this representation is squarely consistent with the way other courts in the Second Circuit have interpreted similar contractual language in like RMBS cases. *See, e.g.*, *U.S. Bank*, 205 F. Supp. at 448, 458-59 (holding the appropriate inquiry for determining whether an exception to the underwriting guidelines was reasonably exercised "*at the time of origination*" was to review what the originator documented contemporaneously) (emphasis added). Unlike Mr. Abshier, Mr. Payne correctly reviewed the contemporaneous evidence to determine that, when the 99 disputed loans were originated over a decade ago, the originating underwriter failed to apply a sound underwriting methodology to ensure that the borrowers had the ability to repay. *See, e.g.*, Tr. 1128:12-17, 1154:2-1155:24, 1165:2-5 (Jan. 22, 2018, Payne).

### (b)      Representation (x) – Underwriting Guidelines

Mortgage underwriting necessarily requires the originator to assess a borrower's ability and willingness to repay the loan; underwriting guidelines (along with manuals, loan program guides, policies, procedures, and credit matrices) are "[e]ssential to the underwriting process" as the "framework of rules that each mortgage lender can use to instruct its underwriters as to the review of a mortgage application." Trial Ex. 160 at 021. WMC explicitly represented that it originated the loans in the Trust in conformance with its own underwriting guidelines. Trial Ex. 1 at 116 ("The Mortgage Loan was underwritten in accordance with the Underwriting Guidelines . . . ."). "[N]umerous defects" in the Sample loans "led [Mr. Payne] to conclude that, for the most

---

[17] *See infra* Part VIII.B.2.

part, the Mortgage Loans did not comply with the R&Ws in the PSA that the Mortgage Loans were originated in accordance with the applicable underwriting guidelines."  Trial Ex. 160 at 079. Thus, for all of the 99 disputed loans, Mr. Payne identified a breach of representation (x) in the PSA.  *Id.* at 008-10, 025, 038-39, 080-88; *see also* Tr. 1410:7-22 (Jan. 23, 2018, Payne).

### (c)    Representation (m) – "No Fraud"

In subparagraph (m), WMC also represented that no misrepresentations had been made in connection with the origination of the mortgage loans in the Trust.  Trial Ex. 1 at 114.  This representation is colloquially referred to as a "No Fraud rep."  Tr. 2534:19-23 (Jan. 30, 2018, Abshier); *see also* Tr. 1145:21-1146:2 (Jan. 22, 2018, Payne) ("[A]ll this information was to determine if the loans complied with the rep and warrant M, I believe, which was a no fraud rep."). In addition to promising that WMC itself did not engage in any "fraud, error, omission, misrepresentation, negligence or similar occurrence" during the origination of the loans in the Trust, WMC also represented that:

> No fraud, misrepresentation, or similar occurrence or, to Seller's knowledge, error, omission, or negligence with respect to a Mortgage Loan has taken place on the part of ***any Person*** (other than Seller), including without limitation, the Mortgagor, any appraiser, any builder or developer, or any other party involved in the origination of the Mortgage Loan. . . .  WMC has reviewed all of the documents constituting the Servicing File and has made such inquiries as it deems necessary to make and confirm the accuracy of the representations set forth herein.

Trial Ex. 1 at 114 (emphasis added).  WMC thus agreed to bear the risk of any misrepresentation, even if the misrepresentation was made by the borrower or broker.  *See id.*  Accordingly, where Mr. Payne identified a misrepresentation in connection with a sample loan, he listed a violation of subparagraph (m) in his report.[18]  *See, e.g.*, Tr. 1171:23-1172:3 (Jan. 22, 2018, Payne).  Of the 99

---

[18] Mr. Payne also mapped certain "Imprudent Underwriting" findings to a breach of representation (m).  *See* Trial Ex. 653 at 275, 277 (Loan No. 11580538); *id.* at 287 (Loan No. 11581799); *id.* at

disputed loans, Mr. Payne identified one or more misrepresentations – and thus, one or more breaches of subparagraph (m) – in 32 loans.[19]

Both Mr. Payne and Mr. Abshier agreed that fraud or misrepresentation automatically constituted a material breach of the PSA.  *See, e.g.*, Tr. 1407:11-15 (Jan. 23, 2018, Payne) ("[I]f I found a misrepresentation, that [would] automatically make it a material breach because you have to question the integrity of the loan file as a whole."); Tr. 2534:24-2535:11 (Jan. 30, 2018, Abshier) ("Q.  So if the loan file contained evidence of intentional misrepresentation or fraud, then you concluded there was a significant increase in the risk of loss, by that itself, right?  A. Yes, deemed it material.").  Thus, where there was misrepresentation or fraud in connection with a loan, it is undisputed that no further materiality inquiry was required.

### B.    By Contrast, Mr. Abshier Made Critical Errors that Undercut the Reliability of his Re-Underwriting Work.

Mr. Abshier failed to perform a reliable re-underwriting review of the Sample loans.  His numerous methodological errors obviate the need for the Court to perform a loan-by-loan review of the 99 disputed loans, because his opinions are unreliable.

---

317 (Loan No. 11587892); *id.* at 330 (Loan No. 11588544); *id.* at 343 (Loan No. 11589368); *id.* at 349 (Loan No. 11589457); *id.* at 355 (Loan No. 11590881); *id.* at 366 (Loan No. 11592625). Mr. Payne determined that these loans violated WMC's representation in subparagraph (m) because WMC promised that no negligence had taken place on the part of WMC in connection with the loans' originations.  Trial Ex. 1 at 114 (representation (m)); Trial Ex. 160 at 088 ("WMC underwriters committed negligent errors in the performance of their duties, which was apparent based on documentation in the loan file.").

[19] *See* App. B, Mr. Payne's Breaches of Representation (m) for Misrepresentations in the 99 Disputed Loans.

### 1.   Mr. Abshier Performed the Wrong Inquiry in Evaluating Whether WMC Breached its Representations and Warranties.

The purpose of WMC's underwriting guidelines was to "ensure that loans are only granted to borrowers who exhibit both willingness and ability to produce timely payments."  Trial Ex. 160 at 027 & n.18 (quoting Trial Ex. 13 at 015 (WMC Underwriting Guidelines, April 2006)).  WMC promised in representations (x) and (lll) that it followed those procedures.  Trial Ex. 1 at 116, 121.  As discussed in further detail above, *supra* Part V, where a loan did not meet the guidelines, "WMC's policy [was] to consider exceptions on a case-by-case basis, given compensating factors that enhance the decision."  *E.g.*, Trial Ex. 13 at 015; Trial Ex. 14 at 015; Trial Ex. 15 at 014.  If an underwriter determined that the borrower was able to repay the loan despite the guideline violation, the accepted practice at both WMC and in the mortgage industry generally was to require the underwriter to *document* any compensating factors.  *See, e.g.*, Trial Ex. 14 at 014 ("**MUST**. Policy Requirement.  Exceptions and overrides require proper approval and documentation and are reportable to management via dashboards and reports."); Trial Ex. 87 at 003 ("Underwriting Guideline Overrides MUST be documented thoroughly and approved by someone with sufficient delegated authority.  Appropriate documentation includes the compensating factors that justify the decision to approve an override.");[20] Tr. 738:11-17 (Jan. 18, 2018, Hamilton).  As Mr. Abshier acknowledged, WMC had a specific form to document exceptions and their supporting compensating factors.  Tr. 2632:8-2633:17 (Jan. 30, 2018, Abshier) (referring to an example of the form in Trial Ex. 291 at 012).  Mr. Abshier also acknowledged on the stand (as he had testified

---

[20] As noted above, the Credit Policy Update remained WMC's policy throughout the entire relevant time period – "it went on forever."  Tr. 2351:7-20 (Jan. 29, 2018, Huber).  Mr. Abshier was informed of this testimony prior to taking the stand, but apparently chose not to credit it because of "inconsistent testimony" between two of WMC's fact witnesses – Mr. Huber and Mr. Rothleder – and based on his own experience in other mortgage-industry contexts (not at WMC). Tr. 2647:12-2649:22 (Jan. 30, 2018, Abshier).

at deposition) that he had not "made any determination on whether the WMC underwriters and other employees of WMC were exercising their judgment in good faith."  Tr. 2528:6-15 (Jan. 30, 2018, Abshier).

Mr. Payne's re-underwriting methodology included an investigation into whether WMC recorded any compensating factors at the time of origination.  *See, e.g.*, Trial Ex. 160 at 066, 075-76.  By contrast, Mr. Abshier repeatedly testified that he substituted his own judgment for that of the WMC underwriter by "independently evaluat[ing] the loan."  Tr. 2527:4-24 (Jan. 30, 2018, Abshier).  As part of his own substitution of judgment, Mr. Abshier admitted that he "took into account compensating factors that the underwriter didn't log in or identify."  *Id.*; *see also id.* at 2525:5-2526:4 ("I was not looking at what the WMC [underwriter] did.  I'm independently judging and evaluating each loan to determine whether it was reasonable based on the underwriting guidelines."); *id.* at 2526:14-25 ("I don't know what an underwriter, re-underwriter may have done.").

### (a)    Other Courts Have Rejected Analogous Re-Underwriting Expert Opinions when Evaluating Breaches of Representations and Warranties.

Presented with similar expert testimony and contractual language, courts in the Second Circuit have held that a re-underwriter may not consider an exception to a loan in breach unless the loan originator "provid[ed] some record of the exception's existence and the basis for exercising it" at the time of origination.  *U.S. Bank*, 205 F. Supp. 3d at 451; *see also FHFA II*, 104 F. Supp. 3d at 524.

Judge Castel rejected precisely the same methodology employed by Mr. Abshier in *U.S. Bank*, where defendant's re-underwriting expert testified that undocumented "exceptions may be inferred from the fact that a loan not otherwise in compliance with the Guidelines was approved and funded."  205 F. Supp. 3d at 459.  UBS's re-underwriter – like WMC's re-underwriter –

considered compensating factors for certain loans where "there [was] no written evidence that an exception was exercised" at origination. *Id.* at 503. Judge Castel declined to credit such "circular reasoning," because "an undocumented exception [was] nothing more than a post-hoc attempt to rationalize an Originator's noncompliance with the guidelines and is not an exception exercised in a reasonable manner." *Id.* at 450, 459; *see also Green v. City of New York*, 359 F. App'x 197, 199 (2d Cir. 2009) (rejecting the "post-hoc . . . justifications" of the City's medical expert who was not present at the time of the plaintiff's injury and could not speak to the City's "subjective intent"). In the context of mortgage-loan securitization, Judge Castel reasoned that the originator had an incentive to record that "there were good and sufficient reasons *at the time of origination* for making an exception to the guidelines." *U.S. Bank*, 205 F. Supp. 3d at 451 (emphasis added). Judge Castel rejected the re-underwriter's work to the extent it relied on such an unreasonable methodology. *Id.* at 451, 459.

Judge Cote reached a similar conclusion in *FHFA II*. Defendants' expert testified that a reasonable underwriter at the time of origination "could have found" that the loans satisfied the originators' underwriting guidelines. *FHFA II*, 104 F. Supp. 3d at 523. In reaching that conclusion, the expert assumed that the originator "investigated the red flags in the loan file, even when there is no evidence that the originator did so." *Id.* at 524. Judge Cote identified two flaws with this approach:

> [1] Underwriting guidelines required that red flags be investigated and that exceptions to underwriting criteria be documented. Documentation was critical so that supervisors and each of the units within an originator, including its auditors, could examine the file and determine what had been done. [2] Documentation was also critical because these loans were originated to be sold, and the file would be leaving the originator's office.

*Id.* Judge Cote concluded that it was "improbable in the extreme—and untenable to presume—that every originator diligently followed up on all red flags and merely failed to document its efforts." *Id.* Therefore, she did not credit the testimony of defendants' expert. *Id.* at 524-25, 531.

Mr. Abshier committed the same fundamental errors as the re-underwriting experts criticized by Judges Castel and Cote. The operative PSA in this matter – like those in *U.S. Bank* and *FHFA II* – contained representations about what conduct was ***actually*** performed by WMC's underwriters at the time of origination. *See* Trial Ex. 1 at 121 (representation (lll): ". . . the Mortgage Loan's ***originator <u>made a reasonable <u>determination</u></u>*** that at the time of origination the Mortgagor had the ability to make timely payments . . . .") (emphasis added); *see also id.* at 116 (representation (x): "The Mortgage Loan ***was*** underwritten in accordance with the Underwriting Guidelines . . . .") (emphasis added). Instead of evaluating the process WMC's underwriters actually applied, Mr. Abshier exercised his own, independent discretion to excuse breaching loans when there is no evidence that WMC's management considered and approved such exceptions or compensating factors.

### (b)     This Issue Pervaded Mr. Abshier's Work.

Mr. Abshier's substitution of his own judgment for that of WMC pervaded his work. It was perhaps most evident where both re-underwriters *agreed* that WMC had made an error. Throughout the 99 disputed loans, WMC "miscalculated" borrowers' debt-to-income ratios at the time of origination, and both re-underwriters determined that the correct calculation resulted in a guideline violation. *See, e.g.*, Trial Ex. 653 at 180-81 (relating to Loan No. 11568305; both re-underwriters agreed that WMC miscalculated the DTI at 46.96%, but the DTI was actually over the limit at 51.84%); *see also* Tr. 2608:10-2611:24 (Jan. 30, 2018, Abshier). WMC's miscalculation was often a "smidgen" under the 50% maximum, which by itself raised the issue of intent. In these cases, it was Mr. Abshier who "came up with the exception [and the

compensating factors, not the WMC underwriters at the time of origination." Tr. 2611:10-24 (Jan. 30, 2018, Abshier). Indeed, WMC had miscalculated the DTI and thus "didn't know an exception for an excessive DTI" was even required. *Id.* This exact situation repeated five other times in the 99 disputed loans: Mr. Abshier found a DTI ratio miscalculation, but excused it with an exception supported by compensating factors of his own determination (since WMC could not have explicitly logged any exception or compensating factors for its mistake) in each of Loan Nos. 11577459 (*id.* at 2612:14-21); 11580538 (*id.* at 2612:24-2613:6); 11582280 (*id.* at 2613:8-15); 11589368 (*id.* at 2613:16-18); 11592625 (*id.* at 2613:19-21).

Beyond those six indisputable examples, Mr. Abshier made the same error cloaked in other language. He repeatedly concluded throughout his report that a loan file "reflects" an exception supported by compensating factors, Trial Ex. 183, but his use of the verb "reflect" was his euphemism for the fact that the loan file contained no record of WMC's consideration of compensating factors at the time of origination. *See* Tr. 2630:23-2631:13 (Jan. 30, 2018, Abshier) (agreeing that Trial Ex. 183 collects 33 instances among the 99 disputed loans where Mr. Abshier "said the loan file ***reflected*** an exception with compensating factors") (emphasis added); *see also id.* at 2629:6-2630:5 (agreeing that where he wrote "that the file reflects an exception with compensating factors, that was [Mr. Abshier] doing the reflecting, WMC underwriters at the time of origination hadn't mentioned anything about it"); Tr. 1470:9-14, 1476:14-20 (Jan. 23, 2018, Payne) ("When Mr. Abshier used the word 'reflects,' I never saw a documented compensating factor to – or exception."). It is Mr. Abshier who determined that these compensating factors are

"reflected" in the loan file, based on his *post-hoc* judgment, even though there was no record of WMC having evaluated any compensating factors at the time.[21]

Examples abound.  Mr. Abshier determined that compensating factors existed to justify an exception to the underwriting guidelines even where WMC underwriters recorded none as to Loan No. 11601917.  *See* Trial Ex. 653 at 387-88.  The borrower obtained loans totaling over $300,000 on a property with 100% combined-loan-to-value ratio (*i.e.*, the borrower had no skin in the game) under WMC's full documentation program,[22] which required 24 months of bank statements under WMC's underwriting guidelines.  *See id.* at 387; Trial Ex. 15 at 083; *see also* Tr. 2623:2-22, 2624:7-10 (Jan. 30, 2018, Abshier).  However, Mr. Payne found an income violation because WMC collected only 12 months of bank statements, in violation of the guidelines.  Trial Ex. 653 at 387-88.  Mr. Abshier agreed that only 12 months of bank statements were in the loan file, but concluded the loan file "reflect[ed] an exception" for this violation, *id.* at 387, and that the loan was reasonable based on "sufficient compensating factors" that he conjured up, "even though the WMC underwriters . . . never mentioned or recorded or logged any exceptions or compensating factors at the time of origination."  Tr. 2626:25-2627:10 (Jan. 30, 2018, Abshier).  For this very same loan, Mr. Abshier also excused a "payment shock" violation where the borrower's payment increase on the new loan was more than double the underwriting guidelines' maximum on the

---

[21] Anticipating that WMC would attempt to defend these loans by conjuring up "compensating factors" that were not cited at the time of origination, Mr. Payne reviewed the loan files for additional compensating factors and gave WMC the benefit of the doubt in cases where the breaches were marginal.  *See* Trial Ex. 160 at 075-76.  Had Mr. Payne ignored these additional compensating factors, in accordance with the case law, the breach rate would have been even higher.  Therefore, this issue is largely moot, because Mr. Payne only cited clear-cut breaches in his report, regardless of whether compensating factors were recorded at the time of origination.  However, Mr. Abshier's attempt to defend these loans through his "independent" analysis of compensating factors is completely at odds with the case law, and should be rejected wholesale.

[22] WMC gave borrowers who applied under the full documentation loan program better interest rates than borrowers who provided less documentation.  Tr. 2624:11-16 (Jan. 30, 2018, Abshier).

same basis – without regard to whether WMC recorded or even considered the violation. *Id.* at 2626:15-2627:10.

Similarly, Mr. Abshier excused guideline violations with respect to Loan No. 11577088 based solely on his own, *post-hoc* rationalizations. *See* Trial Ex. 653 at 235-36. This loan involved a borrower seeking over $300,000 in mortgages under WMC's "lite" documentation program, with 100% CLTV and a DTI only just under the 50% limit. *Id.* at 235. Mr. Payne found five breaches, including a credit score violation based on the fact that the borrower's FICO score was only 595, and the guidelines for this loan program required a FICO score of 600. *Id.* at 235-36; *see also* Tr. 2627:20-2628:13 (Jan. 30, 2018, Abshier). Acknowledging that this borrower did not meet the program guidelines, Mr. Abshier nonetheless determined that there was an exception based on sufficient compensating factors, despite the fact that the loan file contained no evidence of WMC's underwriters determining that. Tr. 2628:14-2629:5 (Jan. 30, 2018, Abshier). That same fundamental error is present in each and every loan identified on Trial Exhibit 183, which collects instances of Mr. Abshier's "reflects" language throughout his report.

Even where WMC made use of its exception form, followed its own policy, and actually recorded compensating factors, Mr. Abshier often supplemented or replaced WMC's judgment with his own.[23] Though there are many such instances in the 99 disputed loans, Loan No. 11568836 provides a stark example – and a clear illustration of *why* Mr. Abshier's methodology is inappropriate. *See* Trial Ex. 653 at 188. This borrower applied for a loan using the stated income loan program, and had a FICO score of 602, 100% CLTV, and a DTI ratio in excess of 45%. *Id.*; *see also* Tr. 2636:8-23 (Jan. 30, 2018, Abshier). Mr. Payne identified a CLTV violation because the program maximum was only 95% given the borrower's qualifying credit score. Trial Ex. 653

---

[23] *See* App. C, Mr. Abshier's Identification of Supplemental or Different Compensating Factors.

at 189.  Here, Mr. Abshier correctly pointed out that WMC had recorded a 5% CLTV exception, and concluded "the exception was offset by sufficient compensating factors." *Id.*  Mr. Abshier's report then identified the compensating factors on which *he* relied.  *Id.* at 190.  But WMC identified a wholly different reason for making this exception at the time of origination: "broker relations." Trial Ex. 236 at 014.  Recognizing that it was not appropriate to approve a loan exception "to preserve relationships with the broker," Mr. Abshier devised his own compensating factors more than a decade later to justify WMC's unacceptable conduct.  *See* Tr. 2637:14-2639:15 (Jan. 30, 2018, Abshier) ("I used my independent judgment to make a determination of whether to rely or not rely [on WMC's stated reasons].  In this case, I would not rely on broker relations as a compensating factor."); *see also* Trial Ex. 87 at 003 ("'To get the Broker's business' or 'for business reasons' are NOT compensating factors.  This practice is discouraged and is to be strictly limited.").

### 2.    Mr. Abshier Excused Breaches Based on Information Unavailable to WMC at the Time of Origination.

Mr. Abshier's approach also enabled him to conclude that loans were "reasonable" based on information available to him in 2016, but that was certainly *unavailable* to WMC's underwriters at the time of origination because it did not yet exist.  For example, in Loan No. 11568506, Mr. Payne found an "Improper Calculation of Debt" violation based on WMC's failure to obtain leases to verify the rental income the borrower claimed on his loan application.  Trial Ex. 653 at 183-84. Mr. Abshier conceded that no leases were in the loan file, said the file "reflect[ed] an exception" to use the rental income anyway, and then cited to post-closing tax returns and credit reports apparently "indicat[ing] the borrower was receiving rents for the investment property" after the closing.  *Id.*  The information from the servicing file, which was submitted in 2009 (three years after the loan originated) was obviously unavailable to WMC in 2006, and is entirely irrelevant to

the question of whether WMC's underwriting complied with the PSA's representations and warranties at the time of origination. *See id.*; Tr. 2696:10-22 (Jan. 30, 2018, Abshier).

In another instance, Loan No. 11539948, Mr. Payne found a violation based on WMC's failure to secure certain documentation at the time of origination, including bank statements and tax returns. *See* Trial Ex. 653 at 074. Mr. Abshier acknowledged those records were not in the loan file, but nevertheless relied on an "A" on a form indicating that the loan had been "approved" even though the required documentation was admittedly absent from the file – and ultimately cited to post-closing records which, he claimed, "corroborat[ed] the borrower's ownership of the business in 2007, 2008, and 2009." *Id.* at 074-75; *see also* Tr. 2699:10-24 (Jan. 30, 2018, Abshier). But whether or not the borrower owned the business after the loan was originated is wholly irrelevant to whether WMC collected sufficient information at the time of origination to evaluate and ensure the borrower's ability to repay the loan.

At trial, Mr. Abshier testified that he relied on post-closing information *not* to determine whether breaches (other than misrepresentations) had occurred, but instead to determine materiality. Tr. 2692:2-20, 2693:12-18 (Jan. 30, 2018, Abshier). But where the breach violated representation (lll), because the underwriter failed to determine that the borrower had the ability to repay at the time of origination, that determination is unnecessary because the express language of the PSA provides that breaches of representation (lll) are "deemed material." Trial Ex. 1 at 121; *see, e.g.*, Trial Ex. 653 at 183-84 (Mr. Payne alleged a violation of (lll) for Count 3; Mr. Abshier relied on 2008 tax returns submitted in connection with a 2009 loan modification, purportedly to assess the materiality of WMC's improper calculation of debt). Mr. Abshier's materiality assessment is irrelevant.

Taken together, these problems make clear that Mr. Abshier simply failed to evaluate whether WMC's underwriters made reasonable determinations of the borrowers' ability to repay at the time of origination, as required by representation (lll).  Instead, Mr. Abshier attempted to determine whether the loans in the Trust represented a reasonable extension of credit based on his own, independent judgment more than a decade later, and with the benefit of hindsight and supplemental information unavailable in 2006.  He performed the wrong inquiry, and thus failed to review, let alone refute, Mr. Payne's conclusion that each of the 99 disputed loans violated representation (lll), materially breaching the PSA.  Without more, this alone is sufficient for the Court to credit Mr. Payne's conclusions for all the Sample loans.

### C. Mr. Abshier Unreasonably Accepted WMC's "Approvals" on the Loan Files' Condition Forms.

In addition to the defects identified above, Mr. Abshier made a critical error by accepting "condition approvals" in WMC's loan files as sufficient evidence that WMC followed its underwriting requirements.  WMC's condition decision form was used to identify all the required underwriting steps for each loan, and (at least ostensibly) to track WMC's progress in completing those steps.  Standard, pre-printed elements on the form included: Condition 5 (relating to housing history verification), Condition 6 (relating to income verification), Condition 8 (relating to asset verification, including sourcing/seasoning), and Condition 14 (relating to the performance of WMC's quality control process).  *See, e.g.*, Trial Ex. 279 at 014.  Underwriters could fill in additional requirements or notes in the form.  *See id.*

In performing his re-underwriting work, Mr. Abshier relied on circular logic to excuse numerous breaches identified by Mr. Payne.  For over half of the 99 disputed loans, Mr. Abshier accepted WMC's indication that a requirement was "approved" on the condition decisions form as evidence that WMC had actually complied with an underwriting requirement.  *See* Trial Ex.

182 (summarizing Mr. Abshier's findings in Trial Ex. 653 as to 33 of the 99 disputed loans); Trial

Ex. 184 (summarizing Mr. Abshier's findings in Trial Ex. 653 as to 22 of the 99 disputed loans).

This flaw most frequently presented where Mr. Payne identified an asset violation and Mr. Abshier

relied on an approved "Condition 8" on the form, *see* Trial Ex. 182, though it appeared in other

contexts as well.  *See* Trial Ex. 184 (*e.g.*, accepting approval of Conditions 6, 7, and 14 to excuse

income and employment violations).

　　　　Mr. Abshier testified that "if an underwriter had done an affirmative approval of a condition

. . . then yes, I would take that as evidence that that had been done."  Tr. 2518:24-2519:9 (Jan. 30,

2018, Abshier).  This logic is circular.  Every loan file in the Sample – including all 99 in dispute

– includes a document indicating that various "conditions" had been "approved."  But that does

not mean that WMC underwriters *actually* took the required steps to approve the loans – it simply

means that an underwriter checked a box, even though the disputed loan files typically contain no

evidence that the required steps actually had been taken.  In light of the substantial record evidence

that the culture at WMC encouraged pumping loans through the underwriting spigot without regard

to the guidelines or the borrower's ability to repay, *see supra* Parts II-V, it is simply not appropriate

for Mr. Abshier to have blindly accepted a condition approval – without more – to conclude that a

loan contained no breach.

　　　　Mr. Abshier did not consider basic but critical facts about the operation and integrity of

WMC's underwriting processes at the time that may have caused him to rethink his approach.  He

testified he was never given the multiple submissions reports prepared by David Gitson (Trial Exs.

37, 38, and 39) which showed that for at least 3 of the 99 disputed loans (Nos. 11550621,

11566501, and 11588544, respectively), the borrower had submitted multiple applications with

different incomes.  Tr. 2498:18-2508:7 (Jan. 30, 2018, Abshier).  Mr. Abshier further stated he

was not given investor due diligence reports which indicated investors had found guidelines exceptions related to certain of the Sample loans in breach, including disputed loan No. 11542051). *Id.* at 2508:8-2513:2; Trial Ex. 25; Trial Ex. 178. He testified he was unfamiliar with internal risk management documents, including Trial Exhibit 171, which indicated WMC did "not have a centralized and robust quality management system that combines compliance, quality review and resolution tracking." Tr. 2514:10-2516:12 (Jan. 30, 2018, Abshier). He did not consider the fact that, in the aftermath of the financial crisis, WMC was listed as one of the "Worst Ten in the Worst Ten" mortgage companies for foreclosures in a government report. *Id.* at 2513:3-2514:9 (testimony regarding Trial Ex. 88). And, though he reviewed the testimony of WMC underwriters describing the quality issues at the time, he apparently did not take it into account. *See* Trial Ex. 653 at 052 (App. B indicating he reviewed depositions of Ms. Hamilton and Ms. Mentzer, among others).

At trial, Mr. Abshier doubled-down on the approach, continuing to contend that a condition approval could suffice absent documentary evidence that WMC complied with its underwriting methodology. For example, in Loan No. 11589284, Mr. Payne identified seven breaches, including an asset violation. Trial Ex. 653 at 336-42. Mr. Payne pointed out that WMC should have sourced and seasoned $10,141.62,[24] but the verification of deposit ("VOD") in the loan file indicated an average balance of only $2,250 – well below the amount required to season the funds. *Id.* at 337-38. Mr. Abshier relied on approved Condition 8 in the loan file as conclusive evidence that the "required assets were appropriately sourced and seasoned." *Id.* at 337; *see also* Tr. 2658:2-

---

[24] Mr. Abshier contended the amount to be sourced and seasoned was only $9,141, but the difference between the re-underwriters is immaterial for purposes of this discussion because both amounts are well above the $2,250 average balance on the VOD. *See* Trial Ex. 653 at 337; Tr. 2655:15-2656:11 (Jan. 30, 2018, Abshier).

8 (Jan. 30, 2018, Abshier) ("Affirmative approval by the underwriter, who identifies who they are, yes, I accept this as an approval."); Trial Ex. 279 at 014 (conditional approval form reflecting "Aussy Manuhu" as BDR and an approved Condition 8). And he testified to the same effect – relying on WMC's condition sign-off on Condition 8 in lieu of requiring documentation of compliance with the guidelines' seasoning requirement – for Loan No 11578996. Tr. 2659:20-2662:6 (Jan. 30, 2018, Abshier); *see also* Ex. 257 at 010. Mr. Abshier acknowledged that he followed this same process numerous times, including for all the loans on Trial Exhibit 182. Tr. 2662:7-15 (Jan. 30, 2018, Abshier) ("Sir, there's many times I reviewed and determined that, an affirmative approval of the condition 8 by the underwriter and, yes, I did rely on that."); *id.* at 2663:4-20 (agreeing that Trial Ex. 182 showed 33 loans where Mr. Payne alleged an asset violation and Mr. Abshier relied on approval of Condition 8).

Contrast this with Mr. Payne's approach. Mr. Payne found an asset violation for Loan No. 11599580 because there was no evidence in the loan file that borrower's assets of $5,307.49 were "seasoned" for the requisite 60 days. Trial Ex. 653 at 384-85. Mr. Payne concluded that there was an asset violation because the borrower offered only a current balance for his assets; there was no information about how long the borrower had such funds (*i.e.*, there was no "seasoning"). *See* Trial Ex. 653 at 384-85; Tr. at 1386:2-1387:12 (Jan. 23, 2018, Payne) (WMC had to season the funds by verifying that they were in the borrower's account for a period of time – typically 60 days – "so that it wasn't money paid in by an indulgent parent" or "a payday loan"). Mr. Abshier relied on a handwritten note on the letter of explanation from the borrower's bank, and on the approval of Condition 8 on WMC's conditions form. Trial Ex. 653 at 384. But, as Mr. Payne pointed out, there was no evidence in the loan file that WMC appropriately *seasoned* the funds, only that the underwriter verified the current balance. Tr. 1384:18-1385:16 (Jan. 23, 2018, Payne); *see also id.*

at 1493:18-1494:10 ("All [the letter] does is verify a balance. And that's not what they should accept. They should accept a couple of bank statements."). Absent evidence in the loan file that the funds were *actually* seasoned, Mr. Payne was unwilling to accept the underwriter's unsupported approval of Condition 8. *Id.* at 1387:22-1388:2. He testified to the same approach as to a number of other loans, including:

- **Loan No. 11538788:** Mr. Payne found an asset violation for this loan because the borrower's verification of deposit did not season the assets, and the loan file contained no evidence that WMC sought alternative evidence of seasoning. Trial Ex. 653 at 070-71; *see also* Tr. 1378:8-1383:19 (Jan. 23, 2018, Payne). Mr. Payne pointed out that the Condition 8 approval was not sufficient to determine whether the borrower's assets were seasoned, adding "it's not hard to get two months' bank statements" to otherwise verify seasoning. *Id.* at 1381-83; *see also id.* at 1491:5-1492:12 (noting on the condition form, WMC relied solely on the Wells Fargo VOD as support for seasoning).

- **Loan No. 11572496**: Mr. Payne concluded that WMC failed to source the earnest money deposit in connection with this loan. *See* Trial Ex. 653 at 208-09. WMC's failure to comply with that requirement was material (and a violation of representation (lll) because "it's very important to source and season all funds." Tr. 1451:6-24 (Jan. 23, 2018, Payne). When WMC failed to source the funds, they may have come from an "indulgent parent coming back again and furnishing the child with the earnest money," or – more troublingly – "the opposite of indulgent -- unindulgent payday lender giving the money to him." *Id.* at 1453:3-16.

Mr. Abshier extended this substantial error to other types of conditions beyond Condition 8 and asset violations:

- **Loan No. 11577088**: Mr. Payne identified five breaches, including an income violation. Trial Ex. 653 at 235-38. Both re-underwriters agreed that WMC's underwriting guidelines required the borrower to provide a current paystub showing a minimum of six months of year-to-date earnings, but the borrower produced information for only 4.16 months of earnings. *Id.* at 238; *see also* Tr. 2665:19-2667:7 (Jan. 30, 2018, Abshier). Mr. Abshier accepted the approval of Condition 6 as sufficient evidence that WMC had complied with its guidelines; Mr. Payne did not. Trial Ex. 653 at 238; *see also* Tr. 2668:12-16 (Jan. 30, 2018, Abshier).

- **Loan No. 11597775**: This loan involved a wage-earning borrower who applied under the stated income loan program for a $440,000 loan as part of a cash-out refinance. Trial Ex. 653 at 378; Tr. 2668:17-2669:18 (Jan. 30, 2018, Abshier). Mr. Payne found an employment violation because WMC failed to obtain a verification of employment for the co-borrower; Mr. Abshier agreed there was no VOE in the loan file. Trial Ex. 653 at 379;

*see also* Tr. 2671:3-5 (Jan. 30, 2018, Abshier).  But, Mr. Abshier found no breach because WMC marked an "affirmative approval" on Condition 14.  Tr. 2671:6-2672:2, 2672:25-2673:5 (Jan. 30, 2018, Abshier); *see also* Trial Ex. 290 at 010.  And, for the very same loan, Mr. Abshier excused a housing history violation even though he acknowledged that the borrower's credit report did not meet the guidelines, because WMC had checked off Condition 5 on the same worksheet.  Tr. 2673:6-2674:6 (Jan. 30, 2018, Abshier); *see also* Trial Ex. 290 at 010.

And there were many others reflecting the same critical flaw.  *See generally* Trial Ex. 184 (summarizing disputed sample loans for which Mr. Abshier relied on condition approvals *other than* Condition 8).

In each of these cases, Mr. Payne looked to the loan file to evaluate what information WMC actually gathered and to identify the process WMC actually followed at the time of origination. He relied on contemporaneous, documentary evidence of that process, in contrast with Mr. Abshier's willingness to accept the circular logic that WMC approved the loan, therefore it *must* have sufficiently evaluated the loan.

> **D.     Mr. Abshier's Methodology Otherwise Excused Significant Problems with WMC's Underwriting.**

In addition to the broader, systemic problems identified above, Mr. Abshier's approach to re-underwriting attempted to explain away clear patterns of breakdowns in appropriate underwriting practices at WMC.

> **1.     Mr. Abshier Ignored that WMC Frequently Made Convenient "Mistakes" in Calculating Borrower's Debt-to-Income Ratios.**

Among the 99 disputed loans, there were multiple occasions in which WMC's calculation of the borrower's DTI ratio was slightly off, but the "mistake" took the borrower from a non-qualifying DTI to a qualifying DTI.  Counting *only* those instances where Mr. Abshier *agreed* the DTI was miscalculated, those loans include:

- **Loan No. 11577459**:  WMC calculated the borrower's DTI ratio at 49.79%, but Mr. Abshier recalculated it over the 50% limit at 50.83%.  Trial Ex. 653 at 239.

- **Loan No. 11580538**: WMC calculated the loan as .03% under the limit, and Mr. Abshier re-calculated it over the limit at 47.7%. *Id.* at 275.

- **Loan No. 11589368**: WMC calculated the DTI ratio as 49.63%, and Mr. Abshier re-calculated it at 50.21%. *Id.* at 343, 345.

- **Loan No. 11582280**: WMC calculated the DTI ratio as 37.06%, and Mr. Abshier re-calculated it at 50.33%. *Id.* at 290.

- **Loan No. 11592625**: WMC calculated the DTI ratio as 49.98%, and Mr. Abshier re-calculated it as 50.28%. *Id.* at 366-67.

*See also* Tr. 2614:4-2619:3 (Jan. 30, 2018, Abshier). Mr. Payne found a number of other examples. *See, e.g.*, Trial Ex. 653 at 293-94 (regarding Loan No. 11582331, Mr. Payne found WMC had improperly calculated debts at origination, and the correct DTI ratio was 55.74%, over the guideline maximum). Mr. Payne called this solving for income, *i.e.*, the originator "saw that the DTI was going to be . . . above the maximum, they raised it a little bit so that it would comply with the guidelines." Tr. 1255:2-13 (Jan. 22, 2018, Payne); *see also* Tr. 1322:23-1323:6 (Jan. 23, 2018, Payne); *see also* Tr. 800:20-802:2 (Jan. 18, 2018, Heagy) (describing a loan when the underwriter calculated the loan above the maximum DTI ratio, but when the WMC manager reviewed, he "recalculated the income" so that "[i]t closed"). Nonetheless, Mr. Abshier was unwilling to consider that the frequent, slight "errors" in calculating borrowers' DTI ratios may reflect a broader pattern in underwriting at WMC. Tr. 2621:25-2622:19 (Jan. 30, 2018, Abshier) (testifying there was no evidence of WMC "fudging" DTI calculations).

## 2. Mr. Abshier Did Not Reliably Evaluate Whether a Borrower's Stated Income Was Reasonable.

WMC's underwriting guidelines permitted the origination of loans under the "stated income" program, but required underwriters to assess whether a borrower's stated income was reasonable, meaning the income claimed by the borrower had to be within an acceptable range in light of the type of employment and the geographical location. *See, e.g.*, Tr. 762:24-763:11 (Jan.

18, 2018, Heagy); Trial Ex. 15 at 084.  However, WMC often failed to perform that inquiry.  *See, e.g.*, Tr. 749:6-16 (Jan. 18, 2018, Hamilton) ("Q.  And if a borrower was self-employed, how would you verify whether the stated income was reasonable?  A.  We wouldn't."); Trial Ex. 160 at 009, 083-85.

Unlike Mr. Payne, Mr. Abshier declined to use objective data to evaluate whether WMC had properly considered if a borrower's stated income was reasonable at the time of origination. He rejected Mr. Payne's use of and reliance on industry-standard tools like the Bureau of Labor Statistics ("BLS") database and Salary.com.  Trial Ex. 653 at 026-27; *see also, e.g.*, *id.* at 244-45 (regarding Loan No. 11578574).  Mr. Abshier's critiques generally boiled down concerns about the limitations of the data and disclaimers that purportedly accompany the use of such data.  *See* Trial Ex. 653 at 026-27.  Notwithstanding those concerns, WMC's underwriting guidelines suggested that its WMC underwriters use Salary.com data to verify whether stated income is reasonable.  Trial Ex. 15 at 085 (noting also that the quality assurance department relies on Salary.com data when it audits files to validate income reasonableness); *see also* Tr. 2555:5-2557:2 (Jan. 30, 2018, Abshier) (testifying that WMC underwriters and quality assurance employees, "a number of lenders in the subprime mortgage industry," and even Mr. Abshier himself (in other re-underwriting engagements) relied on Salary.com data); Trial Ex. 160 at 084 (Loan No. 11586708: evidence in the loan file showed WMC obtained Salary.com information at the time of origination demonstrating a large discrepancy between the stated income and median annual salary for the borrower's position).  Instead, Mr. Abshier purported to rely on his own experience, untethered to any objective source.  Tr. 2557:20-2558:3 (Jan. 30, 2018, Abshier).  This resulted in the manifestly outlandish opinion that BLS and Salary.com data had too many limitations to be reliably applied, but that it was perfectly reasonable for Mr. Abshier to rely on his personal understanding of what

senior plasterers – like the borrower in Loan No. 11538788 – earned in Los Angeles in 2006 based on what one of Mr. Abshier's neighbors "kind of indicated [that] he was making." *Id.* at 2558:4-2559:5, 2560:3-14.  It simply cannot be that Mr. Payne's reliance on objective data is unreliable because it has too many limitations, and Mr. Abshier's reliance on a single, uncorroborated anecdote is reliable.

Mr. Abshier also repeatedly engaged in speculation about alternate or additional facts that *may* explain away breaches identified by Mr. Payne.  For instance, when evaluating a borrower's income, Mr. Payne routinely looked to specific items reported on the borrower's credit report as indicators of whether the borrower's purported income matched his overall credit profile.  *E.g.*, Trial Ex. 653 at 185-86 (concluding the borrower's stated annual income of $120,000 was not reasonable in part because the borrower had many consumer debt payment delinquencies in the prior two years and a total collection balance of nearly $1,000).  Numerous delinquent payments or collection accounts in the borrower's recent credit history were probative of whether the borrower would be able to repay the loan, even if the borrower's FICO score met the minimum loan qualification requirements.  But Mr. Abshier repeatedly waved away Mr. Payne's concerns, pointing out that the borrower's FICO score met the minimum guideline requirement and supposedly accounted for the borrower's credit.  *E.g., id.* at 186 ("The borrower had a median FICO of 609 as compared to the minimum required of 600.").  Mr. Abshier did not address Mr. Payne's specific concern, which was that these *kinds* of payment delinquencies (as opposed to other potential causes of a lower credit score) suggest the borrower may not have earned what he claimed.  *See generally* Trial Ex. 180.

Similarly, Mr. Payne would review how much the borrower had in verified assets against the borrower's purported income, but Mr. Abshier routinely speculated in response that "[i]t is

*possible* the borrower had other assets that were not disclosed on the application." *See generally*
Trial Ex. 181 (emphasis added).  Judge Castel rejected an expert's similar approach in *U.S. Bank*.
There, one loan application stated that a professional skater earned $12,000 per month.  *U.S. Bank,*
205 F. Supp. 3d at 497.  Tax returns filed post-origination with the servicer reflected income of
only $1,276 per month.  *Id.*  UBS's re-underwriting expert testified that the variance might have
been due to "the unpredictable nature of professional athletes' income, and that the borrower might
have sincerely expected to earn $12,000 a month in 2006."  *Id.*  The court rejected this explanation,
finding that U.S. Bank's re-underwriting expert "appropriately relied" on the borrower's tax return
to prove that the "DTI ratio listed on the MLS . . . was not true and correct."  *Id.*  This Court should
similarly disregard Mr. Abshier's opinions that are rooted in speculation, and plainly intended to
excuse WMC's failure to comply with its contractual representations.

### E.  WMC Cross-Examined Mr. Payne on Only 16 of the 99 Disputed Loans.

During cross-examination, WMC's counsel questioned Mr. Payne on only 16 of the 99
loans.  WMC's rifle shot, piecemeal attack virtually always focused on only one finding (of
multiple), and ultimately failed to undermine Mr. Payne's material breach conclusions as to any
of the 16 loans.  Tr. 1521:5-24 (Jan. 23, 2018, Payne).

For one of the 16 disputed loans, WMC questioned Mr. Payne *only* about the materials he
relied upon to reach certain findings.  Both re-underwriters agreed that the use of post-closing
information is appropriate for determining whether there was a misrepresentation in the loan file.
Tr. 1164:11-16 (Jan. 22, 2018, Payne); Tr. 2535:21-25 (Jan. 30, 2018, Abshier).  Mr. Payne's
testimony made clear that in assessing whether WMC breached representation (lll) (regarding
whether WMC made a reasonable determination at the time of origination that the borrower had
the ability to make timely payments), his inquiry was focused on information available to WMC
at the time of origination, and that he may have reviewed some post-closing information only "to

give the defendant the benefit of the doubt." Tr. 1165:7-25 (Jan. 22, 2018, Payne). As to Loan No. 11560058, Mr. Payne found multiple defects resulting in a material breach, including an income misrepresentation, a disposable income violation, and a "stated income not reasonable" violation. Trial Ex. 160 at 285-87. At trial, WMC pointed out that Mr. Payne had relied on post-closing bankruptcy information to demonstrate the income misrepresentation, and that two breach findings – the disposable income violation and the "stated income not reasonable" finding – cited to that same bankruptcy filing. *See* Tr. 1173:14-1176:17 (Jan. 22, 2018, Payne). As Mr. Payne testified, the disposable income violation was derivative of the income misrepresentation, so the materials relied upon would naturally be the same: because the borrower did not actually earn the amount of income stated on the loan application, the borrower's disposable income (which was originally calculated from the same misrepresented income figure) also did not meet the guidelines. *See* Tr. 1432:14-1434:25 (Jan. 23, 2018, Payne). Mr. Payne did not rely on the information drawn from the bankruptcy filing for his stated income not reasonable finding at all. *Id.* And WMC did not substantively question Mr. Payne about the particular opinions he offered as to this loan at all. *See generally* Tr. 1173-1176 (Jan. 22, 2018, Payne).

In response to many of the other issues raised by WMC during cross-examination, Mr. Payne explained why his analysis was correct. For example, as to Loan No. 11581125, Mr. Payne concluded that WMC's originating underwriter had improperly calculated the borrower's debt because it failed to include a Honda car payment that appeared on the borrower's credit report. Trial Ex. 653 at 285-86. Mr. Abshier argued that WMC had properly excluded the payment from the borrower's DTI ratio because the loan file contained evidence that the borrower's daughter was making the car payments. *See id.* At trial, WMC showed Mr. Payne the credit report, which supported Mr. Payne's conclusion that the account was coded as "Individual," meaning the

borrower was individually liable for the debt – regardless of whether his daughter helped to make the payments.  Tr. 1205:9-1206:24 (Jan. 22, 2018, Payne); Tr. 1446:21-1449:9 (Jan. 23, 2018, Payne) (testifying the "I" on the credit report "means that this – even if somebody else was making a payment on this, this person was ultimately responsible for the payment of that loan"); Trial Ex. 1235 at 272.[25]  And there are numerous similar examples from WMC's cross-examination of Mr. Payne, including:

- **Loan No. 11572981**:  This loan involved a roofer in Las Vegas who stated his annual income was $90,000, despite the fact that the borrower had his current job for only four months, and had a very low credit limit.  Trial Ex. 653 at 210-11.  Mr. Payne identified an income misrepresentation with red flags, based on a W-2 indicating the borrower earned less than $30,000 in all of 2007.  *Id.* at 210.  At trial, WMC's counsel inquired about this loan based on servicing information indicating the borrower was on unemployment in 2007.[26]  Tr. 1286:12-1295:15 (Jan. 22, 2018, Payne).  Mr. Payne explained that the borrower's history of "mov[ing] from job to job three times in the last 24 months," coupled with the W-2, "would indicate to me he never made this $90,000 a year."  Tr. 1464:17-1467:19 (Jan. 23, 2018, Payne) ("I don't think this borrower ever made this income.  So I think it's in . . . material breach.").

- **Loan No. 11573287**:  Mr. Payne asserted a credit violation based on the borrower's unpaid child support obligations.  Trial Ex. 653 at 213-14 ("The borrower's credit report indicates that the borrower is $16,367.13 in arrears and is consistently 90 days behind on child support payments.").  No exception was warranted, because the compensating factors were not adequate to offset the risk; Mr. Abshier disagreed.  *Id.* at 214.  At trial, Mr. Payne testified that "the guidelines say you cannot have any delinquent child support.  So their balance was still delinquent."  Tr. 1374:9-14 (Jan. 23, 2018, Payne); *see also id.* at 1489:10-15 ("Well, WMC was very specific that you

---

[25] WMC's counsel disregarded Mr. Payne's expert explanation, stating "I'm not going to argue about the account.  We'll have Mr. Abshier explain how this works."  Tr. 1206:25-1207:2 (Jan. 22, 2018, Payne).  No such testimony was elicited, and Mr. Payne's testimony about the meaning of the "I" on the borrower's credit report stands unrebutted.

[26] WMC also asked Mr. Payne about two letters in the servicing file entirely in Spanish.  Tr. 1286:12-1295:15 (Jan. 22, 2018, Payne).  Though neither re-underwriter indicated he read and understood Spanish, and though there was no record that anyone reviewed or relied on any translation, WMC introduced into evidence translations of those Spanish-language letters.  *See* Tr. 3498:12-3508:9 (Feb. 5, 2018).  In any event, they did not undermine Mr. Payne's conclusions as to the income misrepresentations in this loan, as neither letter says anything about when the borrower lost his job or what caused his 2007 income to be less than one-third the amount he claimed in mid-2006.  *See* Trial Exs. 341A.012, 341A.013.

had to bring current any delinquent child support.  So it just – it violated the guidelines."); Trial Ex. 14 at 037.[27]  The size of the balance and the frequency of the borrower's late payments were so great that the compensating factors identified by WMC plainly did not suffice.  *See* Trial Ex. 653 at 214.

- **Loan No. 11592625**:  Mr. Payne found, among other breaches, that WMC engaged in imprudent underwriting and that the loan contained a DTI ratio violation.  Trial Ex. 653 at 367-68.  WMC's counsel attempted to point out that Mr. Payne's description of the DTI miscalculation was incorrect.  Tr. 1253:2-1257:8 (Jan. 22, 2018, Payne); Tr. 1321:5-1327:10 (Jan. 23, 2018, Payne).  However, Mr. Payne correctly testified that ***both*** he and Mr. Abshier had re-calculated the DTI from 49.998% to 50.28%, resulting in a violation.  Tr. 1479:6-16 (Jan. 23, 2018, Payne); Trial Ex. 653 at 367.  In addition, Mr. Payne explained that a borrower with a DTI over the limit – "even a little bit over" – is a breach, because that 50% limit is "pre-tax, pre-car insurance, pre-household items and the like," meaning the borrower "probably doesn't have a whole lot left over at the end of the month."  Tr. 1480:4-22 (Jan. 23, 2018, Payne).  Moreover, the inconsistent incomes in the loan file constitute "an industry standard universal red flag" for income misrepresentation.  *Id.* at 1481:8-17.

These examples, and others, demonstrate that WMC was unable to mount any meaningful challenge to any of the 99 disputed loans.

WMC's attacks on Mr. Payne's specific conclusions often highlighted its own re-underwriter's improper methodology.  For instance, WMC attempted to demonstrate that the property violation that Mr. Payne identified in Loan No. 11542051 was incorrect.  *See generally* Tr. 1297:17-1304:6 (Jan. 22, 2018, Payne).  Mr. Payne had concluded that this loan was in breach because, among other issues, the appraisal in the loan file failed to identify the appraiser's licensure.  Trial Ex. 653 at 079.  Mr. Abshier claimed that an internet search – apparently conducted by WMC's re-underwriting team in 2016 – showed this particular appraiser was

---

[27] Once again, WMC's counsel suggested that the testimony may return to the issue of whether it was appropriate to make an exception for delinquent child support, but he never raised the issue again.  Tr. 1375:21-22 (Jan. 23, 2018, Payne) ("We may talk more about that when we come back to exceptions.).  Mr. Abshier offered no contrary testimony that, under the WMC guidelines, delinquent child support balances must be brought current, either in his report or during live testimony.  *See generally* Trial Ex. 653.  Thus, Mr. Payne's interpretation of the WMC Underwriting Guidelines was not rebutted.

licensed at the time of origination. *See id.* But, as Mr. Payne pointed out at trial, the basis of his finding for a property violation "is not whether they're licensed or not," but instead that WMC "did a sloppy job." Tr. 1300:23-1301:2 (Jan. 22, 2018, Payne). It is of no moment whether a re-underwriter in litigation (more than a decade later) researched the appraiser involved; the point is that WMC's own guidelines required *WMC's underwriter* to ensure that the appraiser was licensed at the time of origination.[28] *See* Trial Ex. 1 at 121 (representation (lll)). Here, the necessary information was not on the appraisal, and nothing in the loan file indicated that the originating underwriter made such an inquiry at the time. *See* Tr. 1302:11-13, 1303:22-24 (Jan. 22, 2018, Payne). The "sloppy" (at best) underwriting is evident from other problems with this loan: in addition to the property violation, Mr. Payne found an income violation, an employment violation, a DTI ratio violation, and a data discrepancy. *See* Trial Ex. 653 at 076-079. Four of Mr. Payne's five findings resulted in a breach of representation (lll), which is deemed material and adverse under the PSA. *See id.*; Trial Ex. 1 at 121 (representation (lll)).

This theme was consistent throughout WMC's cross-examination: WMC attacked one or two of Mr. Payne's breach findings for a loan, but completely ignored the other breaches identified. Perhaps the most striking example of this phenomenon was with respect to Loan No. 11556450, where Mr. Payne identified no fewer than *ten* breach findings. *See* Trial Ex. 653 at 114-21. WMC attempted to demonstrate during its cross-examination that just one of those ten counts, the Undisclosed Mortgage with Red Flags, may have been incorrect. Mr. Payne relied on a review of LexisNexis reports[29] and the servicing credit reports to conclude that this borrower had an

---

[28] *See* Trial Ex. 14 at 126 ("Qualified appraisers **must** have either a certified residential appraiser license, or a certified general appraiser license, in good standing. The appraisal license **must** be issued in the state where the subject property is located.") (emphases in original).

[29] "LexisNexis is a repository that collects information from several public databases," including motor vehicle registries, public telephone directories, courthouses for registries of deeds, etc. Tr.

undisclosed mortgage; Mr. Abshier's report concluded that Mr. Payne's cited evidence was insufficient to support that claim.  Trial Ex. 653 at 121.  WMC produced records at trial from a separate WMC loan file – not in the Sample, and thus not provided to the re-underwriters for their re-underwriting review[30] – indicating that two borrowers with the same first name, middle initial, and last name had applied for a loan on the same day.[31]  Tr. 1259:2-1264:22 (Jan. 22, 2018, Payne).  Upon review of the additional information, Mr. Payne agreed that these unusual circumstances negated his undisclosed mortgage finding, but that nonetheless, the loan was still in material breach because of nine other breaches.  *Id.* at 1265:17-22; Tr. 1437:9-1440:3 (Jan. 23, 2018, Payne).  The same is true for many of the other 16 loans upon which Mr. Payne was cross-examined.[32]

WMC questioned Mr. Payne only about these one-off issues regarding particular breaches in 16 disputed loans.  WMC said nothing about the remaining 83 of 99 loans in dispute.  Mr. Payne

---

1435:21-1436:7 (Jan. 23, 2018, Payne).  Mr. Payne relied on reports from LexisNexis and other publicly- and commercially-available databases in re-underwriting the Sample loans.  *See, e.g.*, Trial Ex. 160 at 021, 072.

[30] *See* Trial Ex. 1854, regarding Loan No. 11589534.  Notably, Mr. Abshier made no reference to this loan in his rebuttal to Mr. Payne's conclusions.  *See* Trial Ex. 653 at 121.

[31] From this, WMC encouraged this Court to draw the inference that reliance on LexisNexis materials is unreasonable, instead of the far more logical conclusion that this was a highly unusual occurrence that was very unlikely to replicate itself.  As Mr. Payne testified, after using LexisNexis in underwriting and re-underwriting "thousands of loans, if not tens of thousands," he can remember "maybe two or three" similar cases.  Tr. 1440:21-1441:21 (Jan. 23, 2018, Payne).

[32] *See, e.g.*, Loan No. 11580018.  Trial Ex. 653 at 266; Tr. 1389:12-1394:10, 1401:15-1402:21, 1405:15-1407:24, 1495:15-1497:11 (Jan. 23, 2018, Payne).  WMC's counsel asked about two of the eight breaches Mr. Payne asserted, and Mr. Payne maintained that both the occupancy misrepresentation and the income violation persisted.  Tr. 1391:11-1394:10 (Jan. 23, 2018, Payne) (explaining the materials in the servicing file and in phone records supporting the occupancy misrepresentation); *id.* at 1401:15-1402:20 (noting his income violation stands because the loan files did not contain a portion of the 2004 tax return, the profit and loss statement).  In any event, Mr. Payne also testified that his report identified other breaches – including an asset violation breaching representation (lll) – and thus the loan is in material breach with or without the breaches that WMC questioned.  *Id.* at 1495:15-1497:11.

offered credible testimony about the reliable methodology he applied, and this Court should conclude that all 99 of the disputed loans are in breach.

## IX.   THIS COURT SHOULD AWARD DAMAGES TO THE TRUST AS CALCULATED BY TMI'S EXPERT, DR. MASON.

TMI's damages expert, Dr. Joseph Mason, reliably calculated two alternate forms of damages: (1) "benefit of the bargain" damages, and (2) repurchase damages.  The Separate Trustee is not pursuing cumulative damages based on both calculations, but rather is pursuing such damages in the alternative.

### A.   Benefit of the Bargain Damages.

#### 1.   Benefit of the Bargain Damages Are Available as a Remedy for WMC's Breach of Its Duty to Notify and as a Result of WMC's Grossly Negligent Conduct.

Benefit of the bargain damages are available under relevant case law as the remedy for WMC's breach of its duty to notify.[33]  TMI's failure to notify claim under section 2.03(c) of the PSA is based on WMC's failure to adhere to its contractual duties, and is independent of its claim for failure to repurchase.  Accordingly, it is governed by separate damages remedies and is not limited by the PSA's "sole remedy" clause.  *See Nomura Home Equity Loan, Inc. v. Nomura Credit & Capital, Inc.*, 19 N.Y.S.3d 1, 6 (First Dep't 2015) (seller's failure to provide the trustee with notice of material breaches it discovered constitutes an independently breached contractual obligation, permitting a plaintiff to pursue separate damages); *Morgan Stanley Mortg. Loan Tr. 2006-13ARX*, 36 N.Y.S.3d at 463.  This Court has previously concluded that New York precedent holding "a loan originator may be liable for failing to notify an RMBS trustee of mortgage breaches

---

[33] Prior to trial, this Court precluded testimony regarding rescissory damages because Dr. Mason's calculation of damages at law for lost benefit of the bargain because the "legal remedy is adequate." *TMI Tr. Co. v. WMC Mortgage, LLC*, Civil Action No. 3:12-cv-1538 (CSH), at 6 (Dec. 28, 2018) (ECF No. 258).

the originator knew *or should have known* about" indicates that the Separate Trustee's failure to notify claim "is viable in law, and beyond the reach of the 'sole remedy' provision. *Law Debenture Tr. Co. of New York v. WMC Mortg., LLC*, No. 3:12-cv-1538 (CSH), 2017 WL 3401254, at *19 (D. Conn. Aug. 8, 2017) (remarking on *Morgan Stanley 2006-13ARX Mortg.* and other precedent) (emphasis in original). WMC's gross negligence also precludes the sole remedy clause from limiting the Separate Trustee's claims. *See Bank of New York Mellon v. WMC Mortg., LLC*, 39 N.Y.S.3d 892, 900 (N.Y. Sup. Ct. 2016) ("Under *Nomura* and *Morgan Stanley*, a trustee may maintain an independent failure to notify claim so long as such notification obligation is beyond the scope of the sole remedy clause or, even if that is not the case, if gross negligence is pleaded.").

Recent decisions further support the conclusion that benefit of the bargain damages are available as a matter of New York law. *See Deutsche Bank Nat'l Trust Co.*, 2018 WL 583116, at *12-*14; *Fed. Hous. Fin. Agency v. Morgan Stanley ABS Capital I Inc., et al.*, No. 650291/2013 , 2018 WL 1187676 (N.Y. Sup. Mar. 6, 2018) (Friedman, J.). During the trial of this matter, Judge Forrest issued an opinion citing numerous cases "holding that sole remedy provisions similar to the one in this case do not conclusively foreclose an award of money damages." *Deutsche Bank Nat'l Trust Co.*, 2018 WL 583116, at *7. Consistent with the clear trend in New York courts, Judge Forrest held that the sole remedy provision may be voidable in light of gross negligence by the originator. *Id.* at *10-*12; *see also* Tr. 2148:16-2150:7 (Jan. 29, 2018). Even more recently, Justice Friedman – the New York Supreme Court Justice assigned to manage coordinated RMBS proceedings for approximately 40 cases pending in Part 60 of the Commercial Division – issued an opinion holding that the "sole remedies" provision does not limit an independent claim for "failure to notify." *Fed. Hous. Fin. Agency*, 2018 WL 1187676, at *18. Justice Friedman

specifically denied the defendants' motion to dismiss rescissory or consequential damages, leaving those open as available remedies for the defendant's breach of the duty to notify.  *Id.* at \*19.

In light of WMC's grossly negligent conduct, benefit of the bargain damages are appropriate to make the Trust whole for the extensive losses that have been incurred since the transaction.  *See, e.g.*, Trial Ex. 159 at 051 ("Had WMC's lack of adherence to its stated underwriting processes been known, the loans would have had no value and would not have been purchased by the Trust.  Benefit of the Bargain Damages are therefore approximated by putting the parties back to where they would have been if the transaction had never taken place – in this case, if the [T]rust had never purchased the loans."); Tr. 1792:4-1798:10 (Jan. 24, 2018, Mason).

## 2.    Dr. Mason Appropriately Calculated Benefit of the Bargain Damages.

Dr. Mason calculated benefit of the bargain damages in the amount of $983,490,310.  Trial Ex. 159 at 030.  That amount includes $597,748,766 in remaining principal due to the Trust plus interest of $484,504,647 on that amount, less the net present value of future collections of principal and interest.  *Id.*; *see also* Tr. 1774:11-1776:9 (Jan. 24, 2018, Mason).  WMC misapprehends the purpose and effect of benefit of the bargain damages, which are intended solely to compensate the Trust for the actual, massive losses sustained as a result of WMC's grossly negligent conduct.  Contrary to WMC's contention at trial, the benefit of the bargain damages figure provides no "windfall" to the Trust, because any principal or interest received by the Trust to date has been netted out of the calculation.  *Cf.* Tr. 120:12-22 (Jan. 16, 2018).

The specifics of Dr. Mason's calculations are as follows.  He began with the original outstanding principal balance of the loans in the Trust, in the amount of $1,000,956,056.  Trial Ex. 159 at 028-29.  Dr. Mason then credited WMC with all payments of principal and interest received by the Certificateholders of the Trust, as reflected in the monthly remittance reports.  *Id.* at 029.  Dr. Mason added the remaining principal due to the Trust ($597,748,766) together with statutory

interest calculated on that remaining principal balance ($484,504,627). *Id.* at 30. This amount compensates investors in the Trust for all principal that remains unpaid, and credits the Trust with statutory interest "for the period over which [it was] historically without the funds that were used to purchase the loans." *Id.* at 029.[34] The interest figure nets out the interest actually received by the Trust during this time period to avoid over-compensating the Trust. *Id.* ("Since the loans paid some amount of interest during the historical time period, statutory interest for the historical period must be netted against the actual interest received by the Trust on the WMC loans to the Valuation Date.").

From this total, Dr. Mason further adjusted the benefit of the bargain damages downward to account for the value of anticipated future payments. *Id.* at 53. As of November 2017, the Trust had sustained cumulative realized losses of $480,729,418. *Id.* at 020-21. The difference between the total remaining principal balance ($597,748,766) and the cumulative realized losses ($480,729,418) is $117,019,348 – which is the most that could potentially be received. However, of that $117 million, the Trust will not recoup the entire amount, because many of the remaining loans in the Trust are seriously delinquent and in the foreclosure process, although not yet liquidated. Dr. Mason calculated that the Trust will therefore lose an additional $26.7 million, but is expected to receive an additional $90.3 million in principal payments.[35] *Id.* at 030-31. To that amount, Dr. Mason applied a discount rate of 2.79% per annum, and subtracted a total of $73,181,869 for the net present value of the Trust's future principal collections. *Id.* at 030.

---

[34] Dr. Mason used statutory interest, rather than the note rate, to calculate the interest component of the benefit of the bargain damages to account for the fact that investors should have had access to these funds – and the ability to reinvest them – long ago. Trial Ex. 159 at 029; *see also* Trial Ex. 1 at 105 (§ 10.03) (applying New York law).

[35] $26.7 million in additional principal losses, plus interest, equals the $35.9 million of additional unrealized future losses calculated by Dr. Mason for purposes of the repurchase damages. Trial Ex. 159 at 025; *see also infra* at Part IX.B.

Similarly, Dr. Mason expected the Trust to receive an additional $33.3 million in net interest payments, so he subtracted a total of $25,581,233, reflecting the net present value of those future interest collections.  *Id.* at 030-31.

Benefit of the bargain damages are to be measured at the time of the securitization of the Trust.  *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 185 (2d Cir. 2007). Dr. Mason's calculation is based on his testimony and conclusion that, if the market had the same information as WMC about the quality of the loans it originated at the time of the transaction, the securitized loan pool would have had no significant value.  Trial Ex. 159 at 028 ("[H]ad WMC's lack of adherence to its stated underwriting processes been known, it is my opinion that the loans would have had no value and would not have been purchased by the Trust."); *see also* Tr. 1740:2-23 (Jan. 24, 2018, Mason) ("[T]hey're generally not marketable.  We don't sell loans coming from a flawed production line where such a flawed production line is revealed.").  Accordingly, Dr. Mason opined that no reasonable market participant would have purchased a pool of loans with a pervasive but unknown number of material breaches of representations and warranties.  Tr. 1772:21-1773:2 (Jan. 24, 2018, Mason) ("I reasoned that these loans are unmarketable at the time of sale."); *id.* at 1743:22-1744:2 ("These types of loans do not sell in the marketplace unless the pool is analyzed and the problems identified specifically . . . .").

WMC contends that these loans could have been sold (albeit at a discount) in the so-called "scratch and dent" market.  *See*, *e.g.*, Trial Ex. 654 at 043; *see also* Tr. 3380:2-8 (Feb. 1, 2018, Greenspan) ("By definition, scratch and dent do not trade the same price as – as loans that are not scratch and dent.").  However, as Dr. Mason testified, at the time of securitization – the only relevant time period to measuring damages – the loans in the Trust were *worse* than scratch and dent loans, because the nature and extent of the breaches was unknown to investors.  Trial Ex. 159

at 027 (scratch and dent markets deal in "the sale of loans where such ***defects have been identified and cured***") (emphasis added); *id.* at 028 ("The true nature of the loans at the time they were sold was simply that WMC did not follow their underwriting guidelines.  The WMC loans were ***worse*** than Scratch and Dent loans, therefore, because the specific breaches or other problems had not been identified.") (emphasis added); *see also* Tr. 3747:9-23 (Feb. 5, 2018, Mason) (testifying the Trust loans were "quite a bit worse" than scratch and dent loans, because the Trust lost 48% of the loans' original principal balance, while loans sold on the scratch and dent market lost only 24 cents on the dollar).

To illustrate, Dr. Mason provided a "hamburger" analogy: if a hamburger restaurant "is selling 50 percent flawed hamburgers that are inedible, I don't want to go there.  The market value of – of their production is pretty close to zero."  Tr. 1740:19-23 (Jan. 24, 2018, Mason).  And, to continue the analogy, it is "even worse" in the case of this Trust, because at the time of sale, the restaurant "can't even tell you it's 57.8 percent.  It might be a hundred.  I really don't know, but we're not adhering to any food safety standards on our line.  Come on in."  *Id.* at 1774:3-15.  The market would not buy the hamburgers at a discount; the market would refuse to buy hamburgers from that restaurant altogether.  So, too, here.  *See also id.* at 1741:5-21 ("[T]his is really a matter of quality control on a production line, the same as an automobile manufacturer or a refrigerator manufacturer, a McDonald's, in this case it's a – a mortgage underwriter."); *id.* at 1743:7-12 (the Trust did not know the value of properties secured by the loans, "because [they] came off a flawed production line") *id.* at 1789:21-1790:24 ("I would say that from my perspective and my expertise in the sector, that a defect rate of 57.8 percent is really high.  Just thinking about Maytag making refrigerators, even a defect rate of 33 percent or even 20 percent is probably too high for Maytag to make money in a reasonable way.").

At trial, WMC's damages witness, Mr. Ronald Greenspan, offered a previously undisclosed opinion that loans trade in the scratch and dent market at a discount to par of 80% to 95%. Tr. 3380:9-3381:4 (Feb. 1, 2018, Greenspan) ("I did not have it in my report because all I was doing was critiquing Dr. Mason, who said zero . . . ."). Dr. Mason disagreed. Tr. 3737:22-3738:3 (Feb. 5, 2018, Mason). Dr. Mason testified that *if* the defects in the loan pool were identified, disclosed, and remediated (which they were not) – thus *actually* making the loan pool appropriate for the scratch and dent market – the loan pool would have traded at a much lower price – approximately 50 to 60 cents on the dollar. *See id.* at 3738:4-15. Dr. Mason buttressed his opinion with a number of factors about the loan pool and the RMBS market at the time, including: (1) the significantly worse performance of the loan pool securitized in the Trust relative to the performance of loans sold on the scratch and dent market in the same time period; (2) the glut of loans – even good loans – on the market at the time that "were not selling," causing a "fire sale" that forced originators to accept whatever price they could get; and (3) the closure of the scratch and dent market by mid-2007 because "certainly no one wanted to face the risk of a flawed overall production line". *Id.* at 3745:21-3747:23.

The Court can turn to the Damages Calculator to calculate benefit of the bargain damages at the discounted prices identified by the parties' respective witnesses. *See* Trial Ex. 162. Multiplying the original purchase price of the loan pool of $1,000,956,055.98 by the discounted prices (*i.e.*, 80-95% for Mr. Greenspan, and 50-60% for Dr. Mason) in the Benefit of the Bargain Damages tab of the Damages Calculator yields damages figures that account for the potential that the loan pool could have sold at a discounted price. *See* Trial Ex. 162, "Benefit of the Bargain Damages" Tab, Cell G5; *id.* at "Breach Rate Analysis & Damages" Tab, Cell L22. Based on Dr. Mason's testimony that the loans would have traded at 60% of their original value – at most – on

the scratch-and-dent market, the benefit of the bargain damages would be $800,216,376.[36]  *See* Trial Ex. 162.  Using Mr. Greenspan's estimate of 80%, the benefit of the bargain damages would be calculated as $400,108,188.[37]  *See id.*

Had the loan pool been sold on the scratch and dent market at a 50% discount in 2006, as Dr. Mason testified the price would have been, the benefit of the bargain damages today would be the same as the figure calculated by Dr. Mason.  The Trust has been repaid only approximately $403 million of the original principal balance in excess of $1 billion.  *See* Trial Ex. 159 at 028-30 ($1,000,956,056 minus $597,748,766 equals $403,207,290).  Almost 50% of the original principal balance has been written off to loss, and thus remains unpaid.  *See id.*  So, even if investors had paid only 50 cents on the dollar for this loan pool, they still would have just barely broken even.  Said otherwise, Dr. Mason's testimony that this loan pool would have traded at a discount of 50% is entirely consistent with the actual performance of the pool over time which, to date, has suffered cumulative losses of 48%; that rate continues to grow.  *See* Trial Ex. 159 at 020-21; *see also* Trial Ex. 2345 at 007 (reflecting cumulative realized loss of $480,729,417.73).  Accordingly, even crediting WMC's assertion that this pool of loans – with an unknown number of uncured breaches of representations and warranties – could have traded for some value at the time, the benefit of the bargain calculation would remain unchanged.

---

[36] In cell G5, multiply the original purchase price by 0.6, which results in a "Benefit of the Bargain Damages Due" figure of $183,273,934.  The original benefit of the bargain damages figure less $183,273,934 equals $800,216,376.

[37] In cell G5, multiply the original purchase price by 0.8, which results in a "Benefit of the Bargain Damages Due" figure of $583,382,122.  The original benefit of the bargain damages figure less $583,382,122 equals $400,108,188.

## B.    Repurchase Damages.

As discussed in further detail above, the Separate Trustee's re-underwriting expert, Richard Payne, reviewed the 400 loans in the Sample to identify breaches of representations and warranties, finding that 231 of them – or 57.75% – were in breach.  Trial Ex. 161 at 002.  Dr. Lipshutz opined that this percentage could be extrapolated reliably to the pool of loans from which it was drawn for purposes of determining liability and damages.  This approach is entirely consistent with numerous RMBS cases from across the country, and is appropriate here.

### 1.    Dr. Mason Correctly Calculated Repurchase Damages.

Dr. Mason arrived at his $380,438,140 repurchase damages figure by adhering the definition of "Repurchase Price" as laid out in the PSA, and applying the 57.8% dollar-weighted breach rate determined by Mr. Payne and Dr. Lipshutz.[38]  Trial Ex. 159 at 020-24.  The Repurchase Price is based on the "unpaid principal balance" of each loan, plus interest.  Trial Ex. 1 at 040.  Dr. Mason used "Realized Losses," which are based on the "unpaid principal balance" of loans that have incurred losses, as the starting point for his calculation.  Trial Ex. 159 at 022-24.[39]  As Dr. Mason explained, using "Realized Losses" as the basis for calculating the aggregate "Repurchase

---

[38] The PSA defines "Repurchase Price" as follows: "With respect to any Mortgage Loan, an amount equal to the sum of (i) the unpaid principal balance of such Mortgage Loan as of the date of repurchase, (ii) interest on such unpaid principal balance of such Mortgage Loan at the Mortgage Rate from the last date through which interest has been paid to the date of repurchase, (iii) all unreimbursed Servicing Advances and (iv) all expenses incurred by the Trustee arising out of the Trustee's enforcement of the applicable Person's repurchase obligation hereunder or under the Sponsor Representation Letter."  Trial Ex. 1 at 040.

[39] "Realized Losses" are defined as: "With respect to any date of determination and any Liquidated Mortgage Loan, the amount, if any, by which (a) the unpaid principal balance of such Liquidated Mortgage Loan together with accrued and unpaid interest thereon exceeds (b) the Liquidation Proceeds with respect thereto net of the expenses incurred by the Servicer in connection with the liquidation of such Liquidated Mortgage Loan and net of the amount of unreimbursed Servicing Advances with respect to such Liquidated Mortgage Loan."  Trial Ex. 1 at 040.

Price" captures the economic elements of the Repurchase Price.  Tr. 1751:25-1752:12 (Jan. 24,

2018, Mason).  Therefore, there is no need to calculate the Repurchase Price on a loan-by-loan

basis.  *See id.* at 1752:5-15.

### 2. Dr. Mason Properly Included Future Losses in his Calculation of the Repurchase Damages.

WMC contends that future losses on active loans are not a component of the Repurchase

Price under the PSA, and should be excluded from Dr. Mason's calculations.  *See, e.g.*, Trial Ex.

654 at 016, 021-24; Tr. 1688:10-17 (Jan. 24, 2018, Mason).  Future losses are an appropriate

component of repurchase damages.  *See Fin. Guar. Ins. Co. v. Morgan Stanley ABS Capital I Inc.,*

54 N.Y.S.3d 610, 2017 WL 593142, at *4-5 (N.Y. Sup. Ct. 2017). WMC spent a disproportionate

amount of time at trial questioning Dr. Mason about future losses, which account for less than 5%

of the $380 million aggregate damages calculated under the Repurchase Price.  Trial Ex. 159 at

026.

First, WMC challenged Dr. Mason's calculation of loss severity, which is the portion of a

loan's principal that is lost when the loan is foreclosed and liquidated, expressed as a percentage.

Tr. 1693:8-1697:20 (Jan. 24, 2018, Mason).  WMC argued that Dr. Mason's calculation of loss

severity in Trial Exhibit 159 was inflated, and that he erred by relying on data from a third-party

source (Fitch) as opposed to data specific to the Trust.  Tr. 1694:22-1696:13 (Jan. 24, 2018,

Mason).  However, as Dr. Mason explained, the Fitch data he relied upon is based upon a much

broader set of data than the specific loans in the Trust, and is therefore a reliable indicator of

potential loss severity.  *Id.* at 1765:8-1766:25.  Furthermore, Dr. Mason updated his calculations

in December 2017 using the most recent available Fitch data to ensure that his calculation reflects

the most current market information.  *Id.*; *see also id.* at 1694:22-1695:22.

Next, WMC challenged Dr. Mason's calculation of the discount rate (which is used to discount the potential value of future losses to their net present value), arguing that he improperly lowered the rate in his December 2017 report. *Id.* at 1704:23-1707:5.   But as Dr. Mason explained at trial, it is important to use market data for calculating the discount rate, because it represents the "time value of money." *Id.* at 1767:2-23.   Dr. Mason updated his discount rate calculation in December 2017 using the most recent available market data, which resulted in a slightly lower discount rate than the calculation made in his original expert report in May 2016. *Id.* at 1767:2-1768:13.   Dr. Mason testified that the change was due simply to changes in the market in the intervening 18 months.[40] *Id.* at 1767:2-1768:13.

### 3.   Dr. Mason Appropriately Included Paid-in-Full Loans in his Calculation of Repurchase Damages.

At trial, WMC argued that Dr. Mason should not have included losses arising from paid-in-full loans in his calculation, because such loans were excluded from the Sample.   Tr. 1718:17-1720:23 (Jan. 24, 2018, Mason).   As Dr. Mason explained at trial, there were a total of twelve loans identified as "paid-in-full" in the remittance reports for the Trust, but which actually caused losses to the Trust. *Id.* at 1771:15-23.   As a result, Dr. Mason properly included losses from those loans, which in any event amounted to less than 0.2% of the total repurchase damages figure of over $380 million. *Id.* at 1771:24-1772:6.   According to TMI's statistical expert, Dr. Lipshutz, Dr. Mason's inclusion of those loans in his damages calculation had no material impact on the reliability of the statistical sample.   Tr. 1654:19-24 (Jan. 24, 2018, Lipshutz).

---

[40] In his original report, Dr. Mason had relied on data provided by a company called Markit, which no longer publishes data in the Markit US ABS pricing sector yield.   Trial Ex. 159 at 25 n.32; *see also* Tr. 1706:11-21 (Jan. 24, 2018, Mason).   Therefore, when he updated his report in December 2017, he used analogous data in a "weekly mortgage snapshot," also published by the Markit Group.   Tr. 1706:11-21 (Jan. 24, 2018, Mason) ("[I]t's the same number from the new source.").

### 4.     The Separate Trustee Does Not Need to Prove Causation to Recover Repurchase Damages.

Section 2.03(d) of the PSA provides that within 60 days of "discovery by or notice to the Responsible Party" of any material breach, WMC must remedy or cure the breach and, if the breach cannot be remedied or cured, WMC must substitute or "repurchase such Mortgage Loan at the Repurchase Price." Trial Ex. 1 at 049.  As WMC's counsel conceded at trial, if a loan is in material breach of WMC's representations and warranties, TMI need not prove causation to recover the Repurchase Price.   Tr. 128:10-129:3 (Jan. 16, 2018, WMC Opening).  In fact, in its opening, WMC virtually conceded that TMI is entitled to repurchase damages, which Dr. Mason calculated to be over $380 million:

> *[T]his 380 million-dollar number, the repurchase damages number that plaintiff is seeking here makes them whole* for every dollar of loss that the Trust has incurred with respect to every loan that they have identified as materially breaching WMC's representations and warranties, plus interest.

*Id.* at 118:15-24 (emphasis added).  WMC's damages expert, Ronald Greenspan, agreed that repurchase damages do not require proof of causation. Tr. 3369:7-20 (Feb. 1, 2018, Greenspan). Accordingly, the issue of causation is not relevant to Dr. Mason's calculation of repurchase damages.

### 5.     WMC's Contention that Liquidated Loans Should Be Assigned a Value of $0 Is Obviously Incorrect.

Dr. Mason properly included liquidated loans in his calculation of damages under the PSA definition of Repurchase Price.  *See* Trial Ex. 159 at 022.  Courts applying New York law have consistently held that, because liquidated or foreclosed loans are no longer subject to specific performance, courts may award monetary damages equivalent to the repurchase price as a substitute remedy for repurchase.  *See e.g., U.S. Bank*, 205 F. Supp. 3d at 415; *see also Nomura Home Equity Loan, Inc.*, 19 N.Y.S.3d at 9.  In the RMBS context, "while a provision providing

for equitable relief as the 'sole remedy' will generally foreclose alternative relief, 'where the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy.'" *Bank of New York Mellon v. WMC Mortg.*, LLC, No. 12-cv-7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) ("*BONY*") (quoting *Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 443 (1956)). If liquidated or foreclosed loans were not subject to repurchase or an alternative remedy, the sponsor "would be perversely incentivized to fill the Trust with junk mortgages that would expeditiously default so that they could be Released, Charged Off, or Liquidated before a repurchase claim [could be] made." *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 965 N.Y.S.2d 844, 850 (N.Y. Sup. Ct. 2013), *rev'd on other grounds*, 112 A.D.3d 522 (2013), *aff'd*, 25 N.Y.3d 581 (2015); *see also Deutsche Alt-A Sec. Mortg. Loan Tr., Series 2006-OA1 v. DB Structured Prods., Inc.*, 958 F. Supp. 2d 488, 504 (S.D.N.Y. 2013) ("Indeed, foreclosure cannot be an alternative to a repurchase remedy for non-conforming loans of which DBSP breached its RWs; this implication would give DBSP the ability to frustrate the Trust's repurchase remedy by delaying or refusing to repurchase the breaching Mortgage Loans until the servicer had, in mitigation of the Trust's losses, foreclosed on them.").

The PSA defines "Repurchase Price" as follows:

> "With respect to any Mortgage Loan, an amount equal to the sum of (i) the unpaid principal balance of such Mortgage Loan as of the date of repurchase, (ii) interest on such unpaid principal balance of such Mortgage Loan at the Mortgage Rate from the last date through which interest has been paid to the date of repurchase, (iii) all unreimbursed Servicing Advances and (iv) all expenses incurred by the Trustee arising out of the Trustee's enforcement of the applicable Person's repurchase obligation hereunder or under the Sponsor Representation Letter."

Trial Ex. 1 at 040. The term "unpaid principal balance," while not specifically defined in the PSA, is the same term that appears in the definition of "Realized Losses," which *specifically include* the "unpaid principal balance of such *Liquidated Mortgage Loan*." *Id.* (emphasis added). As such,

the PSA explicitly contemplates that a "Liquidated Mortgage Loan" would have an unpaid principal balance, equal to the difference between the principal balance outstanding at the time of liquidation and the proceeds recovered from foreclosure. Therefore, repurchase damages properly include liquidated loans.

WMC has previously relied on the entirely distinguishable *BONY* case to argue that liquidated loans should be worth nothing. But the governing contract in *BONY* explicitly defined the Stated Principal Balance of a liquidated mortgage loan as "zero." BONY PSA, § 1.01;[41] *see also BONY*, 2015 WL 2449313, at *1 ("[T]he purchase Price of some loans where the underlying property has been foreclosed upon will be zero."). In stark contrast, the PSA in this case does ***not*** define the "unpaid principal balance" as "zero" for liquidated loans.[42] Indeed, if a defined term is included in other contracts, its absence underscores that the parties purposefully chose not to include it in this one. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 992 N.Y.S.2d 687, 694 (2014); *In re Ore Cargo, Inc.*, 544 F.2d 80, 82 (2d Cir. 1976) (where sophisticated drafter omits a

---

[41] In the PSA at issue in *BONY,* the "Stated Principal Balance" definition stated: "as of any date of determination coinciding with or subsequent to the [date] on which the proceeds, if any, of a Liquidation Event with respect to such Mortgage Loan would be distributed, zero." Wilhelm Decl., Ex. D, Pooling and Servicing Agreement for Asset-Backed Pass-Through Certificates Series 2006-1, dated August 1, 2006 ("BONY PSA"), § 1.01 (ECF No. 102).

[42] In the PSA applicable to the case at bar, "Stated Principal Balance" is defined in relevant part as follows: "For purposes of any Distribution Date, the Stated Principal Balance of any Mortgage Loan will give effect to any scheduled payments of principal received by the Servicer on or prior to the related Determination Date or advanced by the Servicer for the related Remittance Date and any unscheduled principal payments and other unscheduled principal collections received during the related Prepayment Period, and *the Stated Principal Balance of any Mortgage Loan that has prepaid in full or has become a Liquidated Mortgage Loan during the related Prepayment Period shall be zero*." Trial Ex. 1 at 042-43) (emphasis added). This definition is incorporated into several definitions and substantive provisions, but is *not* incorporated into Repurchase Price. *See id.* at 040.

term, *expressio unius est exclusio alterius* precludes the court from implying it from the general language of the agreement).

WMC's damages witness, Mr. Greenspan, accepted the instruction from WMC's counsel that liquidated loans should have "zero" value for purposes of determining the repurchase damages.  *See, e.g.*, Trial Ex. 654 at 035; *see also* Tr. 3344:20-3345:8 (Feb. 1, 2018, Greenspan). Mr. Greenspan, a lawyer by training, testified at trial that he reviewed the PSA in this case,  but – in contrast to the PSA in *BONY* – did not find any language providing that the "term unpaid principal balance" was defined as "zero."  Tr. 3348:18-3349:5 (Feb. 1, 2018, Greenspan).  And, upon review of certain documentation produced by the servicer in this case known as "Form 332," Mr. Greenspan admitted that a non-zero number (in the case of this example, $416,799.99) appeared next to the line item of "actual unpaid principal balance."  *Id.* at 3349:12-3352:9; Trial Ex. 104.   As Mr. Greenspan also acknowledged, he performed no alternate calculation of the repurchase price *not* based on the liquidated loans being assigned a value of $0.  Tr. 3352:10-18 (Feb. 1, 2018, Greenspan).  Accordingly, when applying the correct provisions of the PSA to calculate the "Repurchase Price" in this case, Dr. Mason's calculation of the repurchase damages arising from liquidated loans stands unrebutted.

### 6.    Dr. Mason Properly Included Losses from Loan Modifications when Determining the Repurchase Damages.

WMC incorrectly argues that any decision by the Servicer to offer principal or interest forgiveness to a borrower should somehow offset the Repurchase Price.  *See* Trial Ex. 654 at 029-30.  However, this ignores the plain language of the PSA.  The Repurchase Price definition includes both "(i) the unpaid principal balance of such Mortgage Loan as of the date of repurchase [and] (ii) interest on such unpaid principal balance of such Mortgage Loan at the Mortgage Rate from the last date through which interest has been paid to the date of repurchase."  Trial Ex. 1 at

040.  Any principal or interest forgiven by the Servicer should therefore be included when calculating the "unpaid principal balance" or interest on such "unpaid principal balance" with respect to active loans that have incurred losses as a result of modification.  *Id.*; *see also* Tr. 1707:6-15, 1708:5-18, 1753:4-1755:13 (Jan. 24, 2018, Mason).

As with liquidated or foreclosed loans, excluding any principal or interest forgiven by the Servicer from repurchase damages would perversely incentivize WMC to fill the Trust with subpar loans so that the Servicer would be forced to modify the loans quickly, thus ultimately decreasing any damages.  Crediting WMC's interpretation of how loan modifications affect the Repurchase Price of a loan would violate the principle that "[a] contract should not be interpreted to produce a result that is absurd, commercially unreasonable or contrary to the reasonable expectation of the parties."  *Greenwich Capital Fin. Prods. Inc. v. Negrin*, 903 N.Y.S.2d 346, 348 (1st Dep't 2010) (quotation omitted).  Dr. Mason's calculation of the Repurchase Price to include loan modifications is appropriate and reliable.  The Court should not credit Mr. Greenspan's unwarranted opinions on this point.

### 7.    This Court Can and Should Rely on Dr. Mason's Damages Calculator to Determine the Appropriate Repurchase Damages Figure.

After identifying all of the components of repurchase damages, Dr. Mason applied the breach rate as determined by Mr. Payne and Dr. Lipshutz – 57.8% – to calculate the repurchase damages figure as approximately $380 million.  *See* Trial Ex. 159 at 025.  In the interest of assisting the Court with its assessment of damages, Dr. Mason prepared the Damages Calculator, which can

precisely re-calculate the repurchase damages in the event that the Court determines that one or more of the 99 disputed loans is not in material breach.[43]  *See* Trial Ex. 162.[44]

The total damages figure, as calculated by Dr. Mason, depends on which of the Sample loans are in breach, because the breach rate is weighted by the balance of each loan.  *See* Trial Ex. 159 at 047 ("Appendix D: Description of Damages Calculator").  Column A ("Loan Number") of the Damages Calculator identifies each of the 99 disputed loans.[45]  *See* Trial Ex. 162.  Column E of the Damages Calculator contains a checkbox that corresponds to each of the disputed loans.  *Id.* If the Court determines that a disputed loan is not in material breach, it can simply click on the checkbox corresponding with that loan.  *See id.*  When a box is clicked, the checkmark disappears, and the values throughout the remaining "steps" automatically update to reveal revised damages figures.  *See* Trial Ex. 159 at 048-51.  Most critically, changing the breach status of any particular loan will automatically result in an update to the breach rate (Cell H7 of the Excel version) and the repurchase damages total figure (Cell M15 of the Excel version).

---

[43] WMC made no attempt to attack the accuracy or reliability of Dr. Mason's damages calculator. Indeed, counsel for WMC used the damages calculator in connection with questioning WMC's own statistician, Dr. Edward Leamer.  Tr. 3068:3-3070:2 (Jan. 31, 2018, Leamer).

[44] In addition to the hard copy submitted to the Court in paper, an electronic version of Trial Ex. 162 was produced on the disc marked Plaintiff's Exhibit B.  The Court can use the electronic copy to adjust the damages figure to match its conclusions about the breach status of each Sample loan.

[45] Both the Damages Calculator and Dr. Mason's report cite to 98 loans in dispute.  *See, e.g.*, Trial Ex. 159 at 047; Trial Ex. 162 at 001-02 (Column A: "*(Selection 1 of 2) – Of 98 Disputed Loans*").  At the time Dr. Mason's report was submitted and the Damages Calculator was finalized, Mr. Abshier had not yet updated his report.  *Compare* Trial Ex. 159 at 001 (dated Dec. 31, 2017), *with* Trial Ex. 653 at 001 (dated Jan. 12, 2018).  When Mr. Abshier updated his report, he changed his conclusion as to one loan, No. 11559049, and decided it was not in material breach.  *See, e.g.*, Ex. 653 at 006 & n.7.  If the Court decides that loan is not in material breach – though it is, according to Mr. Payne – Loan No. 11559049 appears as the first row in "Selection 2 of 2" – the Not Supported Loans – and the breach status can be changed to conform to the Court's opinion.  Trial Ex. 162 at 002.

X.   **WMC CANNOT RELY ON IMPROPER SERVICING OR OTHER POST-CLOSING EVENTS TO OFFSET DAMAGES.**

    A.   **Mr. Olasov's Testimony Regarding Post-Closing Events and Causation Is Legally Irrelevant.**

WMC retained a servicing witness, Mr. Brian Olasov, to opine that the losses on certain Trust loans were caused or exacerbated by post-closing events, such as poor servicing or purported borrower change-of-life events.  Trial Ex. 663 at 014-15.  Mr. Olasov's opinions on causation are legally irrelevant under both New York law and the terms of the PSA.

First, WMC admitted at trial that under the PSA, "plaintiff does not have to prove causation between a material breach and damages calculated pursuant to the contract's repurchase price." Tr. 128:10-15 (Jan. 16, 2018, WMC Opening).  Accordingly, there is no dispute that Mr. Olasov's opinions have no relevance to the Trust's claim for repurchase damages.  Second, under New York law, breaches of representations and warranties are determined as of the closing date of a trust, and events that occur after the closing date are legally irrelevant. *See, e.g.*, *Deutsche Bank Nat'l Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 865, 867 (2d Cir. 2015) ("A cause of action for breach of contractual representations and warranties that guarantee certain facts as of a certain date—but do not guarantee future performance—accrues on the date those representations and warranties become effective," adding "R&Ws were true or false—either performed or not—at the moment they were made . . . ."); *Nomura Asset Acceptance Corp. Alt. Loan Tr. v. Nomura Credit & Capital, Inc.*, 31 N.Y.S.3d 863, 863 (1st Dep't 2016) ("[D]efendant made its loan representations 'as of the Closing Date,' . . . the claims accrued on that date and not earlier."); *ACE Sec. Corp. v. DB Structured Prods., Inc.*, 25 N.Y.3d 581, 589 (2015) (representations and warranties in a residential mortgage-backed security "concern the characteristics of their subject as of the date they are made, they are breached, if at all, on that date . . . .").

WMC's causation argument also disregards the express terms of the PSA.  Section 2.03(b) of the PSA states: "The Responsible Party hereby makes the representations and warranties set forth in Schedule III and Schedule IV to the Depositor and the Trustee, as of the *Closing Date*." Trial Ex. 1 at 049 (emphasis added).  Section 2.03(d) further states that if a breach "materially and adversely affects the value of any Mortgage Loan or the interest of the Trustee or the Certificateholders therein," WMC must cure or "repurchase such Mortgage Loan at the Repurchase Price."  *Id.*  As WMC's damages expert Ronald Greenspan conceded, nothing in the PSA suggests that the repurchase price should be reduced by change-of-life events.  Tr. 3373:9-17 (Feb. 1, 2018, Greenspan) ("I don't think that's a relevant factor").

Furthermore, post-closing events may not be asserted to reduce benefit-of-the-bargain damages.  As the Second Circuit has recently held, "events subsequent to the breach, viewed in hindsight, may neither offset nor enhance" benefit of the bargain damages.  *Merrill Lynch & Co. Inc.*, 500 F.3d at 185.  Mr. Olasov's testimony that servicing or change-of-life events caused the Trust loans to default is entitled to no weight.

### B.    Mr. Olasov Ignored the PSA's Servicing Standard.

Even assuming his opinions on post-closing events had any relevance, Mr. Olasov's opinions regarding supposed errors by the servicer are unreliable, because he disregarded the servicing standard forth in Section 3.01 of the PSA:

> Servicer to Service Mortgage Loans.
>
> (a) For and on behalf of the Certificateholders, the Servicer shall service and administer the Mortgage Loans in accordance with the terms of this Agreement and the respective Mortgage Loans and, to the extent consistent with such terms, *in the same manner in which it services and administers similar mortgage loans for its own portfolio, giving due consideration to customary and usual standards of practice of mortgage lenders and loan servicers administering similar mortgage loans* . . .

Trial Ex. 1 at 052-53 (emphasis added).   Section 3.01 further describes the Servicer's duties: "[t]o the extent consistent with the foregoing, [ ] the Servicer shall seek to maximize the timely and complete recovery of principal and interest on the Mortgage Notes."  *Id.* at 053.  These duties and obligations apply to each loan in the Trust.  Trial Ex. 663 at 018.  In his report, Mr. Olasov focuses exclusively on the question of whether the Servicer "maximize[d] the recovery of principal and interest," and ignores entirely the obligation of the Servicer to manage the portfolio "in the same manner" as it would for its own portfolio, taking into account "customary and usual standards of practice" in the industry.  *Id.* at 015, 017-18.  This is improper, and renders his opinions unreliable.

In his rebuttal report, the Separate Trustee's damages and servicing expert, Joseph Mason, opined that Mr. Olasov provides no comparison between the servicing of the SABR loans and "the manner in which [the servicer] services and administers similar mortgage loans for its own portfolio," Trial Ex. 167 at 011, and therefore that "Mr. Olasov fails to show that any of the above criteria were breached."  *Id.* at 011.  The Separate Trustee's other servicing rebuttal expert, Peter Ross, also opined that Mr. Olasov failed to apply the correct servicing standard, as set forth in the PSA.  Trial Ex. 166 at 012.  As Mr. Ross explained, Mr. Olasov developed his own standard based on whether the Servicers' actions "have an 'adverse impact' on the loans' performance."  *Id.*  Mr. Olasov's standard is improper because "servicing performance cannot be judged solely by the outcome of specific actions, but rather whether the Servicers' actions were consistent with the Servicing Standard described [in the PSA]."  *Id.*

Dr. Mason's report identifies an additional flaw with Mr. Olasov's work: Mr. Olasov's opinion that "improper servicing negatively impacts loan performance" is overly simplistic:

> [T]hat simple statement applies only in a world devoid of the underwriting breaches alleged in this case. Even the best servicing cannot make much of a difference in the performance of shoddily underwritten loans. It is well-

> recognized in the industry that "Good servicing can make the
> most of a pool of loans, but it cannot make the loans
> something that they are not."

Trial Ex. 167 at 011-12.

At trial, WMC declined to cross-examine Dr. Mason regarding his critique of Mr. Olasov.

Accordingly, Dr. Mason's opinions with regard to Mr. Olasov remain unrefuted. *See Caruolo v.*

*John Crane, Inc*., 226 F.3d 46, 54 (2d Cir. 2000) (explaining that plaintiffs' expert testimony was

"unchallenged" where the defendant had the opportunity to cross-examine an opposing witness to

refute his opinion); *Dennis v. N.Y.C. Police Dep't*, 89-CV-7810 (LJF), 1992 WL 177157, at *2 n.3

(S.D.N.Y. July 13, 1992) (noting that when a party declines to cross-examine an opposing witness,

the witness's testimony "stands unrebutted").

### C.      Mr. Olasov's Methodology Is Unreliable.

Finally, Mr. Olasov's opinions regarding servicing and change-of-life events are also

unreliable, because he failed to employ a sound methodology as required by Rule 702 of the

Federal Rules of Evidence.  First, with respect to servicing issues, Mr. Olasov conceded that he

reviewed the complete loan files and offered opinions about just 30 loans, or 0.5% of the 5,162

loans in the Trust.  Tr. 3098:10-3099:17 (Jan. 31, 2018, Olasov).  Mr. Olasov testified that he had

complete servicing files for only 216 loans.  *Id.* at 3098:10-20.  Of those, only 15 loans were in

the Sample.  *Id.* at 3098:21-3099:9.  He then selected and analyzed the servicing files for another

15 loans outside of the Sample.  *Id.* at 3099:15-17.  Mr. Olasov admitted that he did not conduct a

random sample to select those additional 15 loans.  *Id.* at 3099:18-3101:6.  Instead, he cherry-

picked the loans with the longest foreclosure timelines and highest loss severities.  *Id.*  Even though

Mr. Olasov admitted that these 30 loans were not "representative" of the population, he

extrapolated broader conclusions from his fatally incomplete data.  *Id.* at 3104:9-3106:14.

Second, with respect to change-of-life events, Mr. Olasov identified 307 loans where he claims the borrower defaulted due to post-origination change-of-life events. *Id.* at 3149:6-14. To select those 307 loans – which again Mr. Olasov agreed do not constitute a representative sample – Mr. Olasov reviewed the servicing comments for the 5,162 loans in the Trust. *Id.* at 3149:15-3150:22. These servicing comments are based in part on borrower's hardship letters, which borrowers provided to servicers to substantiate a reason for their payment defaults. *Id.* at 3157:5-19. Although these hardship letters are inadmissible hearsay, Mr. Olasov relied on them for their truth. *See id.* at 3157:22-3159:23. Such reliance is not only improper but also ironic given that WMC's own re-underwriting witness, David Abshier, opined that borrowers have incentives to lie to servicers to obtain loan modifications. Trial Ex. 653 at 034, 123.

While Mr. Olasov opined that these so-called "change of life" events may have been a "contributing factor" to the loans' default, he made no effort to determine the extent to which these events caused the loans to incur losses. Tr. 3152:7-12 (Feb. 1, 2018, Olasov) ("I haven't gone through a weighting exercise"). Furthermore, Mr. Olasov failed to evaluate whether the reason for default included underwriting defects or other breaches of the representations and warranties. *Id.* at 3151:19-25. The Separate Trustee's other rebuttal expert on "change of life" issues, Nigel Brazier, observed that most of Mr. Olasov's 307 loans defaulted within the first two or three years of origination. Tr. 3799:8-3800:3 (Feb. 5, 2018, Brazier). He opined that such default rates are "typically associated with underwriting defects." *Id.* at 3799:8-3800:3. More specifically, with regard to those loans identified by Mr. Olasov that were also in the Sample, Mr. Brazier opined that the defaults often resulted from the very risks created by the underwriting breaches identified by Mr. Payne. Trial Ex. 165 at 005, 007-13. Thus, even if causation was relevant, these change-of-life events cannot be solely responsible for the Trust's losses on these loans.

90

## XI.    CONCLUSION.

For the foregoing reasons, the Separate Trustee respectfully requests that the Court enter judgment in favor of the Trust on its claims for breach of contract against WMC, and award damages as specified herein.

Dated: March 22, 2018                                       Respectfully submitted,

TMI Trust Company, solely in its capacity as Separate Trustee of the Securitized Asset Backed Receivables LLC Trust 2006-WM2

/s/ Harvey J. Wolkoff
Harvey J. Wolkoff (*phv* 01103)
Brian F. Shaughnessy (*phv pending*)
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
111 Huntington Avenue
Boston, MA 02199
Tel. (617) 712-7100
Fax (617) 712-7200
harveywolkoff@quinnemanuel.com
brianshaughnessy@quinnemanuel.com


Daniel V. Ward (*phv* 05850)
Kathryn E. Wilhelm (*phv* 08528)
Stacylyn M. Doore (*phv* 07627)
Elizabeth Bierut
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199-3600
Tel.: (617) 951-7000
Fax: (617) 951-7050
daniel.ward@ropesgray.com
kathryn.wilhelm@ropesgray.com
stacylyn.doore@ropesgray.com
elizabeth.bierut@ropesgray.com

Thomas D. Goldberg (ct 04386)
Kevin C. Brown (ct 29774)
DAY PITNEY LLP
One Canterbury Green
201 Broad Street
Stamford, Connecticut 06901
Tel.: (203) 977-7300
Fax: (203) 977-7301
tgoldberg@daypitney.com
kbrown@daypitney.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 22, 2018, the foregoing Post-Trial Brief and accompanying Proposed Findings of Fact and Conclusions of Law were served by email on counsel for the defendant, in accordance with the Court's Memorandum and Order of February 13, 2018 (ECF No. 297).

/s/ Daniel V. Ward
Daniel V. Ward

# Appendix A

**Mr. Payne's Breaches of Representation (lll) in the 99 Disputed Loans**

| Loan No. | Ex. 653 Ref. | Breach(es) of (lll) |
|---|---|---|
| 11523148 | 653.063 | Employment Violation, Income Violation |
| 11526279 | 653.065 | Document Deficiency – Purchase Contract, Employment Violation |
| 11534347 | 653.067 | Ineligible Transaction, Occupancy Misrepresentation with Red Flags |
| 11538788 | 653.070 | Asset Violation, CLTV Ratio Violation, DTI Ratio Violation, Stated Income Not Reasonable |
| 11539948 | 653.074 | Income Violation |
| 11542051 | 653.076 | DTI Ratio Violation, Employment Violation, Income Violation, Property Violation |
| 11542084 | 653.080 | Asset Violation, Ineligible Transaction |
| 11543881 | 653.083 | CLTV Ratio Violation, LTV Ratio Violation, Seller Concession Violation |
| 11544061 | 653.086 | Asset Violation, Document Deficiency – Hazard Insurance, Imprudent Underwriting |
| 11546935 | 653.089 | Document Deficiency – Purchase Contract, Ineligible Transaction, Occupancy Misrepresentation with Red Flags, Stated Income Not Reasonable |
| 11548039 | 653.094 | Asset Violation, DTI Ratio Violation, Ineligible Transaction |
| 11549518 | 653.098 | DTI Ratio Violation, Employment Violation, Income Violation |
| 11550621 | 653.103 | Housing History Violation, Income Violation |
| 11553149 | 653.106 | Asset Violation, Document Deficiency – HOA Certification, Document Deficiency – Purchase Contract, Employment Violation, Housing History Violation, Income Violation |
| 11556214 | 653.111 | Stated Income Not Reasonable |
| 11556450 | 653.114 | CLTV Ratio Violation, Disposable Income Violation, DTI Ratio Violation, Improper Calculation of Debt, Income Misrepresentation – Same Year with Red Flags, LTV Ratio Violation, Seasoning Violation, Stated Income Not Reasonable, Undisclosed Mortgage with Red Flags |
| 11556542 | 653.122 | Disposable Income Violation, DTI Ratio Violation |
| 11558895 | 653.125 | Asset Violation, Stated Income Not Reasonable |
| 11558897 | 653.128 | Asset Violation, Stated Income Not Reasonable |
| 11560056 | 653.131 | Asset Violation, Disposable Income Violation, Document Deficiency – 1003 Loan Application, DTI Ratio Violation, Income Misrepresentation – Same Year with Red Flags, Stated Income Not Reasonable |
| 11560058 | 653.136 | Asset Violation, Disposable Income Violation, Document Deficiency – 1003 Loan Application, DTI Ratio Violation, Income Misrepresentation – Same Year with Red Flags, Stated Income Not Reasonable |

A-1

| Loan No. | Ex. 653 Ref. | Breach(es) of (lll) |
|---|---|---|
| 11561297 | 653.142 | Asset Violation, Document Deficiency – 1003 Loan Application, DTI Ratio Violation |
| 11561688 | 653.146 | Asset Violation |
| 11562009 | 653.150 | Asset Violation, CLTV Ratio Violation, LTV Ratio Violation, Seller Concession Violation |
| 11564651 | 653.154 | Credit – Derogatory, Employment Violation |
| 11564835 | 653.156 | Asset Violation, Improper Calculation of Debt, Stated Income Not Reasonable |
| 11564979 | 653.160 | Credit Score Violation, DTI Ratio Violation, Income Violation |
| 11566417 | 653.163 | Employment Violation, Improper Calculation of Debt, Ineligible Transaction, Occupancy Misrepresentation with Red Flags |
| 11566501 | 653.167 | Asset Violation, Property Violation |
| 11566691 | 653.170 | Asset Violation, Income Violation |
| 11567317 | 653.173 | DTI Ratio Violation, Income Violation |
| 11568228 | 653.175 | Altered Documents, Asset Violation, DTI Ratio Violation, Income Misrepresentation – Same Year with Red Flags |
| 11568305 | 653.180 | DTI Ratio Violation, Income Violation |
| 11568506 | 653.182 | DTI Ratio Violation, Improper Calculation of Debt |
| 11568719 | 653.185 | Asset Violation, Stated Income Not Reasonable |
| 11568836 | 653.188 | Asset Violation, CLTV Ratio Violation |
| 11569534 | 653.191 | Credit Score Violation, Non-Arm's Length Violation |
| 11571098 | 653.194 | Asset Violation, CLTV Ratio Violation, Improper Calculation of Debt |
| 11571194 | 653.197 | Asset Violation, CLTV Ratio Violation, DTI Ratio Violation |
| 11571264 | 653.201 | DTI Ratio Violation |
| 11572399 | 653.204 | Employment Violation, Stated Income Not Reasonable |
| 11572496 | 653.208 | Asset Violation, Document Deficiency – 1003 Loan Application |
| 11572981 | 653.210 | Income Misrepresentation – Near Year with Red Flags |
| 11573287 | 653.213 | Credit Violation |
| 11573289 | 653.215 | LTV Ratio Violation |
| 11573674 | 653.217 | DTI Ratio Violation |
| 11574345 | 653.220 | Employment Violation, Non-Arm's Length Violation |
| 11574846 | 653.222 | Disposable Income Violation, DTI Ratio Violation, Income Misrepresentation – Same Year with Red Flags, Stated Income Not Reasonable |
| 11575520 | 653.227 | Asset Violation, DTI Ratio Violation, Employment Violation, Income Violation |
| 11575719 | 653.231 | Altered Documents, Asset Violation |
| 11577088 | 653.235 | Asset Violation, Credit Score Violation, Employment Violation, Imprudent Underwriting, Income Violation |
| 11577459 | 653.239 | DTI Ratio Violation, Employment Violation, Income Violation |
| 11577932 | 653.242 | Asset Violation, Improper Calculation of Debt |

| Loan No. | Ex. 653 Ref. | Breach(es) of (lll) |
|---|---|---|
| 11578574 | 653.244 | Income Misrepresentation – Near Year with Red Flags, Stated Income Not Reasonable |
| 11578843 | 653.248 | LTV Ratio Violation |
| 11578913 | 653.250 | Asset Violation, DTI Ratio Violation, Income Violation |
| 11578996 | 653.255 | Asset Violation, Income Misrepresentation – Near Year with Red Flags, Stated Income Not Reasonable |
| 11579496 | 653.260 | Asset Violation, CLTV Ratio Violation, Disposable Income Violation, DTI Ratio Violation, Income Misrepresentation – Same Year with Red Flags, Ineligible Transaction |
| 11580018 | 653.266 | Asset Violation, CLTV Ratio Violation, Document Deficiency – 1003 Loan Application, Improper Calculation of Debt, Income Violation, LTV Ratio Violation |
| 11580534 | 653.271 | Asset Violation, CLTV Ratio Violation, Credit Violation, Employment Violation |
| 11580538 | 653.275 | Disposable Income Violation, DTI Ratio Violation, Improper Calculation of Debt, Imprudent Underwriting, Income Misrepresentation – Same Year with Red Flags, Stated Income Not Reasonable |
| 11580712 | 653.282 | Employment Violation, Income Violation |
| 11581125 | 653.285 | DTI Ratio Violation, Improper Calculation of Debt |
| 11581799 | 653.287 | Asset Violation, Imprudent Underwriting |
| 11582280 | 653.290 | Improper Calculation of Debt |
| 11582331 | 653.293 | DTI Ratio Violation, Improper Calculation of Debt |
| 11582602 | 653.295 | DTI Ratio Violation, Ineligible Transaction, Property Violation |
| 11583142 | 653.299 | Asset Violation, DTI Ratio Violation |
| 11583839 | 653.302 | Employment Violation, Stated Income Not Reasonable |
| 11583898 | 653.306 | Credit – Derogatory, Disposable Income Violation, DTI Ratio Violation, Employment Misrepresentation with Red Flags |
| 11587645 | 653.310 | Document Deficiency – 1003 Loan Application, DTI Ratio Violation, LTV Ratio Violation |
| 11587684 | 653.313 | Credit Score Violation, DTI Ratio Violation |
| 11587892 | 653.317 | Imprudent Underwriting, Income Violation |
| 11587946 | 653.320 | Asset Violation, Stated Income Not Reasonable |
| 11588131 | 653.324 | Unresolved Discrepancies – Employment |
| 11588468 | 653.327 | DTI Ratio Violation |
| 11588544 | 653.330 | DTI Ratio Violation, Imprudent Underwriting, Undisclosed Mortgage with Red Flags |
| 11588803 | 653.333 | CLTV Ratio Violation, Seller Concession Violation |
| 11589284 | 653.336 | Altered Documents, Asset Violation, DTI Ratio Violation, Housing History Violation, Income Misrepresentation – Same Year with Red Flags, Stated Income Not Reasonable |
| 11589368 | 653.343 | Asset Violation, DTI Ratio Violation, Improper Calculation of Debt, Imprudent Underwriting, Stated Income Not Reasonable |

| Loan No. | Ex. 653 Ref. | Breach(es) of (lll) |
|---|---|---|
| **11589457** | 653.349 | Asset Violation, CLTV Ratio Violation, Imprudent Underwriting, LTV Ratio Violation, Non-Arm's Length Violation, Seller Concession Violation |
| **11590881** | 653.355 | Credit – Derogatory, Imprudent Underwriting, Income Violation |
| **11591159** | 653.357 | Credit Depth/History Violation, Stated Income Not Reasonable |
| **11591798** | 653.360 | Document Deficiency - 442 |
| **11592201** | 653.362 | Asset Violation, CLTV Ratio Violation, Property Violation, Seller Concession Violation |
| **11592625** | 653.366 | Asset Violation, DTI Ratio Violation, Imprudent Underwriting |
| **11595085** | 653.369 | Asset Violation, Document Deficiency – 1003 Loan Application, Stated Income Not Reasonable |
| **11596265** | 653.372 | Asset Violation, Employment Violation |
| **11596473** | 653.375 | Asset Violation, Improper Calculation of Debt |
| **11597775** | 653.378 | Document Deficiency – Appraisal, Employment Violation, Housing History Violation |
| **11599162** | 653.381 | DTI Ratio Violation, Income Violation |
| **11599580** | 653.384 | Asset Violation, Non-Arm's Length Violation |
| **11601917** | 653.387 | Income Violation, Payment Shock Violation |
| **11602110** | 653.389 | CLTV Ratio Violation, Employment Violation, Seller Concession Violation |
| **11602119** | 653.392 | Credit Score Violation, Employment Violation |
| **11602122** | 653.395 | Credit Score Violation, Employment Violation |
| **11604011** | 653.398 | Asset Violation |
| **11607357** | 653.401 | Asset Violation |
| **11559049** | 653.404 | Imprudent Underwriting |

A-4

# Appendix B

**Mr. Payne's Breaches of Representation (m) for Misrepresentations
in the 99 Disputed Loans**

| Loan No. | Ex. 653 Ref. | Breach(es) of (m) |
|---|---|---|
| 11534347 | 653.067 | Occupancy Misrepresentation with Red Flags |
| 11542084 | 653.080 | Occupancy Misrepresentation |
| 11546935 | 653.089 | Occupancy Misrepresentation with Red Flags |
| 11548039 | 653.094 | Occupancy Misrepresentation |
| 11549518 | 653.098 | Income Misrepresentation – Same Year |
| 11556450 | 653.114 | Income Misrepresentation – Same Year with Red Flags, Undisclosed Mortgage with Red Flags |
| 11556542 | 653.122 | Income Misrepresentation – Same Year |
| 11560056 | 653.131 | Income Misrepresentation – Same Year with Red Flags |
| 11560058 | 653.136 | Income Misrepresentation – Same Year with Red Flags |
| 11561297 | 653.142 | Income Misrepresentation – Same Year |
| 11566417 | 653.163 | Occupancy Misrepresentation with Red Flags |
| 11568228 | 653.175 | Altered Documents, Income Misrepresentation – Same Year with Red Flags |
| 11571194 | 653.197 | Income Misrepresentation – Same Year |
| 11571264 | 653.201 | Income Misrepresentation – Same Year |
| 11572981 | 653.210 | Income Misrepresentation – Near Year with Red Flags |
| 11573674 | 653.217 | Income Misrepresentation – Same Year |
| 11574846 | 653.222 | Income Misrepresentation – Same Year with Red Flags |
| 11575719 | 653.231 | Altered Documents |
| 11578574 | 653.244 | Income Misrepresentation – Near Year with Red Flags |
| 11578996 | 653.255 | Employment Misrepresentation, Income Misrepresentation – Near Year with Red Flags |
| 11579496 | 653.260 | Income Misrepresentation – Same Year with Red Flags, Occupancy Misrepresentation |
| 11580018 | 653.266 | Occupancy Misrepresentation |
| 11580538 | 653.275 | Income Misrepresentation – Same Year with Red Flags |
| 11582280 | 653.290 | Income Misrepresentation – Same Year |
| 11582602 | 653.295 | Income Misrepresentation – Same Year, Occupancy Misrepresentation |
| 11583142 | 653.299 | Income Misrepresentation – Same Year |
| 11583898 | 653.306 | Employment Misrepresentation with Red Flags, Income Misrepresentation – Same Year |
| 11587645 | 653.310 | Undisclosed Mortgage |
| 11587684 | 653.313 | Income Misrepresentation – Same Year |
| 11588131 | 653.324 | Unresolved Discrepancies - Employment |
| 11588544 | 653.330 | Undisclosed Mortgage with Red Flags |
| 11589284 | 653.336 | Altered Documents, Income Misrepresentation – Same Year with Red Flags |

# Appendix C

**Mr. Abshier's Identification of Supplemental or Different Compensating Factors**

| Loan No. | Ex. 653 Ref. | Breach with Additional Compensating Factors |
|---|---|---|
| 11538788 | 653.070 | DTI Ratio Violation |
| 11548039 | 653.094 | Asset Violation |
| 11568506 | 653.182 | DTI Ratio Violation |
| 11569534 | 653.191 | Credit Score Violation |
| 11573287 | 653.213 | Credit Violation |
| 11573289 | 653.215 | LTV Ratio Violation |
| 11575520 | 653.227 | Income Violation |
| 11578843 | 653.248 | LTV Ratio Violation |
| 11579496 | 653.260 | Asset Violation, CLTV Ratio Violation |
| 11588468 | 653.327 | DTI Ratio Violation |
| 11588803 | 653.333 | Seller Concession Violation |
| 11589457 | 653.349 | Seller Concession Violation |
| 11591159 | 653.357 | Credit Depth/History Violation |
| 11592201 | 653.362 | Seller Concession Violation |
| 11599162 | 653.381 | DTI Ratio Violation |